UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

BRITTAIN J. PURCELLE,

                                        Plaintiff,

                                                                9:18-CV-77
v.                                                              (GLS/TWD)


JOHN THOMAS, et al.,

                                        Defendants.
———————————————————————————

APPEARANCES:                              OF COUNSEL:

BRITTAIN J. PURCELLE
Plaintiff, *pro se*
14-B-0600
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

HON. LETITIA JAMES                        WILLIAM E. ARNOLD, IV, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
300 South State Street, Suite 300
Syracuse, New York 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

On January 18, 2018, Plaintiff Brittain J. Purcelle, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") regarding alleged violations of his constitutional rights while he was housed at Auburn Correctional Facility ("Auburn"). (Dkt. No. 1.) Defendants and claims remaining following the District Court's initial review of the complaint are: (1) Eighth Amendment excessive force claim against Corrections Officer John

Thomas ("Thomas"); (2) Eighth Amendment excessive force and failure to intervene claims against Corrections Officers John Does 1-3; (3) Eighth Amendment medical indifference claims against Nurse A. Hoppins ("Nurse Hoppins"), Dr. Pang Kooi ("Dr. Kooi"), and Nurse Doe; (4) Fourteenth Amendment due process claim against Hearing Officer Brian Bauersfeld ("Bauersfeld") and Director of Special Housing Unit ("SHU") Donald Venettozzi ("Venettozzi"); (5) New York state law claims for assault and battery against Thomas and John Does 1-3; and (6) New York state law claims for negligence against Nurse Hoppins, Dr. Kooi, and Nurse Doe. (Dkt. No. 11.) To date, Plaintiff has not moved to substitute an identified individual as a defendant in place of any Doe Defendant. (*See* Docket Report.)

Defendants now move for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 96.) Defendants seek dismissal of Plaintiff's Eighth Amendment claims against Nurse Hoppins and Dr. Kooi; Fourteenth Amendment claims against Bauersfeld and Venettozzi; state law claims for assault, battery, and negligence; and claims against the Doe Defendants for failure to prosecute. *Id.* Plaintiff submitted an untimely response to Defendants' motion, which the Court accepts and construes solely as a response in opposition to the motion for partial summary judgment, not as a discovery motion. (*See* Dkt. Nos. 103, 104, 106.) Defendants submitted a reply in further support of their motion. (Dkt. No. 107.) The Honorable Gary L. Sharpe, Senior United States District Judge, referred this motion to the undersigned for a report and recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

For the reasons that follow, the Court recommends Defendants' motion be granted.

# I.    FACTUAL BACKGROUND

## A.    January 21, 2015, Incident

On January 21, 2015, Plaintiff wanted to respond to the "early go back" call and return to his cell from the recreation yard at Auburn.  (Dkt. No. 96-2 at 14.[1])  Plaintiff sought to leave recreation early as he had recently fallen on icy stairs and was still experiencing pain in his hip and back.  *Id.*  According to Plaintiff's version of events, as he approached the entrance to A block, Thomas stopped Plaintiff and told him he was too late to take advantage of the early go back.  *Id.* at 15.  Plaintiff tried to explain to Thomas that he had just been released from the infirmary and was moving slowly, and that other inmates were still going inside.  *Id.*  Plaintiff found Thomas' response "[a]ggressive and angry" and wanted to file a grievance.  *Id.*  After Plaintiff looked at Thomas' badge to get his name, Thomas grabbed the back of Plaintiff's jacket and began pushing Plaintiff into A block.  *Id.* at 16-17.  Once inside, Thomas put Plaintiff into a pat-frisk position and then "punched [Plaintiff] in the back of [his] head."  *Id.* at 18.  Plaintiff fell to the floor and Thomas continued punching, kneeing, and kicking Plaintiff.  *Id.*  At least one or two other officers were present during the assault.  *Id.*  According to Thomas' version of events, Thomas was escorting Plaintiff when Plaintiff "turned and struck" Thomas "with both hands in the chest."  (Dkt. No. 96-3 at 2-3.)

Thomas told a sergeant who arrived on the scene Plaintiff had struck him.  (Dkt. No. 96-2 at 21.)  Although Plaintiff disputed this assertion to the sergeant, he was handcuffed and escorted to SHU.  *Id.*  At SHU, Plaintiff was strip-frisked.  *Id.* at 22.  It is undisputed that during the strip-frisk officers found two packets of synthetic marijuana (K-two) on Plaintiff's person between his

---

[1]  Citations to documents on the docket are to the pages the Court's CM/ECF electronic filing system automatically assigns.  Paragraph references are used where the referenced document contains consecutively numbered paragraphs throughout.

buttocks.  (Dkt. Nos. 96-2 at 22; 96-3 at 6.[2])   According to Defendants, Plaintiff was also found

with Neurontin and Flexeril on his person.  (Dkt. No. 96-4 at 1.[3])  Plaintiff denies having

Neurontin on his person.  (Dkt. No. 96-2 at 26.)

     After the strip-frisk, Nurse Hoppins examined Plaintiff.  *Id.* at 24.  According to Plaintiff,

Nurse Hoppins "didn't try to give [him] any help."  *Id.*  Plaintiff pointed to places that hurt,

including his ribs and back, which Nurse Hoppins noted.  *Id.*  Plaintiff told her these areas were

"on fire" and he wanted "some type of relief."  *Id.*  Plaintiff also told her his back "was messed

up, that they had been kicking [him] and kneeing" him.  *Id.* at 25.  Plaintiff did not receive any

treatment from Nurse Hoppins at this time.  *Id.*

     Nurse Hoppins filled out an Ambulatory Health Record ("AHR") Progress Note after

examining Plaintiff.  (Dkt. No. 96-4 at 1.)  Nurse Hoppins reported that Plaintiff complained of

rib and back pain.  *Id.*  Nurse Hoppins noted that Plaintiff moved all of his extremities without

difficulty and was sitting upright on the floor holding his upper body up with his arms.  *Id.*  She

also reported Plaintiff had no difficulty breathing, no ecchymosis, and no abrasions.  *Id.*  The

Note also states Plaintiff was able to dress himself and ambulate without difficulty.  *Id.*

     After the strip-frisk, Plaintiff was placed on a 24-hour contraband watch in an

observation cell.  (Dkt. No. 96-2 at 23.)  According to Plaintiff's complaint, he was under

observation until he had two bowel movements.  (Dkt. No. 1 at ¶ 42.)  Plaintiff began bleeding

from his penis.  *Id.* at ¶ 44.  Plaintiff requested the attention of a nurse and eventually saw Nurse

---

[2]  Plaintiff received the K-two from another prisoner during recreation that night.  (Dkt. No. 96-2 at 14.)
[3]  Plaintiff was taking Neurontin, used to treat nerve pain, for a previous injury sustained to his wrist.  (Dkt. No. 96-2 at 9-10.)

Doe, who did not do anything for Plaintiff. *Id.* at ¶¶ 45-47. Plaintiff contends no mention of this was made in the contraband-watch log. *Id.* at ¶ 49; *see also* Dkt. Nos. 96-5, 96-6.

Also on January 21, 2015, Plaintiff was prescribed Ibuprofen (400 mg), a painkiller, and Cyclobenzaprine (10 mg), a muscle relaxant. (Dkt. No. 96-7 at 1.) Dr. Kooi visited Plaintiff in the contraband watch observation cell the next morning, January 22, 2015. (Dkt. Nos. 96-2 at 26; 96-6 at 4.) According to Plaintiff, Dr. Kooi had been notified Plaintiff was stashing his medication, and, as a result, Dr. Kooi would have to discontinue Plaintiff's Neurontin. (Dkt. No. 96-2 at 27.) Plaintiff received medication on January 22, 2015, at 1:05 pm, 4:10 pm, and 6:30 pm, and refused medication on January 23, 2015, at 7:30 am. (Dkt. No. 96-6 at 4-6, 9.) Plaintiff's AHR Progress Note indicates that, between January 27 and February 27, 2015, Plaintiff received attention from Auburn medical staff. (*See generally* Dkt. 96-4 at 2-7.) Plaintiff generally complained of back pain. *See generally id.* Entries dated January 27, February 6, February 17, February 20, February 23, and February 25, 2015, indicate Plaintiff was in "[no apparent distress]." *Id.* His prescription for Ibuprofen was renewed on February 19, 2015. *Id.* at 6.

Plaintiff was transferred to Southport Correctional Facility on March 3, 2015. (Dkt. No. 96-11.)

## B.    Disciplinary Hearing

Plaintiff was issued two inmate misbehavior reports as a result of the January 21, 2015, incident. (Dkt. Nos. 96-8 at 5-6; 96-2 at 28-29.) Plaintiff was charged with violent conduct, assault on staff, refusing direct order, contraband, smuggling, and refusing search or frisk. (Dkt. No. 96-8 at 1.) Plaintiff's disciplinary hearing began on January 28, 2015, before Bauersfeld. *Id.* Plaintiff pled guilty to the contraband and smuggling charges and not guilty to the remaining

charges. *Id.* at 4. Plaintiff requested video evidence of the officers' escort of him from A block to SHU. (*See* Dkt. No. 96-2 at 30-31.) At the hearing, Bauersfeld first noted Plaintiff had not been provided with all of the requested videos and said he would conduct further inquiries about their existence. (Dkt. No. 96-9 at 11.) After further inquiry, Bauersfeld informed Plaintiff the requested video evidence was unavailable due to a disc malfunction. *Id.* at 52. Plaintiff was provided with a memorandum from Correction Officer M. Roberts, who stated he "was not able to retrieve any data" from the disc used to record the escort "after all resources available to us were exhausted." (Dkt. No. 96-12 at 1; *see* Dkt. No. 96-9 at 52.)

At the hearing, Plaintiff sought to read a twenty-four-page written statement into the record. (Dkt. Nos. 96-2 at 29; *see* Dkt. No. 96-9 at 18-48.) Plaintiff wanted to read this statement because "[he] felt . . . [he] needed to read that entire thing in to the record because this was going to be [his] statement about – from the beginning to end, what took place and what didn't take place." (Dkt. No. 96-2 at 29.) Bauersfeld stopped Plaintiff from reading his statement when Plaintiff began speaking about his medical claims and medical staff, which Bauersfeld opined were not relevant to the subject of the disciplinary hearing. (*See* Dkt. No. 96-9 at 44-48.) Bauersfeld did not permit Plaintiff to read the last three pages of his written statement. *Id.* at 45. Bauersfeld told Plaintiff he would "certainly take [the written statement] as part of the record and put it in the record." *Id.* at 47. Before adjourning the hearing for disposition, Bauersfeld stated "I want to review your [twenty-four]-page statement again before I make any decision with regards to these charges." *Id.* at 77. Bauersfeld listed Plaintiff's "[twenty-four]-page notarized statement that was incorporated as part of the hearing record" in his statement of evidence relied upon for the hearing disposition. (Dkt. No. 96-8 at 2.)

Bauersfeld found Plaintiff guilty of the violent conduct, assault on staff, refusing a direct order, contraband, and smuggling charges and not guilty of the refusing search and frisk charge. (Dkt. Nos. 96-8 at 1; 96-9 at 78.)  While reading this disposition to Plaintiff at the hearing, Bauersfeld stated that although he found Plaintiff guilty of "charge 100.11 assault on staff," he would note later in the disposition that he "refer[red] to it as an attempt to assault on staff." (Dkt. No. 96-9 at 78.)  DOCCS' Standards of Inmate Behavior define charge 100.11 as follows: "An inmate shall not assault or inflict or attempt to inflict bodily harm upon any staff member." (Dkt. No. 96-13 at 3.)  Bauersfeld found Plaintiff guilty of this charge "based upon relevant credible testimony" that Plaintiff "did attempt to push [past] the officer and force was used" to stop and gain control of him.  (Dkt. No. 96-9 at 80.)

As a result of the guilty dispositions, Plaintiff was sentenced to 180 days' confinement in SHU.  (Dkt. No. 96-8 at 1.)  Plaintiff appealed the disposition of his disciplinary hearing to Venettozzi, who affirmed on May 15, 2015.  (Dkt. No. 96-10 ("Please be advised that your Superintendent's hearing of February 13, 2015, has been reviewed and affirmed on May 15, 2015." (capitalization not preserved).)

## II.    SUMMARY JUDGMENT LEGAL STANDARD

A court shall grant summary judgment only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see* Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 & n.11 (1986). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted). A verified complaint, as Plaintiff has filed in this case (Dkt. No. 1 at 15), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and quotation marks omitted).

"Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court must "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[4]

## III.    DISCUSSION

### A.    Plaintiff's Discovery Argument

In his opposition to this summary judgment motion, Plaintiff argues he was not provided discovery responses. (Dkt. No. 103 at 1-2.) However, a review of the docket shows Plaintiff requested an order compelling Defendants to respond to discovery demands after this summary judgment motion was filed. (Dkt. No. 100.) The Court denied Plaintiff's letter request as untimely since it was filed over five months after the discovery deadline expired. (Dkt. No. 102.) Further, the Court found Plaintiff provided no bases for granting his request since he did not describe his specific discovery requests, the documents Defendants purportedly did not

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

provide, nor any information regarding the reasons Defendants asserted for not providing

discovery. *Id.* Accordingly, the Court finds no merit in Plaintiff's opposition argument

concerning discovery.

**B.    Plaintiff's Failure to File a Response to Defendants' Local Rule 7.1 Statement**

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly

supported facts set forth in the Statement of Material Facts that the opposing party does not

specifically controvert." N.D.N.Y. L.R. 7.1(a)(3). Where a party has failed to respond to the

movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the

movant's statement will be accepted as true (1) to the extent they are supported by evidence in

the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the

possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486

(2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of

failing to file a response to Defendants' Rule 7.1 Statement of Material Facts, as did the Court.

(Dkt. Nos. 96-16, 97.) While Plaintiff submitted a response to Defendants' motion, he failed to

do so in the manner required under Local Rule 7.1(a)(3).[5] (*See generally* Dkt. No. 103; *see also*

Dkt. Nos. 100, 102.) "Although a *pro se* litigant is entitled to a liberal construction of his filings,

*see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve

him of his obligation to comply with the relevant procedural rules." *Marino v. Watts*, No. 9:12-

CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-*

---

[5] Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement of
material facts. Under the rule, the response "shall mirror the movant's statement of material
facts by admitting and/or denying each of the movant's assertions in matching numbered
paragraphs. Each denial shall set forth a specific citation to the record where the factual issue
arises."

*recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record. Accordingly, the Court treats the verified complaint as an affidavit for purposes of this motion, along with Plaintiff's sworn response, and considers the factual allegations therein to the extent they are not conclusory and supported by the record. (Dkt. Nos. 1, 103.[6])

## C.    Eighth Amendment Deliberate Indifference Claims

Plaintiff contends Nurse Hoppins was deliberately indifferent to his serious medical needs by failing to provide him treatment following the strip-frisk and falsely stating he was in

---

[6] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

possession of Neurontin during the strip-frisk.  (Dkt. No. 96-2 at 25-26.)  Plaintiff contends Dr. Kooi was deliberately indifferent by discontinuing Plaintiff's Neurontin prescription as a result of Nurse Hoppins' report.  *Id.* at 27.  Defendants argue they are entitled to summary judgment because Plaintiff did not suffer from a serious medical need and because Nurse Hoppins and Dr. Kooi did not act with deliberate indifference.  (Dkt. No. 96-15 at 5-15.)

### 1.    Legal Standard

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain."  U.S. Const. amend. VIII; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This standard contains objective and subjective components.  *Hathaway*, 37 F.3d at 66.  The objective component requires the plaintiff to demonstrate his alleged medical need is "sufficiently serious."  *Id.*  The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind."  *Id.*

To satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  Initially, the court must determine whether the inmate was actually denied adequate medical care.  *Id.*  "Prison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is

reasonable." *Jones v. Westchester Cty. Dep't of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citations and quotation mark omitted).

Second, if the care provided was unreasonable, courts must inquire as to whether that inadequacy was "sufficiently serious." *Salahuddin*, 467 F.3d at 280. Courts must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id*. (citing *Smith v. Carpenter*, 316 F.3d 263, 185-86 (2d Cir. 2006)). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id*. (quotation marks and alterations omitted).

However, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id*. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280. Thus, although courts "sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of medical care is sufficiently grave to establish constitutional liability." *Id*.

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial

13

risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

"Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires

that the charged official act or fail to act while actually aware of a substantial risk that serious

inmate harm will result." *Salahuddin*, 467 F.3d at 280 (quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does

not create a constitutional claim.  So long as the treatment given is adequate, the fact that a

prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim."

*Chance*, 143 F.3d at 703.  Therefore, any "disagreements over medications, diagnostic

techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing

of intervention, are not adequate grounds for a Section 1983 claim." *Randle v. Alexander*, 960 F.

Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

### 2.    Analysis

#### i.    Nurse Hoppins

Plaintiff avers Nurse Hoppins did not "try to give [him] any help" when she examined

him following the strip-frisk.  (Dkt. Nos. 96-2 at 24; 1 at ¶ 39.)  Plaintiff also alleges Nurse

Hoppins falsely stated in Plaintiff's medical records that he was found to have Neurontin on him

during the strip-frisk, in addition to the synthetic marijuana.  (Dkt. Nos. 96-2 at 26; 1 at ¶ 38; *see

also* Dkt. No. 96-4 at 1.)  Dr. Kooi discontinued Plaintiff's prescription for Neurontin as a result.

(Dkt. Nos. 96-2 at 27; 1 at ¶¶ 40-41.)

As to the first inquiry of the objective prong, the Court finds no reasonable jury could

find Plaintiff's medical condition was "sufficiently serious." *See Hathaway*, 37 F.3d at 66.

Plaintiff testified at his deposition that during Nurse Hoppins' examination of him he pointed to

places that hurt, which she noted.  (Dkt. No. 96-2 at 24.)   Plaintiff told Nurse Hoppins his back

14

and ribs were "on fire" and he "wanted to get some type of relief from it," although he did not

ask for any treatment in particular. *Id.* Plaintiff also told Nurse Hoppins his "back was messed

up." *Id.* at 25. Plaintiff's interaction with Nurse Hoppins then ended; Plaintiff did not receive

any treatment from Nurse Hoppins. *Id.*

Nurse Hoppins filled out an AHR Progress Note in which she indicated Plaintiff moved

all of his extremities without difficulty and sat upright holding his upper body up with his arms.

(Dkt. No. 96-4 at 1.) Nurse Hoppins also noted no difficulty breathing, ecchymosis, or

abrasions. *Id.* Nurse Hoppins wrote in the report that Plaintiff was able to ambulate and dress

himself without difficulty. *Id.*

Because Plaintiff alleges Nurse Hoppins failed to provide any medical treatment, the

inquiry is whether Plaintiff's medical condition was "sufficiently serious." *See Salahuddin*, 467

F.3d at 280. The Court finds the evidence in the record does not raise a genuine issue of fact as

to whether Plaintiff's condition was sufficiently serious. The sufficiently serious standard

"contemplates a condition of urgency, one that may produce death, degeneration, or extreme

pain." *Hathaway*, 37 F.3d at 66 (citation and internal quotation marks omitted). Here, Plaintiff

complained to Nurse Hoppins of back and rib pain. However, the AHR Progress Note also

indicates Plaintiff was able to ambulate, move all of his extremities without difficulty, and dress

himself. These circumstances do not suggest a condition which may produce death,

degeneration, or extreme pain. *See id.*; *see also Thomas v. Nassau Cty. Corr. Ctr.*, 288 F. Supp.

2d 333, 338 (E.D.N.Y. 2003) (noting "subjective complaints of pain are not sufficient" to satisfy

the serious medical need standard); *Rivera v. Johnson*, No. 95-CV-0845E(H), 1996 WL 549336,

at *2 (W.D.N.Y. Sept. 20, 1996) (noting courts have found ailments including a toothache,

kidney stone, and broken finger insufficient to constitute a serious medical need).

Moreover, the record shows Plaintiff was prescribed medications and seen by other medical professionals after being admitted to the infirmary on contraband watch. On January 21, 2015, for example, Plaintiff was prescribed Ibuprofen (400 mg), a painkiller, and Cyclobenzaprine (10 mg), a muscle relaxant. (Dkt. No. 96-7 at 1.) The next day, January 22, 2015, Dr. Kooi visited Plaintiff while he was on contraband watch. (Dkt. Nos. 96-2 at 27; 96-6 at 4.) Plaintiff received medication on January 22, 2015, at 1:05 pm, 4:10 pm, and 6:30 pm, and refused medication on January 23, 2015, at 7:30 am. (Dkt. No. 96-6 at 4-6, 9.) To the extent Plaintiff's medical indifference claim against Nurse Hoppins is premised on a delay in receiving treatment, the Court finds such delay insufficient to rise to the level of a constitutional violation. As the record demonstrates, Plaintiff received medication and medical care within hours of Nurse Hoppins' examination of him. *See, e.g.*, *White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL 11478222, at *10 (N.D.N.Y. Feb. 23, 2016) (granting summary judgment for defendants on medical indifference claim where, *inter alia*, plaintiff had not produced any evidence showing a "one-day delay" caused him to suffer substantial harm), *report-recommendation adopted by* 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016).

Even assuming Plaintiff could satisfy the objective prong with respect to Nurse Hoppins, the Court finds no reasonable jury could find Nurse Hoppins acted with a sufficiently culpable state of mind. After the incident with Thomas, Plaintiff complained to Nurse Hoppins of back and rib pain. However, there is no evidence to suggest Nurse Hoppins "[knew] of and disregard[ed] an excessive risk" to Plaintiff's health or safety. *See Farmer*, 511 U.S. at 837. Although Nurse Hoppins did not get Plaintiff any medication or treatment immediately upon examining him, she filled out various forms documenting Plaintiff's complaints and condition. (Dkt. Nos. 96-3 at 4 (Use of Force Report indicating Plaintiff was moving all extremities without

difficulty and had no difficulty breathing); 96-3 at 8 (Use of Force Report addendum noting

complaints of rib and pack pain and full range of motion of all extremities); 96-3 at 9 (Inmate

Injury Report); 96-4 at 1 (AHR Progress Note).)  Given Nurse Hoppins' observations that

Plaintiff was moving and breathing well, the record belies the notion that she knew of and

disregarded an "excessive risk" to Plaintiff's health.  *Cf. Farmer*, 511 U.S. at 837.

Plaintiff's allegation that Nurse Hoppins incorrectly stated in his medical record that he

was found with Neurontin on him during the strip-frisk (Dkt. No. 96-2 at 26), even if true,

likewise does not rise to the level of deliberate indifference.  As an initial matter, the mere

falsification of a report does not state an independent constitutional violation.  *Moore v.*

*Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) (citing *Freeman v. Rideout*, 808 F.2d

949, 951 (2d Cir. 1986)) ("There is no basis for a constitutional claim alleging the mere filing of

a false report.").  There is no evidence in the record to suggest Nurse Hoppins knew of and

disregarded an excessive risk to Plaintiff's safety when she specified in the report he was found

in possession of Neurontin.  As discussed below, Plaintiff was provided with alternative

painkillers, and the discontinuation of his Neurontin prescription does not amount to medical

indifference.  *See infra* Part III.C.2.ii.

Moreover, there is no evidence Nurse Hoppins falsified Plaintiff's medical record out of

deliberate indifference or any other improper motive.  *See Moore*, 584 F. Supp. 2d at 582 & n.1

("There is also no indication in the record that [the nurse] falsified her report out of deliberate

indifference to plaintiff's serious medical needs, or out of any improper motive.").  Plaintiff

testified that, prior to January 21, 2015, he had not had any negative interaction with Nurse

Hoppins.  (Dkt. No. 96-2 at 8.)  Accordingly, the Court finds no evidence from which a

reasonable jury could find Nurse Hoppins acted with deliberate indifference toward Plaintiff.

Therefore, based on the foregoing, the Court recommends granting Defendants' motion for summary judgment on Plaintiff's medical indifference claim against Nurse Hoppins.

### ii.    Dr. Kooi

Plaintiff avers Dr. Kooi discontinued his prescription for Neurontin on January 22, 2015, after Nurse Hoppins informed him Plaintiff was found with Neurontin on him during the strip-frisk.  (Dkt. No. 96-2 at 27.)  Initially, Plaintiff's conclusory statement that Nurse Hoppins falsely wrote in his medical report that he was in possession of Neurontin is insufficient to create an issue of material fact.  *See Ross v. Koenigsmann*, No. 9:14-CV-1321 (GTS/DJS), 2017 WL 9511096, at *4 (N.D.N.Y. Aug. 16, 2017) (citing *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005)), *report-recommendation adopted by* 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).  Moreover, "[t]he decision to discontinue an inmate's medication where there is evidence that the inmate is misusing the medication does not constitute deliberate indifference."  *Id.* (collecting cases).  Plaintiff acknowledges Neurontin is "tightly regulated" and an inmate found to be in possession of it is likely to have his prescription taken away.  (Dkt. No. 96-2 at 28.)  *See also Cole v. Kooi*, No. 9:11-CV-0004 (LEK/RFT), 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013) (finding no deliberate indifference where doctor discontinued prescription for Ultram after learning doses of the medication had been found in the plaintiff's cell and where plaintiff received alternative treatments); *Dabney v. Sawyer*, No. 9:11-CV-0273 (BKS/RFT), 2015 WL 1383828, at *11 (N.D.N.Y. Mar. 25, 2015) (dismissing deliberate indifference claim against doctor who discontinued Ultram prescription where it was discovered the plaintiff was hoarding the medication).  Accordingly, the Court finds Dr. Kooi's decision to discontinue Plaintiff's Neurontin prescription based on reports that Plaintiff was in possession of the drug during the strip-frisk does not constitute deliberate indifference.

Even assuming Plaintiff did not have Neurontin on him during the strip-frisk and Dr. Kooi thus discontinued the Neurontin based on false information, Dr. Kooi's decision does not amount to a constitutional violation. As noted above, the Court finds the record shows Plaintiff's medical condition was not "sufficiently serious" to satisfy the objective prong of a medical indifference claim. Furthermore, there is no record evidence to suggest Dr. Kooi knew of and disregarded an excessive risk to Plaintiff's safety by discontinuing the Neurontin prescription. On the same day Dr. Kooi discontinued Plaintiff's Neurontin prescription, Plaintiff was prescribed both Ibuprofen and Cyclobenzaprine to treat his pain. (Dkt. No. 96-7 at 1.)

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Id*. Thus, the fact that a plaintiff might have preferred an alternative treatment does not rise to the level of a constitutional violation. *Id*. Indeed, an inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). As such, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and do not rise to the level of a constitutional violation. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *see also Washington v. Westchester Cty. Dep't of Corr.*, No. 13 Civ. 5322 (KPF), 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[T]he law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference."); *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not

support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs.") (collecting cases); *Adams v. Smith*, No. 9:15-CV-913 (BKS/DJS), 2018 WL 1363495, at *4 (N.D.N.Y. Mar. 16, 2018) ("Courts have repeatedly rejected medical indifference claims based upon a failure to provide stronger pain medication.") (collecting cases); *Rush v. Fischer*, 09 Civ. 9918 (JGK), 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.").

Here, it is undisputed that when Plaintiff's Neurontin prescription was discontinued, he was prescribed with both Ibuprofen and Cyclobenzaprine to treat his pain. (Dkt. No. 96-7 at 1.) The fact that Plaintiff may prefer Neurontin to these other medications is insufficient to raise the discontinuation of his Neurontin to the level of a constitutional violation. *Cf. Sonds*, 151 F. Supp. 2d at 312. Because Plaintiff was prescribed alternative pain medications, the Court finds Dr. Kooi did not know of and disregard an excessive risk to Plaintiff's safety. *Cf. Farmer*, 511 U.S. at 837. Moreover, Plaintiff testified he had no negative interaction or problems with Dr. Kooi prior to the discontinuation of his Neurontin. (Dkt. No. 96-2 at 8.) Accordingly, the Court recommends granting Defendants' motion for summary judgment on Plaintiff's medical indifference claim against Dr. Kooi.[7]

### D.    Fourteenth Amendment Due Process Claims

Plaintiff claims he was denied due process at his disciplinary hearing conducted by Bauersfeld. (Dkt. No. 1 at ¶¶ 58-60.) He further alleges Venettozzi violated his due process rights by denying Plaintiff's appeal from the disciplinary proceedings. *Id.* at ¶ 62. Defendants

---

[7] Because the Court recommends granting Defendants' motion for summary judgment as to Dr. Kooi on the merits, the Court does not address Defendants' alternative argument based on qualified immunity. (Dkt. No. 96-15 at 15.)

argue Bauersfeld is entitled to summary judgment because Plaintiff has failed to establish a

protected liberty interest and, in any event, he was afforded all the process he was due. (Dkt. No.

96-15 at 16-22.) Thus, Defendants contend Plaintiff's claim against Venettozzi also fails as a

matter of law. *Id*. Additionally, Defendants argue Venettozzi's mere affirmance of the

disciplinary determination is insufficient to establish his personal involvement for purposes of

Section 1983 and Venettozzi is entitled to qualified immunity. *Id*. at 23.

### 1.    Legal Standard

The Fourteenth Amendment to the United States Constitution provides that "[n]o State

shall . . . deprive any person of life, liberty, or property, without due process of law." U.S.

Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may

arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545

U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty

severely curtailed while incarcerated, they are nevertheless entitled to certain procedural

protections when disciplinary actions subject them to further liberty deprivations such as loss of

good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380

F.3d 57, 69 (2d Cir. 2004) (citations omitted).

To establish a procedural due process claim under Section 1983, a plaintiff must show he

(1) possessed an actual liberty interest, and (2) was deprived of that interest without being

afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v.

Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

### 2.    Liberty Interest

An inmate retains a protected liberty interest in remaining free from segregated

confinement if he can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84

(1995).  Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.  As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor."  *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases).

Regarding the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under Section 1983.  *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).  The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement.  *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (citation omitted).  Thus, while not dispositive, the duration of a disciplinary confinement is a significant factor in determining atypicality.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required."  *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004) (quoting *Colon*, 215 F.3d at 232).  Without such a record, due process claims may be dismissed for failure to establish a

22

liberty interest only where "the period of time spent in SHU was exceedingly short—[less than thirty days] —and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 65-66.

Here, after Plaintiff's Tier III disciplinary hearing, Bauersfeld sentenced Plaintiff to 180 days of SHU confinement, along with "loss of packages, commissary and phone." (Dkt. No. 96-9 at 81; Dkt. No. 96-8 at 1.) As the duration of Plaintiff's confinement falls within the intermediate duration range, the Court must develop a detailed factual record to determine whether to dismiss Plaintiff's claim for failing to establish a liberty interest. *See, e.g.*, *Genier v. Vanarnum*, No. 9:13-CV-1460 (GTS/DEP), 2016 WL 4507456, at \*5-7 (N.D.N.Y. June 20, 2016); *Jabot v. Correction Officer Minor*, 9:13-CV-01407 (DNH/TWD), 2016 WL 5322113, at \*7-9 (N.D.N.Y. July 15, 2016).

The Court finds the summary judgment record as a whole lacks sufficient evidence to determine whether Plaintiff established a liberty interest. In his verified complaint, Plaintiff asserted his SHU confinement was "an atypical hardship," but provided no further details about his confinement. (Dkt. No. 1 at ¶ 60.) At Plaintiff's deposition, defense counsel questioned Plaintiff about his Fourteenth Amendment claims against Bauersfeld and Venettozzi, but did not ask about the conditions of Plaintiff's SHU confinement. (Dkt. No. 96-2 at 29-32.) While the record does not contain any evidence demonstrating Plaintiff's SHU confinement was an undue hardship, the record is also absent of any evidence about ordinary SHU conditions at Auburn. Therefore, the Court recommends denying Defendants' summary judgment motion on liberty interest grounds. *See Britt v. Carberry*, No. 9:17-CV-0234 (MAD/DEP), 2019 WL 2437912, at \*8 (N.D.N.Y. June 11, 2019) ("[W]ithout the necessary evidence in the record for the Court to determine if Plaintiff suffered an atypical and significant hardship during his confinement, the

Court must assume Plaintiff was deprived of a liberty interest."); *see also Barsksdale v. Frenya*, No. 9:10-CV-0831 (MAD/DEP), 2012 WL 4107801, at *3-4 (N.D.N.Y. Sept. 19, 2012); *Bowens v. Pollock*, No. 06-CV-0457A(Sr), 2010 WL 5589350, at *15 (W.D.N.Y. Oct. 12, 2010).

However, regardless of whether Plaintiff established a liberty interest, his Fourteenth Amendment due process claim fails because he was afforded all the process he was due at his Tier III disciplinary hearing.

### 3.    Due Process

The Fourteenth Amendment due process protections afforded to a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira*, 380 F.3d at 69 (citation and quotations omitted). The constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). Due process in this context requires only that the hearing officer's decision not be arbitrary. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). A decision is not "arbitrary" if it is supported by "some evidence." *Id.* "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports

the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.'" *Id*. at 76 (quoting *Luna*, 356 F.3d at 488).

Additionally, "[t]o establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing." *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

Here, Plaintiff claims Bauersfeld denied him due process at his Tier III Disciplinary Hearing because Bauersfeld failed to review video evidence Plaintiff requested, prevented Plaintiff from reading the entirety of his prepared statement into the record, and found Plaintiff guilty of "Assault on Staff" after stating he believed Plaintiff was guilty of attempting to assault staff. (Dkt. No. 1 at ¶¶ 59-60; Dkt. No. 96-2 at 29-31.) Plaintiff alleges Venettozzi violated his due process rights by denying Plaintiff's appeal from the disciplinary proceedings. (Dkt. No. 1 at ¶ 62.) Defendants argue Plaintiff was afforded all the process he was due. (Dkt. No. 96-15 at 18-22.) The Court agrees with Defendants.

### i.    Bauersfeld

Plaintiff first contends Bauersfeld denied him due process by failing to review requested "video and audio evidence." (Dkt. No. 96-2 at 30.) At the disciplinary hearing, Bauersfeld informed Plaintiff the requested video was unavailable due to a camera malfunction. (Dkt. No. 96-9 at 11.) He told Plaintiff he would conduct a further inquiry into the existence of the video.

*Id.* After an adjournment, Bauersfeld informed Plaintiff he was unable to receive a copy of the video and "[the officer] called me I said that's not good enough I want the to/from that he couldn't get the small disk to work." *Id.* at 52. The corrections officer later sent Bauersfeld a "to/from," which stated the corrections officer was unable to retrieve the requested video due to a disc malfunction. (Dkt. No. 19-12.)

As Bauersfeld continued to inquire about the requested video after being informed it did not exist, the Court finds Bauersfeld made a "constitutionally significant inquiry into the existence and whereabouts" of the video. *See Brooks v. Piecuch*, 245 F. Supp. 3d 431, 446-48 (W.D.N.Y. 2017) (corrections officer did not deny inmate due process where he made repeated inquiries into the existence of a requested videotape). Further, there is no evidence to suggest the video footage existed at the time of Plaintiff's request. *See Barnes v. Annucci*, No. 9:15-CV-0777 (GLS/DEP), 2019 WL 1387460, at *13 (N.D.N.Y. Mar. 12, 2019), *report-recommendation adopted by* 2019 WL 1385297 (N.D.N.Y. Mar. 27, 2019); *see also Molano v. Bezio*, 42 F. Supp. 3d 465, 468-69 (W.D.N.Y. 2012).

Even assuming Bauersfeld's failure to secure the requested video constituted a procedural deficiency, Plaintiff has not sufficiently established any prejudice resulting from the lack of video footage. At Plaintiff's deposition, defense counsel asked about the relevance of the video and Plaintiff responded, "I believe that there's a possibility of admissions by staff. [ ] Maybe someone was caught saying something that could have exonerated me, on—on tape—." (Dkt. No. 96-2 at 30.) Plaintiff later stated he "assumed" there was an audio component to the video. *Id.* The Court finds Plaintiff's claims are too speculative to establish the video footage would have affected the outcome of the disciplinary hearing. *See Molano*, 42 F. Supp. 3d at 468-69. Moreover, Plaintiff himself does not know whether the video cameras were capable of recording

audio or any sound, which makes it further unlikely Plaintiff was prejudiced by the lack of video footage. *See id.* Therefore, the Court finds Plaintiff has failed to establish Bauersfeld denied him due process by failing to review the requested video.

Next, Plaintiff asserts Bauersfeld denied him due process by preventing him from reading the entirety of his statement into the record. (Dkt. No. 96-2 at 29.) Hearing officers may limit the introduction of evidence at disciplinary hearings where such evidence is irrelevant or unnecessary. *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991); *see also Brooks*, 245 F. Supp. 3d at 445. Here, the purpose of Plaintiff's disciplinary hearing was to determine whether Plaintiff assaulted staff and possessed contraband. (Dkt. No. 96-9 at 12-14.) Bauersfeld stopped Plaintiff from reading his statement when Plaintiff began speaking about medical claims involving Dr. Kooi and Nurse Hoppins. *Id.* at 44. [8] Bauersfeld told Plaintiff he believed the medical claims were outside the scope of the hearing and did not allow him to read the last three pages of his statement into the record. *Id.* at 44-48. However, Bauersfeld told Plaintiff he would "accept a copy of [his] full written [statement] and incorporate it into the record as part of the record" and would review the statement before rendering a final decision. *Id.* at 47, 77.

The Court finds Plaintiff's testimony about the actions of medical staff after the alleged assault was not relevant to determining whether Plaintiff assaulted staff or possessed contraband. *See Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.") (citation omitted). Further, Plaintiff's testimony would have been duplicative, as he had already described his interactions with the medical staff earlier in his statement. (*See* Dkt. No. 96-9 at 24-25, 33-34

---

[8] The Court notes Bauersfeld allowed Plaintiff to read a significant portion of his statement into the record prior to stopping Plaintiff. (*See* Dkt. No. 96-9 at 18-44.) Approximately twenty-five pages of the hearing transcript records Plaintiff reading his statement. *See id.*

("On the following pages I will end by attempting to summarize these thirteen pages so far into chronological order of events.")); *see also Russell v. Selsky*, 35 F.3d 55, 58-59 (2d Cir. 1994).

Plaintiff has also failed to show he was prejudiced by not being allowed to read his full statement into the record.  There is no evidence to suggest that the outcome of the hearing would have been different if Plaintiff had read the final three pages of his statement into the record.  *See Watson v. Annucci*, No. 9:14-CV-00638 (JKS), 2015 WL 5971077, at *5 (N.D.N.Y. Oct. 14, 2015).  Indeed, the hearing transcript indicates Plaintiff was not prejudiced by Bauersfeld's decision, as Bauersfeld considered Plaintiff's full statement before rendering his decision.  (*See* Dkt. No. 96-9 at 77.)  Therefore, the Court finds Bauersfeld did not deny Plaintiff due process by preventing Plaintiff from reading the entirety of his statement at the disciplinary hearing.

As to Plaintiff's contention that he was improperly found guilty of assault on staff, the Court disagrees.  At the conclusion of Plaintiff's disciplinary hearing, Bauersfeld told Plaintiff, "I do find you guilty with the regards of charge 100.11 assault on staff I do find you guilty, however I will note later in my disposition I do refer to it as an attempt to assault on staff."  (Dkt. No. 96-9 at 78.)  In his written decision, Bauersfeld found "substantial evidence does establish that [Plaintiff was] guilty of 104.11, 100.11, and 106.10, in that [Plaintiff] did attempt to push past the officer."  (Dkt. No. 96-8 at 2.)  DOCCS Rule of Conduct 100.11 mandates "[a]n inmate shall not assault or inflict or attempt to inflict bodily harm upon any staff member."  (Dkt. No. 96-13 at 3.)  The Court finds Bauersfeld did not deny Plaintiff due process because the charge of which he found Plaintiff guilty prohibited an attempt to assault staff.

Finally, although not raised by Plaintiff, the Court finds Bauersfeld's decision was supported by "some evidence."  In his decision, Bauersfeld noted he relied upon Thomas' misbehavior report and testimony that Plaintiff "turned and attempted to push past [Thomas] and

force was used against [Plaintiff]." (Dkt. No. 96-8 at 2.) Bauersfeld also relied upon the use of force and injury reports and Officer Stanton's testimony that the five inmate witnesses Plaintiff requested refused to testify. *Id.* As Bauersfeld relied on testimony from an officer present for the incident, his determination was supported by "some evidence" and did not violate Plaintiff's due process rights. *See Allen v. Graham*, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *16 (Sept. 26, 2017), *report-recommendation adopted by* 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017).

Accordingly, the Court recommends granting Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment due process claims.

### ii.    Venettozzi

Plaintiff claims Venettozzi denied him due process by denying Plaintiff's appeal of Bauersfeld's decision. (Dkt. No. 1 at 62.) Specifically, Plaintiff contends Venettozzi "had the same set of facts in front of him, that [Bauersfeld] had . . . and he still upheld the conviction." (Dkt. No. 96-2 at 31-32.) Plaintiff also asserts Venettozzi "never gave [Plaintiff] a—a reason why" he denied the appeal. *Id.* at 32. Defendants argue Venettozzi is entitled to summary judgment because Plaintiff was afforded all the process he was due, Plaintiff has not established Venettozzi's personal involvement in a due process violation, and Venettozzi is entitled to qualified immunity. (Dkt. No. 96-15 at 22-24.)

As set forth above, Plaintiff was afforded due process at his disciplinary hearing. Thus, Plaintiff cannot establish Venettozzi violated his Fourteenth Amendment due process rights by affirming a constitutional disciplinary hearing. *See Cole v. New York State DOCCS*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *28 (N.D.N.Y. Aug. 25, 2016); *see also Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015).

Accordingly, the Court recommends granting Defendants' motion for summary judgment on Plaintiff's due process claim against Venettozzi.[9]

      **E.**      **State Law Claims**

Defendants argue Plaintiff's state law assault and battery claims against Thomas and John Does 1-3 and Plaintiff's state law negligence claims against Dr. Kooi, Nurse Hoppins, and Nurse Doe are barred by New York Corrections Law Section 24.

New York Corrections Law Section 24 provides DOCCS employees immunity from lawsuits based on acts or omissions within the course of their employment. N.Y. Correct. Law § 24; *see also Ierardi v. Sisco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Such actions must be brought in the New York Court of Claims as a claim against the state. N.Y. Correct. Law § 24. If a plaintiff brings such an action in federal court, the court should dismiss his or her state law claims for lack of subject matter jurisdiction. *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996); *Joy v. New York*, No. 5:09 Civ. 841, 2010 WL 3909694, at *4-5 (N.D.N.Y. Sept. 30, 2010) (collecting cases).

An employee's actions are deemed to be within the scope of their employment when "the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Ierardi*, 119 F.3d at 187. "Consistent with this precept, various courts have held that a correctional officer who uses force while on duty is acting within the scope of employment, and therefore is entitled to the protections of section 24." *Deal v. Yurack*, No. 9:04-CV-0072 (LEF/DEP), 2007 WL 2789615, at *10 (N.D.N.Y. Sept. 24, 2007) (collecting cases).

---

[9] As the Court recommends granting Venettozzi summary judgment based upon Defendants' first argument, the Court declines to address whether Venettozzi was personally involved or is entitled to qualified immunity.

Here, as to the assault and battery claims against Thomas and John Does 1-3, the Court finds New York Corrections Law Section 24 bars said claims. Construing the facts most favorably to Plaintiff, the alleged assault occurred while Thomas was on duty as a corrections officer and escorting Plaintiff to A block. (Dkt. No. 96-2 at 15-19.) Accordingly, the Court recommends dismissing Plaintiff's assault and battery claims for lack of subject matter jurisdiction. *See Ames v. New York Dep't of Corr. & Cmty. Supervision*, No. 9:12-CV-01487 (MAD/RFT), 2015 WL 4126326, at *14 (Mar. 24, 2015) ("The alleged . . . excessive use of force during the movement of Plaintiff within the facility [was] not departure[ ] great enough to remove Defendant Correction Officers' actions from within the scope of their employment.").

With respect to Plaintiff's negligence claims against Nurse Hoppins, Nurse Doe, and Dr. Kooi, the Court finds said claims are similarly barred by New York Corrections Law Section 24. The District Court found Plaintiff's negligence claims stemmed from the same conduct constituting his medical indifference claims. (Dkt. No. 11 at 17.) Generally, Plaintiff claims Nurse Hoppins was indifferent to his injuries and falsely reported he was found in possession of Neurontin during the strip-frisk and Dr. Kooi discontinued Plaintiff's Neurontin. (Dkt. No. 96-2 at 24-28.) Nurse Hoppins, Nurse Doe, and Dr. Kooi treated Plaintiff while employed by DOCCS and as part of their duties at Auburn. Therefore, the Court recommends dismissing Plaintiff's state law negligence claims. *See McDay v. Bushey*, No. 9:14-CV-997 (GLS/ATB), 2016 WL 6638182, at *9 (N.D.N.Y. Aug. 10, 2016) (finding plaintiff's state law medical negligence and ministerial neglect claims were barred by New York Corrections Law § 24).

### F.    Claims Against the Doe Defendants

Defendants seek dismissal of any claims against the John and Jane Doe Defendants for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. (Dkt. No. 96-15 at 26-28.) Specifically, Defendants maintain dismissal is appropriate because Plaintiff has

not filed an amended complaint naming the Doe Defendants, despite Defendants' disclosure of their identities on May 20, 2019 (Dkt. No. 90), and the Court's Order directing Plaintiff to file an amended complaint by June 19, 2019 (Dkt. No. 93). (Dkt. No. 95-15 at 27.) Plaintiff has not responded to this argument.

"Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve the John Doe defendants but has failed to do so." *Sawyer v. Prack*, No. 9:14-CV-1198 (DNH/DEP), 2016 WL 5440596, at *15 (N.D.N.Y. July 29, 2016) (citations and quotation marks omitted); *see also Epps v. City of Schenectady*, No. 1:10-CV-1101 (MAD/CFH), 2013 WL 717915, at *4 (N.D.N.Y. Feb. 27, 2013) ("All discovery is complete and thus, plaintiff's failure to identify the 'John Doe' defendant mandates dismissal."); *see also See Rothschild v. Doe #1*, No. 9:14-cv-1343 (GLS/DEP), 2018 WL 4554499, at *4 (N.D.N.Y. Sept. 21, 2018) ("Now, at summary judgment, discovery is closed, and [the plaintiff] has had ample time and opportunity to identify and serve the remaining Doe and Unknown defendants. He has not. Thus dismissal of these defendants without prejudice is appropriate.").

As noted above, Plaintiff's Eighth Amendment excessive force and failure to intervene claims against Corrections Officers John Does 1-3 and medical indifference claims against Nurse Doe survived initial review. (Dkt. No. 11.) By Decision and Order entered April 22, 2019, Plaintiff was directed to file an amended complaint identifying the Doe Defendants within thirty days. (Dkt. No. 87 at 9-11.) Plaintiff was warned that failure to do so would result in dismissal of the claims against the Doe Defendants "**without prejudice without further Order of the Court**." *Id.* at 10-11 (emphasis in original). By Order entered April 29, 2019, this Court, *inter alia*, granted Plaintiff's request for an extension of the deadline to amend his complaint to

identify the Doe Defendants and directed the parties to file status reports concerning their attempts to identify the Doe Defendants on or before May 31, 2019.  (Dkt. No. 90.)  On May 20, 2019, Defendants filed a status report, which purportedly disclosed the identities of the Doe Defendants.  (Dkt. No. 91.)  Therefore, by Order entered May 23, 2019, this Court extended Plaintiff's time to file an amended complaint by thirty days.  (Dkt. No. 93.)  To date, the docket reflects Plaintiff has not filed an amended complaint with the names of any of the Doe Defendants, and the time within which to do so has long passed.  (*See* Docket Report; *see also* Dkt. No. 93.)  Further, as Defendants correctly point out, Plaintiff has not requested any further extensions of time, nor has he provided a reason for his continued delay.  (Dkt. No. 96-15 at 27.[10])

Based on the foregoing, the Court finds Plaintiff was afforded ample opportunity to amend his complaint to identify the Doe Defendants, yet has failed to do so.  Accordingly, the Court recommends dismissal of the complaint as against the John and Jane Doe Defendants, without prejudice, in light of Plaintiff's failure to identify and serve them upon the completion of discovery.  *See Mack v. Wood*, No. 9:17-CV-1146 (BKS/ATB), 2019 WL 5197230, at *4 (N.D.N.Y. July 26, 2019) (recommending dismissal of the *pro se* plaintiff's claims against the

---

[10]  The Court further notes a potential statute of limitations issue with respect to the unserved John and Jane Doe defendants.  The underlying incidents are alleged to have occurred on January 21, 2015.  The statute of limitations for a Section 1983 claim is three years.  *Owens v. Okure*, 488 U.S. 235, 250-51 (1989); *see* N.Y. Civ. Prac. L & R. § 214(5).  Without considering whether the statute would be tolled for any reason, the three year statute of limitations would have run on January 21, 2018.  "If the statute of limitations has run, the only way that plaintiff would be allowed to now name additional defendants is if the substitution 'relates back' to the original complaint."  *Mack v. Wood*, No. 9:17-CV-1146 (BKS/ATB), 2019 WL 5197230, at *4 n.3 (N.D.N.Y. July 26, 2019) (citations omitted).  However, there can be no relation back without a mistake about the party's identity.  *Id.*  The Second Circuit has made it clear that the failure to identify a defendant, when the plaintiff knows that the defendant must be named, may not be characterized as a mistake for relation back purposes.  *Id.* (citing *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013)).

Doe Defendants without prejudice for failure to identify and serve them upon the completion of discovery), *report-recommendation adopted by* 2019 WL 4183894 (N.D.N.Y. Sept. 4, 2019); *see also Coward v. Town & Village of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the [defendant's] name, . . . the plaintiff simply cannot continue to maintain a suit against the John Doe defendant." (internal quotation marks omitted)); *Burns v. Trombly*, 624 F. Supp. 2d 185, 197-98 (N.D.N.Y. 2008) (dismissing without prejudice *pro se* plaintiff's claims against John Doe defendants after two years of litigation and "adequate opportunity to conduct discovery," where plaintiff failed to name or serve said defendants).

## IV.    CONCLUSION

For the reasons stated above, the Court recommends granting summary judgment to Defendants Hoppins, Kooi, Bauersfeld, and Venettozzi.  The Court also recommends dismissing Plaintiff's claims against the Doe Defendants without prejudice.  If the District Court accepts the foregoing recommendations, only Plaintiff's Eighth Amendment excessive force claim against Thomas remains for trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 96) be **GRANTED** with respect to Defendants Hoppins, Kooi, Bauersfeld, and Venettozzi; and it is further

**RECOMMENDED** that Plaintiff's claims against the Doe Defendants be **DISMISSED without prejudice**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: March 6, 2020
　　　　Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"),

1999 WL 983876

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment.)

A. *Standard for Summary Judgment*
Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

   Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    3

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 39 of 328

2018 WL 3121612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Harrell WATTS, et al., Defendants.

Civ. No. 9:12-CV-801 (NAM/DJS)
|
Signed 03/07/2018

**Attorneys and Law Firms**

VINCENT MICHAEL MARINO, 14431-038, FCI FORT DIX, P.O. Box 2000, Joint Base MDL, New Jersey 08640, Pro Se.

HON. GRANT C. JAQUITH, Acting United States Attorney, OF COUNSEL: KAREN FOLSTER LESPERANCE, ESQ., Assistant United States Attorney, Northern District of New York, James T. Foley U.S. Courthouse, 445 Broadway, Albany, New York 12207, Attorney for Defendants.

### AMENDED REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

*1  This action, brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), returns to the Court on Defendants' Motion for Summary Judgment. Dkt. No. 133, Defs.' Mot. Summ. J. The only remaining claims in this action are First Amendment retaliation claims against Defendants Lucas, Sepanek, and Schult. Defendants move for summary judgment on these remaining claims. Plaintiff has opposed Defendants' Motion, and Defendants have filed a Reply. Dkt. Nos. 139, Pl.'s Resp., & 140, Defs.' Reply. After the Court ordered the Defendants to respond to outstanding discovery requests (Dkt. No. 157), and Defendants complied (Dkt. No. 158), Plaintiff filed supplemental papers in opposition to Defendants' Motion. Dkt. Nos. 162 & 163. For the reasons that follow, the Court recommends that Defendants' Motion be **granted** and this action **dismissed**.

## I. BACKGROUND

### A. Plaintiff's Failure to File a Response to Defendants' Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As required by the Local Rules, Defendants' counsel advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts. Dkt. No. 133-1. Plaintiff, however, did not file a response to Defendants' Statement of Material Facts. *See* Pl.'s Resp. & Dkt. No. 162, Pl.'s Reply Brief. [1] Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). The Court therefore will deem the facts as set forth in Defendants' Statement of Material Facts admitted, to the extent they are properly supported by the record. Dkt. No. 133-3, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) ).

[1]      On March 5, 2018 the Clerk's office received Plaintiffs "Reply Motion In Opposition to Defendant's Local Rule 7.1 ..." Dkt. No. 163. This document was in addition to the Plaintiff's Reply Brief. Dkt. No 162. Dkt. No. 163 violates this Court's directives in several respects. First, it is not a properly formulated Rule 7.1 Reply. The local Rules provide as follows: "The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and /or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). The Plaintiff's

Rule 7.1 reply does not address any of the facts listed in the Defendants Rule 7.1 Statement of Material Facts. Further, Dkt. No. 163 is, in essence, a supplemental reply brief, and when combined with Dkt. No. 162, substantially exceeds the Court-imposed five page limit on this additional brief.

**B. Factual Background**

**\*2** On December 3, 2009, Plaintiff was incarcerated at FCI Ray Brook, when unit officers discovered $2,729.32 of postage stamps, gambling paraphernalia, and a homemade intoxicant in his cell during a routine cell search. Defs.' SMF at ¶¶ 26-27. A disciplinary hearing was held on December 15, 2009, at the conclusion of which Plaintiff was found guilty of several disciplinary violations and sentenced to sixty days in disciplinary segregation, twenty-seven days loss of good time credits, and 180 days restriction on his visiting, telephone, and commissary privileges. *Id.* at ¶ 28. Following the disciplinary hearing, the Special Investigative Supervisor ("SIS") conducted an investigation into the incident, which revealed that Plaintiff's girlfriend had entered into a series of financial transactions with a number of different inmates. *Id.* at ¶ 29. The report concluded that Plaintiff had been running an illegal gambling operation and recommended that he be transferred to another institution in order to "shut down" the operation. *Id.* at ¶ 30.

Defendant Lucas, Plaintiff's case manager, accepted the recommendation of the SIS, as was his standard practice, and completed the necessary paperwork to request a transfer for Plaintiff. *Id.* at ¶ 31. Lucas drafted a Request for Transfer, Form 409. *Id.* at ¶ 33; Dkt. No. 133-10, Decl. of Steven Lucas, dated Aug. 18, 2017, Ex. F ("Form 409"). The transfer request was a "Code 323," which, according to Lucas, means that the inmate "need[s] closer supervision as the result of a disciplinary incident." Dkt. No. 133-4, Lucas Decl. at ¶ 14. In stating the reason for the transfer request, Lucas summarized the findings of the SIS report, and noted that Plaintiff had a previous disciplinary violation in 2007 for operating a gambling operation at USP Canaan. Form 409. Lucas recommended "a transfer to a High security facility no closer to [Plaintiff's] release area of Massachusetts." *Id.* On the Form 409, Lucas indicated that Plaintiff's inmate security level [2] was twenty-four. *Id.* After researching suitable facilities, Lucas identified USP Hazelton and USP Big Sandy as potential facilities to which Plaintiff might be

transferred. Lucas Decl. at ¶ 17. Lucas also completed a new BP-338.[3] *Id.* at ¶ 37.

[2]    Each inmate in the custody of the Federal Bureau of Prisons ("BOP") is assigned a point score, which is used to determine their security classification. Defs.' SMF at ¶¶ 9-11. An inmate's point score, however, is not the sole factor used in determining a security classification; public safety factors and management variables are also considered. *Id.* at ¶ 11. An inmate's security classification is re-assessed at regular intervals throughout the period of incarceration. *Id.* at ¶ 13.

[3]    An Inmate Load and Security Designation Form, or BP-337, is prepared when an inmate first enters federal custody. Defs.' SMF at ¶¶ 7-8. Seven months after the inmate enters federal custody, and annually thereafter, a Custody Classification form, or BP-338, containing updated information relevant to the inmate's security classification, is prepared. *Id.* at ¶¶ 13-14. Additionally, a new BP-338 is issued at any time an event occurs that may affect the inmate's security classification, such as an incident report. *Id.* at ¶ 14.

The Request for Transfer Form was reviewed and approved by the Unit Manager, the Case Management Coordinator, the Assistant Warden, and the Warden, Defendant Schult. *Id.* at ¶ 41. The Request for Transfer Form was then submitted to the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas. *Id.* Once a transfer request is submitted to the DSCC, the determination of whether to approve the request and if approved, what facility the inmate is transferred to, is made solely by the DSCC. *Id.* at ¶¶ 41-42. The staff of the facility submitting the request—in this case, Ray Brook—have no further control over the request after it is submitted. *Id.* at ¶ 42. Plaintiff was transferred out of FCI Ray Brook on February 12, 2010, and arrived at USP Pollock, his new assigned facility, on July 13, 2010. *Id.* at ¶ 43.

**\*3** The remaining claims in this action are First Amendment retaliation claims arising from an affidavit Plaintiff alleges that he submitted in support of a fellow inmate named McCarroll's civil rights action against a BOP employee named Matteau. Am. Compl. at p. 4.[4] Plaintiff claims that on December 2, 2009, Helms and Poirier[5] discovered the affidavit in Plaintiff's cell during a cell search. *Id.* at pp. 6 & 16. Plaintiff claims that the Defendants intentionally

Marino v. Watts, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 41 of 328

2018 WL 3121612

retaliated against him based upon this affidavit. *Id.* at pp. 13-15. Plaintiff claims that he experienced the following specific acts of retaliation:[6] (1) Defendants Lucas and Sepanek confiscated his legal work and law books when he was housed in the Special Housing Unit ("SHU") at Ray Brook, *id.* at pp. 34-35; (2) Defendants Lucas and Sepanek falsified his security level from eleven to twenty-four, causing him to be transferred to USP Pollock, which was known to have violent conditions, *id.* at p. 27; and (3) Defendant Schult caused him to be placed in BOP's "Diesel Therapy" program, whereby he was frequently transferred while on route from Ray Brook to Pollock and did not have access to his legal work, *id.* at p. 21.

| [4] | Because some paragraphs of the Amended Complaint are not numbered, the Court cites to the pagination assigned by Plaintiff. |
|---|---|
| [5] | Poirier was dismissed as a Defendant from this action, Dkt. No. 62, and Plaintiff voluntarily discontinued his claims against Helms after he passed away, Dkt. No. 145. |
| [6] | Plaintiff has alleged other acts of retaliation—including that the incident report filed against him as a result of the cell search was retaliatory—that have been dismissed by the Court. *See* Dkt. No. 49. |

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

**\*4** Defendants move for summary judgment on Plaintiff's remaining First Amendment retaliation claims. For the reasons that follow, the Court agrees that Plaintiff's retaliation claims fail as a matter of law and recommends that Defendants' Motion be **granted**.[7]

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 42 of 328
Marino v. Watts, Not Reported in Fed. Supp. (2018)
2018 WL 3121612

7

Defendants have argued that the Court should reconsider its holding allowing Plaintiff's First Amendment retaliation claim to proceed under *Bivens* in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Dkt. No. 133-2, Defs.' Mem. of Law at pp. 9-10. *Ziglar*—as all of the Supreme Court's recent *Bivens* decisions—emphasizes that *Bivens* is a "'disfavored' judicial activity." 137 S. Ct. at 1857. However, because the Court finds that summary judgment is appropriate on the merits of Plaintiff's First Amendment claims, it declines to revisit the issue of whether a *Bivens* remedy should be implied under the First Amendment.

## A. Legal Standard [8]

8

Due to the similarity between *Bivens* and § 1983 actions, "federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such

evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ).

**\*5** Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

## B. Analysis

Defendants argue that: (1) Plaintiff was transferred to USP Pollock for legitimate non-retaliatory reasons; (2) undisputed evidence shows that Plaintiff's security classification was not falsified; (3) there is no evidence that the Defendants were personally involved in the decision to transfer Plaintiff to USP Pollock or in the manner in which that transfer was conducted; and (4) Plaintiff has not shown that he suffered any injury due to the deprivation of his legal materials. Dkt. No. 133-2, Defs.' Mem. of Law at pp. 2-3.

### 1. Confiscation and Denial of
### Access to Legal Work while in SHU

Plaintiff alleges that the Defendants confiscated his legal materials—his Federal Rules of Civil Procedure book, in particular—while he was in the SHU at Ray Brook. Am. Compl. at pp. 34-35. According to Plaintiff, the Defendants specifically told him that the reason they were confiscating his legal materials was the affidavit he had filed against Matteau. *See* Dkt. No. 133-25, Dep. of Vincent Michael Marino, dated

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Apr. 18, 2017 ("Pl.'s Dep.") at pp. 16-17. Participation in a lawsuit constitutes a protected activity, *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002), and the intentional destruction of an inmate's property may constitute an adverse action for the purposes of a retaliation claim, *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

Plaintiff's claim, however, fails because there is insufficient evidence to conclude that he suffered an adverse action. Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated. Pl.'s Dep. at pp. 71-72, & 85. Furthermore, while Plaintiff claims that Defendants confiscated his Federal Rules of Civil Procedure book, Defendants have produced evidence that inmates in SHU at Ray Brook have access to a basic law library from 8:00 am to 9:00 pm, seven days a week. Dkt. No. 133-23, Decl. of Karen Folster Lesperance, Esq., dated Aug. 18, 2017, Ex. I, at p. 2. Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library. The lack of evidence demonstrating that Plaintiff suffered an adverse action is insufficient to withstand summary judgment. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's retaliation claim based on the confiscation and denial of access to legal materials while he was in the SHU at Ray Brook.

### 2. Falsification of Security Level and Transfer to USP Pollock

Plaintiff alleges that the Defendants falsified his security level and caused him to be transferred to a "facility which had harsher prison conditions such as ... over 16 murders, over 300 stabbings & knife shots." Am. Compl. at p. 27. Based on conversations with the Defendants, Plaintiff asserts that he believes this was out of retaliation for filing the affidavit against Matteau. *See* Pl.'s Dep. at pp. 31-32.

**\*6** Although a transfer to a facility with harsher conditions may constitute an adverse action for the purposes of a retaliation claim, *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), in this case Plaintiff has failed to establish a causal connection between his protected conduct (filing the affidavit) and the Defendants' request for his transfer. "As

a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Plaintiff has claimed that certain of the Defendants had conversations with him regarding his placement in SHU and the diesel therapy program in retaliation for his litigation activities, but notably does not allege such conversations regarding his security level and transfer to USP Pollock. While Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment.

Moreover, even if Plaintiff were able to establish a causal connection between his affidavit and Defendants' alleged adverse actions, Defendants have provided significant evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation.

As proof of his claim that Defendants manipulated his security level, Plaintiff compares a BP-338 dated April 27, 2006 where his security level was 11, with a BP-338 dated February 2, 2011 where his security level was 24. *See* Am. Compl. at pp. 47-48.[9] Plaintiff claims that the transfer forms completed by the Defendants contained false information that there were pending drug and criminal enterprise charges against him and that he had been convicted of assaulting a police officer; Plaintiff asserts that these falsifications inflated his security level. Pl.'s Resp. at p. 16.

[9]     Citation is to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

Contrary to Plaintiff's claims, Defendant Lucas explains that on the Form 409 he is required to note any discrepancies between the inmate's initial BP-337 and the BP-338 completed at the time of the transfer request. Lucas Decl. at ¶ 22. Lucas noted two discrepancies between the BP-337 and the information available when he was completing the Form 409: (1) the BP-337 referenced pending drug and criminal enterprise charges, which had never been lodged as a detainer; and (2) a traffic stop had been scored as a crime of Serious Violence instead of a crime of Minor Violence. *Id.* at ¶ 23; Form 409. Lucas states that both of these discrepancies would have lowered Plaintiff's point score. Lucas Decl. at ¶

Marino v. Watts, Not Reported in Fed. Supp. (2018)
2018 WL 3121612
Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 44 of 328

24. Lucas further explains that in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. *Id.* at ¶¶ 27-28. Lucas' explanations rebut Plaintiff's assertions that the Defendants manipulated his security level in order to transfer him to a higher security facility.

In any event, Lucas explains that the transfer request was "standard practice" following the recommendation of SIS that Plaintiff be transferred in order to "shut down" his gambling operation. *Id.* at ¶¶ 12-13. Plaintiff was transferred pursuant to Program Statement Number P5100.08, "Inmate Security Designation and Custody Classification" Code 323. Lucas Decl. ¶ 14, Ex. A, Chapt. 7, p. 5. Pursuant to that Code, an inmate may be transferred as a result of documented misconduct, to an institution of greater security. *Id.* In such cases, the inmate may only be transferred to a facility of the same level security if placement at a greater security level institution is not possible or other overriding circumstances exist. *Id.* As evidenced on Plaintiff's Form 409, the basis for the transfer was Plaintiff's misconduct. Lucas Decl., ¶ 16, Ex. F ¶ 3 ("An SIS Investigation has recommended the transfer of inmate Marino from FCI Ray Brook to 'shut down' his illicit gambling operation.... Based on the scale of this gambling operation, and the repetitive nature of these infractions, we recommend a transfer to a High security level facility no closer to his release area of Massachusetts. To do otherwise would be a reward for this type of behavior."). Defendants have demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive.

*\*7* Plaintiff also contends that Defendants specifically transferred him to USP Pollock because of its dangerousness. Defendants have demonstrated this is not the case. On Plaintiff's Form 409, Defendant Lucas requested transfer to either USP Hazelton or USP Big Sandy. Lucas Decl. ¶ 17, Ex. F. Thus, even if Plaintiff had established a causal connection between his protected activity and the Defendants' decision to request his transfer, the Defendants have shown that they would have requested Plaintiff's transfer to a higher level security facility even in the absence of the protected activity, and that the assignment to USP Pollock was not Defendants' decision. *See Graham v. Henderson*, 89 F.3d at 79.

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based on the alleged manipulation of his security level. [10]

[10]  Since the issuance of the Court's Original Report-Recommendation and Order, Plaintiff has had the benefit of receiving Defendants' Answers to certain Notices to Admit served by Plaintiff, and being able to make further arguments to the Court. *See* Dkt. No. 158-1, Defs' Objections and Responses to Pl.'s First Set of Requests for Admissions; Dkt. No. 162, Pl.'s Reply Brief. The Court has reviewed and considered these additional documents, but nothing contained therein causes the Court to change its analysis. The Defendants generally deny the admissions sought in the Notices to Admit, and provide additional explanations that are wholly consistent with the Affidavit of Defendant Lucas previously submitted. *See* Dkt. No. 133-4. Plaintiff objects to the Defendants' narrative contained within the Responses to the Notices to Admit, and generally claims that those responses constitute "criminal perjury." Pl.'s Reply Brief at pp. 2-4. Aside from the Plaintiff's general characterizations, Plaintiff again emphasizes that the drug and criminal enterprise charges that are referenced in Form 409 were not pending at the time of the creation that Form. Defendant Lucas responds that the reference to those charges was merely to note discrepancies between the BP-338 form he filled out and the original BP-337 Form. Accordingly, despite these additional submissions, and utilizing the standard of "skepticism and care" mandated by the Second Circuit, the Court again finds that summary judgment is warranted on this First Amendment retaliation claim.

### 3. Placement in Diesel Therapy Program

Plaintiff alleges that the Defendants orchestrated his placement in the "Diesel Therapy" program for eight months, where he was denied access to his legal work. Am. Compl. at p. 26. Plaintiff claims that Defendant Schult told him that placement in the "Diesel Therapy" program was retaliation for his litigation activities. Pl.'s Dep. at p. 17.

With respect to this claim, there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants

2018 WL 3121612

had any personal involvement in Plaintiff's placement in the "Diesel Therapy" program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook. As stated by Defendant Lucas, once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request. Lucas Decl. at ¶ 19. "A *Bivens* action lies against a defendant only when the plaintiff can show the defendant's personal involvement in the constitutional violation." *Cohen v. Holder*, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* ... a plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

**\*8** Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based upon his placement in the "Diesel Therapy" program.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 133) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [11] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[11]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121612

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 46 of 328

2018 WL 1578163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Deborah G. SCHULT, et al., Defendants.

9:12-CV-801 (NAM/DJS)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Vincent Michael Marino, 14431-038, FCI Fort Dix, P.O. Box 2000, Joint Base MDL, NJ 08640, pro se.

Hon. Grant C. Jaquith, Acting United States Attorney, Northern District of New York, Karen Folster Lesperance, Assistant United States Attorney, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U.S. District Court Judge

**I. Introduction**

**\*1** Plaintiff *pro se* Vincent Michael Marino brought this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of his civil rights. (Dkt. No. 52). The only remaining claims are for First Amendment retaliation against Defendants Schult, Sepanek, and Lucas, who at all relevant times were employed at FCI Ray Brook, where Plaintiff was formerly incarcerated. (*See* Dkt. No. 86). Defendants have moved for summary judgment on the remaining claims. (Dkt. No. 133). On December 11, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order, recommending that Defendants' motion be granted and the action dismissed. (Dkt. No. 149). Subsequently, Plaintiff filed objections to the Report-Recommendation,[1] a motion to compel certain discovery and for permission to amend his opposition to summary judgment, and a motion for rejection of the Report-Recommendation, denial of summary judgment, imposition of the sanction of default, and other relief. (Dkt. Nos. 152–154).

[1]   The Court has reviewed Plaintiff's objections to Magistrate Judge Stewart's December 11, 2017 Report-Recommendation, which were based on the outstanding discovery Plaintiff sought in order to respond to Defendants' motion for summary judgment. (Dkt. No. 152). This discovery issue was resolved before the March 7, 2018 Amended Report-Recommendation. (Dkt. Nos. 157, 162–63). Therefore, Plaintiff's objections to the December 11, 2017 Report-Recommendation are not relevant to the March 7, 2018 Amended Report-Recommendation or this decision.

On January 11, 2018, this Court referred Plaintiff's new motions to Magistrate Judge Stewart for decision on non-dispositive issues and/or recommendation on dispositive issues, and held in abeyance the Report-Recommendation and Defendants' motion for summary judgment. (Dkt. No. 155). On January 16, 2018, Plaintiff filed an additional "reply in opposition to Magistrate Judge Stewart's Report-Recommendation and Order," wherein Plaintiff again emphasized the outstanding discovery he needed to oppose Defendants' motion. (Dkt. No. 156). On January 31, 2018, Magistrate Judge Stewart granted Plaintiff's motion to compel, allowed him to submit additional briefing in connection with Defendants' motion for summary judgment, and denied his motion for default judgment. (Dkt. No. 157). Plaintiff then submitted supplemental papers in further opposition to Defendants' motion. (Dkt. Nos. 162–63).

On March 7, 2018, Magistrate Judge Stewart issued an Amended Report Recommendation and Order, which again recommended that Defendants' motion for summary judgment be granted and the action dismissed. (Dkt. No. 164). On March 28, 2018, Plaintiff filed timely objections to the Amended Report-Recommendation.[2] (Dkt. No. 167). For the reasons set forth below, the Amended Report-Recommendation is adopted in its entirety.

[2]   Although Plaintiff's objections were received on March 28, 2018—two days after the March 26, 2018 deadline, they are dated March 20, 2018 and were mailed on March 26, 2018, and therefore, the Court will consider the objections as timely.

**II. Standard of Review**

**\*2** This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen*

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 47 of 328

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

*v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "To the extent ... that the party makes only conclusory or general arguments ... the Court will review the Report strictly for clear error." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "The objections of parties appearing *pro se* are generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Id.* at 340 (quotations and citation omitted).

Summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a summary judgment motion, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted)).

## III. Discussion

### a. The Amended Report-Recommendation

In the Amended Report-Recommendation, Magistrate Judge Stewart deemed admitted the facts set forth in Defendants'

Statement of Material Facts, to the extent they were properly supported by the record, based on Plaintiff's failure to file a response to Defendants' Statement. (Dkt. No. 164, p. 2). Magistrate Judge Stewart then recommended that Defendants' motion for summary judgment be granted as to Plaintiff's First Amendment retaliation claims, which alleged that after Plaintiff filed an affidavit in support of a fellow inmate's civil rights action, the Defendants took the following actions against him: 1) the confiscation of legal work and law books when Plaintiff was housed in the Special Housing Unit ("SHU") at FCI Ray Brook; 2) the falsification of Plaintiff's security level from eleven to twenty-four, and consequent transfer to USP Pollock, which was known to have violent conditions; and 3) his placement in so-called "Diesel Therapy," whereby he was in transit for eight months from one facility to another. (*Id.*).

As to the first claim, Magistrate Judge Stewart Recommended summary judgment based on "insufficient evidence to conclude that [Plaintiff] suffered an adverse action." (*Id.*, p. 10). Magistrate Judge Stewart observed that "Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated." (*Id.*). Further, while Plaintiff claimed that Defendants confiscated his Federal Rules of Civil Procedure book, it was noted that Defendants "produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week," and "Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library." (*Id.*).

**\*3** For Plaintiff's second claim based on the alleged manipulation of his security level and his transfer to a different facility, Magistrate Judge Stewart found that Plaintiff failed to establish a causal connection between his protected conduct—filing the affidavit, and Defendants' request for his transfer. (*Id.*, pp. 10–11). Magistrate Judge Stewart noted that "[w]hile Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment." (*Id.*, p. 11). Magistrate Judge Stewart also found that even if Plaintiff were able to establish a causal connection between his affidavit and the alleged adverse actions, Defendants "provided significant

2018 WL 1578163

evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation." (*Id.*, p. 11). Defendants' evidence supporting the increase in Plaintiff's security level included that "in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification." (*Id.*, pp. 11–12). Further, there was evidence that "the transfer request was 'standard practice' following the recommendation of SIS that Plaintiff be transferred in order to 'shut down' his gambling operation." (*Id.*, p. 12). Thus, Magistrate Judge Stewart found that Defendants "demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive." (*Id.*, p. 13). In addition, the evidence showed that Defendants had no personal involvement in choosing the particular facility, USP Pollock, where Plaintiff was transferred. (*Id.*).

For Plaintiff's third claim related to "Diesel Therapy," Magistrate Judge Stewart found that "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (*Id.*, p. 14). Furthermore, Magistrate Judge Stewart noted evidence that "once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request." (*Id.*).

### b. Plaintiff's Objections

As an initial matter, Plaintiff claims for the first time in his objections that he never received Defendants' Statement of Material Facts in support of their motion for summary judgment, which he now seeks to compel. (Dkt. No. 167, p. 1). The Court has considered this claim as an objection to Magistrate Judge Stewart's decision to deemed admitted the facts set forth in Defendants' Statement of Material Facts based on Plaintiff's failure to file a response. (Dkt. No. 164, p. 2).

Contrary to Plaintiff's claim, the record shows that he received Defendants' Statement of Material Facts, along with notice of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. Nos. 133-1, 133-3, 133-27). In the December 11, 2017 Report-Recommendation, Magistrate Judge Stewart noted

that Plaintiff failed to file a response to Defendants' Statement of Material Facts. (Dkt. No. 149, p. 2). Therefore, under Local Rule 7.1(a)(3), Magistrate Judge Stewart deemed that the facts set forth by Defendants were admitted by Plaintiff, to the extent the facts were properly supported by the record. (*Id.*). Despite that clear notification, Plaintiff never claimed to be missing Defendants' Statement of Material Facts in his objections filed on December 29, 2017. (Dkt. No. 152). Nor did he raise the issue in his motion to compel or letters to the Court thereafter. (Dkt. Nos. 153–54, 156). After Plaintiff obtained additional discovery, Magistrate Judge Stewart permitted Plaintiff to submit a supplemental Rule 7.1 Reply Statement of Material Fact. (Dkt. No. 157). Plaintiff submitted a document entitled "Marino's Reply Motion in Opposition to Defendant's Local Rule 7.1/Statement of Material Fact Motion with Marino's Supportive Affidavit." (Dkt. No. 163). But this document did not specifically address any of the facts listed in Defendants' Statement of Material Facts. Based on Plaintiff's failure to file a proper response, Magistrate Judge Stewart once again, in the Amended Report-Recommendation, deemed admitted Defendants' Statement of Material Facts to the extent they were properly supported by the record. (Dkt. No. 164, p. 2).

After carefully reviewing the issue *de novo*, the Court agrees with Magistrate Judge Stewart's decision because the record shows that Plaintiff received Defendants' Statement of Material Facts, he was warned of the consequences of not responding, and he failed to do so despite multiple opportunities. *See* N.D.N.Y.L.R. 7.1(a)(3). Moreover, Magistrate Judge Stewart only deemed the facts admitted to the extent they were properly supported by the record, and Plaintiff makes no claim that he lacked the record evidence in this case. Indeed, Plaintiff's objections reference such evidence. (*See, e.g.*, Dkt. No. 167, pp. 4–5). Therefore, the Court also denies Plaintiff's request to submit a response to Defendants' Statement of Material Facts.

**\*4** As to the substance of Plaintiff's First Amendment retaliation claims, he does not appear to challenge, with any evidentiary basis, the specific findings made by Magistrate Judge Stewart. Nonetheless, recognizing Plaintiff's *pro se* status, and out of an abundance of caution, the Court has undertaken a *de novo* review. In order to prevail on his retaliation claims, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

"Because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (quotations and citations omitted). If a plaintiff adduces evidence of protected conduct, an adverse action, and a causal connection, the burden shifts to the defendant to demonstrate he "would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (quotations and citations omitted). In other words, a defendant is entitled to judgment in his favor if he shows that the adverse action "would have been taken based on the proper reasons alone." *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Id.* (quotations and citations omitted).

First, for all three claims, there is no dispute that Plaintiff engaged in protected conduct by filing an affidavit in support of a fellow inmate's civil rights action. However, for Plaintiff's retaliation claim based on the alleged confiscation and denial of access to legal materials, he has failed to adduce any specific evidence of an adverse action. Plaintiff's vague allegations that, while in SHU, he was deprived of his "legal work & legal mail" are insufficient at this stage. (*See* Dkt. No. 52, pp. 21–22; Dkt. No. 167, p. 18). The record also shows that Defendant had access to a law library while in SHU. (*See* Dkt. No. 133-23, p. 3). Moreover, Plaintiff has not adduced evidence of *who* allegedly deprived him of legal materials; he simply testified that "[t]hey lost a lot of it," and "[t]hey destroyed a lot of it." (Dkt. No. 133-25, p. 40). But there is no evidence that Defendants worked at SHU or exercised control over his legal materials there. Thus, Plaintiff has also failed to raise an issue of material fact as to Defendants' personal involvement in the alleged adverse action. *See Hallock v. Bonner*, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) ("[T]o defeat the defendants' motion for summary judgment, the plaintiffs must raise an issue of material fact as to the requisite personal involvement of the named defendants under *Bivens*."). Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

Second, for Plaintiff's retaliation claim based on the alleged manipulation of his security level and his transfer to a different facility, the Court agrees with Magistrate Judge Stewart's finding that Defendants demonstrated that they would have increased his security level and requested his transfer even in absence of Plaintiff's protected conduct. Plaintiff argues that Defendants put false information in his prison files in order to raise his security level and get him transferred. (Dkt. No. 167, pp. 3–9). But the record shows that Plaintiff's security classification and transfer were driven by his multiple disciplinary incidents for running gambling operations. (*See* Dkt. No. 133-4, ¶¶ 8–16; Dkt. No. 133-7; Dkt. No. 133-8; Dkt. No. 133-9; Dkt. No. 133-10; Dkt. No. 133-20). The allegedly "inaccurate" files submitted by Plaintiff do not show otherwise. (*See* Dkt. No. 167, pp. 15–22). Defendant Lucas explained that in the five years intervening between the two classification forms relied on by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. (Dkt. No. 133-4, ¶¶ 27–28). Moreover, Plaintiff's transfer was specifically recommended by the Special Investigative Supervisor "as a means to 'shut down' Marino's [gambling] operation," and it was "standard practice" for Defendants to follow that recommendation. (Dkt. No. 133-4, ¶¶ 12–13; Dkt. No. 133-9, p. 5). In sum, Defendants have shown that Plaintiff's security classification and transfer would have taken place even if he had never filed an affidavit for a fellow inmate, and no reasonable jury could find otherwise. Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

**\*5** Third, for Plaintiff's retaliation claim based on his alleged placement in so-called "Diesel Therapy," the Court also agrees that Defendants are entitled to summary judgment. Upon review of the record, "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (Dkt. No. 164, p. 14). For example, Plaintiff alleges that Defendant Schult told him that he was going to experience "Diesel Therapy" and that Defendant Sepanek was involved too because all of the Defendants "were conspiring through this whole retaliation." (Dkt. No. 133-25, pp. 72–75). However, the record shows that Defendants requested the transfer based on Plaintiff's disciplinary incidents, and thereafter, they had no control over the request, Plaintiff's transit schedule, or his specific destination. (*See* Dkt. No. 133-4, ¶¶ 16, 19). Thus, Plaintiff's claim cannot survive summary judgment since he has again failed to raise an issue

2018 WL 1578163

of material fact as to Defendants' personal involvement. *See Hallock*, 567 F. Supp. 2d at 338.

Plaintiff also puts forward a hodgepodge of other objections. He correctly asserts that "credibility determinations are jury functions and not those of a Judge," (Dkt. No. 167, p. 2), but Magistrate Judge Stewart made no such credibility determinations. Plaintiff writes that "in ruling on a motion to Dismiss/Summary Judgment Rule 12(b)(6) '[t]he evidence of Marino's Amended Complaint is to be believed and all justifiable inferences are to be drawn in his Marino's favor.' " (*Id.*). But Magistrate Judge Stewart correctly stated the standard of review *for summary judgment.* (Dkt. No. 164, pp. 5–7). Plaintiff also once again takes issue with Defendants' discovery responses, arguing that "they failed to comply with Marino's Discovery Requests using word gymnastics to prevail." (Dkt. No. 167, p. 6). But Magistrate Judge Stewart already resolved this discovery dispute, as discussed above. Finally, Plaintiff rehashes a number of the conclusory allegations from his Amended Complaint. (Dkt. No. 167, pp. 4–5, 11). However, once again, it must be emphasized that "more than conclusory allegations are required to survive a summary judgment motion." *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In sum, the Court finds no error in the Amended Report-Recommendation based on these general objections.

**IV. Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Stewart's Amended Report-Recommendation (Dkt. No. 164) is **ADOPTED in all respects**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 133) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 52) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York and to serve Plaintiff by both regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578163

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Rivera v. Johnson, Not Reported in F.Supp. (1996)

1996 WL 549336

KeyCite Yellow Flag - Negative Treatment

Distinguished by Carter v. Revine, D.Conn., October 6, 2015

1996 WL 549336
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Felix RIVERA, Plaintiff,

v.

S.B. JOHNSON, Superintendent, Dr. Shinia, Head
Doctor, Admin R.N. E. James, Administrative
Nurse, and R.N. J. Kent, Nurse, Defendants.

No. 95–CV–0845E(H).
|
Sept. 20, 1996.

**Attorneys and Law Firms**

Plaintiff Pro Se, Albion, NY.

Mary C. Baumgarten, Asst. Attorney General, Buffalo, NY,
for Defendant.

MEMORANDUM and ORDER

ELFVIN, District Judge.

**\*1** The plaintiff—an inmate housed at New York's Orleans
Correctional Facility ("Orleans")—commenced this action
pursuant to 42 U.S.C. § 1983 alleging that he had been
denied adequate medical care in violation of his right under
the Eighth Amendment to the United States Constitution to
be free from cruel and unusual punishment. Jurisdiction is
bottomed upon 28 U.S.C. §§ 1331 & 1343(a). The defendants
move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure, to dismiss the Complaint for its failure to state
facts upon which relief may be granted. The motion will be
granted.

According to the plaintiff's Statement of Claim
("Complaint"), at approximately 4:30 p.m. on June 26, 1995
he injured his fourth finger on his right hand and was taken
to the clinic within Orleans where he was seen by Joanne V.
Kent, R.N. The plaintiff alleges that Kent "refused to X-ray
[his] hand and * * * [w]rapped" his finger and instructed him
"to come back if the swelling continues." Two days later the
plaintiff "was taken to a hospital * * * at which time [his]
finger was X-rayed and a cast provided." The plaintiff alleges

that Kent "was negligent in not properly treating [his] broken
finger," that Elizabeth James, R.N., "is directly responsible"
in her administrative position to furnish a capable medical
staff which can provide "the proper treatment to inmate[s]
during emergenc[ies]" and that she was "negligent by staffing
* * * Kent," that Brij N. Shinha, M.D.—sued herein as "Dr.
Shinia"—"is the head doctor, and is directly responsible for
the negligence of his staff" and that Superintendent Sally B.
Johnson "is directly responsible" to assure "that inmates with
emergency needs will receive adequate medical treatment
and not be subjected to gross negligence, wanton disregards
[sic], or mistreated because it is trying to save a few dollars."
Finally, in his prayer for relief, the plaintiff requests that this
Court "find that the medical dept. has acted negligent [sic] by
displaying a wanton disregard to severe medical emergency
needs" and that by subjecting him to "medical neglect during
an emergency situation [it] has created mental anguish, gross
negligence" and that he should be pecuniarily compensated.

When evaluating a motion to dismiss for failure to state a
claim upon which relief can be granted this Court views well-
pleaded allegations in a light most favorable to the plaintiff
and such a motion will be denied unless they present no set
of facts on the basis of which the plaintiff could be entitled
to relief. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). This
lenient standard is even more appropriate when the plaintiff is
representing himself. *Sykes v. James,* 13 F.3d 515, 518–519,
(2nd Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749
(1994).

A claim for damages based upon 42 U.S.C. § 1983 requires
that the plaintiff allege facts which show that he was deprived,
by a person or persons acting under state authority, of a
right, privilege or immunity protected under the Constitution
or a federal statute. *Sykes,* at 519. In order to recover
damages under section 1983, the plaintiff must establish a
defendant's personal involvement in the alleged deprivation.
*Wright v. Smith,* 21 F.3d 496, 501 (2nd Cir.1994). The plaintiff
"must state specific facts, not simply legal and constitutional
conclusions." *Fee v. Herndon,* 900 F.2d 804, 807 (5th Cir.),
*cert. denied,* 498 U.S. 908 (1990). Furthermore, the doctrine
of *respondeat superior* may not be invoked to establish an
individual's liability in a section 1983 claim. *Green v. Bauvi,*
46 F.3d 189, 194 (2nd Cir.1995).

**\*2** The Eighth Amendment to the United States Constitution
prohibits the infliction of unnecessary and wanton pain on
those convicted of crimes. *Hudson v. McMillian,* 503 U.S.
1, 5 (1992). If an inmate suffers from a sufficiently serious

1996 WL 549336

illness or injury or other medical condition, a deliberate indifference to such serious medical needs violates the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976). The inquiry has both objective and subjective elements. *Wilson v. Seiter,* 501 U.S. 294, 298 (1990). The objective component of the inquiry examines whether the deprivation was sufficiently serious, while the subjective component examines whether any defendant acted with a sufficiently culpable state of mind. *Ibid.* In examining the seriousness of the medical need, the constitutional "standard contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain' * * *." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2nd Cir.1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). The subjective component requires the plaintiff to demonstrate that a defendant was both aware of facts from which the inference could have been drawn that a substantial risk of serious harm existed and that such defendant drew such inference. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1979 (1994).

Evaluating the Complaint, the plaintiff has failed to allege sufficient personal involvement on the part of James, Shinha and Johnson to state a claim for a constitutional violation for which monetary damages can be awarded. His allegations of negligent supervision or staffing rely on theories of negligence and vicarious liability, neither of which is available to establish liability under section 1983 actions. In the absence of allegations of direct personal involvement and sufficiently egregious and morally culpable conduct, the plaintiff's claims against James, Shinha and Johnson must be dismissed as a matter of law.

The gravamen of the complaint against Kent is that she "refused to X-ray" the plaintiff's finger or hand and that she "wrapped" his finger and that as a result of her conduct he unnecessarily endured pain for two days prior to being taken to a hospital, where his "finger was X-rayed and [placed in] a cast." The United States Supreme Court has specifically held that "[a] medical decision not to order an X-ray * * * does

not represent cruel and unusual punishment." *Estelle,* at 107. Furthermore, the plaintiff has failed to allege an objectively sufficiently serious medical condition meriting constitutional protection. Prison inmates suffering from ailments such as, *inter alia,* a toothache, a kidney stone and, most pertinently, a broken finger have all been held to fail to satisfy the constitutional serious-medical-need standard. *See Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) and cases cited thereat. A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection. Additionally, the Complaint indicates that Kent attended to and treated his finger and instructed the plaintiff to return if swelling continued. Such does not imply any disregard on her part of an excessive risk to the plaintiff's health. There is no allegation that the two days which passed after Kent attended to the plaintiff's finger and until it was placed in a cast, even if viewed as a delay, escalated or contributed to any harm or adversely affected his prognosis given the type of injury. Negligent diagnosis or treatment of a medical condition at most states a claim for medical malpractice and does not state a valid claim of medical mistreatment of constitutional dimension. *Estelle,* at 106–107. Moreover, it has long been resolved that prisons need not provide a standard of medical care presumed to be administered at hospitals. *Archer v. Dutcher,* 733 F.2d 14, 17 (2nd Cir.1984). Having failed to allege a medical condition that is objectively sufficiently serious and having failed to allege facts which imply deliberate indifference to such, the plaintiff's legal and constitutional conclusions fail to state a claim upon which relief can granted.

**\*3** Accordingly, it is hereby *ORDERED* that the defendants' motion is granted and that the Complaint is dismissed and that this case shall be closed.

### All Citations

Not Reported in F.Supp., 1996 WL 549336

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 11478222
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John H. WHITE, Plaintiff,

v.

David ROCK; et al., Defendants.

No. 9:13-CV-392 (GTS/CFH)
|
Signed 02/23/2016

**Attorneys and Law Firms**

JOHN H. WHITE, Plaintiff Pro Se, 08-A-3366, Attica Correctional Facility, Box 149, Attica, New York 14011.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: C. HARRIS DAGUE, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se John H. White ("White"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Compl."). Presently before the undersigned is defendants' motion for summary judgment and dismissal of White's complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 139. White has opposed the motion. Dkt. Nos. 161, 163, 164, 169, 170, 172, 178. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

**I. BACKGROUND**

**A. Facts** [2]

[2] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

....

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute....

N.D.N.Y. L. R. 7.1(a)(3) (emphasis in original). Defendants filed a Statement of Material Facts with citations to exhibits. White annexed exhibits to his Memorandum of Law in opposition to defendants' motion. The parties have not objected to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion. See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at \*1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. UnumProvident Corp., 261 F. App'x 316, 319 (2d Cir. 2008) ) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party.") (citation omitted). The facts recited are for the relevant time period as referenced in the complaint.

The facts are related herein in the light most favorable to White as the nonmoving party. See subsection II(A) infra. At all relevant times, White was confined at Upstate Correctional Facility ("Upstate C.F."). Dkt. No. 139-2 at 1. [3] White is currently serving a term of incarceration of twenty-five years to life for murder in the second degree, attempted robbery in the first degree, and attempted robbery in the second degree. Dkt. No. 139-6 at 2-3. In June 2010, defendant David Rock ("Rock") was the Superintendent of Upstate C.F., defendant Donald Uhler ("Uhler") was the Deputy Superintendent of Security, and defendant Michael Lira ("Lira") was the Deputy Superintendent of Programs. Dkt. No. 139-4 at 5.

[3]    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

 *2  On June 27, 2010, White was notified, by a public address announcement, that he had a visitor at the facility. Dkt. No. 139-6 at 8. At approximately 9:00 A.M. or 10:00 A.M., defendant Officer Raymond Drake ("Drake") came to White's cell in the Special Housing Unit ("SHU"), [4] and told White that his visitor was arrested and that the visit was cancelled. Id. at 9. White began kicking the cell door to "get attention from the staff." Id. at 10. Drake yelled at White to "calm down" and then walked away. Id. at 10. White knelt down on his hands and knees with his face and chest on the ground in an attempt to utilize the "audio system" to make a "verbal record" of what transpired. Id. at 10, 12-13. The door to White's SHU cell was "a big heavy steel contraption" that was "thick and made out of steel or metal or iron." Dkt. No. 139-6 at 11. If White attempted to talk through the door, the sound would be muffled; therefore, White had to speak through the space between the door and the floor. Id. White was on the floor for less than three minutes. Id. at 12.

[4]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

While White was still on the floor with his face near the bottom of the door, Drake returned and began kicking the door. Dkt. No. 139-6 at 10, 12. White testified that Drake kicked the door five times in a hard manner, analogous to a "football punt." Id. at 13. The SHU door had a roll bar at the top of the door and rested on a slide. Id. at 11. As a result, the door would "rock" and "shake" when struck. Id. When Drake kicked the door, it rocked and hit White, with force similar to a punch, on the right side of his face near his nose, jaw, right eye, and right temple. Dkt. No. 139-6 at 12, 14.

White suffered a split lip that bled for four hours, a bloody nose with swelling, and swelling to the right side of his face. Dkt. No. 139-6 at 14-15. White asked Drake to contact medical, and Drake refused. Id. at 14. White asked Drake why he kicked the door and Drake responded, "because I can." Id. White asked Drake to contact the sergeant, and defendant Sergeant Jon Oropallo ("Oropallo") arrived at White's cell. Id. White asked Oropallo for medical attention, and Oropallo refused. Dkt. No. 139-6 at 14.

On June 28, 2010, at approximately 6:15 A.M., defendant Nurse Elizabeth White ("Nurse White") responded to White's sick call request and examined White at his cell. [5] Dkt. No. 139-4 at 2; Dkt. No. 139-6 at 18. On June 30, 2010, medical staff responded to White's sick call request and examined White at his cell. [6] Dkt. No. 139-6 at 19; Dkt. No. 140 at 8. White complained of jaw pain. Dkt. No. 139-6 at 18. On July 2, 2010, Travers responded to White's sick call request and provided White with four packets of Tylenol. Dkt. No. 139-2 at 2; Dkt. No. 139-6 at 19.

[5]    The facts regarding what transpired during this examination are disputed.

[6]    The progress note memorializing White's June 30, 2010 treatment is illegible. Dkt. No. 140-8. White testified that he was treated by Nurse M. Travers and defendant Nurse Amber Lashway ("Lashway"). Dkt. No. 139-6 at 19. Travers is not a defendant herein. The record does not include an affidavit from Lashway or Travers.

On July 3, 2010, White was treated again by Nurse White. Dkt. No. 139-6 at 19. Nurse White provided him Tylenol for "general pains." Id.; Dkt. No. 139-4 at 3; Dkt. No. 140 at 9. Nurse White did not observe any injury to White's lip, face, nose, or eye. Id. On July 7, 2010, Travers responded to White's sick call request. Dkt. No. 139-4 at 3. White's condition was reported as "no change as documented above." Dkt. No. 140 at 9.

On July 8, 2010, Oropallo and Nurse White came to White's cell to complete a formal injury report regarding the June 27, 2010 incident with Drake. Dkt. No. 139-6 at 19-20. White stated, "I was on the floor talking at bottom of door. He kicked the door and the door hit my face." Dkt. No. 140 at 18. Nurse White completed the medical portion of the Inmate Injury Report. Dkt. No. 139-4 at 4. Nurse White observed White through the cell door and reported, "[n]o injury noted at this time. Inmate argumentative and uncooperative with further evaluation." Dkt. No. 139-4 at 4; Dkt. No. 140 at 18. Nurse White noted that no treatment was "indicated at this time." Id.

**\*3** On July 9, 2010, Drake prepared a Memorandum to Oropallo regarding White. Dkt. No. 164 at 41. Drake claimed that on June 27, 2010, he told White that his visit was canceled. Id. After learning this, White "became angry and started yelling." Id. Drake stated that he did not assault White or cause White to sustain any injury. Id. On July 9, 2010, Oropallo prepared a Memorandum addressed to Lieutenant T. Lombard ("Lombard"). [7] Dkt. No. 164 at 42. Oropallo stated that he interviewed White on July 8, 2010 regarding a complaint that White "authored" on June 27, 2010. Id. Oropallo reported that on June 27, 2010, he arrived at White's cell after Drake informed him that White wanted to speak with a supervisor. Id. At that time, White did not express any medical concerns, and Oropallo did not witness any injuries or blood from an alleged injury. Dkt. No. 164 at 42. During the July 8 interview, White was "visually assessed at his cell" by Nurse White with "no injuries noted." Id. During the interview, White made the same "accusations as he stated in his complaint and added nothing further." Id. White was "argumentative" and insisted on preparing his own inmate injury report. Id.

[7] Lombard is not a defendant herein.

On July 12, 2010, Lombard prepared a memorandum for Captain D. Quinn ("Quinn"). [8] Dkt. No. 164 at 43. Lombard indicated that on July 12, 2010, he interviewed Inmate E. Allen ("Allen"), an alleged witness to the June 27, 2010 incident. Id. Allen stated that the incident happened, "just as White wrote it." Id. Allen claimed that Drake kicked the door while White was kicking the door and yelling out from under the door. Id.

[8] Quinn is not a defendant herein.

White received additional medical treatment on July 13, 2010; July 14, 2010; July 15, 2010; and July 19, 2010 for complaints

of jaw pain, and "regularly" received Tylenol and Ibuprofen. Dkt. No. 139-6 at 21; Dkt. No. 139-4 at 4-5. At some point, White also attended a dental "call-out" and was seen by a dentist. Dkt. No. 139-6 at 21.

### B. Procedural History

On April 8, 2013, White filed his complaint in this action. Dkt. No. 1 ("Compl."). [9] Following an initial review of White's complaint, the Court directed Drake, Oropallo, White, Lashway, Rock, Uhler, and Lira to respond to White's Eighth Amendment excessive force claims and deliberate indifference to medical care claims. Dkt. No. 42 at 13-14. On May 11, 2015, defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of White's complaint. Dkt. No. 139.

[9]
The Court observes that White initially filed a complaint regarding the actions allegedly occurring on June 27, 2010 on August 9, 2010. Adopting Magistrate Judge Homer's Report-Recommendation, District Judge Suddaby granted defendants' motion to dismiss, dismissed White's complaint without prejudice, and denied White's cross motion to amend his complaint. See White v. Drake, 10-CV-1034 (GTS/DRH), 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011). In granting the motion to dismiss, Judge Suddaby concluded that White complaint should be dismissed but that White

should be required to file a new action rather than be permitted to simply file an Amended Complaint in this action on the following additional grounds: (1) plaintiff will not be untimely prejudiced by the Court's current Decision and Order, because the three-year limitations period governing his claims ... does not yet appear to have expired, and because no reason exists to believe that plaintiff in forma pauperis status has changed since it was granted ..., and (2) if the court were to simply accept for filing the proposed Amended Complaint that has been submitted, the Court would actually be prejudicing plaintiff because the pleading deficiencies in that Amended Complaint ... would cause the Court to dismiss the action *with prejudice.*

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 11478222

Id. at *8. It appears that plaintiff's commencement of the instant action is in accordance with Judge Suddaby's September 26, 2011 Decision and Order dismissing the action without prejudice.

## II. DISCUSSION [10]

[10] All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

**\*4** White alleges that he was subjected to Eighth Amendment violations related to the use of excessive force and deliberate indifference to a serious medical condition. See generally Compl. White also asserts supervisory claims against Rock, Uhler, Lira, and Lashway, and alleges that defendants violated various sections of the New York State Corrections Law and DOCCS policies/procedures. See id.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Eleventh Amendment

Defendants move for summary judgment and dismissal of White's claims against them in their official capacity. Dkt. No. 139-3 at 10. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890) ). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

**\*5** A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974) ). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets,

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 57 of 328

2016 WL 11478222

a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, because White seeks monetary damages against defendants for acts allegedly occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal of White's claims for monetary damages against defendants in their official capacity be granted.[11]

[11]    White's opposition papers provide that he "withdraws civil penalties against defendants in their official capacities on basis of the established case law of the Supreme Court of the United States." Dkt. No. 164 at 6.

### C. Eighth Amendment[12]

[12]    White argues that defendants mistakenly rely upon the Fourth Amendment in their analysis of his excessive force claim. Dkt. No. 164 at 6-8. The undersigned's reading of defendants' opposition papers suggests that defendants argued against the excessive force claim pursuant to the Eighth Amendment; regardless, assessing the excessive force claims under the Eighth Amendment is proper. See Bonilla v. Jaronczyk, 354 F. App'x 579, 581 (2d Cir. 2009) ("While claims of excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment, post-conviction excessive force claims [...], are properly considered under the Eighth Amendment.") (internal quotation marks and citation omitted).

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson, 503 U.S. at 9-10. T he Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction

of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (citations omitted). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ).

*6  The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness[.]" Sims, 230 F.3d at 21 (citation and internal quotation marks omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 58 of 328

2016 WL 11478222

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, White claims that, on June 27, 2010, Drake kicked his cell door several times, "caus[ing] plaintiff bodily harm [including] swelling of the face, nose & jaw, with a discharge of blood from the mouth & nose." See Dkt. Compl. at 5; Dkt. No. 42 at 7. White alleges that Drake "launch[ed]" a steel door into his skull and facial area with "rapid and successive" kicks. See Dkt. No. 164 at 9. Defendants argue that, even assuming that White's allegations are true, the level of force exerted was de minimis, and, thus, summary judgment is warranted. See Dkt. No. 139-3 at 11-12. Defendants contend that the "rocking on its track of a metal SHU cell door approximately 2 inches, 5 times," is insufficient to satisfy the objective prong of an excessive force claim. See Dkt. No. 139-3 at 11.

Viewing the evidence in a light most favorable to White, there are genuine issues of material fact precluding summary judgment on the excessive force claim, including the level of force used, the extent of White's injuries, and whether Drake used force in a malicious manner. See Grippin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se ... whether or not significant injury is evident."). With respect to the objective analysis, the record contains conflicting testimony and evidence regarding the severity of White's injuries following the incident. White testified that immediately following the incident, he was "bleeding profusely." Dkt. No. 139-6 at 14. White contends that his nose continued to bleed f or approximately four hours and asserts that he was not permitted to photograph his injuries or prepare an Injury Report on the day of the incident. Id.; Dkt. No. 164 at 11. Oropallo concedes that on the day of the incident, White reported what transpired, but Oropallo did not prepare an Injury Report/Facility Health Services Report until July 8, 2010. See Dkt. No. 140 at 18; Dkt. No. 164 at 42. White received medical attention the day after the incident. Dkt. No. 139-4 at 2; Dkt. No. 139-6 at 18. White testified that he told Nurse White that he was "injured by an officer the previous day," and asserts that his face was swollen at the time of the examination. Dkt. No. 139-6 at 18. Conversely, Nurse White avers that she did not observe any facial injuries and claims that White did not complain of any such injuries. Dkt. No. 139-4 at 3. Nurse White's medical note indicates that she provided "Tylenol for general pain." Dkt. No. 139-4 at 3; Dkt. No. 140 at 7.

*7 Where the issue of "whether [the] plaintiff's injuries [...] were significant enough to avoid the de minimis label depends on the resolution of a triable issue of fact," summary judgment is not appropriate. See McCrory v. Belden, No. 01 Civ. 0525, 2003 WL 22271192, at *6 (S.D.N.Y. Sept. 30, 2003) (" 'Minor' injuries suffice for an Eighth Amendment claim, and bruising or equivalent injuries may be found be a reasonable fact-finder to constitute minor rather than de[ ]minimis harm.") (citation omitted); see also Webster v. City of New York, 333 F. Supp. 2d 184, 197 (S.D.N.Y. 2004) (finding that, while the plaintiff's injuries appeared to be minor and a reasonable fact-finder "may well conclude that they do not rise to the level of a constitutional violation," the injuries were not, "as a matter of law, de minimis.").

The cases cited by defendants in support of the motion are distinguishable from the facts at hand. Dkt. No. 139-3 at 11-12. In those cases, the parties did not dispute the nature and extent of the injuries that the plaintiffs sustained as a result of the uses of force. In the absence of any genuine, material issue of fact regarding the injuries, the courts in those cases determined, as a matter of law, that the force exerted was de minimis. See Bermudez v. Waugh, No. 9:11-CV-0947 (MAD/DEP), 2013 WL 654401, at *5 (N.D.N.Y. Feb. 21, 2013) (granting summary judgment where the defendant's conduct resulted in injuries that the plaintiff described as a "little red mark" or "red bruise"); Rincon v. City of New York, No. 03 Civ. 8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (dismissing excessive force claim where the plaintiff admitted she was treated only for swelling in her right leg and wrist); Brown v. Busch, 954 F. Supp. 588, 595-96 (W.D.N.Y. 1997) (dismissing excessive force claim where medical records established that two hours after the incident, the plaintiff had a small abrasion on his back); DeArmas v. Jaycox, No. 92 Civ. 6139, 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993) (dismissing excessive force claim because a medical examination, conducted within hours of the alleged assault, revealed no bruising, swelling, redness, or reports of pain). Here, as stated, there are disputed material facts with respect to the seriousness of White's injuries; thus, the Court cannot determine, as a matter of law, that the amount of force used was de minimis.

As for the subjective prong of the excessive force analysis, although it is undisputed that defendants were tasked with the safety and order of inmates, there are disputed factual issues regarding whether the use of force was necessary, reasonable, or was applied in a malicious manner. The only factual account in the record of what transpired on the day

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 11478222

of the incident is taken from White's deposition testimony. White testified that the assault was unprovoked, and that Drake was aware that White was on the floor when he kicked the door:

> Q. Do you believe that Drake knew you were on the ground with your face against the door when he kicked the door?
>
> A. Yes. I believe that because there was at no time did Drake hear or see me standing to either side of the door and whether it be the left side of the door or the right side of the door yelling through these areas or the front area where the window is at. The only obvious place I could be was on the ground.

Dkt. No. 139-6 at 13.

Defendants have not offered any evidence challenging White's account of the events surrounding the use of force, and have failed to provide an account from Drake addressing whether he was aware that White was laying at the base of the door when he kicked it. Were a trier of fact presented with White's account of the events, the trier or fact could arguably infer that Drake acted maliciously, insofar as he was aware that the door would hit White because he knew White was laying at the bottom of the door. See Crawford v. Braun, No. 99 Civ. 5851, 2001 WL 127306, at *4 (S.D.N.Y. Feb. 9, 2001) (finding that disputed issues of fact regarding whether force was applied in a good faith manner preclude summary judgment even absent a significant injury); cf. Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *16 (N.D.N.Y. Mar. 28, 2014) (finding that the plaintiff could not establish wanton or malicious conduct where the defendant "busted open" a bathroom door, causing the door to hit the plaintiff who was on the other side, where the defendant "could not have know [that the plaintiff] was positioned in such a way that the door would hurt [the] plaintiff if [the defendant] opened it forcefully.").

 **\*8** In these circumstances, the governing law dictating that the evidence must be viewed in a light most favorable to the non-moving party directs the Court to credit White's version of events for the purposes of this motion. See In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in the favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury) (citing cases); Robinson v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (citations omitted). Thus, viewing the evidence in the light

most favorable to White, he has presented sufficient evidence to raise genuine issues of material fact as to the objective and subjective prongs of the Eighth Amendment excessive force analysis. Accordingly, the undersigned recommends that defendants' motion on this ground be denied. [13]

[13]    In his Memorandum of Law in opposition to defendants' motion, White claims that defendants, "concealed materially relevant evidence of [the] steel door that is much needed to combat their summary judgment motion." Dkt. No. 164 at 9. White also argues that defendants failed to provide him with relevant video evidence of the incident. Dkt. No. 164 at 10-11. To the extent that White is attempting to defeat defendants' motion on the basis that he requires additional discovery, that claim/request is denied. Upon review of White's opposition, the Court directed defendants to provide the Court with a copy of the subject video that defendants were instructed to provide to plaintiff's counselor for his viewing following April 9, 2015 telephone conference and subsequent Decision and Order (Dkt. No. 137). Dkt. No. 179. Defendants provided the Court with the video (Dkt. No.180) and claim that the video was made available to plaintiff pursuant to the Court's April 9, 2015 Decision and Order (Dkt. No. 137). Defendants contend that, despite being provided with an opportunity to view the video, White refused to view the video. Dkt. No. 180-2. Assuming, for the purposes of this motion only, that the video is in proper evidentiary form, the undersigned concludes the video is not relevant to the motion herein as it provides no support for plaintiff's claims. The undersigned has carefully reviewed the entire video, which is five minutes and twenty-five seconds in length. The video contains audio; however, no conversation can be discerned.

## 2. Deliberate Indifference to Medical Needs

White claims that Drake, Oropallo, Nurse White, Lashway, Rock, Uhler, and Lira delayed medical treatment and failed to provide adequate medical treatment. See Dkt. No. 139-6 at 21-22. Specifically, White alleges that defendants failed to "document" his "abnormalities," refused to allow him to be examined by a nurse within twenty-four hours of the alleged

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 60 of 328

White v. Rock, Not Reported in Fed. Supp. (2016)
2016 WL 11478222

incident, failed to refer him to a specialist, and refused to order "x-rays, c-scan, MRI (etc.)." See Dkt. No. 164 at 19; Dkt. No. 139-6 at 21-22. White further contends that Nurse White and Lashway were "apathetic" to his complaints and failed to make an accurate and timely injury report. See Dkt. No. 139-6 at 21, 25.

The Eighth Amendment's prohibition against cruel and unusual punishment extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66.

A claim for deliberate indifference to medical needs has two necessary components, one objective and the other subjective. See Hathaway, 99 F.3d at 553. The objective test asks whether there was a sufficiently serious medical need. Chance, 143 F.3d at 702. Deprivation of medical treatment is "sufficiently serious" if there exists "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury' in order to state an Eighth Amendment claim for denial of medical care." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson, 503 U.S. at 9).

 **9**  As there is no bright-line test to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are relevant to the objective prong's inquiry, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (quoting McGuckin v. Smith, 974 F.3d 132, 137 (2d Cir. 2000) ).

Under the subjective prong, the prisoner must demonstrate that the defendants were deliberately indifferent to his serious medical needs. The prisoner may do so when he demonstrates that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "[P]rison officials who actually knew of a substantial risk to inmate heath or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not avoided." Id. at 844 (citation and internal quotation marks omitted),

To assert a claim for deliberate indifference, an inmate must allege that: (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702. T he inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. Farmer, 511 U.S. at 835. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (footnotes omitted). "[M]ere disagreement over the proper treatment does not create a constitutional claim.... [s]o long as the treatment was adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703 (citation omitted). Thus,

> disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

Sonds v. St. Barnabas Hosp. Corr. Health Services, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### a. Objective Prong

White has failed to establish, with competent, admissible proof, that he suffered from a serious medical condition. White claims, without providing medical support, that he

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 61 of 328

2016 WL 11478222

sustained skull trauma and a brain hemorrhage. [14] See Dkt. No. 164 at 20, 21, 25. Construing the record in a light most favorable to White, White suffered a "split lip," "bloody nose," swelling, and jaw pain. See Dkt. No. 139-3.

[14]   White alleges that defendants "have offered no proof that plaintiff did not suffer any brain hemorrhages." Dkt. No. 164 at 20. White misinterprets defendants' burden on the motion for summary judgment. As plaintiff has asserted a deliberate indifference claim under the Eighth Amendment, the *plaintiff* bears the burden of proving that defendants acted with deliberate indifference to a serious medical need, not defendants. Wilson v. Seiter, 501 U.S. 294, 297 (1991).

**\*10** Courts in this Circuit, including within this District, have consistently held that "cuts, lacerations, bruises, and other superficial injuries," are not "sufficiently serious to support" a deliberate indifference claim. Goodwin v. Kennedy, No. CV 13-1774, 2015 WL 1040663, at \*12 (E.D.N.Y. Mar. 10, 2015) (citation omitted) (holding that "a split lip, which bled and became swollen ... [and] needed stitches" did not constitute serious medical condition); Latouche v. Tompkins, No. 09-CV-308 (NAM/RFT), 2011 WL 1103022, at \*14 (N.D.N.Y. Mar. 4, 2011) (finding that a four to five centimeter bruise, a two to three centimeter cut, a scratch on the plaintiff's face, and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), adopting Report-Recommendation, 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); Dallio v. Hebert, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (holding that two black eyes, bruising in kidney area, kick marks, open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain.") (collecting cases). Accordingly, plaintiff has failed to demonstrate that his split lip, bloody nose, and swelling to his face amounts to a serious medical condition. Dkt. No. 139-6 at 14-15.

**b. Subjective Prong**

Even assuming that White suffered from a "serious medical condition" sufficient to establish the objective element of the Eighth Amendment, White has failed to raise a question of material fact with respect to the subjective prong of the deliberate indifference analysis.

**i. Delay in Medical Treatment**

White claims that defendants Drake, Oropallo, Nurse White, Lashway, Rock, Uhler, and Lira intentionally denied or delayed access to medical care. See Dkt. No. 164 at 24.

As set out by the Eastern District,

> When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.

Brunskill v. County of Suffolk, No. 11-CV-586, 2012 WL 2921180, at \*3 (E.D.N.Y. July 11, 2012) (quoting Smith, 316 F.3d at 185) (internal quotation marks omitted). Courts have determined that a delay may constitute deliberate indifference when "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." Brunskill, 2012 WL 2921180, at \*3 (citation omitted).

In this instance, White's claims are not supported by the record. The evidence reveals that White was treated on June 28, 2010, just one day after the alleged incident with Drake. Although he claims that he was in pain, White has failed to produce any evidence that the one-day delay caused him to suffer "substantial harm." Further, he has not demonstrated that the one-day delay was an effort to punish him. Cf. Brunskill, 2012 WL 2921180, at \*3. Even where a plaintiff makes conclusory allegations of extreme pain, a very short delay in treatment is insufficient where the plaintiff cannot show adverse medical effects or demonstrable physical injury resulting from a minor delay in treatment. See, e.g., Evans

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 62 of 328

2016 WL 11478222

v. Manos, 336 F. Supp. 2d 255, 260, 262 (W.D.N.Y. 2004) (holding that subjective claims of pain, unaccompanied by substantial medical complications, are not sufficient to create a factual issue that the plaintiff was suffering from a "serious" and unmet medial need as "delay alone will not give rise to a constitutional claim unless the delay causes substantial harm.") (citation omitted). Consequently, White cannot establish that defendants were deliberately indifferent to his medical needs by delaying to treatment by one day. See Watts v. New York City Police Dep't, 100 F. Supp. 3d 314, 327 (S.D.N.Y. 2015) (finding that one-day delay in providing medical treatment did not constitute deliberate indifference); Brooks, 2014 WL 1292232, at *16 (holding that the plaintiff failed to establish the objective element against a defendant who did not allow the plaintiff to obtain immediate medical treatment after the defendant allegedly kicked open a bathroom door which struck the inmate in the head because the two-day delay in treatment did not involve a significant risk of degeneration of the plaintiff's medical condition or require the plaintiff to endure extreme pain); Williams v. Raimo, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at *5 (N.D.N.Y. Dec. 2, 2011) ("[P]laintiff failed to provide any evidence to suggest that he was substantially harmed from the one-day delay in treatment.") (citing Croft v. Hampton, 286 F. App'x 955, 959 (8th Cir. 2007) ).

### ii. Disagreements Regarding Treatment

*11  White claims that he was not (1) sent for treatment with a specialist, (2) provided "self-carry medication," (3) referred for a "skull examination," or (4) prescribed a timely MRI. See Dkt. No. 164 at 19, 24. Even assuming White's allegations to be true, "[i]nmates do not have a right to chose [sic] a specific type of treatment." Veloz v. New York, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004). A medical "professional's decision not to administer a specific medical test, regardless of a prisoner's disagreement with that decision, 'is a classic example of the type of medical judgment that is given judicial deference, and does not form the basis of a deliberate indifference claim.' " Curtis v. Williams, No. 11 Civ. 1186 (JMF), 2013 WL 1915447, at *7 (S.D.N.Y. May 9, 2013) (quoting Verley v. Goord, 02-Civ-1182 (PKC/DF), 2004 WL 526740, at *12 (S.D.N.Y. Jan. 23, 2004) and Estelle, 429 U.S. at 107) ("[A] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

With respect to the MRI, White concedes that an "MRI was actually taken," but asserts that there was a "nine month"

lag between when the test was ordered and when it was administered. Dkt. No. 164 at 25. To the extent that White attempts to assert a "deliberate indifference" claim against any defendant as a result of that delay, this claim is subject to dismissal. The record lacks any evidence that would permit a rational jury to conclude that any named defendant was responsible or personally involved in any decision regarding White's MRI. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Further, the medical records are void of any reference to radiological films. White's claims amount to a disagreement over treatment, and, as such, are insufficient to establish an Eighth Amendment claim. See Dkt. No. 164 at 19-20, 24; Sonds, 151 F.Supp.2d at 312; see Wright v. Conway, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("[The plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). White's "dissatisfaction" with his level of care and course of treatment does not support a finding of deliberate indifference. See Soto v. Wright, No. 11 Civ. 2289, 2013 WL 474291, at *5 (S.D.N.Y. Feb. 1, 2013) (citation omitted).

### iii. Apathy

White claims that Nurse White and Lashway made repetitive entries documenting his "pain and suffering" but their treatment was "cursory" and they displayed "apathy to [his] complaints." See Dkt. No. 164 at 25. In support of his argument that a display of apathy amounts to deliberate indifference, White cites Ruffin v. Deperio, 97 F. Supp. 2d 346 (S.D.N.Y. 2000). In Ruffin, the plaintiff, a diabetic inmate, sustained an injury in an accident in March 1994. Id. at 349. The plaintiff's condition deteriorated but he did not undergo surgery until July 1995. Id. In opposition to the defendants' motion for summary judgment, the plaintiff provided admissible evidence, including medical records, deposition testimony, and expert witness testimony that established that the defendants' "treatment" of the plaintiff consisted of nothing more than documenting his worsening condition, including "blackening of his toes" and rising glycerin levels, and providing ineffective medications. Id. at 353-54. The defendants argued that the plaintiff's allegations were merely a "disagreement over the course of treatment." Id. at 354. The Southern District held that, "[a] defendant

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 11478222

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 63 of 328

may not escape liability if the evidence shows that he 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.' " Id. (quoting Farmer, 511 U.S. at 842); Hudak v. Miller, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [the defendants'] part, this Court must deny summary judgment."). The Southern District held further that the defendants' "apathy or unconcern" for the plaintiff's plainly serious medical needs could amount to deliberate indifference and refused to award summary judgment, as the defendants' conduct was not remedied by the fact that the plaintiff was provided with some treatment and referred to outside specialists. See id. at 353.

**\*12** White's reliance upon Ruffin is misplaced. In this instance, White has failed to produce competent, admissible evidence that defendants' conduct was "a substantial departure from accepted professional judgment" and thereby placed him at risk for serious medical problems. From June 28, 2010 until August 31, 2010, White was seen by medical staff on approximately twenty-five occasions. See Dkt. No. 140 at 1-17. White's medical records lack any reference to complaints of specified pain. White continually complained of "general pains" and jaw pain, and was repeatedly treated by Nurse White, Lashway, and other members of the medical staff with Tylenol and Ibuprofen. See id. The record does not establish that White was ignored, that his pain increased in severity, or that his condition deteriorated. Unlike the defendants' failure to act in response to the "obvious symptoms of serious medical problems" in Ruffin, the treatment that Nurses White and Lashway provided does not rise to the level of apathy presented in Ruffin. See Taylor v. Kooi, No. 9:09-CV-1036 (FJS/DEP), 2012 WL 7784264, at \*11-12 (N.D.N.Y. Feb. 29, 2012) (declining to apply Ruffin, which preceded Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006), where there was no evidence that the plaintiff's condition deteriorated or that his condition was ignored during a five-year period when the plaintiff was provided X-rays, pain medication, and continued monitoring).

Accordingly, White has failed to establish facts sufficient to demonstrate that Nurse White or Lashway made a "substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to [the] plaintiff." Ruffin, 97 F. Supp. 2d at 355.

### iv. Failure to Prepare a Timely Injury Report

White alleges that Nurse White and Lashway failed to prepare a timely and accurate injury report. See Dkt. No. 139-6 at 21. The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test. See Harris v. Howard, 07-CV-1065 (TJM/GJD), 2009 WL 537550, at \*12 (N.D.N.Y. Mar. 3, 2009) (holding that the defendant nurses' failure to complete an injury report "is not an Eighth Amendment claim under any view of the facts."); Mitchell v. City of New York, 09-CV-3623, 2010 WL 3734098, at \*3 (S.D.N.Y. Sept. 23, 2010); Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) (finding a failure to fill out an injury report does not state an Eighth Amendment claim as "[a]n injury report is not medically necessary for a minimally civilized life."). Further, White does not present any evidence from which a reasonable fact finder could conclude that defendants acted with a "sufficiently culpable mental state." Salahuddin, 467 F.3d at 282. The record establishes that from June 28, 2010 until July 19, 2010, White requested and received Nurses Sick Call on ten separate occasions. Dkt. No. 139-4; Dkt. No. 140. The medical record belies White's claim that any defendant intentionally denied him medical care. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal of White's claim that defendants violated his Eighth Amendment rights through their deliberate indifference to his serious medical needs be granted.

### C. Supervisory Liability

White claims that Rock, Uhler, and Lira failed to adequately train or supervise their subordinates.[15] See Dkt. No. 139-6 at 22. White also asserts that Rock, Uhler, and Lira were deliberately indifferent to his serious medical needs because the defendants "should have known" that his condition was deteriorating because White "routinely encountered each [defendant] and they failed to act on his complaints." See Dkt. No. 164 at 26. White also claims that Lashway failed to properly train the nurses under her supervision. See Dkt. No. 139-6 at 22.

[15]     White's claims against Rock, Lira, and Uhler that are based upon their alleged failure to follow

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 11478222

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 64 of 328

DOCCS procedures and regulations are discussed *infra*.

Supervisory officials may not be held liable merely because they hold a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

**\*13** (1) [T]he defendant participated directly in the alleged constitutional violation,

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ). Section 1983 liability cannot be based upon a defendants' position in the prison hierarchy. See Colon, 58 F.3d at 873.

Conclusory claims that a supervisory official has failed to provide proper supervision and supervision, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in Colon. See Bridgewater v. Taylor, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011); White v. Fischer, No. 9:09-CV-0240 (DNH/DEP), 2010 WL 624081, at \*6 (N.D.N.Y. Feb. 18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); see also Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009) (affirming dismissal of complaint against a supervisor when the complaint did not allege any personal involvement and "lack[ed] any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ("Dismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege that [defendant] was in charge of the prison.' ") (quoting Williams v. Vincent, 508 F.2d 541, 546 (2d Cir. 1974) ).

### 1. Rock, Uhler, and Lira

White has failed to establish the personal involvement of Rock, Uhler, or Lira for the claims of excessive force or deliberate indifference to his serious medical needs. The record lacks any evidence suggesting that Rock, Uhler, or Lira directly participated, were involved in, or even aware of the alleged incident with Drake. White's attempt at establishing personal involvement based upon defendants' supervisory roles is inappropriate. See Colon, 58 F.3d at 873. The record is lacks evidence that White complained to any supervisory defendant, other than Oropallo, about the incident with Drake.

Similarly, with regard to the medical indifference claims against the above defendants, White refers generally to "encountering" defendants, but fails to establish, with admissible evidence, when the "encounters" took place or the sum and substance of any conversation that White had with these defendants regarding alleged constitutional violations. Without more, White's conclusory allegations are insufficient to defeat defendants' motion for summary judgment. Moreover, as discussed *supra*, summary judgment is warranted because White failed to raise an issue of material fact with respect to his Eighth Amendment claims related to the deliberate indifference to his serious medical needs. Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir. 2003) (" 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.") (quoting Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [the p]laintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisory liability.") (internal quotation marks and citation omitted).

**\*14** Accordingly, it is recommended that summary judgment be granted as to White's claims for supervisory liability and deliberate indifference against defendants Rock, Uhler, and Lira.

### 2. Lashway

White claims that Lashway "failed to properly train" nurses under her supervision. For the reasons set forth above in

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 65 of 328

2016 WL 11478222

section II (C)(1), White's supervisory claims against Lashway are also ripe for summary judgment.

Accordingly, the undersigned recommends that summary judgment be granted as to White's supervisory claims against Lashway.

### D. Remaining Claims [16]

[16]    The Court previously dismissed plaintiff's claim that Rock, Uhler, and Lira violated state laws or regulations regarding the preservation of facility videos and failed to "follow their own state regulations and directives." Dkt. No. 42 at 20.

### 1. Oropallo, Lashway and Nurse White

White claims that defendants Oropallo, Lashway, and Nurse White violated DOCCS Directive #4933 (Special Housing Units); DOCCS Directive #4065 (Reporting Injuries and Occupational Illnesses); DOCCS Directive #4059 (Response to Health Care Emergencies), 9 N.Y.C.R.R. §§ 7651.10(h), [17] and 7651.12(a). [18] See Dkt. No. 164 at 13-17, 23-24; Dkt. No. 170; Dkt. No. 178.

[17]    Section 7651.10 is entitled Ambulatory Health Care Services and provides, in pertinent part:
        (h) Where an inmate is punitively segregated in a cell or room apart from the general population of the facility for a period in excess of 24 hours, such inmate shall be visited by a member of the health care staff in accordance with paragraph (c) of subdivision (6) of section 137 of the Correction Law.
        9 NYCRR § 7651.10.

[18]    Section 7651.12 is entitled Medical Emergency Services and provides, in pertinent part:
        (a) Each correctional facility shall provide access to emergency services which permit the medical evaluation, treatment and disposition of medical emergency cases on a 24-hour basis each day.
        9 NYCRR § 7651.12.

"Violations of state law do not give rise to claims under 42 U.S.C. § 1983 ... [, and, m]ore specifically, a violation of a

DOCCS directive does not state a claim for a constitutional violation under § 1983." Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) (citation omitted); Cusamano v. Sobek, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases). Similarly, a state employee's violation of the New York Regulations and prison procedures, without more, does not give rise to liability under § 1983. See Cepeda v. Urban, No. 12-CV-0408, 2014 WL 2587746, at *5-6 (W.D.N.Y. June 10, 2014) (citations omitted); see also Austin v. Fischer, No. 09 Civ. 4812, 2010 WL 3187642, at *4 (S.D.N.Y. Aug. 11, 2010) (quoting Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 363 (2d Cir. 2004) ) (" '[s]tate procedures designed to protect substantive liberty interests entitled to protection under the federal constitution do not themselves give rise to additional substantive liberty interests.' "). A violation of a DOCCS directive, with out more is also not "a violation of any New York State law, statute, or regulation." Collins v. Ferguson, 10-CV-6350 (FPG), 2015 WL 1044359, at *7 (W.D.N.Y. Mar. 10, 2015) (citation omitted). As discussed supra, the undersigned recommends dismissal of all federal claims against Oropallo, Lashway, and Nurse White as White has failed to produce admissible establishing that these defendants violated White's constitutional rights. With respect to violations of DOCCS Directives, as it is well settled that violations of state law or DOCCS directives do not give rise to claims under section 1983, the undersigned also recommends summary judgment be granted on these state claims against Oropallo, Lashway, and Nurse White.

### 2. Drake

**\*15** White claims that Drake violated New York Correction Law § 137(5) and various sections of the DOCCS Employee Manual (Rev. 2013). [19] See Dkt. No. 164 at 13. New York Correction Law § 137(5) provides, in pertinent part, "[n]o inmate in the care or custody of the department shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection." N.Y. Corr. Law § 137(5).

[19]    White alleges violations of sections 2.1, 2.2, and 9.4 of the DOCCS Employee Manual. The DOCCS Employee Manual is not part of the record herein. According to plaintiff's iteration of the Manual, section 2.1 addresses the need to avoid

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 66 of 328

2016 WL 11478222

"unethical conduct" and section 2.2 provides that the employee is to avoid violation of any state or federal law, or any rule, regulation, or DOCCS directive. Dkt. No. 163 at 13. Plaintiff alleges that section 9.4 addresses the need to submit a "use of force report" by any employee who uses force against an inmate. Id.

White's New York Correction Law § 137(5) claim is barred pursuant to New York Correction Law § 24(1). Section 24(1) provides:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

New York Correction Law § 24(1); Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996). "Section 24 is not a bar to claims against corrections officers and employees under § 1983." Parris v. New York State Dep't of Corr. Services, 947 F. Supp. 2d 354, 356 (S.D.N.Y. 2013) (citing Haywood v. Drown, 556 U.S. 729, 740-41 (2009) ).

Courts look at the following factors to determine whether a defendant's action is within the scope of employment for purposes of determining applicability of section 24:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted) (holding that the defendant's alleged sexual harassment against another employee was not undertaken in the discharge of his duties and, thus, was beyond the protection afforded to officers under § 24).

The test to determine whether the defendants' actions fall within the scope of their employment is " 'whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of instructions.' " Cruz v. New York, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citation omitted). Conduct that is "purely for personal reasons unrelated to the employer's interests, ... which is a substantial departure from the normal methods of performing [an officer's or employee's] duties is not considered within the scope of employment." Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2013 WL 5347468, at *2 (W.D.N.Y. Sept. 23, 2013) (quoting Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 1995) ). "Custody and control of inmates and the maintenance of prison safety and security are the primary duties and responsibilities of correction officers." Cepeda v. Coughlin, 128 A.D.2d 995, 997 (N.Y. App. Div. 1987).

*16 Based upon the record herein, Drake was on duty in the correctional facility and performing his "basic job function(s)" at the time of the alleged constitutional violations. See Crosby v. Russell, No. 10-CV-0595 (TJM/ DEP), 2014 WL 3809129, at *6 (N.D.N.Y. Aug. 1, 2014) ("Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common[ ]' conduct by a DOCCS officer or sergeant."). " 'While they may allege constitutional deprivations and actions exceeding the scope of a correction[ ] officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against correction[ ] officers in their individual capacities.' " See Ames v. New York Dep't of Corr. & Cmty. Supervision, No. 9:12-CV-01487 (MAD), 2015 WL 4126326, at *14 (N.D.N.Y. Mar. 24, 2015) (quoting Crump v. Ekpe, No. 07-CV-1331, 2010 WL 502762, at *18 (N.D.N.Y. Feb. 8, 2010) ); Williams v. Fischer, 09-CV-1258 (NAM/DEP), 2011 WL 1812527, at *11 (N.D.N.Y. Feb. 9, 2011) (citing, inter alia, Baker v. Coughlin, 77 F.3d 12, 15-16 (2d Cir. 1996) ). Thus, White's pendent state law claims are barred by New York Corrections Law § 24.

Furthermore, for the reasons set forth supra, Drake's alleged violations of various sections of the DOCCS Employee Manual fail to give rise to a constitutional claim actionable

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 67 of 328

White v. Rock, Not Reported in Fed. Supp. (2016)
2016 WL 11478222

under § 1983. See Flynn v. Ward, No. 15-CV-1028 (GLS/ CFH), 2015 WL 8056060, at *4 (N.D.N.Y. Dec. 4, 2015) (dismissing the plaintiff's claim that the defendants violated the Facility Operations Manual because "[a] Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations."). Accordingly, the undersigned recommends summary judgment be granted on these claims against Drake.

## E. Qualified Immunity

Defendants argue that, even if White's claims are substantiated, they are nevertheless entitled to qualified immunity. Defendants assert that, "for all the reasons outlined above setting forth the medical treatment provided to Plaintiff during the time period in issue," defendants acted reasonably. Dkt. No. 139-3 at 19.

Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (citing Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) ). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194 (2001). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights are clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, with respect to Nurse White, Oropallo, Lashway, Rock, Uhler, and Lira, the second prong of the inquiry need not be addressed with respect to White's claims because, as discussed supra, it has not been shown that these defendants violated White's constitutional rights. Accordingly, in the alternative to a dismissal on the merits, it is recommended that defendants' motion on behalf of Nurse White, Oropallo, Lashway, Rock, Lira, and Uhler, on this ground be granted.

Having determined that White's excessive force claim presents triable issues of fact, the undersigned recommends denying the motion for summary judgment on the basis of qualified immunity as it relates to defendant Drake.

## III. CONCLUSION

**\*17  WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 139) be **GRANTED as to**:

(1) the Eighth Amendment medical indifference claims against all defendants;

(2) the supervisory liability claims against Rock, Uhler, Lira, and Lashway; and

(3) the state law claims against Drake, Nurse White, Lashway, and Oropallo; and it is further;

(4) all claims against defendants in their official capacities; or, in the alternative, that summary judgment be granted as to defendants Rock, Uhler, Lira, Lashway, Drake, White, and Oropallo on the basis of qualified immunity; and it is further

**RECOMMENDED** that White, Lashway, Oropallo, Rock, Uhler, and Lira be **dismissed** as defendants from this action; and it is further

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 139) be **DENIED as to**:

(1) the Eighth Amendment excessive force claim against defendant Drake; and

(2) defendants' qualified immunity defense as to defendant Drake; it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

White v. Rock, Not Reported in Fed. Supp. (2016)
2016 WL 11478222

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11478222

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 1248904

2016 WL 1248904
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John H. WHITE, Plaintiff,

v.

David ROCK, Superintendent; Donald Uhler,
Dep. of Security; Michael Lira, Dep. of Programs;
Raymond Drake; Jon Oropallo; Elizabeth
White; and Amber Lashway, Nurse, Defendants.

9:13-CV-392(GTS/CFH)
|
Signed 03/29/2016

**Attorneys and Law Firms**

JOHN H. WHITE, 08-A-3366, Southport Correctional
Facility, P.O. Box 2000, Pine City, New York 14871, Plaintiff,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: LOIS JIM,
ESQ., Assistant Attorney General, Albany, New York 12224,
Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by John H. White ("Plaintiff")
against the seven above-captioned employees of the New
York State Department of Corrections and Community
Supervision ("Defendants") pursuant to 42 U.S.C. § 1983,
are the following: (1) Defendants' motion for summary
judgment; (2) United States Magistrate Judge Christian
F. Hummel's Report-Recommendation recommending that
Defendants' motion be granted in part and denied in part;
and (3) Plaintiff's Objections to the Report-Recommendation.
(Dkt. Nos. 139, 186, 189.) For the reasons set forth
below, Magistrate Judge Hummel's Report-Recommendation
is accepted and adopted in its entirety; all of the claims
asserted in Plaintiff's Complaint are dismissed except for his
Eighth Amendment excessive force claim against Defendant
Drake, which survives Defendants' motion.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Hummel's Report-
Recommendation**
Generally, in his Report-Recommendation, Magistrate Judge
Hummel rendered the following recommendations: (1) that
Plaintiff's claims for monetary damages against Defendants in
their official capacities be dismissed pursuant to the Eleventh
Amendment; (2) that Plaintiff's Eighth Amendment excessive
force claim against Defendant Drake survive Defendants'
motion due to a genuine dispute of material fact as to
both the objective and subjective prongs of the standard
governing that claim; (3) that Plaintiff's Eighth Amendment
deliberate indifference claim be dismissed based on his failure
to adduce admissible record evidence establishing either the
objective or subjective prongs of the standard governing
that claim; (4) that Plaintiff's supervisory-liability claims
be dismissed based on his failure to adduce admissible
record evidence establishing the supervisory Defendants
personal involvement in the Eighth Amendment deliberate
indifference violation alleged; (5) that Plaintiff's state law
claims be dismissed as not actionable under 42 U.S.C. §
1983 and/or as barred by New York Correctional Law §
24(1); and (6) that, in the alternative, Plaintiff's claims against
Defendants Rock, Uhler, Lira, Oropallo, White, and Lashway
be dismissed because, based on the current record, they are
protected from liability as a matter of law based on the
doctrine of qualified immunity. (Dkt. No. 186, Part II.)

**B. Plaintiff's Objections to the Report-
Recommendation**
Generally, in his Objections, Plaintiff argues that the Court
should reject the Report-Recommendation for the following
reasons: (1) Magistrate Judge Hummel erroneously found
that Plaintiff provoked Defendant Drake; (2) by refusing to
comply with Plaintiff's request to contact the medical staff to
treat Plaintiff's injuries, Defendant Drake not only failed to
perform his professional duties but interfered with his medical
treatment; (3) Defendant Drakes statement to Plaintiff
following the attack (i.e., that he kicked the door which
struck Plaintiff's head "Because I can") further demonstrates
Drake's professional misconduct; (4) by refusing to comply
with Plaintiff's request to contact the medical staff to treat
Plaintiff's injuries, Defendant Drake similarly interfered
with his medical treatment; (5) by failing to document
Plaintiff's injuries and failing to arrive at Plaintiff's cell
in a timely fashion, Defendant White not only failed to
perform his professional duties but interfered with his

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 1248904

medical treatment; (6) by failing to arrive at Plaintiff's cell in a timely fashion, Defendant Oropallo not only failed to perform his professional duties but interfered with his medical treatment; (7) Magistrate Judge Hummel improperly overlooked all of the shortcomings of Defendants' motion, improperly considered the video evidence belatedly provided by Defendants, and improperly failed to sanction Defendants for spoliation of evidence; and (8) Defendants' colleagues have improperly confiscated Plaintiff's records, and the Court has improperly let that confiscation occur. (*See generally* Dkt. No. 189.)

## II. STANDARD OF REVIEW

**\*2** When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence. ..." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]   *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last

page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]   *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error*

review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

[3]     *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *8 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

[4]     *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3**  After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Hummel's thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its

entirety for the reasons stated therein. To those reasons, the Court adds the following three points.

First, Plaintiff's objections to the Report-Recommendation (described above in Part I.B. of this Decision and Order) consist largely if not exclusively of reiterations of arguments previously asserted in his opposition memorandum of law. (*Compare* Dkt. No. 189 at 2-8 [Plf.'s Obj.] *with* Dkt. No. 164 [Plf.'s Opp'n Memo. of Law at Point III with regard to Plf.'s Eighth Amendment claim] *and* Dkt. Nos. 170, 178 [Plf.'s Suppl. Opp'n Memo of Law with regard to professional violations].) As a result, most if not all of the "challenged" portions of the Report-Recommendation are entitled to only a clear-error review, which they easily survives. The remainder of the challenged portions of the Report-Recommendation survive a *de novo* review for the reasons stated by Defendants and Magistrate Judge Hummel.

Second, the Court notes that Plaintiff's argument that corrections officers failed to properly preserve video evidence appears to have been rejected by the Court in its Decision and Order of January 24, 2014. (Dkt. No. 42 at Part III.C.10.a.) Moreover, an alternative reason for rejecting Plaintiff's discovery argument (*see* note 13 of Dkt. No. 186) is that he has not satisfied the requirements of a request made pursuant to Fed. R. Civ. P. 56(d). Cornell v. Kapral, 09-CV-0387, 2011 WL 94063, at *4 & n.2 (N.D.N.Y. Jan. 11, 2011) (Suddaby, J.), *aff'd*, 483 F. App'x 590, 591-92 (2d Cir. 2012).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 186) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 139) is **GRANTED in part** and **DENIED in part** such that all of the claims asserted in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED** except for Plaintiff's Eighth Amendment excessive force claim asserted against Defendant Drake, which **SURVIVES** Defendants' motion; and it is further

**ORDERED** that Pro Bono Counsel be appointed for Plaintiff for purposes of trial only (and not for any appeal) and that, upon assignment of Pro Bono Counsel, a final pretrial conference with counsel be scheduled, at which counsel for both parties shall appear with settlement authority.

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 72 of 328

2016 WL 1248904

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1248904

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2017)

2017 WL 9511096

2017 WL 9511096
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alonzo ROSS, Plaintiff,

v.

Carl J. KOENIGSMANN, et al., Defendants.

Civ. No. 9:14-CV-1321 (GTS/DJS)
|
Signed 08/16/2017

**Attorneys and Law Firms**

ALONZO ROSS, Plaintiff, Pro Se, 12-B-3789, Attica
Correctional Facility, Box 149, Attica, New York 14011.

HON. ERIC T. SCHNEIDERMAN, Attorney General of
the State of New York, OF COUNSEL: CHRISTOPHER J.
HUMMEL, ESQ., Assistant Attorney General, Attorney for
Defendants, The Capitol, Albany, New York 12224.

<u>**REPORT-RECOMMENDATION and ORDER**</u>

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** This matter returns to the Court on Defendants Ventaka
Mannava and Amy Ferguson's second Motion for Summary
Judgment, filed pursuant to FED. R. CIV. P. 56. Dkt. No. 90,
Defs.' Mot. Summ. J. Defendants previously filed a Motion
for Summary Judgment, and in a Report-Recommendation
and Order, dated September 8, 2016 ("September Report-
Recommendation"), this Court recommended that that
Motion be granted in all respects, except as to Plaintiff's
Eighth Amendment medical indifference claim against
Defendants Mannava and Ferguson. Dkt. No. 79, Rep.-Rec.
& Order, dated Sept. 8, 2016. That recommendation was
accepted and adopted by the Honorable Glenn T. Suddaby,
Chief United States District Judge, in a Decision and Order,
dated September 28, 2016. Dkt. No. 84. Chief Judge Suddaby,
however, granted Defendants leave to file a second Motion
for Summary Judgment as to Plaintiff's surviving claim. *Id.*
at p. 10. Defendants Mannava and Ferguson have now filed a
second Motion, which seeks to dismiss Plaintiff's remaining
claim. Defs.' Mot. Summ. J. Plaintiff opposes the Motion.
Dkt. Nos. 94, Pl.'s Resp, & 101, Pl.'s Suppl. Resp. For the
reasons that follow, the Court recommends that Defendants'
Motion be **granted**.

## I. LEGAL STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." The moving party bears the burden to demonstrate
through "pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if any,"
that there is no genuine issue of material fact. *F.D.I.C. v.
Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or
denials of the facts submitted by the movant. FED. R. CIV.
P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d
Cir. 2003) ("Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment when
the moving party has set out a documentary case."); *Rexnord
Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.
1994). To that end, sworn statements are "more than mere
conclusory allegations subject to disregard ... they are specific
and detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements is
better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289
(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)
and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages, Inc.
v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.
1998). "[T]he trial court's task at the summary judgment
motion stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact to be
tried, not to deciding them. Its duty, in short, is confined at this
point to issue-finding; it does not extend to issue-resolution."
*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d
1219, 1224 (2d Cir. 1994). Furthermore, where a party is
proceeding *pro se*, the court must "read [his or her] supporting
papers liberally, and ... interpret them to raise the strongest
arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d
787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169,
173 (2d Cir. 1995). Nonetheless, mere conclusory allegations,
unsupported by the record, are insufficient to defeat a motion

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2017)

2017 WL 9511096

for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. DISCUSSION

### A. Eighth Amendment

**\*2** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects

an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996) ); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### B. Relevant Background

**\*3** The Court herein summarizes the factual and procedural background relevant to Plaintiff's remaining claim. For further background on this action, the Court makes reference to its summary of the material facts in its September Report-Recommendation. Sept. Rep.-Rec. at pp. 2-10.

Plaintiff was transferred to Mid-State Correctional Facility ("Mid-State") on April 5, 2013. Dkt. No. 90-1, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF") at ¶ 13. At that time, Plaintiff was suffering from a number of chronic medical conditions, including neuropathy, lower-back pain, and sciatic nerve pain. *Id.* Plaintiff was receiving Neurontin to treat his pain symptoms resulting from these conditions,

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2017)

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 75 of 328

2017 WL 9511096

at his admission health screening, Defendant Nurse Practitioner ("NP") Ferguson continued Plaintiff's Neurontin prescription. *Id.* at ¶¶ 13-14.

Plaintiff received this prescription until October 21, 2013, when NP Ferguson discontinued the prescription after being informed by another nurse that Plaintiff was misusing the medication by "cheeking" it. *Id.* at ¶ 19. NP Ferguson was informed that Plaintiff had placed the medication in his mouth, quickly drank the cup of water, opened his mouth, and then walked away from his cell window without permitting a full inspection by the nurse to determine that he had properly taken the medication. Dkt. No. 90-3, Decl. of Amy Ferguson, dated Sept. 21, 2016 ("2d Ferguson Decl."), at ¶ 13. When Plaintiff was called back to the cell window, he initially refused, but eventually did open his mouth and revealed that he had secreted the medication under his tongue. *Id.* The nurse recorded this incident in Plaintiff's medical records. Dkt. No. 32-4, Decl. of Amy Ferguson, dated Jan. 27, 2016, Ex. I. On October 28, 2013, Defendant Dr. Mannava affirmed the decision to discontinue Plaintiff's Neurontin prescription after discussing the incident with the nurse. Defs.' SMF at ¶ 6.

According to NP Ferguson, she discontinued Plaintiff's Neurontin prescription for several reasons: (1) a patient's misuse of a medication poses a health risk to the patient; (2) a patient's misuse of a medication poses a risk to the security of the facility and the health of other inmates if the patient were to attempt to sell the medication to other inmates; (3) a patient's misuse of a medication indicates that the patient may not actually need the medication; (4) Ferguson was aware that Plaintiff had a history of cheeking medications; and (5) Plaintiff had been prescribed other medications to treat his chronic pain. *Id.* at ¶ 32.

Plaintiff, on the other hand, claims that the report that he attempted to cheek his medication was "fabricated." Dkt. No. 94, Pl.'s Rule 7.1 Counter-Statement of Material Facts ("Pl.'s Counter-SMF") at ¶ 19. Plaintiff further claims that his medication was given to him crushed and dissolved in a cup of water, and it was therefore impossible for him to cheek the medication. *Id.* at ¶¶ 21 & 23.

In its September Report-Recommendation, this Court found, at the objective prong of the Eighth Amendment claim, that there was a genuine issue of material fact as to whether the discontinuation of Plaintiff's Neurontin prescription was a "sufficiently serious" deprivation of adequate care. Sept. Rep-Rec. at p. 25. In this analysis, the Court considered Plaintiff's

testimony that he suffered withdrawals, worsening pain, and difficulty walking after his prescription was discontinued. *Id.*

**\*4** The Court also found a disputed issue of material fact at the subjective prong. *Id.* at p. 26. Specifically, the Court noted that Plaintiff's claim that his Neurontin was crushed and dissolved in water appeared to be supported by his medical records, thus lending support to Plaintiff's contention that it would have been impossible for him to have cheeked his Neurontin. *Id.* Defendants did not address or explain whether Plaintiff's Neurontin was in fact dissolved in water. *Id.* Thus, the Court found that there was "a disputed issue of material fact as to whether Defendants discontinued Plaintiff's Neurontin prescription pursuant to a medical judgment or based on other, non-medical reasons." *Id.*

### C. Analysis

In the present Motion, Defendants seek to clarify Plaintiff's medical records. Dkt. No. 90-4, Defs.' Mem. of Law at pp. 2-3. Defendants argue that Plaintiff's medical records in fact contradict his assertions and establish that they did not act with deliberate indifference in discontinuing his Neurontin prescription. [1] *Id.* at pp. 10-12.

[1]  Defendants argue, at the subjective prong, that they did not act with deliberate indifference, but do not address whether the discontinuation of Plaintiff's Neurontin constituted a sufficiently serious deprivation of care. The Court therefore will not re-visit its analysis in that regard. Sept. Rep.-Rec. at p. 25.

Plaintiff's medical records indicating his Neurontin prescription, dated May 9, 2013 and June 27, 2013, contain the notation "crush." *See* Ferguson Decl., Exs. C & E. As Defendant NP Ferguson explains, "crush" indicates that the nursing staff is to provide the medication in a crushed or powdered form. 2d Ferguson Decl. at ¶ 4. The inmate receives the crushed medication and a cup of water, and then is to take the medication with the water, and allow the nurse to conduct a visual inspection to ensure that the medication has been properly taken. *Id.* Medication is delivered in this manner in order that staff may easily detect when an inmate is attempting to cheek the medication. *Id.* at ¶ 12. Alternatively, a prescription may be noted as "crushed and dissolved" or "liquefied." *Id.* at ¶ 5. A medication administered in this

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 76 of 328

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2017)

2017 WL 9511096

manner is crushed and dissolved in a cup of water before being given to the inmate. *Id.* If a medication is notated "crushed," however, it may not be delivered "crushed and dissolved." *Id.* at ¶ 8.

In opposition, Plaintiff argues even if his medical records only contain the notation "crush," his Neurontin prescription was always delivered "crushed and dissolved" in water. Pl.'s Counter-SMF at ¶ 21. Plaintiff again argues that his medical records were fabricated in order to discontinue his Neurontin prescription. Dkt. No. 94-1, Pl.'s Mem. of Law at p. 6.

The supplemented record is sufficient to establish that Defendants NP Ferguson and Dr. Mannava did not act with deliberate indifference in discontinuing Plaintiff's Neurontin prescription. The decision to discontinue an inmate's medication where there is evidence that the inmate is misusing the medication does not constitute deliberate indifference. *See Sanchez v. Docs Med. Dep't*, 2016 WL 5956072, at *4 (W.D.N.Y. Aug. 16, 2016); *Jones v. Tompkins*, 2016 WL 4211610, at *7 (W.D.N.Y. Aug. 10, 2016); *Cole v. Pang Lay Kooi*, 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013); *Josey v. Rock*, 2013 WL 1500435, at *9 (N.D.N.Y. Mar. 19, 2013); *see also Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."). Here, Plaintiff's medical records, supported by NP Ferguson's Second Declaration, establish that Plaintiff's Neurontin prescription was discontinued after he was caught cheeking it. Plaintiff's conclusory assertion that his records were "fabricated" is insufficient to create an issue of material fact. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005) ("The law is 'well-established that conclusory statements, conjecture, or speculation' are inadequate to defeat a motion for summary judgment."). [2]

[2] Plaintiff also argues that Defendants' Motion is unsupported insofar as they do not offer a sworn affidavit of the unidentified nurse who allegedly caught Plaintiff cheeking his Neurontin. *See* Pl.'s Mem. of Law at pp. 6, 11, & 14. However, contemporaneous medical records are properly considered in ruling on a summary judgment motion. *See, e.g., Sanchez v. Docs Med. Dep't*, 2016 WL 5956072, at *5. Medical records, although hearsay, "can be admissible under Federal Rule of Evidence 803(6), provided

that they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated." *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995). The medical record Plaintiff challenges is introduced as an Exhibit to the Declaration of NP Ferguson, who has personal knowledge of the record, as she prepared it. Ferguson Decl. at ¶ 19. To the extent Plaintiff is challenging the authenticity of this particular record, that objection is not properly raised since Plaintiff himself relied upon his ambulatory health records in opposing Defendants' first Motion for Summary Judgment, and in support of his Cross-Motion for Summary Judgment, without objecting to their authenticity. *See generally* Dkt. No. 64-3; *see also Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) ("Mr. Parks argues that, without any foundation for the exhibits' admissibility, the Court cannot consider Defendants' medical records. The Court disagrees. Even if the exhibits are not properly authenticated under Rule 803(6)(D), Mr. Parks relied on Defendants' medical records in opposing Defendants' summary judgment motion without objecting to their authenticity.").

**\*5** Accordingly, the Court recommends that Defendants' Motion be **granted**. [3]

[3] Because the Court recommends that summary judgment be granted on the merits of Plaintiff's remaining claims, it does not reach Defendants' alternative argument that they are entitled to qualified immunity.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 90) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

2017 WL 9511096

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[4]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9511096

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ross v. Mannava, Not Reported in Fed. Supp. (2017)

2017 WL 4338883

2017 WL 4338883
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alonzo ROSS, Plaintiff,
v.
Dr. Ventaka MANNAVA; and Amy
Ferguson, Nurse Practitioner, Defendants.

9:14-CV-1321 (GTS/DJS)
|
Signed 09/29/2017

**Attorneys and Law Firms**

ALONZO ROSS, 12-B-3789, Attica Correctional Facility,
Box 149, Attica, New York 14011, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Attorney General for
the State of New York, The Capitol, Albany, New York 12224,
Counsel for Defendants.

**<u>DECISION and ORDER</u>**

HON. GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Alonzo Ross ("Plaintiff") against
the two above-captioned employees of the New York State
Department of Corrections and Community Supervision
at Mid-State Correctional Facility ("Defendants"), are
(1) United States Magistrate Judge Daniel J. Stewart's
Report-Recommendation recommending that Defendants'
motion for summary judgment be granted and Plaintiff's
Complaint be dismissed, and (2) Plaintiff's Objection to
the Report-Recommendation. (Dkt. Nos. 111, 114.) For the
reasons set forth below, Magistrate Judge Stewart's Report-
Recommendation is accepted and adopted in its entirety,
Defendant's motion is granted, and Plaintiff's Complaint is
dismissed.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Stewart's Report-
Recommendation**

Generally, in his Report-Recommendation, Magistrate Judge
Stewart recommended that Plaintiff's Eighth Amendment
claim of deliberate medical indifference arising from
Defendants' discontinuance of his Neurontin medication
based on his asserted misuse of the medication (which is
the sole remaining claim in this action) should be dismissed
because (1) a defendant's decision to discontinue an inmate's
medication where there is evidence that the inmate is misusing
the medication does not demonstrate that the defendant
acted with the requisite culpable mental state which is
similar to that of criminal recklessness, (2) here, Plaintiff's
medical records, supported by Defendant Ferguson's Second
Declaration (including Plaintiff's medical record of October
21, 2013), establish that (a) Plaintiff's Neurontin medication
was given to him in "crushed" form, rather than "crushed and
dissolved" or "liquefied" form, in order that staff could easily
detect if Plaintiff was attempting to "cheek" the medication,
and (b) Plaintiff's Neurontin medication was discontinued
after he was caught cheeking it, and (3) Plaintiff's conclusory
assertion that his medical records were "fabricated" is
insufficient to create a genuine issue of material fact on the
subject. (Dkt. No. 111, at Part II.C.)

**B. Plaintiff's Objection to the Report-
Recommendation**

Generally, liberally construed, Plaintiff's Objection argues
that a genuine dispute of material fact still exists as to whether
he was caught cheeking Neurontin for two reasons: (1) in
note 2 of Magistrate Judge Stewart Report-Recommendation
(in which rejects Plaintiff's challenge to the authenticity of
a medical record, dated October 21, 2013, because Plaintiff
himself previously relied on that record), Magistrate Judge
Stewart "obviously missed the mark" in that Plaintiff is not
simply challenging the *authenticity* of the medical record but
arguing that Defendant Ferguson *fabricated* that record; and
(2) more specifically, Plaintiff's medical record dated October
21, 2013, lacks reliability due to the fact that (a) Defendant
Ferguson did not actually observe the administration of
Neurontin to Plaintiff in crushed form on that date or his
cheeking of it, and (b) the truthfulness of the record (which
she drafted) is undermined by her self-interest, which is not
diminished by the fact that such records are made pursuant to
strict instructions. (Dkt. No. 114, at Parts C and D.)

**II. STANDARD OF REVIEW**

**\*2** When a *specific* objection is made to a portion of a
magistrate judge's report-recommendation, the Court subjects
that portion of the report-recommendation to a *de novo*

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 79 of 328

review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]    *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am.*

*World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

[3]    *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3).."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord,*

Case 9:18-cv-00077-GLS-TWD  Document 111  Filed 03/06/20  Page 80 of 328

Ross v. Mannava, Not Reported in Fed. Supp. (2017)

2017 WL 4338883

*Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4  *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Stewart's thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Stewart employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds the following three points.

First, the crux of Plaintiff's Objection is his argument that his medical record dated October 21, 2013, lacks reliability due to the fact that (a) Defendant Ferguson did not actually observe the administration of Neurontin to Plaintiff in crushed form on that date or his cheeking of it, and (b) the truthfulness of the record (which she drafted) is undermined by her self-interest. *See, supra,* Part I.B. of this Decision and Order. To the extent his Objection asserts this argument, the assertion is simply a reiteration of an argument previously asserted by Plaintiff in his underlying opposition memorandum of law. (*Compare* Dkt. No. 114, at Parts C and D [Plf.'s Obj.] *with* Dkt. No. 94, Attach. 1, at 13, 16-17 [attaching pages "11," "14" and "15" of Plf.'s Opp'n Memo. of Law, arguing that the medical record of Oct. 1, 2013, is self-serving and

not based on Def. Ferguson's personal knowledge].) As a result, Magistrate Judge Stewart's finding of reliability as to Plaintiff's medical record of October 21, 2013, is subject to only a clear-error review. *See, supra,* Part II of this Decision and Order. This finding easily survives that review, for the reasons stated by Magistrate Judge Stewart. (Dkt. No. 111, at 8-9 & n.2.)

Second, relatedly, even when construed with the utmost of special leniency, Plaintiff's Objection fails to specifically challenge Magistrate Judge Stewart's finding that the record before him establishes that Plaintiff's Neurontin medication was given to him in "crushed" form, rather than "crushed and dissolved" or "liquefied" form, in order that staff could easily detect if he was attempting to "cheek" the medication. (*Compare* Dkt. No. 114 [Plf.'s Obj.] *with* Dkt. No. 111, at 8-9 [Report-Recommendation].) For example, conspicuously missing from Plaintiff's Objection is even an *argument* that (1) those portions of Plaintiff's medical records that say "crush" (and not "crush dissolve") were fabricated, and/or (2) Defendant Ferguson was lying in Paragraphs 4, 5, 8, and 12 of her Second Declaration (when she testified that Plaintiff's Neurontin medication was given to him in "crushed" form, rather than "crushed and dissolved" or "liquefied" form, in order that staff may easily detect if Plaintiff was attempting to "cheek" the medication). (*See generally* Dkt. No. 114.) As a result, the finding in question (i.e., that the record before Magistrate Judge Stewart establishes that Plaintiff's Neurontin medication was given to Plaintiff in "crushed" form, rather than "crushed and dissolved" or "liquefied" form, in order that staff may easily detect if Plaintiff was attempting to "cheek" the medication) is subject to only a clear-error review. *See, supra,* Part II of this Decision and Order. Again, this finding easily survives that review, for the reasons stated by Magistrate Judge Stewart. (Dkt. No. 111, at 8-9 & n.2.)

**\*4** Third, even if the Court were to subject the entirety of the Report-Recommendation to *a de novo* review, the Report-Recommendation would survive that review. With regard to Plaintiff's argument that his medical record of October 21, 2013, cannot be relied on because Defendant Ferguson did not actually observe the administration of Neurontin to Plaintiff in crushed form on that date or his cheeking of it, that argument fails because, in addition to the Fed. R. Civ. P. 803(6) point correctly made by Magistrate Judge Stewart, the fact remains that the standard for admissibility under Fed. R. Civ. P. 56 is merely whether the evidence can "be presented in a form that would be admissible in evidence" (which, here, the evidence can be). Fed. R. Civ. P. 56(c)(2). Furthermore, with regard to

2017 WL 4338883

Plaintiff's argument that his medical record of October 21, 2013, cannot be relied on because Defendant Ferguson had a motive to lie about it, that argument fails because, in addition to the prior-reliance point correctly made by Magistrate Judge Stewart, the fact remains that a non-movant cannot create a genuine dispute of material fact for purposes of a motion for summary judgment by simply challenging the credibility of a declarant. [5] Finally, even if the Court were to look beyond Plaintiff's Objections and *sua sponte* scour the record for a genuine dispute of material fact, the Court would be unable to find one: most notably, Plaintiff's assertion that his medication was given to him in dissolved form (despite what his medical records state) is not supported by a citation to admissible record evidence. (Dkt. No. 94, at ¶ 21 [Plf.'s Rule 7.1 Response].)

[5]     *See, e.g., McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness'] honesty"); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp.2d 378, 391 (S.D.N.Y. 2012) ("Neither conclusory assertions,

nor contentions that the affidavits supporting the motion are not credible, create a genuine issue of material fact."); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378 (S.D.N.Y. 1979) ("[A] naked attack upon the affidavits of a moving party is, without more, insufficient to place the credibility of the affiant in issue.").

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 111) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 90) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4338883

---

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Darnell v. Pineiro, 2nd Cir., February 21, 2017

2013 WL 4026842
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Antonio COLE, Plaintiff,

v.

PANG LAY KOOI, Doctor, Auburn
Correctional Facility; et al., Defendants.

No. 9:11–CV–0004 (LEK/RFT).
|
Aug. 6, 2013.

**Attorneys and Law Firms**

Antonio Cole, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, David L. Cochran, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*ORDER*

LAWRENCE E. KAHN, District Judge.

 **\*1**  This matter comes before the Court following a Report–
Recommendation filed on July 19, 2013, by the Honorable
Randolph F. Treece, U.S. Magistrate Judge, pursuant to 28
U.S.C. § 636(b) and Northern District of New York Local
Rule 72.3(d). Dkt. No. 71 ("Report–Recommendation").

Within fourteen days after a party has been served with
a copy of a magistrate judge's reportrecommendation, the
party "may serve and file specific, written objections to
the proposed findings and recommendations." FED. R. CIV.
P. 72(b); L.R. 72.1(c). A court is to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b). Where, however, an objecting
"party makes only conclusory or general objections, or simply
reiterates his original arguments, [a court] reviews [a report-
recommendation] only for clear error." Farid v. Bouey, 554
F.Supp.2d 301, 306 (N.D.N.Y.2008) (quoting McAllan v. Von
Essen, 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)); see also
Brown v. Peters, No. 95–CV–1641, 1997 WL 599355, at

*2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28 U.S.C.
§ 636(b)(1).

Plaintiff filed Objections to the Report–Recommendation
on July 31, 2013. Dkt. No. 69 ("Objections"). In his
Objections, Plaintiff states only that he objects to the Report–
Recommendation in its entirety. *Id.* Such a broad, generalized
objection warrants clear-error, rather than *de novo,* review.
See Farid, 554 F.Supp. at 306. After a thorough review
of the Report–Recommendation and the record, the Court
determines that the Report–Recommendation is not clearly
erroneous.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 71)
is **APPROVED** and **ADOPTED** in its entirety; and it is
further

**ORDERED,** that Defendants' Motion (Dkt. No. 61) for
summary judgment is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is
DISMISSED; and it is further ORDERED, that the Clerk of
the Court serve a copy of this Order upon the parties to this
action.

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Antonio Cole brings this civil rights action,
pursuant to 42 U.S.C. § 1983, alleging that Defendants
violated his Eighth and Fourteenth Amendment rights by
discontinuing his prescription pain reliever after five doses
of the medication were found in his cell. *See generally* Dkt.
No. 14, Am. Compl. Defendants now move for Summary
Judgment. Dkt. No. 61. Plaintiff opposes the Motion. Dkt.
No. 66. For the reasons that follow we recommend that
Defendants' Motion for Summary Judgment be **GRANTED.**

**I. STANDARD OF REVIEW**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [FED. R. CIV. P. 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest

arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Background

At all times relevant to the Amended Complaint, Plaintiff was an inmate at Auburn Correctional Facility ("ACF"). Dkt. No. 66, Antonio Cole Aff. (hereinafter "Cole Aff. 1"), [1] dated Dec. 5, 2012, at ¶ 1. In February of 2008, Plaintiff was diagnosed with "disc protrusion/herniation at the L4–5 level with moderate to severe, if not severe, central stenosis ... [and] [d]isc bulge at the L3–4 level." Am. Compl., Ex. A, MRI Imaging Report (hereinafter "MRI Rep."), dated Feb. 12, 2008. Prior to June 17, 2010, Plaintiff received various forms of treatment at ACF for his back pain, including prescription and over-the-counter medications, physical therapy, an extra mattress, x-rays, an MRI, and steroid injections. Cole Aff. 1 at ¶¶ 3–7. By June 17, 2010, Plaintiff's treatment regiment included the prescription drugs Neurontin and Ultram. *Id.* at ¶ 8.

[1]    Plaintiff includes two documents entitled "Affidavit" in his Opposition papers. We refer here to the Affidavit at Docket Number 66, and not the Affidavit at Docket Number 66–1.

**\*3** On June 17, 2010, guards at ACF found five white pills in an unlabeled medication bag in Plaintiff's cell, that were later identified as Ultram by a nurse. *Id.* Defendant Dr. Kooi was telephoned, and Dr. Kooi ordered Plaintiff's Ultram prescription be discontinued. *See* Dkt. No. 62–2, Portions of Plaintiff's Ambulatory Health R. (hereinafter "AHR") at p. 20.[2] The following morning, June 18, a nurse gave Plaintiff his Neurontin, and informed him that his Ultram prescription had been discontinued because of the pills that were found in his cell. Cole Aff. 1 at ¶ 9. Later that evening, Plaintiff experienced trouble sleeping, increased pain in his lower back, and pain in his right testicles and right leg. By June 28, 2010, Plaintiff was "unable to put on [his] shoes, stand up for the count, ... [or] sit without experiencing extreme pain." *Id.* at ¶ 10.

2    The AHR is not paginated, therefore, we reference the page numbers automatically assigned by the Court's Case Management/Electronic Case Filing System.

On July 7, 2010, Plaintiff informed Defendant Nurse O'Connor–Ryerson that he "was in extreme pain and that [he] needed the ultram[ ] reinstated, if not, [he] would be in bad shape." Defendant O'Connor–Ryerson later sent Plaintiff Tylenol for his pain. *Id.* at ¶¶ 12–13. Thereafter, Plaintiff regularly complained to ACF medical staff that he was experiencing severe pain and/or that he needed his Ultram prescription to be reinstated. *See, e.g.,* AHR at pp. 10–19. Between June 17, 2010, when Plaintiff's Ultram prescription was discontinued, and April 12, 2011, the date Plaintiff filed his Amended Complaint, his treatment at ACF included an extra mattress, Neurontin, Tylenol, and a TENS unit. *See generally id.* at pp. 10–20.

On June 28, Plaintiff filed a grievance claiming that the discontinuation of his Ultram constituted deliberate indifference to his serious medical needs. Cole Aff. 1 at ¶ 11; Am. Compl., Ex. C, Inmate Grievance, dated June, 28, 2010. That grievance was denied and Plaintiff appealed the decision. Eventually, Plaintiff's grievance was reviewed and ultimately denied by Defendant Graham, ACF's Superintendent. Cole Aff. 1 at ¶¶ 14 & 16. In addition, Plaintiff wrote a letter directly to Defendant Wright the Chief Medical Officer at the Department of Corrections and Community Supervision ("DOCCS"). However, Defendant Wright did not respond personally to Plaintiff's letter. Cole Aff. 1 at ¶¶ 14 & 17; Am. Compl., Ex. D.

**B. Plaintiff's Claims**

Plaintiff claims that (1) Defendant Dr. Kooi was deliberately indifferent towards his serious medical needs because Dr. Kooi chose to discontinue his Ultram prescription, resulting in a course of treatment that did not adequately control Plaintiff's pain, (2) Defendant Nurse O'Connor–Ryerson subjected him to an unreasonable risk of future harm by refusing to reinstate his Ultram prescription, and (3) Defendants Dr. Wright and Superintendent Graham were liable in their supervisory capacities for failing to remedy the alleged violations after he brought them to their attention. Am. Compl. at First–Fourth Causes of Action.

*1. Eighth Amendment*

**\*4** Plaintiff's claims against Defendants Dr. Kooi and Nurse O'Connor–Ryerson fall under the Eighth Amendment. [3] To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency' that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

3    To the extent Plaintiff attempts to bring his medical indifference claims under the due process clause of the Fourteenth Amendment, *see e.g.,* Am. Compl., First Cause of Action at ¶ 8, we note that "[a] convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.' " *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (citing *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hathaway v. Coughlin ("Hathaway T" ),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted

with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ).

Plaintiff has presented us with a lengthy and documented history of the severe and chronic pain he has suffered as a result of his spinal condition. *See* MRI Rep.; *see generally* AHR; *see also* Dkt. No. 62–1, Antonio Cole Dep., dated Apr. 13, 2012, at pp. 4–5, 12–14, & 18–19. For purposes of the objective element of our analysis, Plaintiff's spinal problems clearly constitute a serious underlying medical condition. *See Rodriguez v. Smith,* 2011 WL 4479689, at *5 (N.D.N.Y. Aug. 19, 2011) (collecting cases for the proposition that severe long-lasting back pain constitutes a serious medical need); *see also Brock v. Wright,* 315 F.3d 158,163 (2d Cir.2003) (overturning district court's ruling that pain caused by a keloid scar on the plaintiff's cheek was not a sufficiently serious medical need because "the district court either erred in not treating [plaintiff's claims of chronic pain] as true or [in] believ[ing] that only extreme pain or a degenerative condition would suffice to meet the legal standard"). Nonetheless, Plaintiff's claims against Dr. Kooi and Nurse O'ConnerRyerson still fail because his preference for a treatment other than the one provided by Defendants does not rise to the level of an Eighth Amendment violation.

**\*5** An inmate who disagrees with his physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance v. Armstrong,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dep't of Corrs.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). "[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim ." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Here, Dr. Kooi discontinued Plaintiff's prescription for Ultram after learning that five doses of Ultram had been found in Plaintiff's cell. *See* AHR at p. 20. Dr. Kooi's decision to suspend a prescription pain reliever in the face of evidence that Plaintiff was hoarding doses of the drug, while concomitantly providing other forms of treatment instead was not only patently reasonable, but medically prudent. Plaintiff's attempts to undermine the reasonableness of this decision by characterizing it as a non-medical decision made solely "for disciplinary purposes" are unavailing. *See e.g.,* Am. Compl. at First Cause of Action, ¶ 4. Plaintiff next claims that Nurse O'ConnorRyerson deliberately subjected him to the risk of future harm by refusing to provide him with Ultram on July 7, 2010, even though he had explained to her that he was in "extreme pain." *See* Am. Compl. at Third Cause of Action; *see also* Cole Aff. 1 at ¶¶ 12 & 13. Like Dr. Kooi, Nurse O'Connor–Ryerson refused to reinstate Plaintiff's Ultram prescription on July 7, 2010, because he had been caught hoarding doses of the medication in his cell. *See* AHR at p. 18. And, although she did not provide Ultram, she did prescribe Tylenol. *Id* . Thus, even though Plaintiff was not given Ultram, the treatments provided Defendants Kooi and O'Connor–Ryerson—Neurontin, Tylenol, a TENS unit, and an extra mattress—can hardly constitute deliberate indifference to Plaintiff's serious medical needs. *See Rush v. Fischer,* 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) ("[t]he decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.") (citing, *inter alia, Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011), & *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (summary order); *see also Price v. Reilly,* 697 F.Supp.2d 344, 360–61 (E.D.N.Y.2010) (citing cases for the proposition that "mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference."). Thus, no reasonable juror could conclude that either Dr. Kooi or Nurse O'Connor–Ryerson was deliberately indifferent to Plaintiff's medical needs.

**\*6** Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's claims against Defendants Dr. Kooi and Nurse O'Connor–Ryerson.

### *2. Supervisory Liability*

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 86 of 328
Cole v. Fang Lay Kooi, Not Reported in F.Supp.2d (2013)
2013 WL 4026842

*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (citing *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995)). Here, there is no evidence of any constitutional violation, and therefore, there is no basis to hold Defendants Superintendent Graham or Dr. Wright liable in their supervisory capacities. *See Dorsey v. Fisher,* 2010 WL 2008966, at * 13 (N.D.N.Y. May 19, 2010) (citing cases).

Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Defendants Graham and Wright.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 61) be **GRANTED** and this action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4026842

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1383828
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bartram Yihni DABNEY, Plaintiff,

v.

Donald SAWYER, Executive Director; Marcy
Mental Health Hospital, et. al., Defendants.

No. 9:11–CV–0273 (BKS/RFT).
|
Signed March 25, 2015.

**Attorneys and Law Firms**

Bartram Yihni Dabney, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, JAmes B. Mcgowan, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *ORDER*

Hon. BRENDA K. SANNES, District Judge.

 **\*1** The above-captioned matter comes to this Court
following a Report–Recommendation by Magistrate Judge
Randolph F. Treece dated February 24, 2015. Magistrate
Treece recommended that the defendants' motion for
summary judgment (Dkt. No. 89) be granted in its entirety,
and that the case be dismissed. No objections to the Report–
Recommendation have been filed and the time for filing
objections has expired.

This Court has reviewed the Report–Recommendation for
clear error and found none. Accordingly, it is hereby:

ORDERED that the Report–Recommendation (Dkt. No. 99)
is ADOPTED in its entirety for the reasons stated therein; and
it is further

ORDERED that the defendants' motion for summary
judgment (Dkt. No. 89) is GRANTED in its entirety; and it
is further

ORDERED that plaintiff's complaint (Dkt. No. 1) is
DISMISSED; and it is further

ORDERED that the Clerk shall close this case; and it is further

ORDERED that the Clerk of the Court shall serve a copy of
this Order upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

BARTRAM YIHNI DABNEY,

Plaintiff,

-v-

DONALD SAWYER, Executive Director, Marcy Mental
Health Hospital, JOANN WALDRON, Chief of OMH
Satellite, Clinton Correctional Facility, DR. BERGREN, [1]
Psychiatrist, Clinton Correctional Facility, DR. LEE, Medical
Doctor, Clinton Correctional Facility, DR. FAROOKI,
Dentist, SARA NEPHEW, OMH Therapist, Clinton
Correctional Facility; RON DUMONT, Nurse, Clinton
Correctional Facility, DR. BATTU, Psychiatrist, Great
Meadow Correctional Facility, JONATHAN NOCERA,
Assistant Inspector General, Department of Correctional
Services; VIRGINIA DONOHUE, Social Worker, Great
Meadow Correctional Facility, THOMAS FOLEY,
Corrections Officer, Clinton Correctional Facility,

[1]      Berggren is properly spelled with two "G"s. Dkt.
         No 89–4, Jean Berggren, M.D., Decl., dated June
         24, 2014. Hereinafter, the Court will use the correct
         spelling to refer to Defendant Jean Berggren.

Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

#### I. PROCEDURAL HISTORY

On December 30, 2010, [2] *pro se* Plaintiff Dabney, while
incarcerated at Clinton Correctional Facility, filed a civil
rights action, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986,
alleging a number of constitutional violations against the
Defendants stemming from his confinement at Great Meadow
Correctional Facility and Clinton Correctional Facility. *See
generally* Dkt. Nos. 1 & 1–1, Compl. [3] On September 30,
2013, the Honorable Lawrence E. Kahn, Senior United

States District Judge, issued an Order granting, in part, Defendants' Motion for Judgment on the Pleadings and providing Plaintiff leave to file an amended complaint. Dkt. No. 60. However, Plaintiff did not file an amended complaint, thus, the following claims were dismissed in accordance with the September 30, 2013 Order: (1) Plaintiff's allegation that Defendant Nocera conducted an improper investigation; (2) Plaintiff's allegation that Defendant Foley provided him with inadequate winter clothing during recreation; and (3) the claim that Dr. Lee acted with deliberate indifference by failing to x-ray Plaintiff's sore rib. The following claims remain in this action: 1) deliberate indifference claims against Sawyer, Waldron, Donohue, Battu, Berggren, and Nephew for inadequate mental health treatment; 2) deliberative indifference claim against Dr. Lee for failing to adequately treat Plaintiff's Hepatitis C; 3) deliberate indifference claim against Dr. Farooki for inadequate dental care; 4) deliberate indifference claim against Nurse Dumont for delaying urgent dental care; 5) § 1985 conspiracy claim against Defendants Waldron and Battu; 6) § 1986 failure to protect claim against all of the Defendants; and 7) retaliation claims against Defendants Battu, Donohue, Berggren, Waldron, Sawyer, and Nephew.

2    The Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he or she hands the papers to the prison authorities for transmittal to the court. *Dory v. Ryan,* 999 F.2d 679, 681–82 (2d Cir.1993), *modified on reh 'g,* 25 F.3d 81 (2d Cir.1994). It is presumed that a prisoner handed the pleading to the prison guard on the date he signed the complaint. *Shaw v. Superintendent Attica Corr. Fac,* 2007 WL 951459, at *3 n. 3 (N.D.N.Y. Mar. 28, 2007).

3    Plaintiff submitted what appears to be two Complaints at the time he filed this suit. Both documents are exact replicas, except that one is entirely handwritten with sequentially numbered paragraphs and bears Plaintiff's notarized signature. For convenience, the Court will cite to the handwritten Complaint.

**\*2**    Presently, Plaintiff has withdrawn his racial discrimination claim as well as his conspiracy claim against "all" of the Defendants, except for Battu and Waldron. Dkt. No. 92, Pl.'s Resp. in Opp'n, at p. 5. In addition, on April 17, 2014, Defendants Savage and Besaw were terminated

from this action pursuant to a Stipulation and Order of Discontinuance Pursuant to Rule 41(A). Dkt. No. 85.

On July 10, 2014, the Defendants moved for summary judgment. Dkt. No. 89. On July 25, 2014, Plaintiff filed a Response in Opposition thereto. Dkt. No. 92. On July 31, 2014, Defendants filed a Reply. Dkt. No. 93. On August 11, 2014, Plaintiff filed a Sur-reply. Dkt. No. 94.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When aparty has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning

whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. The following facts are undisputed.

**B. Material Facts**

**\*3** Plaintiff claims that on May 21, 2010, he was assaulted at Great Meadow by eighteen New York State Department of Corrections and Community Supervision ("DOCCS") employees. Compl. at ¶¶ 30–31. Plaintiff submitted a letter to DOCCS's Inspector General's Office complaining about the alleged assault. Dkt. No. 89–11, Jonathan Nocera Decl., dated April 15, 2014, at ¶¶ 1 & 3. The Inspector General's Office assigned Senior Investigator Nocera to investigate Plaintiff's complaint. *Id.* at ¶ 1. In connection with the investigation, Nocera learned through interviews with staff that, during a pat frisk, a weapon was found on Plaintiff. *Id.* at ¶ 7. According to the staff witnesses, Plaintiff then struck one of the officers in the head with his elbow. *Id.* Staff admitted struggling with Plaintiff to place him in restraints, but they all denied kicking and assaulting him. *Id.* at ¶¶ 8–9. Plaintiff was found guilty of several infractions relating to this incident. *Id.* at ¶ 11. Plaintiff was sentenced to twelve months in the Special Housing Unit ("SHU") with a corresponding loss of privileges and a recommendation to reduce his good time credit. *Id.* On July 1, 2010, Plaintiff was transferred to Clinton and housed in Clinton's SHU for the same infraction. Dkt. No. 89–13, JoAnne Waldron Decl., dated July 1, 2014, at ¶ 5; *see generally* Compl. ¶¶ 41–42. On September 9, 2010, Plaintiff commenced a federal civil rights action in which he refers to the alleged May 21, 2010 assault. *See Complaint, Dabney v. Fisher,* 9:10–CV–1109 (GTS/TWD) (N.D.N.Y.). [4]

[4] The Complaint cites to *Dabney v. Lapolt,* 9:10–CV–00519 (GTS/DEP) (N.D.N.Y.), but the complaint in that case was filed on April 20, 2010, a month before the alleged May 21, 2010 assault. Dkt. No. 1–1, Compl. at ¶ 50. The Court presumes that Plaintiff was in fact referring to *Dabney v. Fisher,* 9:10–CV–1109 (GTS/TWD) (N.D.N.Y.).

*1. Inmate Grievances*

Between the years 2010 through 2012, Plaintiff filed several grievances including Grievance No. CL–60783–11. *See generally* Dkt.No. 89–14, Deborah Jarvis Certified Records, dated Apr. 22, 2014. On February 14, 2011, Plaintiff filed Grievance No. CL–60783–11 regarding Dr. Lee in order to "correct his deliberate indifference," and requested that he be provided with new medical boots, adequate treatment for his Hepatitis C, a renewed prescription for Ultram, a hand brace, and back brace. Pl.'s Resp. in Opp'n, Ex. B(4) (1), Inmate Grievance Compl., dated Feb. 14, 2011. On February 22, 2011, Plaintiff appealed the Inmate Grievance Resolution Committee's ("IGRC") Response. Pl.'s Resp. in Opp'n, Ex. A(5)-A(6), IGRC Resp., dated Feb. 22, 2011. On March 9, 2011, the Superintendent issued its determination concerning Grievance No. 60783–11. Pl.'s Resp. in Opp'n, Ex. B(4)(2), Superintendent's Determination, dated Mar. 9, 2011. The determination, in part, explained that the "Ultram medication was discontinued by Dr. Lee as the grievant had been caught hoarding the medication" and "there was no recommendation made for a back brace [or] hand brace [.]" *Id.* The determination also stated that the Plaintiff had been approved for medical boots, and that he would be scheduled for an evaluation to determine a course of treatment for his Hepatitis C. *Id.* Plaintiff did not appeal this determination. *See* Dkt. No. 89–15, Jeffrey Hale Decl., dated June 26, 2010, at ¶ 10 & Ex. A.

*2. Deliberate Indifference*

*a. Dr. Battu*

**\*4** Defendant Kalyana R. Battu is employed by the Office of Mental Health ("OMH") as a Psychiatrist at Great Meadow, and provided mental health care to Plaintiff while he was housed at Great Meadow. Dkt. No. 89–3, Kalyana R. Battu, M.D., Decl., dated June 13, 2014, at ¶¶ 1 & 3. On January 16, 2007, Plaintiff was transferred to Great Meadows with a

level one mental health designation. Dkt. No. 90–2, James B. McGowan Decl., dated July 10, 2014, Ex. 2 at p. 1, CNYPC Chron. R. On or about March 8, 2010, Plaintiff's mental health service level designation was reassessed. Battu Decl. at ¶ 7. Based on the reassessment, his mental health level was changed to a two, and it was determined that he did not meet the criteria for the "serious mental illness," or an "S" designation. *Id.;* Dkt. No. 90–1, McGowan Ex. 1 at p. 2, Treatment Needs/Serv. Level Designation, dated Mar. 9, 2010. An "S" designation requires a diagnosis of a major/serious mental illness and psychiatric instability for a minimum of six months. [5] *Id.* Plaintiff's psychiatric condition was "stable" during his confinement at Great Meadow. Pl.'s Resp. in Opp'n, Ex. C(3), Physician's Orders, dated May 27, 2010, at Part IV.

[5]     Criteria for an "S" designation includes, a current diagnosis or recent significant history of any of the following types of Diagnostic and Statistical Manual IV (DSM–IV) Axis I diagnoses: (1) Schizophrenia (all sub-types); (2) Delusional Disorder; (3) Schizophreniform Disorder; (4) Schizoaffective Disorder; (5) Substance–Induced Psychotic Disorder (excluding intoxication and withdrawal); (7) Psychotic Disorder Not Otherwise Specified; (8) Major Depressive Disorders; (9) Bipolar Disorder I and II; or been actively suicidal or who have engaged in a recent, serious suicide attempt; or diagnosed with a serious mental illness, and psychiatric instability for a minimum of six months. N.Y. Correct. Law § 137(e); Dkt. No. 89–13, JoAnne Waldron Decl., dated July 1, 2014, at ¶ 8.

At the time the reassessment was conducted, Plaintiff's medical record stated that he suffered from depressive disorder, posttraumatic stress disorder ("PTSD"), polysubstance dependance, and antisocial personality; none of which are entitled to an "S" designation. McGowan Ex. 1 at pp. 6–7, Progress Notes, dated Jan. 29, 2010 & Feb. 28, 2010; Battu Decl. at ¶ 9; *see supra* note 7. His psychiatric condition was also listed as stable at the time of the reassessment. McGowan Ex. 1 at pp. 4 & 6–7, Progress Notes, dated Sept. 30, 2009, Jan. 29, 2010, & Feb. 28, 2010.

On June 4, 2010, Plaintiff did not attend his sick call appointment scheduled with Dr. Battu. McGowan Ex. 1 at p. 14, Progress Note, dated June 4, 2010. On that date, upon reviewing Plaintiff's medical record, Dr. Battu determined

that Plaintiff did not suffer from depressive episodes or PTSD. *Id.;* Battu Decl. at ¶ 11. As a result, PTSD and depression were removed from Plaintiff's Diagnosis Record. McGowan Ex. 1 at p. 1, Diagnosis R., dated June 4, 2010. In addition, Dr. Battu asked staff to submit paperwork to assist him with reassessing Plaintiff's eligibility for an "S" designation as Plaintiff had been asking for reconsideration of his detention in SHU. McGowan Ex. 1 at p. 14, Progress Note, dated June 4, 2010; *see* Battu Decl. at ¶¶ 13–14.

### b. Donohue

Defendant Virginia Donohue is employed by the Office of Mental Health as a Social Worker at Great Meadow. Dkt. No. 89–5, Virginia Donohue Decl., dated June 12, 2014, at ¶ 1. On June 28, 2010, Donohue filled out the Termination Transfer Progress Note ("Transfer Note") based on Plaintiff's medical records. *Id.* at ¶ 3 & 11. The Transfer Note, in part, indicated that Plaintiff required level two OMH services, and that his psychiatric condition was "stable per chart review." McGowan Ex. 1 at p. 26, Termination Transfer Progress Note [hereinafter "Transfer Note"]; Donohue Decl. at ¶ 12. The Transfer Note also recommended that Plaintiff continue receiving mental health services, and advised of the recent change to Plaintiff's service level designation and Great Meadow's intention of reassessing Plaintiff's eligibility for the "S" designation. Transfer Note. On July 1, 2010, Plaintiff was transferred to Clinton's SHU. Waldron Decl. at ¶ 5; Compl. at ¶¶ 42–43.

### c. Waldron, Berggren, and Nephew

**\*5** Defendant Jean Berggren is employed by OMH as a Psychiatrist at Clinton, and was a member of Plaintiff's Clinton mental health treatment team. Dkt. No. 89–4, Jean Berggren, M.D., Decl., dated June 24, 2014, at ¶ 1 & 3. Defendant JoAnne Waldron is employed by OMH as the Mental Health Unit Chief at Clinton. Waldron Decl. at ¶ 1. Defendant Sarah L. Nephew is employed by OMH as the Residential Crisis Treatment Program ("RCTP") Coordinator at the OMH Satellite Unit of the Central New York Psychiatric Center ("CNYPC") at Clinton. Dkt. No. 89–10, Sara L. Nephew Decl., dated June 24, 2014, at ¶¶ 1 & 3.

The RCTP is intended to house inmates in need of immediate mental health treatment. *Id.* at ¶ 8. Inmates may also be

placed in the Program for observation and/or a mental health evaluation. *Id* .

On July 1, 2010, the day Plaintiff was transferred to Clinton's SHU, the health services staff noted that he had been receiving mental health level two services. Waldron Decl. at ¶ 5. The next day, on July 2, 2010, the health services staff conducted an assessment of Plaintiff's mental health condition. McGowan Ex. 2 at p. 73, SHU Mental Health Assessment, dated July 2, 2010. Based on that assessment, Plaintiff's mental health level remained designated as a two. *Id.;* Waldron Decl. at ¶ 13; McGowan Ex. 2 at p. 1, CNYPC Chron. R. Plaintiff received several more mental health assessments during his time in SHU, all which affirmed that Plaintiff did not exhibit behaviors consistent with an "S" designation. Waldron Decl. at ¶¶ 18–20; *see also* Dkt. No. 90–3, McGowan Ex. 3, Patient Lt. Email, dated Aug. 9, 2010; McGowan Ex. 2 at p. 37, RCTP Monitoring Chart, dated Nov. 15, 2010. At Clinton, Plaintiff received direct mental health treatment in accordance with his level two treatment plan. Waldron Decl. at ¶ 40. His medical record reflects frequent mental health assessments. Berggren Decl. at ¶ 9; McGowan Ex. 2 at p. 1, CNYPC Chron. R. At least twice per month, he was scheduled to meet with a primary therapist, and, once a month, he was scheduled to meet with a psychiatrist. Waldron Decl. at ¶ 40. Plaintiff also had daily access to nurses during their daily rounds in SHU. *Id.;* Dkt. No. 89–6, Ronald Dumont, R.N., Decl., dated July 1, 2014, at ¶ 3. Plaintiff was placed in RCTP twice because he was threatening to harm himself and was refusing to eat. Waldron Decl. at ¶ 24; McGowan Ex. 2 at p. 1, CNYPC Chron. R.

Plaintiff's mental health condition significantly improved during his stay at Clinton. Waldron Decl. at ¶ 39. On June 20, 2011, approximately a year after being admitted to Clinton, Plaintiff's mental health level was updated to a level three. McGowan Ex. 2 at p. 1, CNYPC Chron. R. On August 17, 2011, his mental health service level was changed to a six. *Id.* From that date forward, while in Clinton's custody, Plaintiff remained classified as a level six. *Id.*

### d. Sawyer

**\*6** During the relevant time period, Defendant Donald Sawyer worked for OMH and served as the Executive Director of CNYPC. Dkt. No. 89–12, Donald Sawyer, Ph.D., MBA, Decl., dated June 24, 2014, at ¶ 2. He was neither responsible for direct day-to-day patient care nor followed-

up on inmate complaints. *Id.* at ¶ 3. In the ordinary course of business, complaints addressed to the Executive Director are redirected by support staff to the CNYPC Quality Assurance Office. *Id.* at ¶ 8.

Plaintiff wrote a letter, dated August 5, 2010, addressed to the "Director of Mental Health," complaining that he was falsely "written up and place[d] in the SHU," receiving "inadequate mental health treatment," and that the "[Defendants] are adamant in refusing to put [him] in a program that could help [him]." Plaintiff's letter was redirected to Risk Management [6] and his complaint was promptly investigated. McGowan Ex. 3, Dabney Lt., dated Aug. 5, 2010.

[6]     It appears that Risk Management is CNYPC's Quality Assurance Office, or a subdivision of that Office. *See generally* McGowan Ex. 3, Dabney Lt., dated Aug. 5, 2010; Dkt. No. 89–12, Donald Sawyer, Ph.D., MBA, Decl., dated June 24, 2014, at ¶ 8.

### e. Dr. Farooki

Defendant Tahir R. Farooki is employed by DOCCS as a Dentist at Clinton. Dkt. No. 89–7, Tahir R. Farooki Decl., dated Apr. 14, 2014, at ¶ 1. On August 6, 2010, Dr. Farooki met with Plaintiff, evaluated his tooth, and determined that it was "broken down and abessed [sic]." *Id.* at ¶ 4. Dr. Farooki took an x-ray of the infected tooth and determined that it required an extraction. *Id.* at ¶¶ 5–7. Dr. Farooki ordered Plaintiff to take Penicillin for ten days to address the infection and prescribed Motrin for pain. Farooki Decl., Ex. A, Dental Treatment R.; Compl. at ¶ 53. Dr. Farooki scheduled Plaintiff to have his tooth extracted by Dr. Oliviera, another dentist at the facility. Farooki Decl. at ¶ 7 & Ex. A, Dental Treatment R. Dr. Farooki routinely assigns extractions and other dental interventions to other dentists in the facility due to the "volume of patients and breadth of [his] responsibilities at Clinton[ ]." Farooki Decl. at ¶ 8.

On November 19, 2010 and November 26, 2010, Plaintiff submitted sick-call slips complaining that his infected tooth required an extraction. Dkt. No. 89–17, James B. McGowan Decl., Ex. A, Bartram Yihni Dabney, Dep., Jan. 30, 2014, at p. 90. Plaintiff alleges that Nurse Dumont discarded his sick-call slips, in which he requested follow-up dental care. Compl. at ¶ 53. Dr. Farooki was unaware of Plaintiff's intervening complaints and did not see the Plaintiff at any time prior to

January 5, 2011, when his tooth was extracted by another dentist at the facility. Farooki Decl. at ¶¶ 9 & 12 & Ex. A, Dental Treatment R.

#### f. Nurse Dumont

SHU inmates have access to nurses during daily sick call rounds. Dumont Decl. at ¶ 2. In addition to daily sick call rounds, SHU inmates have access to emergency sick call twenty-four hours, seven-days-a-week. *Id.* at ¶ 3. During the relevant time period, Nurse Ronald Dumont generally conducted sick call rounds in SHU. *Id.* at ¶¶ 2 & 7. Defendant Dumont maintains that he was unaware of any serious health care issue that was not being appropriately addressed by the health care staff. *Id.* at ¶ 9. Nurse Dumont did not see Plaintiff on November 19, 2010 or November 26, 2010—the days Plaintiff claims to have submitted his sick call slips seeking dental attention. *Id.* at ¶ 8; Dabney Dep. at p. 90.

#### g. Dr. Lee

**\*7** Defendant Kang Lee is a Physician at Clinton, and he provided medical care to Plaintiff during his incarceration at Clinton. Dkt. No. 89–9, Kang Lee, M.D., Decl., dated June 30, 2014, at ¶¶ 1 & 3. On August 26, 2010, Plaintiff met with Dr. Lee and complained about his neck and back pain. Dkt. No. 90–4, McGowan Ex. 4 at p. 26, Physical Examination, dated Aug. 26, 2010.[7] On examination, Dr. Lee found that Plaintiff suffered from mild arthritis but otherwise had a normal physical. *Id.*; Lee Decl. at ¶ 5. Dr. Lee prescribed Naproxen and Ultram for pain, in addition to other medications. Lee Decl. at ¶ 5. On October 18, 2010, Plaintiff was temporally denied his back brace while pending an assessment of his mental health condition.[8] *Id.* at ¶ 10. Dr. Lee denied Plaintiff's request for a hand brace because "he had good range of motion, no swelling or other deformity of the hand." *Id.* at ¶ 7. Dr. Lee denied Plaintiff's request for medical boots because he "was fully ambulatory and no limping was noted," and walked minimal distances due to his confinement in SHU. *Id.* at ¶ 8. Dr. Lee contemplated treating Plaintiff's Hepatitis C infection with antiviral medication. *Id.* at ¶ 12; *see also* McGowan Ex. 4 at p. 59, Request & Report of Consultation, dated Feb. 28, 2011. Antiviral medication is effective when treatment is continuous. Lee Decl. at ¶ 13. A long course of antiviral medication is also known for increasing symptoms of depression in patients.

*Id.* at ¶ 14. Because Dr. Lee was aware of Plaintiff's history of polysubstance dependance, manipulative behaviors, and depression, he requested a psychiatric consultation on February 28, 2011, in order to determine whether Plaintiff was fit to start an antiviral treatment. Request & Report of Consultation; Lee Decl. at ¶¶ 12, 15, & 18. On March 7, 2011, the psychiatrist concluded that Plaintiff could become depressed while on such a treatment regimen, and advised that if Plaintiff were prescribed the antiviral treatment, he should be closely monitored for signs of depression. Request & Report of Consultation. On March 4, 2011, Plaintiff was informed of the planned treatment for his Hepatitis C, and that anti-depressants would be provided if he developed depression during the course of his treatment. Dkt. No. 90–4, McGowan Ex. 4 at p. 60, Refusal of Medical Examination and/or Treatment, dated Mar. 4, 2011. Plaintiff demanded that he receive anti-depressant medication as a precursor to treatment. *Id.* Dr. Lee declined to issue Plaintiff anti-depressants as Plaintiff did not have symptoms of depression. Lee Decl. at ¶ 18. As a result, Plaintiff refused the Hepatitis C treatment plan. Refusal of Medical Examination and/or Treatment; Lee Decl. at ¶¶ 17 & 19.

[7]   Due to the volume of records contained in Dkt. No. 90–4, the Court will refer to the page numbers automatically assigned by this Court's Case Management Electronic Case Files System when citing documents therein.

[8]   It appears that physicians working at Clinton are mindful that inmates, from time to time, modify materials provided to them solely for treatment and convert those items into weapons. Lee Decl. at ¶ 9.

On September 16, 2010, Plaintiff was caught hiding Ultram. Dkt. No. 90–4, Ambulatory Health Record [hereinafter "AHR"] Progress Note, dated Sept. 16, 2010, at p. 15. Plaintiff held onto the pills so that he could "cut up and bleed out" and "not feel the pain[.]" Compl. at ¶ 54. On September 16, 2010, Dr. Lee ordered Plaintiff's Ultram to be crushed. AHR Progress Note at p. 15. Dr. Lee discontinued Plaintiff's Ultram prescription on November 3, 2010. AHR Progress Note, dated Nov. 3, 2010, at p. 10. It appears that Dr. Lee discontinued Plaintiff's Ultram prescription because he continued to abuse Ultram, had access to other pain medication, and his situation was complicated by his antisocial personality disorder and polysubstance abuse. Lee Decl. at ¶ 21.

### C. Exhaustion Requirement

**\*8** The Prison Litigation Reform Act ("PLRA") imposes several restrictive conditions on the ability of prisoners to maintain federal civil rights actions. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Exhaustion of administrative remedies is required even when the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided that the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2002)). In *Woodford v. NGO,* the Supreme Court stated that to properly exhaust administrative remedies prisoners must "compl[y] with an agency's deadlines and other critical procedural rules [.]" 548 U.S. 81, 90 (2006). The rules are "defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218 (2007). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Id.* "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

New York State's administrative remedies consist of a three-step review process. First, a grievance is submitted to IGRC, a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner

seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. at 524); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516.

Here, Plaintiff failed to exhaust his available remedies with regard to his claims against the DOCCS Defendants [9] as he did not submit any grievances relating to the issues raised in this action, except for one grievance filed regarding Dr. Lee. Although Plaintiff filed a grievance against Dr. Lee, he did not appeal the superintendent's determination. While it may be true that Plaintiff did not need to appeal the favorable aspects of that decision, namely, approval for medical boots and treatment plan for his Hepatitis C, he certainly had to appeal the decision as it failed to resolve his deliberate indifference allegation against Dr. Lee. Nevertheless, due to the extensive procedural history and the number of Defendants involved in this action, the Court will address all of Plaintiff's claims on the merits.

9    "Defendants do not assert failure to exhaust with respect to those defendants employed by the Office of Mental Health: Defendants Sawyer, Battu, Donohue, Nephew, Waldron, and Berggren." Dkt. No. 89–1, Defs.' Mem. of Law at p. 4 n. 1.

### D. Deliberate Indifference

**\*9** To state an Eighth Amendment claim for denial of adequate medical or mental health care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *see also Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) (concluding that "psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [ ] that it must be provided to prisoners."). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35

(1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*10** Here, Defendants do not dispute that Plaintiff suffers from a serious medical condition. *See generally* Dkt. No. 89–1, Defs.' Mem. of Law. Thus, the Court will address whether the Defendants have acted with deliberate indifference.

### 1. Mental Health

#### a. Dr. Battu

Plaintiff alleges that Dr. Battu and Social Worker Donohue falsified his medical record. Compl. at ¶ 34. Setting aside Plaintiff's allegation, the record indicates that Dr. Battu assessed Plaintiff's mental health condition, and concluded that he did not meet the criteria for an "S" designation. In addition, Dr. Battu was unaware of any symptoms or behaviors that would entitle Plaintiff to an "S" designation. Battu Decl. at ¶¶ 7–8. Moreover, Plaintiff has failed to produce evidence that he was in fact entitled to an "S" designation at the time Dr. Battu conducted his assessment. Thus, the Court recommends **dismissing** the deliberate indifference claim against Dr. Battu.

#### b. Donohue

Defendant Donohue merely relied on OMH's medical record, which, at the time, indicated that Plaintiff was designated at mental health level two, in order to fill out Plaintiff's Transfer Note in preparation for Plaintiff's transfer to Clinton. Donohue Decl. at ¶ 9. And, indeed, the Transfer Note received by Clinton stated that Plaintiff required mental health level two services. Thus, there is no merit to Plaintiff's allegation that Defendant Donahue falsified his medical record. As a result, this Court recommends **dismissing** Defendant Donohue from this action.

#### c. Waldron, Berggren, Nephew, and Sawyer

Plaintiff contends that OMH Defendants Sawyer, Waldron, Berggren, and Nephew acted with deliberate indifference towards his mental health condition. Detrimental to Plaintiff's argument is that he in fact received adequate mental health treatment while in Clinton. For instance, the Clinton OMH team exhibited care and diligence by conducting an assessment the day after Plaintiff was admitted to Clinton, despite receiving Great Meadow's recent assessment of Plaintiff's mental health condition. Clinton's reassessment confirmed that Plaintiff required mental health level two treatment. Additionally, due to Plaintiff's repeated complaints that he qualified for the "S" designation and thus should be removed from SHU, he was further evaluated on several occasions. None of the subsequent assessments indicated that he was eligible for the "S" designation. Nonetheless, the Plaintiff was removed from SHU and twice temporally placed in RTCP as the OMH Defendants were concerned with his threats of self-harm and refusal to eat. Moreover, Plaintiff's mental health condition greatly improved while in the care of Clinton's OMH professionals. Thus, the Court recommends **granting** Defendants' Motion for Summary Judgment as to Plaintiff's deliberate indifference claim against Defendants Waldron, Berggren, and Nephew.

As a consequence, the Court also recommends **dismissing** Defendant Sawyer, Executive Director of CNYPC, from this action as Plaintiff cannot sustain his theory of supervisory liability because Plaintiff has not established that any of the OMH Defendants violated his Eighth Amendment right. *Hinton v. Prack,* 2014 WL 4627120, at *10 (N.D.N.Y. Sept. 11, 2014) (citing to *Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability").

### 2. Physical Health

#### a. Dr. Lee

**\*11** The record demonstrates that Dr. Lee was taking into account Plaintiff's overall physical and mental well-being while Plaintiff was in his care. In addition, Dr. Lee provided Plaintiff with an adequate course of treatment for his Hepatitis C, which the Plaintiff refused. Dr. Lee declined to issue Plaintiff a hand brace because he "had good range of motion, no swelling or other deformity of the hand." Lee Decl. at ¶ 7. Dr. Lee also declined to issue medical boots because Plaintiff "was fully ambulatory and no limping was noted," and walked minimal distances due to his confinement in SHU. *Id.* at ¶ 8. A prison doctor's denial of unnecessary medical aids does not support an Eighth Amendment claim as it is antithetical to medical conduct that evinces a mental state similar to criminal recklessness. *See Wilson v. Seiter,* 501 U.S. at 301–03. Lastly, Dr. Lee discontinued Plaintiff's Ultram pain medication when it was discovered that Plaintiff was hoarding the medication to possibly overdose himself. Based on these uncontested facts, the Court recommends **dismissing** Plaintiff's deliberate indifference claim against Dr. Lee.

#### b. Nurse Dumont

Plaintiff's allegation that Nurse Dumont discarded some of his medical slips is highly speculative. The Plaintiff acknowledges that Nurse Dumont is not the only nurse or staff member in charge of collecting sick call slips. Dabney Dep. at p. 100. Plaintiff merely states that he knows that Nurse Dumont discarded his medical slips because he did not receive the medical items or treatment sought in the medical slips. *Id.* at p. 101. With respect to the allegation that Dumont discarded his sick call slips seeking dental intervention, Plaintiff fails to allege that he spoke with or handed Nurse Dumont his medical slip on November 19, 2010, or November 26, 2010. More significantly, Nurse Dumont did not see the Plaintiff on the dates he claims to have submitted his two sick call slips seeking dental assistance. Dumont Decl. at ¶ 8. Thus, the Court recommends **dismissing** Plaintiff's deliberate indifferent claim against Nurse Dumont.

#### c. Dr. Farooki

Plaintiff alleges Dr. Farooki acted with deliberate indifference when he failed to pull out his infected tooth. *See* Compl. at ¶ 53. Defendants raise qualified immunity as an affirmative defense. Defs.' Mem. of Law at p. 15. The doctrine of qualified immunity protects governmental officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Messerschmidt v. Millender,* ––– U.S. ––––, 132 S.Ct. 1235, 1244 (2012). Qualified immunity gives governmental officials "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2085 (2011) (citation omitted); *Jackler v. Byrne,* 658 F.3d 225, 243 (2d Cir.2011) (Making "a mere mistake in the performance of an official duty may not deprive the office of [this] defense."). Determining whether qualified immunity may apply is a two-pronged inquiry: (1) whether the official violated a statutory or constitutional right; and (2) whether the right was clearly established at the time of the challenged conduct. *Coollick v. Hughes,* 699 F.3d 211, 219 (2d Cir.2012). Recently, the United States Supreme Court relieved courts from having to decide sequentially the more difficult question of whether the facts alleged or shown by plaintiff make out a violation of a constitutional right before determining whether the right was clearly established. *Pearson v. Callahan,* 555 U.S. 223, 227 (2009) (holding that the protocol mandated in *Saucier v. Katz,* 533 U.S. 194 (2001) should not be "regarded as an inflexible requirement," but may be considered if a court wishes). With the rigid *Saucier* procedure being alleviated, courts now have the discretion to decide which of the two prongs of this analysis "to tackle first." *Coollick v. Hughes,* 699 F.3d at 219.

2015 WL 1383828

**\*12** In order for a constitutional right to be clearly established, it must be defined with reasonable specificity, as established by both Supreme Court and Second Circuit law, and sufficiently clear that a reasonable official would have understood that the conduct at issue is unlawful under the existing law. *Looney v. Black,* 702 F.3d 701, 706 (2d Cir.2012) (citations omitted); *Reichle v. Howards,* ––– U.S. ––––, 132 S.Ct. 2088, 2093 (2012). A right must be clearly established "not as a broad general proposition ... but in a particularized sense so that the contours of the right are clear to a reasonable official," and that existing precedents have placed it "beyond debate." *Reichle v. Howards,* 132 S.Ct. at 2093 & 2094 (internal quotation marks and citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 753 (2002) (noting that contours of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). If the conduct does not violate a clearly established constitutional right, or, "if it was objectively reasonable for the official to believe that his conduct did not violate such a right, then the official is protected by qualified immunity." *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (citation omitted). Or, conversely, if officers of reasonable competence could disagree that such conduct was unlawful, then qualified immunity should be recognized. *Hope v. Pelzer,* 536 U.S. at 752 (citing *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

Here, Dr. Farooki is entitled to qualified immunity. Dr. Farooki x-rayed Plaintiff's infected tooth, determined it required an extraction, prescribed Penicillin for ten days to address the infection, and prescribed Motrin for pain. Dr. Farooki did not extract the tooth on the date he examined Plaintiff because the infection had to be treated before an extraction could be performed. However, Dr. Farooki relied on Dr. Oliviera, a dentist not named in this suit, to perform the extraction. Dr. Farooki routinely assigns extractions and other dental treatments to other dentists within Clinton due to the "volume of patients and breadth of [his] responsibilities[.]" Farooki Decl. at ¶ 8. There is no evidence suggesting that Farooki was aware of a delay in dental services to Plaintiff. In addition, there is no evidence suggesting that Dr. Farooki should have known that he could not reasonably rely on Dr. Oliviera to perform the extraction in a timely manner. Neither the Supreme Court nor the Second Circuit have announced that medical professionals cannot reasonably rely on support staff or other members of a medical/dental treatment team, or that doing so constitutes deliberate indifference. Because Dr. Farooki is entitled to qualified immunity, the Court recommends **dismissing** Dr. Farooki from this action.

### E. Conspiracy

Plaintiff contends that Drs. Battu and Waldron conspired to deny his constitutional rights in violation of 42 U.S.C. § 1985. The only relevant section of that statute is subsection (3) which states, in pertinent part:

> **\*13** If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ..., if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To recover under this section, a plaintiff must show the existence of (1) a conspiracy (2) meant to deprive a person or persons of the equal protection of the laws or privileges and immunities under the laws with (3) "an overt act in furtherance of the conspiracy[,] (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States[,]" and (5) "some racial or perhaps otherwise class-based, invidious discriminatory animus[.]" *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (citations omitted). A claim of conspiracy under this subsection must include more than conclusory allegations. *Dwares v. City of New York,* 985 F.2d 94, 99–100 (2d Cir.1993) *overruled on other grounds, Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993).

2015 WL 1383828

Plaintiff's conspiracy claim fails for two reasons. One, Plaintiff summarily alleges that Defendants Battu and Waldron conspired to deny him adequate mental health treatment, but provides no other facts, or even circumstances, from which this Court can surmise that any such conspiracy occurred. Two, the Court finds that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. "[T]he intracorporate conspiracy doctrine, which provides that officers, agents, and employees of a single corporate entity are legally incapable of conspiring together[,]" applies to § 1985 conspiracy claims. *Orafan v. Goord,* 411 F.Supp.2d 153, 164–65 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCCS officials and employees acting within the scope of their employment), *vacated on other grounds,* 249 F. App'x 217(2d Cir.2007) (internal citations and quotations omitted); *see also Scott v. Goord,* 2004 WL 2403853, at *13 (S.D.N.Y. Oct. 27, 2004). Thus, Defendants Battu and Waldron are legally incapable of committing a conspiracy as they are both employed by the New York State Office of Mental Health and were acting within in the scope of their employment. We therefore recommend **granting** Defendants' Motion for Summary Judgment as to Plaintiff's conspiracy allegation against Battu and Waldron.

### F. Failure to Protect

Section 1986 applies to "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured[.]" 42 U.S.C. § 1986. A § 1986 claim is predicated upon a valid § 1985 claim. *Brooks v. County of Nassau,* 2014 WL 5093277 at *4 (Oct. 9, 2014) (citations omitted).

**\*14** Accordingly, since Plaintiff has failed to establish a conspiracy claim under Section 1985, Plaintiff has likewise failed to state claim under Section 1986. *Webster v. Fisher,* 694 F.Supp.2d 163, 196 (N.D.N.Y.2010) *aff'd,* 398 F. App'x 683 (2d Cir.2010).

### G. Retaliation

Lastly, Plaintiff alleges that OMH Defendants provided him with inadequate mental health treatment in retaliation for filing *Dabney v. Fisher,* 9:10–CV–1109, on September 9, 2010, against eighteen Great Meadow officials, which included a few OMH employees. Compl. at ¶¶ 34 & 47. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Central to such claims is the notion that in a prison setting, correction officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. *Scott v. Coughlin,* 344 F.3d at 288. In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d at 79 (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977) & *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)).

To be sure, Plaintiff's September 9, 2010 federal filing constitutes protected speech. However, Plaintiff cannot

demonstrate that any adverse action has been taken against him by the OMH Defendants. Instead the evidence demonstrates that at all times Plaintiff was provided with adequate mental health treatment. *See supra* Part II.D. Thus, it cannot be said that such detailed and attentive mental health treatment "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). In any event, Defendants have sufficiently demonstrated that they made medical decisions and diagnoses absent a retaliatory motive. Lastly, we find it unnecessary to address Defendants' argument concerning Defendant Nocera since Plaintiff did not a raise a retaliation cause of action against him. *See generally* Compl.

### III. CONCLUSION

**\*15** For the reasons stated herein, it is hereby **RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 89) be **GRANTED** in its entirety and the case be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Filed Feb. 24, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1383828

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1778410
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Darrell WASHINGTON, Plaintiff,

v.

WESTCHESTER COUNTY DEPT. OF
CORRECTION, et al., Defendants.

No. 13 Civ. 5322(KPF).
|
Signed April 25, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge. [1]

[1]
    Doug Giannantonio, a third-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

**\*1** In early 2013, Plaintiff Darrell Washington, who is proceeding *pro se* and is currently incarcerated, received medical treatment for a severe bacterial infection he experienced while incarcerated at the Westchester County Jail. On July 29, 2013, Plaintiff initiated this action under 42 U.S.C. § 1983 against Defendants Westchester County Department of Correction and Correct Care Solutions, LLC, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants now move to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted in part, and Plaintiff is granted leave to file an amended complaint within 30 days.

**BACKGROUND** [2]

[2]
    The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. For convenience, Defendants' opening brief in support of the instant motion (Dkt.# 15) will be referred to as "Def. Br."; Plaintiff's opposition affirmation

(Dkt.# 23) as "Pl. Opp."; and Defendants' reply brief (Dkt.# 24) as "Def. Reply."
Prior to the filing of Defendants' motion to dismiss, Plaintiff submitted to the Court what he alleges to be the relevant medical records. (Dkt.# 9, 10). However, those materials were not submitted along with the Complaint; they were not referred to in the Complaint; and they were not submitted in connection with the briefing of this motion. Accordingly, the Court may not consider these documents in the context of a motion to dismiss. *See generally Kalyanaram v. American Ass'n of University Professors at New York Institute of Technology, Inc.,* 742 F.3d 42, 44 n. 1 (2d Cir.2014) (discussing circumstances under which courts can consider outside materials in resolving motions to dismiss). Yet to the extent the Court is permitted to review all papers submitted by a *pro se* plaintiff in order to raise the strongest arguments these papers suggest, the Court has reviewed these records, and notes that they facially support the factual allegations discussed herein.

**A. Plaintiff's Incarceration and MRSA Infection**
Plaintiff was arrested on or about January 23, 2013. (Compl.3). Prior to his arrest, Plaintiff had been prescribed a medication called Doxycycline, as well as an ointment, "for MRSA." (*Id.*) . [3] Accordingly, at the time Plaintiff was arrested, he had on his person both the Doxycycline and "some type of ointment." (*Id.*). Plaintiff does not actually allege that he had a MRSA infection prior to his incarceration, or that he suffered any symptoms of that infection, only that he had been prescribed and was taking medication "for MRSA." (*Id.*). [4]

[3]
    MRSA is an acronym for Methicillin-resistant Staphylococcus aureus, a bacterium that can cause serious infections.

[4]
    Plaintiff alleges in opposition that he "did not enter the facility with the deadly disease," and that he "caught" MRSA while at the Jail. (Pl.Opp.1–3). This statement is facially contradictory with Plaintiff's allegation in the Complaint that he was undergoing treatment for MRSA prior to his incarceration. The Court ordinarily may not consider factual allegations contained in opposition papers to a motion to dismiss unless they are consistent with those contained in the complaint.

*See Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000). This is not the case here, and for this reason, the Court disregards the inconsistent factual allegations in Plaintiff's opposition papers.

During the relevant time period, Plaintiff was incarcerated at the Westchester County Jail (the "Jail"), in Valhalla, New York. (Compl.3). The Jail is operated by Defendant Westchester County Department of Correction (the "County"). Defendant Correct Care Solutions, LLC ("Correct Care") provides medical care to prisoners at the Jail.

According to Plaintiff, upon his arrival at the Jail on January 23, 2013, Plaintiff informed a correctional officer and a doctor on staff that Plaintiff was on medication for MRSA. (Compl.3). The doctor informed Plaintiff that he could no longer take his prescribed medications, but that Plaintiff would be prescribed new medication. (*Id.*). In fact, Plaintiff was never prescribed any new medication, and the Doxycycline and ointment were locked up with Plaintiff's property at the Jail. (*Id.*).

On or about March 17, 2013, Plaintiff developed a large lump on his leg. (Compl.3). The lump worsened and "turned into a 2 inch hole." (*Id.*). Plaintiff's leg was "[highly] infected," and he "was in a lot of pain." (*Id.*). In response to Plaintiff's complaint, a doctor performed a blood test, measured the size of the lump, and placed Plaintiff in quarantine for approximately one week. (*Id.*).

The diagnostic test results subsequently revealed that Plaintiff was infected with MRSA. (Compl.3). Accordingly, a doctor prescribed antibiotics and painkillers to Plaintiff, which he took for approximately three weeks. (*Id.*). Plaintiff does not take issue with his medical treatment in connection with his March 2013 infection, but avers that he "feel[s] the doctors [at the Jail] are hiding something." (*Id.*).

*2  Plaintiff alleges that his medical issues are ongoing due to "the medication/MRSA." (Compl.5). Perhaps relatedly, Plaintiff contends that on or about June 14, 2013, he developed "a very bad rash" on his arm. (*Id.* at 3). It is unclear, however, whether this "bad rash" is related in any way to Plaintiff's MRSA infection; Plaintiff does not provide any further details about this rash or its treatment.

**B. The Instant Action**
On June 19, 2013, Plaintiff served a Notice of Claim, dated June 14, 2013, on the Westchester County Attorney,

indicating that Plaintiff planned to pursue a claim against the County and Correct Care under Section 50–e of the New York General Municipal Law. (Def. Br. 3; Dkt. # 18–1 at 2–3). The Westchester County Attorney subsequently rejected Plaintiff's Notice of Claim as untimely. (Def. Br. 3; Dkt. # 18–1 at 1, 4).

On July 29, 2013, Plaintiff initiated the instant action against Defendants (Dkt.# 2), seeking $1 million in damages to "pay for further medical bills and also for pain and suffering." (Compl.5). The allegations contained in Plaintiff's Complaint mirror those in his previously-filed Notice of Claim. (Def. Br. 3; *compare* Compl. 3, *with* Dkt. # 18–1 at 2).

To date, Plaintiff concededly has not filed a grievance with the Jail—or with any other jail, prison, or correctional facility—for improper medical treatment in relation to the events described in the Complaint. (Compl.4). Instead, Plaintiff contends that he does not know whether the Jail has a grievance procedure and "do[es]n['t] know how to file a grievance." (Compl.4).

The case was assigned to the undersigned on August 6, 2013. Pursuant to the briefing schedule set forth at the October 23, 2013 pre-motion conference (Dkt. # 11), Defendants moved to dismiss on November 22, 2013 (Dkt.# 13). Plaintiff filed his opposition on December 17, 2013 (Dkt.# 23), and the motion was fully briefed as of the filing of Defendants' reply on December 24, 2013 (Dkt.# 24). The Court now considers Defendants' motion to dismiss.

**DISCUSSION**

**A. Applicable Law**
When considering a motion under Rule 12(b)(6), the Court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Fed.R.Civ.P. 12(b)(6); *Faber v. Metropolitan Life,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 548 F.3d 82, 88 (2d Cir.2009)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from

2014 WL 1778410

conceivable to plausible." (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 570)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman,* 517 F.3d 140, 149 (2d Cir.2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002)).

**\*3**  "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). That said, the liberal pleading standard accorded to *pro se* litigants "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v.. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980).

## B. Analysis

Plaintiff alleges that his Eighth Amendment rights were violated when Defendants acted with deliberate indifference to his serious medical needs. He brings this claim under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Plaintiff's claim is best understood as a claim for two separate instances of alleged deliberate indifference to serious medical need: first, Defendants' decision to discontinue Plaintiff's medications upon his admission into the Jail, and second, Defendants' treatment of Plaintiff's leg infection in March 2013.

### 1. Defendant County's Affirmative Defense of Exhaustion Is Denied Without Prejudice

Preliminarily, the County raises, as an affirmative defense, Plaintiff's failure to exhaust his administrative remedies, in violation of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, Title VIII, § 803(d), 110 Stat. 1321–71 (1996) (codified as amended at 42 U.S.C. § 1997e). The PLRA requires prisoners to exhaust all "available" administrative remedies prior to filing a claim in federal court. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court

has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (internal citation omitted); *see also Cruz v. Jordan,* 80 F.Supp.2d 109, 111 (S.D.N.Y.1999) ("I hold that an action alleging deliberate indifference to medical needs is an action 'brought with respect to prison conditions,' requiring exhaustion[.]").

The purpose of the exhaustion requirement is to promote efficiency by reducing the quantity and improving the quality of prisoner litigation. *Porter,* 534 U.S. at 516; *see also Woodford v. Ngo,* 548 U.S. 81, 89 (2006) ("Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." (internal citation omitted)). Further, "[e]xhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' " *Woodford,* 548 U.S. at 89 (internal citation omitted).

**\*4**  The Second Circuit has held that there are three exceptions to the PLRA's "mandatory" exhaustion requirement:

> [W]hen (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In light of this case law, Plaintiff's admitted failure to exhaust his administrative remedies is not dispositive. (*See* Compl. 4). Instead, the Court must determine whether, as relevant here, those administrative remedies were available to Plaintiff in

2014 WL 1778410

the first place. Plaintiff contends that he did not know how to file a grievance. (*Id.*). Courts within this District are uniform in holding that "[administrative] remedies are not available where prisoners are not informed of their existence." *Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *8 (S.D.N.Y. Sept. 26, 2013) (internal citation omitted); *see also Rivera v. New York City,* No. 12 Civ. 760(DLC), 2013 WL 6061759, at *4–5 (S.D.N.Y. Nov. 18, 2013) (same).

Specifically, "[a]n institution keeps an inmate ignorant of the grievance procedure [and thus administrative remedies are 'unavailable'] when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about the use of that process." *Arnold v. Goetz,* 245 F.Supp.2d 527, 538 (S.D.N.Y.2003) (internal citation omitted). At the same time, however, " 'correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known.' " *Id.* at 537–38 (internal citation omitted). The availability of those remedies is adjudged not by whether the Plaintiff was unaware of them, but instead by whether " 'a similarly situated individual of ordinary firmness' " would have deemed them available. *Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir.2004) (internal citation omitted). This is a question of fact. *Arnold,* 245 F.Supp.2d at 538.

The record here is devoid of any facts from which such a determination could be made. Most cases in this District considering the topic have explored, in detail, whether the correctional officers provided the inmate with a handbook explaining the grievance procedure, and whether officers explained the grievance procedure prior to the alleged incident; the record before the Court is—understandably, at this procedural juncture—silent as to this information. *See, e.g., Smith,* 2013 WL 5434144, at *10 ("Receipt of such a handbook generally indicates that the inmates were informed of the grievance procedure so as to make that procedure 'available' to them. It alone is not, however, dispositive." (internal citation omitted)); *Arnold,* 245 F.Supp.2d at 539 ("The defendants allege that the 'behavior booklet' provided to an inmate upon his 'entrance to the corrections system' outlines the available grievance procedures." (internal citation omitted)).

**\*5** Failure to comply with the PLRA's exhaustion requirement is an affirmative defense, on which the defendant bears the burden of proof. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999); *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). The County has failed to carry its burden on this affirmative defense; however, its claim in this regard is denied without prejudice to raising such a defense at a later date, upon a more complete record.[5] *See Arnold,* 245 F.Supp.2d at 538–39 ("Since the nonmoving party is proceeding *pro se,* we are obligated to resolve existing doubts in the plaintiff's favor and to read his [ ] Complaint as raising the strongest argument it suggests (namely, that his lack of sufficient knowledge about the procedure is attributable to correctional officials rather than to himself. Giving the plaintiff the benefit of the doubt in this manner despite his failure to clarify his statements comports with the principle that the defendants bear the burden of proving that he failed to satisfy the PLRA's exhaustion requirement.").

[5]     Though the Court does not reach this issue here, it notes that Defendant Correct Care has not also raised the affirmative defense of Plaintiff's failure to comply with the PLRA's exhaustion requirement and, for that reason, may have forfeited this defense. *See Arnold,* 245 F.Supp.2d at 532 (noting that failure to exhaust is an affirmative defense and thus " 'may be waived by a defendant, or forfeited by failure to raise the defense' " (internal citation omitted)).

### 2. The Complaint Fails to Allege Defendants' Deliberate Indifference to a Serious Medical Need

The Court next turns to the merits of Plaintiff's constitutional claim. To sufficiently plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege that (i) the alleged deprivation results in a serious medical condition; and (ii) the defendant, in depriving plaintiff of medical treatment, acted with deliberate indifference. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

#### a. Plaintiff Has Alleged a Serious Medical Condition

A serious medical condition requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal citation omitted); *see also Jones v. Vives,* 523 F. App'x 48, 49 (2d Cir.2013) (summary order).

2014 WL 1778410

Defendants do not dispute that MRSA constitutes a serious medical condition that may produce death, degeneration, or extreme pain. (Def.Br.7). *See generally Gaines v. Armor Health Care, Inc.,* No. 12 Civ. 5663(JS)(WDW), 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013) (noting that MRSA was a sufficiently serious medical condition); *McNulty v. Yaneka,* No. 11 Civ. 8320(ER), 2013 WL 684448, at *7 n. 2 (S.D.N.Y. Feb. 25, 2013) (same). Accordingly, Plaintiff has satisfied the first element of his Eighth Amendment claim.

### b. Plaintiff Has Failed to Allege that Defendants Acted with the Requisite Deliberate Indifference

#### i. Applicable Law

Plaintiff must also allege, however, that Defendants acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway,* 99 F.3d at 553 (internal citation omitted); *see also Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011) (summary order). Such a state of mind " 'entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

**\*6** Mere allegations of medical malpractice are generally insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, " 'the charged official must act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.' " *Bell v.. Jendell,* No. 12 Civ. 6666(KMK), 2013 WL 5863561, at *4 (S.D.N.Y. Oct. 31, 2013) (quoting *Salahuddin,* 467 F.3d at 280) (emphasis in *Bell* ); *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Similarly, "not every lapse in medical care is a constitutional wrong." *Salahuddin,* 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to

deliberate indifference. *See Ross v. Correct Care Solutions LLC,* No. 11 Civ. 8542(DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013) (" '[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' " (internal citation omitted)). Lastly, the law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference. *Thomas v. Westchester Cnty.,* No. 12 Civ. 6718(CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) ("treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference" (internal citation omitted)); *see also Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." (internal citation omitted)).

#### ii. The January 2013 Suspension of Medication

Plaintiff's first claim of deliberate indifference stems from his allegation that he had been prescribed medication for MRSA at the time of his arrest, but that Defendants discontinued those medications and failed to prescribe him new ones, despite their promise to do so. (Compl.3). Plaintiff does not allege that he was suffering from any symptoms of a MRSA infection at the time, nor that he had actually been diagnosed as having MRSA (as opposed to being prescribed medications for the condition, perhaps prophylactically). However, within weeks of Defendants' decision to cease Plaintiff's medication and failure to prescribe new medication, Plaintiff developed a large lump that resulted from a MRSA infection. Accordingly, Plaintiff contends that he should have been prescribed new medication for treatment of MRSA long before the March 17 incident.

**\*7** Delay in providing medication can rise to the level of deliberate indifference, but only where a plaintiff's allegations indicate that the defendants, for instance, "deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for [a period of time], or delayed major surgery for over two years." *Demata v. New York State Correctional Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (internal citations omitted); *cf. Ross,* 2013 WL 5018838, at *5 (denying motion to dismiss a deliberate-indifference claim where defendant "was informed about [the plaintiff's] sleep apnea" but *"deliberately refused*

2014 WL 1778410

to provide him with medical treatment ... on account of his prior complaint and lawsuits" (emphasis added)).

Plaintiff fails to allege any facts demonstrating that Defendants deliberately withheld his medication as a form of punishment, or discontinued his medication while being aware that serious, life-threatening consequences could result therefrom. Instead, Plaintiff's allegations indicate that Defendants agreed to prescribe him new medication, but simply failed to do so; this is insufficient to state a claim for deliberate indifference. *See Ferguson v. Cai,* No. 11 Civ. 6181(PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12, 2012) (dismissing Eighth Amendment claim where plaintiff failed to allege that the defendant "actually disregarded any such known risks," but simply that the defendant " 'forgot to call,' " which fell "well short of the high threshold for deliberate indifference"); *Bell,* 2013 WL 5863561, at *4–6 (same); *Baskerville v. Blot,* 224 F.Supp.2d 723, 735–36 (S.D.N.Y.2002) (dismissing claim based on prison nurse's "failure to obtain a refill of [plaintiff's] ... medication" where plaintiff's "assertions [did] not show that [the nurse] acted intentionally to withhold from him his prescribed medication or was in any way responsible for the delay in obtaining a refill").

In short, Plaintiff has failed to plead deliberate indifference in connection with the discontinuance of his medications, and Defendants' motion to dismiss as to this claim must be granted. The remaining issue, however, is whether such dismissal should be with or without prejudice. Here, too, the Court must construe the record as broadly in favor of Plaintiff's claims as the facts will permit. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (" 'A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " (internal citation omitted)). After reviewing the record, the Court concludes that more particularized pleading—specifically, if Plaintiff were able to allege more details concerning (a) whether he was diagnosed with MRSA prior to his incarceration; (b) whether he was in pain or exhibited symptoms of a MRSA infection at the time of his arrest; (c) whether Defendants were aware that Plaintiff had MRSA and had symptoms of MRSA at the time of his incarceration; and (d) whether Defendants ignored such symptoms or deliberately withheld medication—could cure the deficiencies in Plaintiff's Complaint. Accordingly, Defendants' motion to dismiss is granted without prejudice, and Plaintiff is granted leave to file an amended complaint.

*See Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795–96 (2d Cir.1999) (granting leave to amend a *pro se* complaint where "a liberal reading of the complaint [indicates] that a valid claim might be stated' " (citation omitted)). [6]

[6]     Plaintiff does not allege whether the doctor's decision to discontinue his medication was the result of any official policy or practice, such that liability would attach for the County. Section 1983 " 'extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.' " *Okin v. Village of Cornwall–on–Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (internal citation omitted). Because the Court is permitting Plaintiff to amend his complaint with regard to his Eighth Amendment claim, and because Defendants failed to brief this issue or move upon this ground in their motion to dismiss, the Court declines to reach the issue of whether the Complaint adequately states a claim for municipal liability against the County.

### iii. The March 2013 MRSA Infection

**\*8** Plaintiff also fails to plead sufficiently that Defendants acted with the requisite state of mind with respect to Plaintiff's March 2013 MRSA infection. Plaintiff avers that a large lump was present on his leg on or about March 17, 2013, and that Jail medical staff responded immediately by conducting a blood testing, placing Plaintiff in quarantine, and prescribing him antibiotics and pain medication. (Compl.3). Critically, Plaintiff's only complaint with the treatment of his March infection is his belief that the doctors were "hiding something" from him. (*Id.*). This does not rise to the level of deliberate indifference, rather, Plaintiff's Complaint paints a picture of an attentive medical staff responding proactively to Plaintiff's infection.

As an initial matter, medical providers have wide discretion in treating inmate patients and their determinations "are given a 'presumption of correctness.' " *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311–12 (S.D.N.Y.2001) (internal citation omitted). Here, Plaintiff does not indicate that he was denied medically necessary treatment, or even that he disagrees with the medical treatment he received. Rather, Plaintiff simply alleges that he distrusts the doctors. It is well-settled that a mere disagreement between the inmate and doctor concerning the appropriate treatment or medication does not constitute

2014 WL 1778410

deliberate indifference. *See Hill,* 657 F.3d at 123 (a "prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment" (internal citation omitted)); *Crique v. Magill,* No. 12 Civ. 3345(PAC) (GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention ... does not constitute deliberate indifference." (internal citation omitted)). Simply put, a doctor's determination of the appropriate treatment is a medical judgment and does not in and of itself amount to deliberate indifference or a violation of the Eighth Amendment.

Plaintiff similarly does not allege any facts related to the rash he developed in June 2013 and, more specifically, whether it was related to his MRSA infection, much less does he plead facts indicative of deliberate indifference to his medical needs. Plaintiff does not plausibly allege that Defendants acted with the requisite state of mind necessary to demonstrate deliberate indifference to a serious medical need. Defendants' motion to dismiss as to this claim must also be granted.

Again, the Court must consider whether the dismissal should be with or without prejudice. "Although pro se plaintiffs are generally given leave to amend a deficient complaint, a district court may deny leave to amend when amendment would be futile because the problem with the claim 'is substantive and better pleading will not cure it.' " *Thomas v. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171, at *7 (S.D.N.Y. July 3, 2013) (quoting *Cuoco,* 222 F.3d at 112). Plaintiff's allegations establish that Defendants responded expeditiously and appropriately to his MRSA infection; additional allegations would not change this fact. Plaintiff's claim in connection with his March 2013 MRSA infection is dismissed with prejudice.

**3. Plaintiff's State Law Claims Are Dismissed as to Defendant County**

**\*9** Plaintiff's allegations could also conceivably be construed as state-law tort claims for medical negligence. However, Plaintiff indisputably did not comply with the requirements of Section 50–e of the New York General Municipal Law, and his state law claims brought against Defendant County must be dismissed for that reason.[7]

[7]   N.Y. Gen. Mun. Law § 50–e states in relevant part: In any case founded upon tort where a notice of claim is required by law as a condition

precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F .3d 789, 793 (2d Cir.1999) (internal citations omitted). Section 50–e "has been described by both the New York Court of Appeals and the Second Circuit as a 'condition precedent' as opposed to a 'statute of limitations.' " *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.,* No. 13 Civ. 6705(DLC), 2014 WL 241739, at *9 (S.D.N.Y. Jan. 22, 2014) (internal citations omitted). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle v. City of New York,* 728 F.Supp.2d 332, 348–49 (S.D.N.Y.2010) (internal citation omitted). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 423 (S.D.N.Y.2006) (internal citation omitted).

The Westchester County Attorney rejected Plaintiff's Notice of Claim as untimely, and the Court is unable to excuse or overlook Plaintiff's failure to comply with Section 50–e. Accordingly, Defendant County's motion to dismiss Plaintiff's New York State law claims is granted.[8]

[8]   Defendant Correct Care has not moved to dismiss the New York State law claims brought against it; accordingly, those remain.

**CONCLUSION**

For the reasons discussed herein, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate Docket Entry 13.

Specifically, Defendant County's motion is DENIED without prejudice with respect to the County's affirmative defense for failure to exhaust administrative remedies.

Defendant County's motion is GRANTED with prejudice with respect to Plaintiff's New York State law claims.

2014 WL 1778410

Defendants' motion is GRANTED with prejudice with respect to Plaintiff's Eighth Amendment claim relating to his March 2013 MRSA infection.

Defendants' motion is GRANTED without prejudice with respect to Plaintiff's Eighth Amendment claim relating to Defendants' decision to discontinue his medication in January

2013. Plaintiff is granted leave to file an amended complaint within 30 days from the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1778410

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1363495

2018 WL 1363495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, III, Plaintiff,
v.
Nancy SMITH, et al., Defendants.

9:15-CV-913 (BKS/DJS)
|
Signed 03/16/2018

**Attorneys and Law Firms**

Robert Adams, III, 07-B-1611, Wende Correctional Facility,
P.O. Box 1187, Alden, NY 14004, Plaintiff, pro se

Keith J. Starlin, Esq., Hon. Eric T. Schneiderman, Office of
New York State Attorney General, The Capitol, Albany, NY
12224, Attorney for Defendants

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge

**I. INTRODUCTION**

 *1  Plaintiff pro se Robert Adams, III brought this action
under 42 U.S.C. § 1983 alleging that Defendants Vijay Kumar
Mandalayawala, M.D. and Nurse Administrator Nancy Smith
were deliberately indifferent to his serious medical needs in
violation of the Eighth Amendment, while he was confined
at Upstate Correctional Facility. (Dkt. Nos. 1, 73). On June
9, 2017, Defendants filed a motion for summary judgment.
(Dkt. No. 115). Plaintiff opposed the motion (Dkt. Nos.
124, 125). On December 5, 2017, United States Magistrate
Judge Daniel J. Stewart issued a Report-Recommendation
and Order ("R & R") recommending that the Court grant
Defendants' motion for summary judgment and dismiss this
action. (Dkt. No. 134). After thoroughly reviewing the facts
and the law, Magistrate Judge Stewart found that even if
Plaintiff satisfied the first prong of the deliberate indifference
analysis by showing that his medical need was sufficiently
serious, he failed to present evidence showing that Defendants
acted with a sufficiently culpable statement mind. (Dkt.
No. 134). Specifically, Magistrate Judge Stewart noted that
"[a] disagreement about the proper course of treatment is
insufficient to establish a deliberate indifference claim." [1]
(Dkt. No. 134, at 13). Magistrate Judge Stewart informed the

parties that under 28 U.S.C. § 636(b)(1), they had fourteen
days within which to file written objections and that the
failure to object would preclude appellate review. (Dkt. No.
134, at 14). Plaintiff filed objections to the R & R on
December 21, 2018. (Dkt. No. 138).

[1]       As Magistrate Judge Stewart decided the motion
for summary judgment on the merits, he
did not address Plaintiff's alleged failure to
exhaust his administrative remedies or whether
Defendants were personally involved in the alleged
deprivation. (Dkt. No. 134, at 9–10).

**II. BACKGROUND**
The Court presumes the parties' familiarity with Plaintiff's
factual allegations which are thoroughly set forth in the R &
R. (Dkt. No. 134, at 2–9). Plaintiff's deliberate indifference
claim arises from his confinement at Upstate from February
1, 2013 to April 25, 2013.

Plaintiff claims that on or about January 2013, while he
was confined at Sing Sing Correctional Facility, he began
suffering severe back pain following an assault. (Dkt. No.
124-2, at 1). X-rays revealed "involuntary muscle spasms
and a straightened lordosis." (Id.). On January 25, 2013, a
nurse at Sing Sing advised Plaintiff that he would be referred
to physical therapy and receive a thirty-day prescription for
Baclofen, a muscle relaxant. (Id. at 3). Plaintiff received
Baclofen twice a day from January 25, 2013 through January
30, 2013. (Id.).

On January 31, 2013, prior to his transfer to Upstate, a
facility nurse completed a "Medication Administration Form"
indicating that Plaintiff had received Baclofen at 8:00 a.m.
that day and that Baclofen had been ordered on January 25,
2013 "thru" February 23, 2013. (Dkt. No. 124-2, at 4; Dkt.
No. 124-4, at 17). Plaintiff contends this form is used "to apprise a
transferred inmate's receiving facility, of his/her prescription
medication" and that the nurse who completed it placed it
in his Ambulatory Health Record, which went with him to
Upstate. (Dkt. No. 124-2, at 5).

 *2  On February 1, 2013, Plaintiff arrived at Upstate, where
a nurse "medically screened him." (Dkt. No. 124-2, at 6).
Plaintiff reported "his diagnosed conditions (spasms)" and
that he had been prescribed Baclofen and was to receive
physical therapy. (Id. at 6). Plaintiff claims that when he
asked the nurse making medication rounds that night for
his medication because he was in "extreme physical pain,

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 108 of 328

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

suffering from muscle spasms," the nurse replied that he had no medications for Plaintiff and advised him to sign up for sick call. (Dkt. No.73, ¶ 24).

On February 6, 2013, Dr. Mandalaywala, whom Plaintiff contends was his primary care physician at Upstate, conducted an initial review of Plaintiff's medical records. (Dkt. No. 115, 9, ¶ 8). The parties dispute whether the medical records Dr. Mandalaywala reviewed that day included any indication that Plaintiff had been prescribed Baclofen. (*Id.*, at ¶¶ 22 and 24; Dkt. No. 138, at 8–9; Dkt. No. 124-4, at 17). In his declaration, Dr. Mandalaywala states that he "decided the best course of treatment for plaintiff at that time, in regard to his reported back symptoms, was for him to continue activity," mitigate pain with "a non-prescription pain reliever" (Tylenol), and attend physical therapy. (Dkt. No. 115-9, ¶ 22).

Plaintiff continued to complain, via sick call, to nurses he spoke with at the facility, and in a February 11, 2013 letter to the nurse administrator, Nurse Administrator Smith, of his extreme physical pain and muscle spasms, that he needed Baclofen, and that the non-prescription pain relievers that he had been given at the facility were "ineffective." (Dkt. No. 124-2, at 6–8; Dkt. No. 115-12, ¶ 26). Nurse Administrator Smith responded the next day that Plaintiff "need[ed] to sign up for sick call" and that Baclofen was "approved for short course only" and noted that he was scheduled for physical therapy and had "access to pain medication daily on sick call." (Dkt. No. 115-13, at 3).

On February 24, 2013, Plaintiff "engaged Defendant Smith in a conversation regarding the systematic deprivation of his prescription pain medication," told her that he was in constant pain, and requested a tube of muscle cream. (Dkt. No. 124-2, at 12). Nurse Administrator Smith denied his request for muscle cream and told him: "This is the Box, not a massage parlor; I'm not here to 'cater' to you. If you are in pain, sign up for sick call; I'm not giving you any relaxants; you don't need it." (*Id.*). In response to Plaintiff's complaints of pain, Defendant Smith said: "if you keep crying like a girl, I'll give you some ESTROGEN; you should've thought about your pain, before you did what you did, to come to the Box." (*Id.*).

Despite multiple sick call visits, complaints of pain, spasms, and leg numbness, Plaintiff received only non-prescription pain medication and physical therapy during the entirely of his time at Upstate (February 1, 2013 to April 25, 2013).

## III. STANDARD OF REVIEW

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F.Supp.3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

## IV. DISCUSSION

### A. Procedural and Factual Objections

Plaintiff contends that his response to Defendants' statement of material facts, while imperfect, nonetheless clearly sets forth his arguments in opposition to Defendants' motion and was properly supported by citations to the evidence in the record, and asserts that Magistrate Judge Stewart improperly "disregard[ed] plaintiffs [sic] sworn statements," including his affidavit. (Dkt. No. 138, at 3). Magistrate Judge Stewart noted that Plaintiff's response was "inconsistent" with Local Rule 7.1(a)(3), (Dkt. No. 134, at 3 n.2), but nonetheless considered Plaintiff's arguments as well as Plaintiff's Second Amended Complaint, and deposition testimony. (Dkt. No. 134, at 2–9) (referring to the factual assertions in the Second Amended Complaint, Plaintiff's deposition, and Plaintiff's arguments). The Court has recounted the sworn statements in Plaintiff's affidavit, supra, but concludes, for the reasons that follow, that they fail to raise a material issue of fact.

**\*3** The Court has reviewed all of Plaintiff's specific factual objections de novo. [2] Based upon the evidence in the record, the Court credits the following objections and finds as follows: Defendant Mandalaywala was, as Plaintiff asserts, Plaintiff's primary care physician and decision-maker during his confinement at Upstate. (Dkt. No. 138, at 5–8; Dkt. No. 124-5). Defendant Mandalaywala was aware of and discontinued Plaintiff's prescription for Baclofen. (Dkt. No. 138, at 8; Dkt. No. 124-4, at 11, 17).

[2]     Plaintiff also objects to Magistrate Judge Stewart's failure to bind Defendant Smith to her "Rule 36 F.R.C.P. Admissions." (Dkt. No. 138, at 12; Dkt. No. 124-5, 22–40). This appears to refer to a Decision and Order issued by Magistrate Judge Stewart on April 12, 2017 concerning a discovery issue. (Dkt. No. 104). In it, Magistrate Judge Stewart granted Defendant Smith's motion

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

to withdraw her admissions to Plaintiff's notices to admit. (Dkt. No. 104, at 40). Plaintiff did not appeal that Order, and here is no indication that Magistrate Judge Stewart overlooked any of Defendant Smith's remaining admissions.

The Court rejects Plaintiff's assertion that Magistrate Judge Stewart incorporated the Declaration of Valerie Monroe into the R & R. (Dkt. No. 138, at 26). Magistrate Judge Stewart specifically excluded the Monroe Declaration at Plaintiff's request. (Dkt. No. 134 n.3).

After considering the remainder of Plaintiff's factual and procedural objections, the Court has found them to be unsupported or immaterial to the legal issues pending before the Court. With the minor exceptions set forth above, and any additions contained in Section II., the Court therefore adopts and incorporates into this decision the thorough recitation of facts set forth in the Report-Recommendation.

### B. Objections to Legal Analysis

Plaintiff asserts that Defendants Dr. Mandalaywala and Nurse Administrator Smith failed to give him Baclofen, despite an existing prescription, thus causing him extreme pain. To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard for deliberate indifference includes an objective component and a subjective component. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

"The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' " *Id.* (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "That is, the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

It is well established that "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Id.* at 123. For this reason, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). The "essential test is one of medical necessity and not one simply of desirability." *Id.* (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

**\*4** Plaintiff avers that Dr. Mandalaywala and Nurse Administrator Smith refused to provide him with Baclofen, despite having a prescription for it from another facility, that the non-prescription medication they provided was ineffective, and that, as a result, he suffered extreme pain. Courts have repeatedly rejected medical indifference claims based upon a failure to provide stronger pain medication. *See*, *e.g.*, *Rush v. Fischer*, 09 Civ. 9918, 2011 WL 6747392, at \*3, 2011 U.S. Dist. LEXIS 148080, at \*8 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."); *Harris v. Westchester Cty Med. Ctr.*, No. 08 Civ. 1128 (RJH), 2011 WL 2637429, at \*3, 2011 U.S. Dist. LEXIS 72566, \*9 (S.D.N.Y. July 6, 2011) ("the failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese*, 694 F.Supp.2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment").

Here, Plaintiff fails to raise a question of fact indicating that Dr. Mandalaywala knew that his prescribed course of treatment—physical therapy and non-prescription pain medication—was medically inadequate, or that he had in improper motive in not continuing Plaintiff's Baclofen prescription. That Dr. Mandalaywala differed with the Sing Sing medical providers as to the proper course of treatment for Plaintiff is not evidence of deliberate indifference. "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 110 of 328

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

a constitutional claim of deliberate indifference." *Cole v. Goord*, No. 04 CIV. 8906GEL, 2009 WL 1181295, at *8 n.9, 2009 U.S. Dist. LEXIS 37088, at *23 n.9 (S.D.N.Y. Apr. 30, 2009), *aff'd*, 379 Fed.Appx. 28 (2d Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 97, 97 (S.Ct. 285, 50 L.Ed.2d 251 1976)).

Nor does the evidence before the Court raise a question of fact as to whether Nurse Administrator Smith acted with a sufficiently culpable mind in refusing to provide Baclofen or in failing to "refer[ ] the matter" to Dr. Mandalaywala. (Dkt. No. 138, at 18–19). Even crediting Plaintiff's assertion that on February 24, 2013, in response to his complaints of extreme pain, spasms, and paresthesia and request for Baclofen, Nurse Administrator Smith told him that he did not "need" Baclofen, she would not give him "any relaxants" and that he "should've thought about [his] pain, before [he] did what [he] did, to come to the Box," (Dkt. No. 124-2, at 12; Dkt. No. 73, ¶ 82), no reasonable fact finder could conclude that she was deliberately indifferent to Plaintiff's medical needs on the basis that she failed to procure Plaintiff's preferred medication. Indeed, even under Plaintiff's version of the facts, subjectively, Nurse Administrator Smith, relying on the course of treatment Dr. Mandalaywala had recommended, [3] did not believe that Plaintiff needed a muscle relaxant. *See Veloz*, 339 F.Supp.2d at 525 (finding medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference, explaining that "[t]he Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to disagreement over the appropriateness of a particular prescription plan."); *Hill*, 657 F.3d at 123 ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."). The Court has considered Plaintiff's remaining objections and finds them without merit. Accordingly, the Court concludes that there are no material issues of fact requiring trial and that Defendants are entitled to summary judgment.

[3]     Nurse Administrator Smith states that she did not "examine or treat Plaintiff while he was housed at Upstate." (Dkt. No. 115-12, ¶ 26). In her declaration, she avers that when she received

Plaintiff's February 11, 2013 letter concerning a prescription for Baclofen, she, as was her practice when receiving an inmate letter, would have requested "that the nurse caring for the inmate ... provide pertinent information, so that [she can respond] to the inmate." (*Id.*, at ¶ 27). In her declaration, Nurse Administrator Smith outlines Plaintiff's medical records, including his complaint of "LBP [lower back pain] chronic," the recommendation for physical therapy, and Dr. Mandalaywala's determination not to issue any "new orders," or prescription medication, (*id.* at ¶¶ 38–39), and states that she based her response to Plaintiff's letter—denying his request for Baclofen—on the information in his medical records. (*Id.* at ¶ 42). Further, although Nurse Administrator Smith states she has "no memory of having ever personally spoken with plaintiff," (*id.* at ¶ 58), assuming, as Plaintiff asserts, that they spoke on February 24, 2013, she would have been aware of his medical record, and that his current treatment plan did not contain a prescription for a muscle relaxant.

## V. CONCLUSION

 *5 **ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 134) is **ADOPTED** in all respects; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED** and this action is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk serve this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1363495

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    4

2011 WL 6747392
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Basheen RUSH, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 09 Civ. 9918(JGK).
|
Dec. 23, 2011.

***MEMORANDUM OPINION AND ORDER***

JOHN G. KOELTL, District Judge.

**\*1** The plaintiff, Basheen Rush, who is currently incarcerated at Sing Sing Correctional Facility ("Sing Sing"), brings this motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). The plaintiff seeks an injunction enjoining the defendants from denying him an effective course of medical treatment for the chronic wrist and back pain he suffers and ordering the defendants to reinstate his prior medication regimen, which included the prescription of Percocet.

**I.**

The plaintiff, Basheen Rush, is currently incarcerated at Sing Sing. The plaintiff suffers from extreme and chronic pain in his back and wrist. (Aff. of Basheen Rush in Supp. of Pl.'s Mot. for Prelim. Inj. ("Rush Aff.") ¶¶ 2–3.)

The plaintiff arrived at Sing Sing on October 6, 2011, after being transferred from Coxsackie Correctional Facility ("Coxsackie"). (Rush Aff. ¶ 1; Decl. of Razia Ferdous, M.D. in Opp. to Pl.'s Mot. for Prelim. Inj. ("Ferdous Decl.") ¶ 7.) At Coxsackie, the plaintiff had been prescribed Percocet to manage his pain and was taking 5/325 mg twice a day, with instructions that the medication be administered in liquefied form and consumed by the plaintiff in front of medical staff. (Ferdous Decl. ¶ 6.) Upon his transfer to Sing Sing, the plaintiff was initially continued on Percocet. (Ferdous Decl. ¶ 7.) However, on October 11, 2011, the plaintiff had a follow-up appointment with a medical provider, who explained that

the plaintiff would be weaned off Percocet over a two-week period. (Ferdous Decl. ¶ 8.) On October 27, 2011, the plaintiff was discontinued from Percocet. (Ferdous Decl. ¶ 9.)

The defendants submit a declaration from Dr. Razia Ferdous who states that, to replace Percocet, the plaintiff was given Baclofen twice a day in combination with Ibuprofen. (Ferdous Decl. ¶ 8.) Dr. Ferdous states that Baclofen is a non-narcotic pain medication used to treat back pain and muscle strain which is effective in managing pain when used in combination with Ibuprofen. (Ferdous Decl. ¶ 8.) The plaintiff contends that he is no longer receiving the Baclofen and Ibuprofen and that he is currently not being provided with any pain medication. (Letter of Basheen Rush dated Nov. 23, 2011.)

The plaintiff brings this motion for a preliminary injunction enjoining the defendants from denying him an effective course of medical treatment to manage his pain. In particular, the plaintiff seeks to have his prior course of treatment, in which he was prescribed Percocet, reinstated.

**II.**

**A.**

The standards that govern the issuance of a preliminary injunction are well established. Ordinarily, a party seeking a preliminary injunction must show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008). However, "[w]here a moving party challenges governmental action taken in the public interest pursuant to a statutory or regulatory scheme," as does the plaintiff here, "the moving party cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks and citations omitted).

**\*2** Moreover, where the plaintiff seeks a mandatory injunction—one that "alter[s] the status quo by commanding some positive act"—an even higher standard applies. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). Namely, the plaintiff must make a "clear" or "substantial" showing of likelihood of success on the merits

2011 WL 6747392

or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Jolly,* 76 F.3d at 473; *Tom Doherty,* 60 F.3d at 33–34; *Cherry River Music Co. v. Simitar Entm't Inc.,* 38 F.Supp.2d 310, 316 (S.D.N.Y.1999). In this case, the relief sought by the plaintiff is properly characterized as a mandatory rather than a prohibitory injunction. The plaintiff seeks an injunction that would alter the status quo by departing from his current course of treatment and ordering the reinstatement of his prior medication regimen which included the prescription of Percocet. *See Jolly,* 76 F.3d at 474 (injunction sought by prisoner was properly characterized as mandatory injunction where relief requested would have required shift in established Department of Correctional Services policy). Accordingly, the plaintiff must meet this more stringent standard.

Because the plaintiff is proceeding pro se, his submissions must be "read liberally and be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**B.**

The plaintiff claims that the defendants violated the Eighth Amendment by providing him with inadequate medical treatment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In order to prevail on a deliberate indifference claim, a prisoner must satisfy a two-part test: first, the "objective" prong requires that the deprivation be "sufficiently serious"; and second, the "subjective" prong requires that the charged official act with a "sufficiently culpable state of mind." *See, e.g., Salahuddin,* 467 F.3d at 279–80; *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005); *Chance,* 143 F.3d at 702. With respect to this second prong, the prisoner must show more than mere negligence in diagnosis or treatment. *See Estelle,* 429 U.S. at 105–06; *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). Instead, the prisoner must show that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety ...." *Farmer v. Brennan,* 511 U.S. 825, 837,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 184.

**\*3** In this case, the plaintiff asserts that the defendants acted with deliberate indifference to his serious medical needs when they discontinued his course of treatment which had included the prescription of Percocet. However, although the plaintiff was taken off Percocet, he was provided with another medication regimen consisting of Baclofen and Ibuprofen to manage his pain.[1] (Ferdous Decl. ¶ 8.) The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs. *See, e.g., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) (prisoner's claim that Motrin medication was insufficient and that stronger pain medication was required for his wrist injuries did not state a deliberate indifference claim); *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (summary order) (defendants' decision to prescribe Tylenol or Motrin to manage prisoner's pain and to administer Demerol or Morphine only when necessary did not constitute deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr.,* No. 08 Civ. 1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004) (medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference); *Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at *9–10 (S.D.N.Y. Dec.21, 2000) (doctor's decision to prescribe Motrin in lieu of Percocet for prisoner's medical condition did not amount to deliberate indifference, even when that decision contravened recommendation of specialist).

[1]      In his reply papers in connection with this motion, the plaintiff asserts that he is no longer receiving the Baclofen and Ibuprofen to treat his pain and that he has been provided with no pain medication at all. (Letter of Basheen Rush dated Nov. 23, 2011 .) However, the plaintiff submits no affidavit or medical records to support this assertion, other than two labels from his prescriptions indicating that there were to be "(0) Refills." (Letter of Basheen Rush dated Nov. 23, Ex. 1.) In contrast,

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 113 of 328
**Rush v. Fischer, Not Reported in F.Supp.2d (2011)**

2011 WL 6747392

the declaration of Dr. Ferdous indicates that the plaintiff has been and continues to be provided with a nonnarcotic alternative to manage his pain. (Ferdous Decl. ¶¶ 4, 8, 11.) If in fact the plaintiff is denied all pain medication in the future, he can renew his motion for a preliminary injunction at that time.

The plaintiff has made no showing that the decision to prescribe Baclofen and Ibuprofen in lieu of Percocet deviated from reasonable medical practice for the treatment of his pain, much less that the defendants acted with a culpable state of mind in making this decision. To the contrary, Dr. Ferdous asserts that discontinuing the use of Percocet minimizes health risks such as liver damage that can result from prolonged use of Percocet and avoids the possibility of abuse of narcotic pain medication. (Ferdous Decl. ¶ 5.) The plaintiff's allegations demonstrate a "mere disagreement over the proper treatment" of his pain, which "does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703; *see also Veloz,* 339 F.Supp.2d at 525 ("The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to disagreement over the appropriateness of a particular prescription plan."). "Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." *Hill,* 667 F.3d at 123.

 **\*4** Thus, the plaintiff has not demonstrated a likelihood of success on the merits, much less a "clear" or "substantial" showing to this effect. Because the plaintiff must demonstrate

a likelihood of success on the merits in order to obtain an injunction challenging governmental action, *Jolly,* 76 F.3d at 473, the plaintiff's motion for a preliminary injunction is **denied.** [2] The denial is **without prejudice** because the plaintiff may renew the motion if he is denied adequate medical treatment in the future.

[2]     The defendants also contend that the motion for a preliminary injunction should be denied because the plaintiff has failed to serve the proper defendants and has failed to allege that the defendants were personally involved in the purported constitutional deprivation. Because the Court denies the motion for a preliminary injunction on the meri ts, it is unnecessary to reach these arguments.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the plaintiff's motion for a preliminary injunction is **denied without prejudice.**

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6747392

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shihsiang LIAO, a/k/a Shih-
Siang Shawn Liao, Plaintiff,

v.

Faisal MALIK,[1] Defendant.

[1] The remaining defendant in this action is identified in plaintiff's complaint as S. Malik. *Dkt. No. 1 at 3.* It is clear from his motion papers, however, that defendant's first name is "Faisal." See, e.g., *Dkt. No. 41-2 at 1.* The clerk of the court is respectfully directed to adjust the court's records accordingly.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O. Box 472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, KEITH J. STARLIN, ESQ., Assistant Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Shihsiang Liao, a former New York State prison inmate who has also identified himself as Shih–Siang Shawn Liao, against four employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), including its former commissioner and current acting commissioner, pursuant to 42 U.S.C. § 1983. While his complaint contains additional claims, the sole remaining cause of action in this case is asserted against defendant Faisal Malik based on allegations that he denied plaintiff due process while assisting him in preparing for a disciplinary hearing by failing to interview and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought by the defendant Malik requesting the entry of summary judgment dismissing plaintiff's remaining claim. For the reasons set forth below, I recommend that defendant's motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2] In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September 2014, *Dkt. No. 25,* plaintiff was an inmate held in the custody of the DOCCS.[3] *See generally Dkt. No. 1.* At the times relevant to his remaining claim, plaintiff was confined initially in the Ogdensburg Correctional Facility ("Ogdensburg"), located in Ogdensburg, New York, and later the Gouverneur Correctional Facility ("Gouverneur"), located in Gouverneur, New York. *Id.*; *Dkt. No. 41–6 at 19.*

[3] It appears that following his release from prison in New York, plaintiff served time in two correctional facilities in Ohio. Dkt. Nos. 25, 30; *see also Dkt. No. 41–6 at 129.*

On November 19, 2010, plaintiff was issued a series of misbehavior reports accusing him of violating prison rules arising from conduct occurring while housed in Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The charges set forth in those misbehavior reports accused the plaintiff of (1) soliciting goods or services without consent from the superintendent or his designee; (2) the unauthorized exchange of personal items without authorization; (3) possession of contraband; (4) taking state property; (5) providing incomplete, misleading, and/or false statements or information; (6) impersonation; and (7) providing legal assistance to another inmate without prior approval from the superintendent or his designee. *Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were based upon a search of plaintiff's cell, conducted on November 19, 2010, and the resulting confiscation of several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7; see also Dkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports, plaintiff was transferred to a special housing unit ("SHU") in Gouverneur to await a Tier III disciplinary hearing concerning

Liao v. Malik, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 115 of 328

2016 WL 1128245

the pending charges. [4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.*; *see also Dkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

[4]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

 **\*2**  A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

  A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 116 of 328

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact's support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

[5]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed

to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at* 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 117 of 328

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

   C. *Analysis of Plaintiff's Procedural Due Process Claim*
In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

6     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 118 of 328

court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way, [7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

[7]   Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him

approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's

precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id.* at 898; accord, *Samuels v. Selsky*, 166 F. App'x 552, 556 (2d Cir. 2006). [8]

[8]    The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at *9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at *6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at *12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generallyDkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.; see alsoDkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see alsoDkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 120 of 328

*Id.*; Dkt. No. 41–3. Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58.* While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng.* Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel

or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *SeeDkt. No. 41–2.* This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2,* 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

[9]    At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generallyDkt. No. 41–8.*

[10]    In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

 **\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1128245

---

                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 122 of 328
Genier v. Vanarnum, Not Reported in Fed. Supp. (2016)

2016 WL 4507456

2016 WL 4507456
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony J. GENIER, Sr., Plaintiff,
v.
Sergeant VANARNUM and
Captain McKenna, Defendants.

Civil Action No. 9:13-CV-1460 (GTS/DEP)
|
Signed 06/20/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: ANTHONY J. GENIER, SR., Pro se, 14-A-0698, Downstate Correctional Facility, Box F, Fishkill, NY 12524.

FOR DEFENDANTS: FITZGERALD MORRIS BAKER, FIRTH, P.C., 16 Pearl Street, P.O. Box 2017, OF COUNSEL: JOSHUA D. LINDY, ESQ., Glens Falls, NY 12801.

<u>REPORT AND RECOMMENDATION</u>

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Anthony Genier, Sr., a former inmate at the Washington County Correctional Facility ("WCCF"), has commenced this action against two corrections workers employed at the facility, pursuant to 42 U.S.C. § 1983, alleging that they deprived him of his civil rights. In his complaint, plaintiff alleges that his procedural due process rights were violated during the course of a disciplinary hearing, based upon the hearing officer's refusal to permit him to present witnesses and cross-examine the corrections officers upon whose statements a finding of guilt was based, in violation of his rights under the Fourteenth Amendment to the United States Constitution.

Currently pending before the court is a motion by the defendants for summary judgment dismissing plaintiff's complaint. In their motion, defendants argue that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's procedural due process rights were violated, and that in any event they are entitled to qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted.

I. <u>BACKGROUND</u> [1]

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

At the times relevant to his claims in this action, plaintiff was an inmate in the WCCF as a result of a conviction for driving while intoxicated, resulting in a sentence of ten months of incarceration. [2] Dkt. No. 33-5 at 11-17. On July 2, 2013, an incident occurred in the WCCF cell block area where plaintiff was housed, involving the plaintiff and other inmates throwing items, including playing cards. [3] *Id.* at 38-41. As a result of the commotion, the plaintiff and two other inmates were told to pack their belongings, and that they were being transferred to another cell block. *Id.* During the course of the transfer, a confrontation occurred between the plaintiff and several corrections officers. *Id.*; *see also* Dkt. No. 33-8 at 2-3.

[2]    The record is equivocal as to whether the conviction giving rise to the ten month sentence was for misdemeanor driving while intoxicated, in violation of N.Y. Vehicle and Traffic Law § 1192(2) and/or (3), or instead driving while ability impaired as prohibited by N.Y. Vehicle and Traffic Law § 1192(1). *See, e.g.* Dkt. No. 33-5 at 12 ("the charges I went to jail for was [sic] a DWI, ..."); Dkt. No. 33-5 at 13 ("... I ended up pleading out to a misdemeanor DWI."); Dkt. No. 33-5 at 16-17 ("Q. DWAI? A. Yeah, there you go. Q. The misdemeanor level? A. yes."). *Id.* Though not relevant to plaintiff's claims in this action, it is likely that the conviction was for driving while intoxicated because the term of imprisonment that can be imposed for driving while ability impaired is limited to fifteen days, and a sentence to a period of incarceration of ten months is more consistent with a penalty for misdemeanor driving while intoxicated. *See* N.Y. Vehicle & Traffic Law § 1193(1).

[3]    At the time of the occurrence, plaintiff was on "lock-in" status as a result of a February 19, 2013 incident in which he assaulted another inmate by pouring hot water on him. Dkt. No. 33-5 at 28-29, 46-47.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 123 of 328
Genier v. Vanarnum, Not Reported in Fed. Supp. (2016)
2016 WL 4507456

**\*2** At this point the parties' versions of the relevant events diverge. According to the plaintiff, he was pushed and assaulted by corrections officers, to a point where he lost consciousness. Dkt. No. 33-5 at 38-41. In contrast, the corrections officers involved allege that plaintiff was ordered to hasten his pace to keep up with the other two inmates walking ahead of him, and that when Corrections Officer David Jamieson placed his hand on plaintiff's back, plaintiff resisted and pushed back in an aggressive manner, leading to a "code red" call for assistance and efforts on the part of several corrections officers to subdue the plaintiff and place him in restraints. *See* Dkt. Nos. 33-8, 33-9, 33-10 and 33-11.

As a result of the incident, plaintiff was transferred into the facility's special housing unit ("SHU"), and a misbehavior report was issued by Corrections Officer Jamison accusing plaintiff of violating four WCCF rules, including injuring officers while resisting, disturbing the orderly running of the facility, failure to follow orders of staff, and engaging in violent conduct.[4] Dkt. No. 33-8 at 3; *see* Dkt. No. 33-7 at 34. Corrections Sergeant Terry VanArnum, a defendant in this action, was assigned to conduct a disciplinary hearing to address the charges set forth in that misbehavior report. *See generally* Dkt. No. 33-7. Defendant VanArnum provided the plaintiff with a "24 Hour Hearing Board Notice" on July 11, 2013, advising that a hearing would be conducted in connection with the matter on July 15, 2013. *Id.* at 6, ¶¶ 14-16; *see* Dkt. No. 33-7 at 40. Plaintiff signed and acknowledged receipt of that notice. *Id.*

[4]     Under the Inmate Discipline Policy and Procedure in place at the WCCF, disciplinary matters are broken down into three classes, including (1) Class A, representing the most serious, (2) Class B, an intermediate designation, and (3) Class C, representing "infractions of rules that do not threaten the security of the Facility or a unit...". Dkt. No. 33-7 at 10. Neither the misbehavior report issued to the plaintiff nor the hearing officer's determination reveals the level of severity of the offense under this regime. The misbehavior report issued to the plaintiff specifies disciplinary violations numbered 2.10, 6.13, 11.12, and 6.11. *See* Dkt. No. 33-7 at 34. Unfortunately, none of those numbers appears on the portion of the disciplinary policy that assigns the violations listed to an appropriate class. *Id.* at 19. However, it would appear that the charges most closely align with Class B violations, which are defined as

"[b]ehavior that violates a Facility rule, regulation, or a behavior expectation that does not present an immediate serious threat to the safety and security of the CF facility, but is disruptive to the unit or area in which it occurs."

Defendant VanArnum convened the disciplinary hearing on July 15, 2013, as scheduled. Dkt. No. 33-7 at 7, ¶ 18. At the outset of the hearing, plaintiff was asked whether he understood the charges, and stated that he did. *Id.*, ¶ 19. When asked by the hearing officer to respond to the charges, plaintiff pleaded not guilty to all counts. *Id.*; *see also* Dkt. No. 33-5 at 58-60. The parties' versions concerning the remainder of the hearing are conflicting.

According to defendant VanArnum, "during the hearing, Mr. Genier failed to call witnesses or request any statements regarding the charges brought against him." Dkt. No. 33-7 at 7. Plaintiff, in stark contrast, states that his request to call witnesses at the hearing was denied, and further that he was not permitted to view surveillance video footage of the incident. Dkt. No. 9 at 4-5; Dkt. No. 33-5 at 57-66.

At the conclusion of the hearing, which consisted principally of the hearing officer's review of supporting depositions from Corrections Officers Phillip White, Brian Tripp, Kyle Sweet, and Jacob Freeburne, and Corrections Sergeant David Jamison, defendant VanArnum found plaintiff guilty on all four counts, and imposed sentences, cumulatively, totaling two-hundred sixty days of keeplock confinement, with a corresponding loss of various prison privileges. Dkt. No. 33-7 at 7-8, 47.

**\*3** Hearing Officer VanArnum's determination was upheld on appeal to Captain Eugene McKenna, the jail administrator for the WCCF and the other defendant in this action. Dkt. No. 33-6 at 2, 7-9; Dkt. No. 33-7 at 8, 47. When considering plaintiff's appeal, defendant McKenna reviewed the responding officers' statements, the felony criminal complaint charging the plaintiff in connection with the incident, and plaintiff's disciplinary record.[5] Dkt. No. 33-6, at 7-8. In addition, defendant McKenna visited the scene of the incident, and spoke with defendant VanArnum. *Id.* at 8. Defendant McKenna also determined that the inmate worker claimed by plaintiff to have witnessed the incident from the facility laundry room could have not observed the altercation, which occurred in front of the medical room some thirty feet away from the laundry room and down a hallway from the medical room. *Id.* at 9.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 124 of 328

Genier v. VanArnum, Not Reported in Fed. Supp. (2016)

2016 WL 4507456

5    A felony criminal complaint was lodged against the
     plaintiff as a result of the incident, charging him
     with assault in the second degree. Dkt. 33-6 at
     8; Dkt. No. 33-7 at 6; *see* Dkt. No. 37-6 at 36. As
     a result of that felony complaint, plaintiff entered a
     plea of guilty in January 2014 to attempted assault
     in the second degree, and was sentenced to a period
     of incarceration of between one and three years
     based upon his plea. Dkt. No. 33-5 at 71-75.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 25, 2013, and
later filed an amended complaint, the currently operative
pleading, on June 26, 2014. Dkt. Nos. 1, 9. Plaintiff's
amended complaint names Sergeant VanArnum, the hearing
officer, and Captain McKenna, who affirmed the hearing
determination on appeal, as defendants, and asserts against
them a single claim for the deprivation of procedural due
process. Dkt. No. 9. Plaintiff requests an award of damages
in the amount of $40 million.[6] *Id.* Issue was subsequently
joined by defendants' filing of an answer on September
16, 2014, in which they have generally denied plaintiff's
allegations and asserted various affirmative defenses. Dkt.
No. 15.

6    Plaintiff also requests that the misbehavior report
     issued against him be removed from his prison
     records. Dkt. No. 9 at 7. At least one court has
     concluded that such relief is available only via
     a habeas corpus petition, and cannot properly
     be issued in a section 1983 action. *See Burnell
     v. Coughlin, et al.*, 975 F.Supp. 473, 479 n.3
     (W.D.N.Y. 1997) (citing *Preiser v. Rodriguez*, 411
     U.S. 475, 500 (1973)). In any event, plaintiff pled
     guilty in a criminal proceeding to the same charges
     that were contained in the misbehavior report.
     As a result, he is estopped from litigating the
     merits of the misbehavior report and seeking its
     expungement.

On September 30, 2015, following the close of discovery,
defendants moved for the entry of summary judgment. Dkt.
No. 33. Despite receiving notice of that motion and the
requirement that any response to the motion be filed by
October 20, 2015, plaintiff has failed to oppose defendants'
motion, which is now ripe for determination, and has
been referred to me for the issuance of a report and
recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c). *See* Fed.
R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of
the Federal Rules of Civil Procedure. Under that provision,
the entry of summary judgment is warranted "if the movant
shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact
is "material" for purposes of this inquiry if it "might affect the
outcome of the suit under the governing law." *Anderson*, 477
U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553
(2d Cir. 2005). A material fact is genuinely in dispute "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial
burden of demonstrating that there is no genuine dispute
of material fact to be decided with respect to any essential
element of the claim in issue; the failure to meet this burden
warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4;
*Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden
is met, the opposing party must show, through affidavits or
otherwise, that there is a material dispute of fact for trial. Fed.
R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S.
at 250.

When deciding a summary judgment motion, a court must
resolve any ambiguities, and draw all inferences, in a light
most favorable to the non-moving party. *Anderson*, 477 U.S.
at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d
133, 137-38 (2d Cir. 1998). The entry of summary judgment
is justified only in the event of a finding that no reasonable
trier of fact could rule in favor of the non-moving party. *Bldg.
Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501,
507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250
(finding summary judgment appropriate only when "there can
be but one reasonable conclusion as to the verdict").

When a non-moving party fails to respond to a motion for
summary judgment, the movants' burden on their motion "is
lightened such that, in order to succeed, they need only show
the facial merit of their request, which has appropriately been

characterized as a 'modest' burden." *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 Fed.Appx. 105 (2d Cir. Oct. 10, 2012)).

B. Analysis of Plaintiff's Procedural Due Process Claim
In his complaint, as amended, plaintiff asserts a single cause of action, claiming that the defendants violated his rights under the Fourteenth Amendment. More specifically, plaintiff claims that defendant VanArnum violated his rights by finding him guilty of disciplinary infractions and sentencing him to a period of two hundred sixty days of SHU confinement, without affording him procedural due process, and that defendant McKenna violated his rights by upholding that determination on appeal. In support of that claim, plaintiff contends that defendant VanArnum rejected his request to call witnesses in his defense, and to cross-examine the complaining corrections officers, and refused to permit him to review and offer into evidence surveillance video recordings of the relevant events. *See generally*, Dkt. No. 9.

To establish a procedural due process claim under section 1983, the plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Defendants maintain that plaintiff cannot make either of these required showings.

As it relates to the first required showing, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a constitutionally significant liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state, or in this case Washington County, has created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. It appears from the record now before the court that, by its regulatory scheme, Washington County has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, and the defendants do not appear to argue otherwise. *Cf.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6

(S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).[7] Accordingly, in evaluating the defendants' motion, I must determine whether there exists evidence in the record showing that the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

[7]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*5** Atypicality in a *Sandin* inquiry is normally a question of law.[8] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)).

[8]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

Restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citing *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000)). Accordingly, when the length of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary

2016 WL 4507456

incidents of prison life to require procedural due process protections under *Sandin*.").

The Second Circuit has explained that where the plaintiff was confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions ... and make a fact-intensive inquiry, ... examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, ... but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff's amended complaint does not elaborate on the conditions of his SHU confinement during the period in question, and his failure to oppose defendants' motion leaves uncontested their claims concerning the conditions that he faced while serving his disciplinary sentence.[9] According to the defendants' submissions, SHU cells at the WCCF are configured in one linear row, each measuring seven feet by sixteen feet in dimension. Dkt. No. 33-6 at 5. Attached to the outside of each cell is a cage of seven feet by eight feet in dimension, for use for recreational purposes. *Id.* Inmates relegated to SHU confinement are permitted to have their property, after it is searched; are offered one hour of recreation and a shower daily; are served the same meals, in their cells, as those served to the general population in the facility messhall; are provided with visitation privileges; and have the same access to healthcare and mental health services afforded to all other inmates in general population. *Id.* at 6.

[9]     The record is nebulous as to how much of the penalty imposed was actually served. Plaintiff's deposition transcript suggests that his criminal sentence ran for ten months beginning February 8, 2013, and that he was transferred out of the WCCF on February 20, 2014. *See* Dkt. No. 33-5 at 17, 71. It appears that plaintiff was confined in SHU from July 2, 2013 – the date of the incident that gave rise to his SHU confinement – until the date of his transfer. Dkt. No. 33-7 at 45; Dkt. No. 33-5 at 49, 58, 75-76. Plaintiff testified that his confinement in SHU ended with his transfer. Dkt. No. 33-5 at

70-71. It therefore appears that he was required to serve only 234 days of the full 260 day sentence.

**\*6** Because plaintiff has failed to oppose the defendants' motion, the foregoing represent the only facts in the record relative to plaintiff's SHU confinement.[10] Accordingly, there exists no genuine dispute regarding the conditions of plaintiff's confinement requiring determination by a jury, and the court is thus positioned to decide the *Sandin* issue as a matter of law.

[10]     Plaintiff did not address the conditions of his confinement in his amended complaint or during his deposition.

The record includes no evidence suggesting that the plaintiff's SHU confinement imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. Under such circumstances, to deny the defendants' motion would be tantamount to a conclusion that SHU confinement of 234 days imposes a *per se* atypical and significant hardship on an inmate such that a liberty interest automatically attaches to such a term of SHU confinement. Such a conclusion would run afoul of Second Circuit precedent expressly requiring an analysis of confinement conditions in a case where the plaintiff has been confined for an intermediate duration of between 101 and 305 days, effectively narrowing the 305-day window to 233 days. Several other courts, when similarly faced with the absence of any record evidence showing an atypical and significant hardship resulting from SHU confinement of between 101 and 305 days, have declined to find the existence of a liberty interest. *See, e.g., Henry*, 2011 WL 5975027, at *10 (dismissing due process claim where the plaintiff "failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150-day period were more severe than normal SHU conditions"); *Dawkins v. Gonyea et al.*, 646 F.Supp.2d 594, 606-607 (S.D.N.Y. 2009) ("Because Dawkins failed to make any allegations detailing the conditions of his confinement in SHU, and because the [280-day] duration of his confinement was shorter than confinements that courts in this Circuit have deemed sufficient to impose per se atypical or significant hardship, the Court finds that Dawkins has not pled a cognizable liberty interest."); *Black v. Selsky, et al.*, 15 F.Supp.2d 311, 314-316 (W.D.N.Y. 1998) (concluding that plaintiff's "confinement in SHU for 180 days does not present the type of atypical and significant deprivation in which a state may conceivably create a liberty interest" where there was no accompanying record evidence showing

2016 WL 4507456

restrictions "greater than the restrictions imposed on the inmate in *Sandin*"); *Spence v. Senkowski*, 91-CV-0955, 1998 WL 214719, at \*3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days spent by the plaintiff in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan*, 990 F.Supp. 214, 217-19 (W.D.N.Y. 1998) (finding no liberty interest deprivation where the plaintiff served 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky*, 96-CV-2003, 1997 WL 137448, at \*4-6 (S.D.N.Y. 1997) (same, in a case involving 192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996) (same, in a case involving 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin*, 94-CV-4094, 1996 WL 487951, at \*4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *Carter v. Carriero*, 905 F.Supp. 99, 103-104 (W.D.N.Y. 1995) (270 days of SHU confinement did not impose a *per se* "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" such that the failure to allow plaintiff to call a witness at a disciplinary hearing giving rise to his confinement did not trigger a liberty interest).

\*7 For these reasons, I find that the defendants have satisfied their burden of showing facial merit to their request that plaintiff's due process claim be dismissed for failure to establish the deprivation of a cognizable liberty interest. Accordingly, I recommend the dismissal of plaintiff's due process claim on that basis, and find it unnecessary to address either the second prong of the due process test or defendants' qualified immunity argument. [11] In declining to address the second prong of the due process test, I note in passing that I believe there exists a genuine material issue of fact that would preclude the entry of summary judgment in defendants' favor on this prong. [12]

[11]    With respect to the second prong of the due process test, the procedural safeguards to which a prison inmate is entitled before being

deprived of a constitutionally cognizable liberty interest were discussed by the Supreme Court in seminal its decision in *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

[12]    In their motion, defendants contend that plaintiff was provided with all of the procedural due process guaranteed under the Fourteenth Amendment. In support of that position they assert, including in their statement of undisputed material facts propounded pursuant to Local Rule 7.1(a)(3) of the Northern District of New York, that the plaintiff failed to call witnesses or request any statements regarding the charges brought against him during the hearing before defendant VanArnum. *See* Dkt. No. 33-12 at 7. Plaintiff, however, has squarely controverted this statement, both in his amended complaint, which is submitted under penalty of perjury, and in his deposition testimony, which is also sworn. Dkt. No. 9 at 4; Dkt. No. 33-5 at 65-69.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff claims that he was deprived of an actual liberty interest without procedural due process in violation of the Fourteenth Amendment. Because I conclude, based upon the record now before the court, that there exists no evidence in the record showing that plaintiff's confinement in the WCCF SHU represented a significant and a typical departure from the ordinary incidents of prison life, and that, accordingly, he was not deprived of a liberty interest sufficient to trigger

2016 WL 4507456

the procedural safeguards guaranteed under the Fourteenth Amendment, I find that the entry of summary judgment dismissing plaintiff's complaint is warranted. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 33), be GRANTED, and that plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

 **\*8** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4507456

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 129 of 328

2016 WL 5322113
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Aaron JABOT, Plaintiff,
v.
CORRECTION OFFICER MINOR, Defendant.

9:13-CV-01407 (DNH/TWD)
|
Signed July 14, 2016
|
Filed 07/15/2016

**Attorneys and Law Firms**

AARON JABOT, 15-A-4539, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13201, Plaintiff, pro se.

FITZGERALD MORRIS BAKER FIRTH P.C., 16 Pearl Street, P.O. Box. 2017, OF COUNSEL: JOSHUA D. LINDY, ESQ., Glens Falls, New York 12801, Attorneys for Defendant.

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c). Plaintiff Aaron Jabot, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges violations of his civil rights while confined at Washington County Correctional Facility, located in the Town of Fort Edward, New York. (*See generally* Dkt. No. 5.) Specifically, Plaintiff alleges that Defendant Correction Officer Michele Minor, who served as the hearing officer at Plaintiff's November 6, 2013, disciplinary hearing, violated his Fourteenth Amendment due process rights. *Id.* at 2. [1]

[1]        Unless otherwise noted, page references to documents identified by docket number are to the

page number assigned by the Court's CM/ECF electronic docketing system.

Currently pending before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 52.) Plaintiff has opposed the motion. (Dkt. No. 54.) Defendant has filed a reply. (Dkt. No. 55.) For the reasons that follow, the Court recommends that Defendant's motion be granted. (Dkt. No. 52.)

**I. BACKGROUND** [2]

[2]        In light of the procedural posture of this case, the following recitation is derived from the record now before the Court, with all inferences and ambiguities resolved in Plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

On July 2, 2013, Plaintiff was arrested on a parole violation, and was committed to the Washington County Correctional Facility. (Dkt. No. 52-11 at ¶ 7.) On or about October 20, 2013, at approximately 18:20 hours, Plaintiff asked Correction Officer Jacob Freebern ("C.O. Freebern") if he could have some hot water. (Dkt. No. 52-8 at ¶ 4.) C.O. Freebern reminded Plaintiff that his microwave privileges had been suspended by Sergeant Strain, and advised Plaintiff that if he had any questions regarding the microwave suspension, he could address the issue with Sergeant Strain when he was in the unit. [3] *Id.* at ¶ 5. Immediately thereafter, Plaintiff became verbally assaultive by shouting obscenities and banging on his cell door. *Id.*

[3]        Plaintiff was housed in administrative segregation in the C-Unit. (Dkt. No. 52-8 at ¶ 3.)

Later that evening, C.O. Freebern issued Plaintiff a misbehavior report charging him with the following violations: (1) verbal or written harassment; (2) profanity and unnecessary noise; (3) insolence towards facility staff; and (4) disruptive conduct. (Dkt. No. 52-8 at 10. [4]) C.O. Freebern provided a copy of the Inmate Misbehavior Report to Plaintiff. (Dkt. No. 52-11.) On November 3, 2013, Plaintiff was provided with a "24 Hour Hearing Board Notice," indicating that the disciplinary hearing was scheduled to take place November 6, 2013. (Dkt. No. 52-9 at 41.) Plaintiff refused to acknowledge receipt of that Notice. *Id.*

[4]        Specifically, Plaintiff shouted "suck my dick" and "freebitch" at C.O. Freebern. (Dkt. No. 52-8 at ¶ 6.) Plaintiff also yelled obscenities of a sexual

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 130 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

nature regarding Correction Officer Kendrick. *Id.* Plaintiff threatened to call social services because C.O. Freebern was planning to harm his son. *Id.* at ¶ 8. Plaintiff also made numerous threats of lawsuits and prison time to C.O. Freebern, if he did not get what he wanted. *Id.* at ¶ 9. Plaintiff claims that the charges were all lies. (Dkt. No. 52-6 at 135.)

**\*2** On November 6, 2013, Defendant served as the Hearing Officer at Plaintiff's disciplinary hearing. (Dkt. No. 52-9 at ¶ 17.) Plaintiff did not object in writing to Defendant serving as the hearing officer, nor did Plaintiff submit in writing (or any other form), a list of questions that he wanted asked of any potential witnesses. *Id.* at ¶ 18.

At the beginning of the hearing, Defendant read the charges to Plaintiff. *Id.* Plaintiff responded that he understood the charges. *Id.* at ¶ 19. Defendant then read C.O. Freebern's statement. *Id.* In response, Plaintiff stated, "I object, you are not laying grounds for proper evidence." *Id.* at ¶ 20. Thereafter, Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant denied that request because she had previously questioned C.O. Freebern and read his statement into evidence. *Id.* at ¶ 21. Plaintiff responded to Defendant's denial by stating, "Monroe vs. Monroe." *Id.* at ¶ 22.

Defendant then asked Plaintiff if he wanted to call other any witnesses. *Id.* Plaintiff objected again. *Id.* Defendant informed Plaintiff that this was his opportunity to present his defense to the October 20, 2013, disciplinary charges. *Id.* at ¶ 23. In response, Plaintiff stated that he no longer felt safe and requested to return to his cell. *Id.* at ¶ 24. Accordingly, two correction officers escorted Plaintiff to his cell. *Id.*

On November 6, 2013, following the conclusion of the disciplinary hearing, Defendant prepared an "Inmate Disciplinary Hearing Record." *Id.* at p. 47. Based upon C.O. Freebern's statement, Defendant found Plaintiff guilty of all charges, and sentenced Plaintiff to 200 days of keep lock, 30 days loss of commissary, reduced showers and shaving for 40 days, loss of 1 visit for 30 days, and a $25.00 fine. *Id.* at p. 47. [5] Plaintiff did not appeal the disposition of the November 6, 2013, disciplinary hearing. *Id.* at ¶ 28. [6]

[5]     Specifically, Plaintiff was sentenced as follows: (i) 90 days keep lock with 30 days loss of commissary for verbally (or in writing) harassing anyone; (ii) 40 days keep lock with three showers/shaving per week at 08:30 on Monday, Wednesday, and

Friday for failing to refrain from profanity and unnecessary noise; (iii) 60 days of keep lock with loss of 1 visit for 30 days for displaying insolence towards facility staff; and (iv) 10 days keep lock and a $25.00 fine for the disruption of facility routine. (Dkt. No. 52-9 at 47.)

[6]     Although Plaintiff alleges that Washington County Correctional Facility does not have an appeal process, Plaintiff testified that he may have appealed Defendant's decision. Plaintiff has not produced a copy of an appeal. (Dkt. No. 52-6 at 160).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2013, alleging that on November 6, 2013, Defendant denied him a fair disciplinary hearing. (Dkt. No. 1 at 4-5.) Specifically, Plaintiff alleged he was not permitted to call witnesses at the hearing, he was denied access to the statements made against him by corrections staff, and Defendant failed to make a proper and complete recording of the disciplinary hearing. *Id.* at 4. As a result of these purported injustices, Plaintiff alleged he was being held in the segregated housing unit ("SHU") illegally. *Id.*

Upon initial review, the Court *sua sponte* dismissed Plaintiff's complaint with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted, in part, because Plaintiff failed to include any factual allegations regarding the length of the disciplinary confinement imposed as a sanction, nor did he allege any facts regarding the conditions of that confinement. (Dkt. No. 4 at 6-8.)

**\*3** Plaintiff timely filed an amended complaint on December 4, 2013. (Dkt. No. 5.) Plaintiff alleged he was denied due process at the November 6, 2013, hearing, and claimed the conditions of his disciplinary confinement were atypical and significant, in part, due to his mental illness. *Id.* at 2-13. Plaintiff also attached a copy of Defendant's written statement of the November 6, 2013, decision to the amended complaint. *Id.* at 17. Upon initial review of the amended complaint, the Court found Plaintiff's allegations were sufficient to the cure the pleading deficiencies described in the November 12, 2013, Order. [7] Plaintiff's amended complaint was accepted for filing and is the operative complaint in this action. (Dkt. No. 8.) Defendant filed her answer on June 6, 2014. (Dkt. No. 12.)

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 131 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

7    Although Plaintiff alleged he was "being placed in SHU for no reason," and thus was being subjected to "cruel and unusual punishment," the Court did not construe the amended complaint to raise a separate Eighth Amendment challenge to the conditions of confinement. (*See* Dkt. No. 8.) Instead, the Court determined Plaintiff's allegations that his SHU confinement "worsened" his "mental illness" and thus was "cruel and unusual punishment" was Plaintiff's attempt to demonstrate an "atypical and significant hardship" under *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). *Id.* at 3.

### III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, including pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006); *see also F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

*4    In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3, (S.D.N.Y. Oct. 28, 1999) [8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 132 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

8    The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

## IV. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition

As required under L.R. 7.1, Defendant filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 52-11.) Although Plaintiff has opposed Defendant's motion, Plaintiff failed to respond to the statement of material facts filed by Defendant as required under L.R. 7.1(a)(3). (*See* Dkt No. 54.) Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, [9] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [10] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

9    L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>" *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

10    Defendant has complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to summary judgment motion. (Dkt. Nos. 52, 52-11.)

**\*5** Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendant's L.R. 7.1 Statement, and he failed to do so, the Court recommends that the facts contained in Defendant's Statement be treated as having been admitted to the extent they are supported by accurate record citations. *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011). As to any facts not contained in Defendant's Statement of Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). The Court has opted to review the entire record in this case.

A verified complaint is to be treated as an affidavit for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Here, however, Plaintiff's amended complaint is not verified, nor is his opposition to Defendant's motion. (*See* Dkt. Nos. 5, 54.) Unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g., Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at \*11 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment).

Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at \*7 (S.D.N.Y. Jan. 7, 2013) (to afford the *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 133 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012).

In deference to Plaintiff's *pro se* status, the Court has considered Plaintiff's unsworn response (Dkt. No. 54) in opposition to Defendant's motion for summary judgment (Dkt. No. 52). However, the Court's review has revealed that Plaintiff's submission contains very little in the way of admissible evidence.

### B. Due Process Rights under the Fourteenth Amendment

Plaintiff alleges that Defendant deprived him of due process at the November 6, 2013, disciplinary hearing. (Dkt. No. 5.) Defendant moves for summary judgment arguing that (1) Plaintiff was not deprived of a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process to which he was entitled at the disciplinary hearing; and (3) in the alternative, Defendant is entitled to qualified immunity. (Dkt. No. 52-12 at 4-16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

*6  To establish a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Accordingly, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). Thus, the Court must inquire whether the allegations related to the conditions of Plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*. "Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *see Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). However, the Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64-65 (citing *Colon*, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued as a matter of law. *Id.* at 65 (citations omitted).

**\*7** Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon*, 215 F.3d at 231-32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder*, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia*, *Palmer*, 364 F 3d at 65-66).

Here, Plaintiff was sentenced to 200 days of segregated confinement. (Dkt. No. 52-9 at 47.) Because Plaintiff's confinement was of an "intermediate duration," the Court must make a fact-intensive inquiry that examines the actual conditions of SHU confinement compared to the ordinary prison conditions at Washington County Correctional Facility. *See Palmer*, 364 F.3d at 65; *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009).

To establish that Plaintiff's 200 day SHU confinement was not atypical and not significant, Defendant submits the affidavit of Eugene McKenna, Jail Administrator at Washington County Correctional Facility. (Dkt. No. 52-10.[11]) McKenna declares that all inmates held at the Washington County Correctional Facility are provided with a handbook to assist them during their incarceration. *Id.* at ¶ 5. The handbook is meant to provide inmates with a written explanation of facility policies, including policies concerning visitation, exercise, hygiene, discipline, and restrictive housing. *Id.* The handbook provides that inmates will be entitled to two contact visits per week, with each visit not to exceed one hour. *Id.* at ¶ 6, p. 9. With regard to hygiene, showers are available to inmates throughout the day, except for mandatory lock-in times. *Id.* at ¶ 7, p. 15. Inmates are afforded a minimum of one hour of exercise per day, which may be extended based upon inmate behavior, including the cleanliness of the housing unit. *Id.*

[11]  McKenna was hired as a Correction Officer for the Washington County Sheriff's Office at the Washington County Correctional Facility in October 2003, and was promoted to Sergeant in 2008. (Dkt. No. 52-10 at ¶ 2.) He became the Jail Administrator for the facility on October 23, 2009. *Id.* Prior to his employment at the Washington County Correctional Facility, McKenna was a Police Officer at the Whitehall Police Department from 1986 through 2002. *Id.* at ¶ 3. He also served as a Correction Officer at Riker's Island for the New York City Department of Corrections from 1983 through 1985. *Id.* McKenna's affidavit is based upon the records, regulations, directions, and policy guidelines of the Washington County Correctional Facility, as well as he own personal knowledge as the Jail Administrator. *Id.* at ¶ 2. A copy of the handbook is attached to McKenna's Affidavit. *See id.* at pp. 8-36.

With regard to discipline, inmates are subject to different levels of discipline including verbal warnings, being locked in a cell, loss of privileges, or loss of good-time credits. *Id.* at ¶ 8, p. 20. If the infraction is of a more serious or repetitive nature, the inmate will be issued a misbehavior report and will appear in front of a hearing officer. *Id.* at ¶ 9, p. 20. Inmates receive a notice within twenty-four hours of a hearing board proceeding, which can be waived by the inmate. *Id.* at ¶ 10, p. 20. If the charges against the inmate are affirmed as a result of the hearing, sanctions may be imposed based upon the inmate's past history and the severity of the offense, including (1) counsel or reprimand, (2) loss of one or more specific privileges, (3) restitution; and/or (4) confinement to a cell, room, or the SHU. *Id.* at ¶ 11, p. 21.

**\*8** At Washington County Correctional Facility, the SHU consists of ten cells in one linear row, one of which is designated for medical confinement. *Id.* at ¶ 13. Each cell is seven feet by sixteen feet in dimension. *Id.* On the outside of each cell is an attached seven feet by eight feet cage reserved for recreation purposes. *Id.* Inmates housed in the SHU can communicate with other inmates in the SHU based upon their proximity to each other. *Id.*

McKenna declares, and the handbook provides, that all SHU inmates are offered one hour of recreation and a shower between the hours of 8:30am and 2:00pm at the housing unit officer's discretion. *Id.* at ¶ 14, p. 21. In addition, all inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, have access to the

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 135 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

same healthcare and mental-health services afforded to all other inmates, and are served the same meals in their cells as those served in the facility mess hall. *Id.* at ¶¶ 15-17.

Similarly, in *Vasquez v. Coughlin,* the defendants submitted the affidavit of Anthony J. Annucci, Deputy Commissioner and Counsel for the New York State Department of Correctional Services, which provided a thorough analysis of segregated housing in comparison with other types of confinement. 2 F. Supp. 2d 255, 259-60 (N.D.N.Y. 1998). Relying on Annucci's affidavit, Judge McAvoy held that despite being housed in the SHU for 545 days, the conditions of the inmate's confinement in the SHU did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. *Id.* Indeed, Judge McAvoy noted that the conditions of the inmate's confinement were, for the most part, similar to those of the general prison population with the exception that the inmate received his meals in his cell and received one less shower per week. *Id.*; *cf. Bowens v. Pollock,* No. 06-CV-0457A (SR), 2010 WL 5589350, at *15 (W.D.N.Y. Oct. 12, 2010) (district court concluded that it lacked a sufficient record upon which to assess whether plaintiff had demonstrated a liberty interest where defendants had presented no evidence regarding typical conditions of keeplock confinement compared to the general population and the actual conditions of the plaintiff's keeplock).

Defendant has provided extensive information regarding the conditions of Plaintiff's segregated confinement at Washington County Correctional Facility compared to the general population at the facility. (Dkt. No. 52-10.) However, despite bearing the burden of proving that the conditions of his confinement constituted an atypical, significant hardship, *Vasquez,* 2 F. Supp. 2d at 260, Plaintiff has offered no challenge to the submitted facts of McKenna, nor has he disputed them with facts of his own. (Dkt. No. 54.) Instead, the entire focus of Plaintiff's opposition is on the purported due process violations at his November 6, 2013, disciplinary hearing. *Id.*

Plaintiff alleges that being housed in the SHU "illegally" for twenty-three hours a day, and being denied visitation and telephone calls with family, "worsened" his mental health issues, including having a hard time sleeping and eating. (Dkt. No. 54 at 10-11.) Plaintiff's testimony regarding his loss of privileges (such as telephone, visitation, and use of microwave) and the conditions of his confinement (including lack of sleep, trouble eating, and being handcuffed and shackled during facility transport), is insufficient to warrant

constitutional protections. Indeed, "there is no liberty interest in remaining a part of the general prison population." *Lewis,* 2014 WL 3729362, at *8 (citing *Frazier,* 81 F.3d at 317).

**\*9** While Plaintiff's conditions of confinement are certainly more restrictive than those in general population, they are insufficient to implicate a liberty interest, even when coupled with Plaintiff's 200 days confined to the SHU. *See, e.g.,* *Johnson v. Enu,* No. 08-CV-158 (FHS/DNH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Smart v. Goord,* 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) (loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest); *Spence v. Senkowski,* No. 91-CV-955 (NPM), 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (plaintiff's confinement in the SHU for 180 days, with a corresponding loss of packages, telephone privileges, commissary privileges and his prison job was not an atypical or significant hardship to establish the existence of a liberty interest).

At his deposition, Plaintiff testified that he has borderline personality order, depression, and anxiety. (Dkt. No. 52-6 at 176.) As set forth above, McKenna's affidavit established that all Washington County Correctional Facility inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, and have access to the same healthcare and mental health services afforded to all other inmates. (Dkt. No. 52-10 at ¶ 15.) Significantly, Plaintiff never testified that he was denied healthcare or mental-health services while housed in the SHU.

Based on the undisputed evidence in the record, the Court finds that Plaintiff's 200 day confinement to the SHU with loss of certain privileges was not an atypical, significant hardship in relation to other ordinary incidents of prison life. *See Palmer,* 364 F.3d at 65 (if the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law). Thus, Plaintiff is not entitled to the protections of the Fourteenth Amendment. *See Palmer,* 364 F.3d at 64 (plaintiff has "no right to due process [at his hearing] *unless* a liberty interest was infringed as a result") (emphasis in original).

Accordingly, the Court recommends granting Defendant's motion for summary judgment (Dkt. No. 52).

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

### 2. Due Process

Even assuming a liberty interest exists, the Court recommends granting Defendant's motion because Plaintiff was afforded the minimum requirements of due process at his November 6, 2013, disciplinary hearing.

The Fourteenth Amendment due process protections afforded to a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "An inmate is entitled to advance written notice of the charges against him; a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). In some circumstances, an inmate also has a limited right to assistance. *Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1998).

The due process clause requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

**\*10** Moreover, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

#### a. Notice

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are ...." *Wolff*, 418 U.S. 563-64. Here, Plaintiff was provided with a copy of the October 20, 2013, Inmate Misbehavior Report. (Dkt. No. 52-9 at 34.) On November 3, 2013, Plaintiff was provided with formal notice that his disciplinary hearing involving the October 20, 2013, events was scheduled to take place on November 6, 2013. *Id.* at 41. As such, Plaintiff was provided with adequate written notice. *See Sira*, 380 F.3d at 69.

#### b. Opportunity to be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. Here, Plaintiff was afforded the opportunity to be present at his disciplinary hearing on November 6, 2013. *See, e.g.*, *Smith v. Fisher*, 803 F.3d 124 (2d Cir. 2015) (inmate had an "opportunity to attend" where he knowingly waived his right to attend his disciplinary hearing, where he asked to leave the room, and refused to participate).

However, Plaintiff alleges that he was denied all witnesses and deprived of an opportunity to present documentary evidence. (Dkt. No. 5 at 2.) Contrary to Plaintiff's position, the record supports the conclusion that Plaintiff was granted a hearing with a reasonable opportunity to call witnesses and present documentary evidence.

Prior to the hearing, Defendant questioned C.O. Freebern, and he provided a written statement. (Dkt. No. 52-9 at ¶ 20.) At the beginning of the hearing, Defendant read C.O. Freebern's statement into the record. *Id.* Defendant then provided Plaintiff with an opportunity to call witnesses. *Id.* at ¶ 21. Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant explained to Plaintiff he would not be permitted to call C.O. Freebern as a witness, as she had already questioned C.O. Freebern and had just read his statement into the record. *Id.*

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 137 of 328
Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)
2016 WL 5322113

excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative"). Thus, having explained her reasoning for denying Plaintiff's request to call C.O. Freebern as a witness, Defendant was acting within her discretion as a hearing officer to control the hearing. Moreover, despite being offered numerous opportunities to do so, Plaintiff failed to request any other witness to testify at the hearing.

**\*11** In addition, Plaintiff raised several objections throughout the hearing, and although he was provided with an opportunity to present evidence, Plaintiff declined to do so. (Dkt. No. 52-9 at ¶ 21.) Accordingly, the Court finds no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

c. Impartial Hearing Officer and "Some Evidence"

Prisoners have a constitutional right to a fair and impartial hearing officer. *Sira*, 380 F.3d at 69. However, it is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent*, 472 U.S. at 455. "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

In this case, Plaintiff was charged and found guilty, of the following violations: (i) Rule 2.05 (verbally or in writing harass anyone); (ii) Rule 5.06 (inmate shall refrain from profanity and unnecessary noise); (iii) Rule 5.03 (insolence towards facility staff); and (iv) Rule 5.00 (conduct which disrupts the orderly running of the facility). (Dkt. No. 52-9 at 47.)

Defendant relied upon C.O. Freebern's statement that on October 20, 2013, Plaintiff "became verbally assaultive, shouting obscenities at me and banging on his cell door. [Plaintiff] continued to shout 'suck my dick' and 'freebitch' as well as many obscenities of a sexual nature pertaining" to Correction Officer Kendrick. (Dkt. No. 52-9 at 36.) C.O. Freebern further declared that Plaintiff "proceeded to threaten me numerous times with lawsuits and prison time if he was not granted what he wanted." *Id.* Thus, Defendant's determination of Plaintiff's guilt was supported by "some evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna*, 356 F.3d at 488. *See Hinton v. Prack*, No. 9:12–CV–1844 (LEK/RFT), 2014 WL 4627120, at \*15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident; *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

Moreover, prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky*, No. 9:07–CV–0432 (LEK/DEP), 2011 WL 1086001, at \*11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*, 891 F.2d at 46). Thus, Plaintiff's conclusory allegation that he did not "get along" with Defendant fails to create an issue of material fact. [12]

[12]    Plaintiff's claim that he was falsely issued the October 20, 2013, misbehavior report, and thus Defendant was biased for "covering up" the "trumped up charges" is without merit. *See, e.g., Gantt v. Mielenz*, No. 9:10-CV-0083 (GTS/TWD), 2012 WL 4033723, at \*4 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("[J]ust as an inmate possess no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at disciplinary hearing.").

**\*12** In light of the above, the Court finds that Defendant was impartial and that her guilty determination was supported by "some evidence" sufficient for due process.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 138 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

#### d. Written Statement of Decision

An accused prisoner has the right to a written statement of decision, including a statement of the evidence relied upon by the hearing officer. *Sira*, 380 F.3d at 69. In this case, Plaintiff does not allege, nor does the record support, a claim that he was not provided with such a written statement of Defendant's decision. (*See* Dkt. No. 52-9 at pp. 46-47.) In fact, Plaintiff attached a copy of the November 6, 2013, Inmate Disciplinary Hearing Record to his amended complaint. (Dkt. No. 5 at 17.)

#### e. Assistance

In certain circumstances, inmates have a "limited" right to assistance. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng*, 858 F.2d at 897. An inmate may need assistance, for example, if they are "illiterate, confined to [the] SHU, or unable to grasp the complexity of the issues." *Silva*, 992 F.2d at (citing *Wolff*, 418 U.S. at 570, *Eng*, 858 F.2d at 897). However an inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva*, 992 F.2d at 22. Indeed, the assistant need only perform what the plaintiff would have done but need not go beyond. *Lewis v. Johnson*, No. 9:08-CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

Plaintiff argues that he was entitled to assistance, and Defendant fails to address this argument in her motion papers. However, even assuming Plaintiff was entitled to assistance which he did not receive, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff. *See, e.g., Pilgrim*, 571 F.3d at 206 (any error on the assistant assigned to assist the plaintiff, including failing to comply with the plaintiff's instructions on interviewing witnesses and gathering documents, were harmless in light of the plaintiff's failure to identify any relevant testimony that was excluded as a result, his decision not to call witnesses when given the opportunity, and his decision to walk out of the hearing in protest of a particular defendant serving as the hearing officer).

At the outset of the hearing, Defendant read the charges to Plaintiff. (Dkt. No. 52-9 at 45.) Plaintiff stated that he understood the charges. *Id.* Defendant provided Plaintiff with an opportunity to present witnesses and rebuttal evidence. *Id.* Plaintiff made several objections throughout the hearing. *Id.* Yet Plaintiff failed to name any witnesses, other than C.O. Freebern, that he wished to call. *Id.*

Plaintiff has argued that the October 20, 2013, charges "were all lies." (Dkt. No. 52-6 at 135.) However, Plaintiff has failed to demonstrate that the outcome of his disciplinary hearing would have been any different had he been provided with an assistant. *Lewis*, 2014 WL 3729362, at *13 (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results); *Liao*, 2016 WL 1128245 at *7 (finding any error on assistant was harmless in light of hearing officer's rejection of plaintiff's request to recall the potential witnesses plaintiff alleges that his assistant should have contacted prior to the hearing).

**\*13** Plaintiff testified that had he been provided with an assistant, the assistant would have interviewed witnesses to the alleged events of October 20, 2013, including "a couple of inmates," and that their testimony would have proven Plaintiff's innocence. (Dkt. No. 52-6 at 135.) Plaintiff's argument that these witnesses' testimonies would have affected the outcome of his hearing is entirely speculative and conclusory. *See Hinton*, 2014 WL 4627120, at *2 (citation omitted). Further, Plaintiff admitted that had his witnesses testified, Defendant would have been presented with two versions of the October 20, 2013, events, C.O. Freebern's and Plaintiff's witnesses. *Id.* However, as set forth above, Defendant based her decision on C.O. Freebern's statement, which was supported by "some evidence."

Finally, Plaintiff testified that he expressed all of his concerns and purported violations of due process, including the denial of assistance and witnesses, to Defendant during the disciplinary hearing. (Dkt. No. 52-6 at 125-128.) However, Plaintiff did not appeal Defendant's decision. (Dkt. No. 52-9 at ¶ 28.)

Accordingly, the Court finds that Plaintiff was not prejudiced, in the sense that the errors affected the outcome of the hearing, based upon his purported lack of assistance.

#### f. Additional Due Process Violations

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 139 of 328

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

Plaintiff also alleges that his due process rights were violated because Defendant failed to tape record the hearing, there is "no verbatim" record of his objections, and therefore, he was unable to appeal Defendant's decision. (Dkt. No. 5 at 2-3 [13] .)

[13]    At his deposition, Plaintiff testified "how can you appeal a record if a record don't exist? How can you appeal your objections if your objections don't exist on paper because there is not a verbatim record?" (Dkt. No. 52-6 at 161.)

As an initial matter, due process does not require that disciplinary proceedings be recorded. [14] *See Livingston v. Griffin*, 9:04-CV-00607-JKS, 2007 WL 1500382, at *5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

[14]    In fact, Plaintiff should be aware that there is no constitutional right to have disciplinary hearings recorded by stenograph or other means. (*See* November 11, 2012, Decision and Order, Dkt. No. 33 at 6 in *Jabot v. Warren County Sheriff's Office*, No. 9:11-cv-01217 (GLS/DEP)).

Although Plaintiff contends that "[t]here is no appeals process [at Washington County Correctional Facility] ... [t]here is no verbatim records ... [t]here's nothing" (Dkt. No. 52-6 at 126), his argument is undermined by his testimony that he has in fact utilized the appeals process at Washington County Correctional Facility. *Id.* at 154. What's more, Plaintiff testified that he received an appeal form from Defendant on November 8, 2013, and that he "may" have appealed Defendant's November 6, 2013, determination. *Id.* at 160, 162. Thus, Plaintiff's argument is without merit, and his dissatisfaction with the appeals process, in part because disciplinary hearings are not tape recorded at Washington County Correctional Facility, is misplaced.

Based upon the aforementioned, the Court finds that Plaintiff received the minimum due process to which he was entitled during his November 6, 2013, disciplinary hearing. Therefore, the Court also recommends that Defendant's motion for summary judgment (Dkt. No. 52) be granted on the grounds that she did not violate Plaintiff's due process rights during his November 6, 2013, disciplinary hearing.

### C. Qualified Immunity

**\*14**  In the alternative, Defendant seeks dismissal of Plaintiff's Fourteenth Amendment due process claim on qualified immunity grounds. (Dkt. No. 52-12 at 15-16.) Inasmuch as the Court is recommending that Defendant's motion for summary judgment be granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 52) be **GRANTED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: July 14, 2016.

### All Citations

Not Reported in Fed. Supp., 2016 WL 5322113

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 140 of 328

2019 WL 2437912
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy BRITT, Plaintiff,
v.
Anne CARBERRY, et al., Defendants.

9:17-CV-0234 (MAD/DEP)
|
Signed 06/11/2019

**Attorneys and Law Firms**

TROY BRITT, 781 E. 135 th Street, Bronx, New York 10454, Plaintiff, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, OF COUNSEL: KYLE W. STURGESS, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

 *1 *Pro se* plaintiff, Troy Britt ("Plaintiff"), a former New York State prison inmate, commenced this civil rights action against several individuals employed by New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983. Dkt. No. 1. As narrowed by a series of decisions of this Court, Plaintiff's claims currently at issue include allegations that (1) Defendants T.L. Penn ("Nurse Penn") and Dr. M. Chalom violated Plaintiff's Eight Amendment rights by exhibiting deliberate indifference to Plaintiff's medical needs; and (2) Defendants Anne Carberry and Sergeant Thomas McKinley ("Sgt. McKinley") violated Plaintiff's Fourteenth Amendment due process rights in connection with Plaintiff's Tier III disciplinary hearing. *See* Dkt. Nos. 1, 4, 8, 9, 24, 25, 49, 50. Plaintiff's claims arose from events between July 30, 2015 and about October 7, 2016, while he was in custody of DOCCS as an inmate in Ogdensburg Correctional Facility ("Ogdensburg C.F."), Riverview Correctional Facility ("Riverview C.F."), and Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No. 50.

On September 27, 2018, Defendants moved for entry of summary judgment dismissing Plaintiff's remaining claims on the merits. *See* Dkt. No. 73. In a February 1, 2019 Report and Recommendation, Magistrate Judge Peebles recommended Plaintiff's second amended complaint be dismissed in its entirety for failure to prosecute and comply with this Court's orders and local rules of practice and that Defendants' motion for summary judgment be denied as moot. *See* Dkt. No. 81. On February 14, 2019, Plaintiff filed objections to the February 1 Report and Recommendation. *See* Dkt. No. 84. Subsequently, Magistrate Judge Peebles issued the March 22, 2019 Report and Recommendation presently before this Court. *See* Dkt. No. 87.

In the March 22, 2019 Report and Recommendation, Magistrate Judge Peebles recommended that Defendants' motion for summary judgment be granted and Plaintiff's second amended complaint be dismissed in its entirety. *See* Dkt. No. 87. Specifically, Magistrate Judge Peebles found (1) Plaintiff failed to exhaust his administrative remedies with respect to his October 2015 grievance; (2) Plaintiff failed to establish a sufficiently serious deprivation and failed to establish that Defendants Dr. Chalom and Nurse Penn had the requisite state of mind with respect to his deliberate indifference claims and; (3) although Plaintiff had a liberty interest, he was afforded the necessary procedural protections with respect to his disciplinary hearing and due process claims against Defendants Sgt. McKinley and Carberry. *See id.* Neither party objected to the March 22 Report-Recommendation and Order.

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate

review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## II. DISCUSSION

### A. Standard of Review

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v.*

*Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *Id.* at 295 (citing *Showers v. Eastmont*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") expressly provides that "no action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). In the event a defendant establishes that an inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006); *see also Wilson v. McKenna*, 661 Fed. Appx. 750, 752 (2d Cir. 2016). "Proper exhaustion requires a plaintiff to procedurally exhaust his claims by compl[ying] with the system's critical procedural rules," and "demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90, 95. In the context of a Section 1983 claim, the court must look at the relevant state's prison procedures to determine if the inmate-plaintiff complied with the appropriate procedures. *See Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford*, 548 U.S. at 88-90.

**\*3** New York State has a three-step administrative review process, or Inmate Grievance Program ("IGP"). *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, a grievance must be submitted to the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence giving right to the complaint. *See* 7 N.Y.C.R.R. § 701.5(a)(1). After the grievance has been filed, the IGRC reviews and investigates the formal complaint and must informally resolve the issue within sixteen days of the filing or conduct a hearing. *See id.* at § 701.5(b). Second, within seven days after receipt of the IGRC's written decision, the inmate-plaintiff may appeal to the superintendent of the facility, who must then issue a written decision within a certain number of days.[1] *See id.* at § 701.5(c). Third, within seven days after the receipt of the superintendent's decision, the

2019 WL 2437912

inmate-plaintiff may appeal it to the Central Office Review Committee ("CORC"), who will issue the final administrative decision. *See id.* at § 701.5(d). When an inmate does not receive a timely response to a filed grievance, the inmate is permitted to appeal "to the next step." *See id.* at § 701.6(g)(2).

| 1 | Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3). |
|---|---|

If all three of these levels of review are exhausted, then the inmate may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. N.Y.*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, the plaintiff has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

In the current case, Defendants claim Plaintiff failed to satisfy the exhaustion requirements for all claims contained in the second amended complaint. *See* Dkt. No. 73. During Plaintiff's deposition on July 30, 2018, Plaintiff expressed a general understanding of how the grievance process operates. Dkt. No. 73-2 at 58-59. DOCCS computer printouts show that Plaintiff properly appealed at least six other grievances prior to commencing this action, thereby demonstrating that Plaintiff generally knew how to exhaust his administrative remedies prior to filing suit. Dkt. No. 73-5 at 6.

Although DOCCS records do not show any grievances which were filed and appealed regarding the claims of deliberate indifference against Defendants Dr. Chalom and Nurse Penn, Plaintiff contends he filed three grievances for "medical," or inadequate medical care, in October 2015, January 2016, and on July 7, 2016. Dkt. No. 73-2 at 59-64; *See* Dkt. No. 73-5 at 6. Plaintiff alleges he filed a grievance with the grievance office at Ogdensburg C.F. in October 2015 in connection with the medical treatment Plaintiff received on July 30, 2015. Dkt. No. 73-2 at 60-61. Even assuming the DOCCS records were incorrect and the grievance was filed, it would have been filed over two months after Plaintiff received the complained of medical treatment and therefore untimely. Dkt. No. 74-1 at 30; *see* 7 N.Y.C.R.R. § 701.5(a)(1). Untimely grievances are insufficient to exhaust administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g., Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, *7 (N.D.N.Y. Feb. 15, 2019) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies"); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, *5 (N.D.N.Y. Aug. 10, 2018) ("An untimely grievance does not satisfy the exhaustion requirement").

**\*4** Although Plaintiff wrote a follow up letter on the October 2015 grievance to the Ogdensburg C.F. Deputy Chief Medical Officer Carl J. Koenigsmann, this too was insufficient to properly exhaust Plaintiff's administrative remedies because Koenigsmann is a prison official outside of the grievance chain of command. Dkt. No. 73-2 at 60-62; *see Louis-Charles v. Barker*, No. 16-CV-1417, 2018 WL 4299982, *2 (N.D.N.Y. Sept. 10, 2018) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (N.D.N.Y. Sept. 26, 2016)); *see also Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007). [2]

| 2 | While placing prison officials on notice of a grievance through less formal channels may constitute a claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)). |
|---|---|

Plaintiff asserted he submitted a second grievance to the grievance office at Ogdensburg C.F. in January 2016. Dkt. No. 73-2 at 63. Plaintiff also alleges he filed a third grievance on July 7, 2016 by handing the grievance to an officer to mail for him while he was confined in the Riverview C.F. Special Housing Unit ("SHU"). Dkt. No. 73-2 at 63-64. Although these grievances would have been timely with the corresponding medical treatment, Plaintiff did not receive a response and did not follow up or file any appeals. Dkt. No. 73-2 at 63-64. Therefore, Magistrate Judge Peebles correctly

found that Plaintiff failed to properly use the IGP and proceeded to address a possible exception to the exhaustion requirement.

Although the PLRA requires inmates to exhaust all available administrative remedies prior to filing a § 1983 claim, courts have interpreted this Act to contain an important textual exception: an inmate is not required to exhaust administrative remedies if such remedies are not "available." *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). There are three circumstances in which the Supreme Court has found administrative remedies are not available. *Id.* at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* at 123 (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

In this case, there is no allegation that the staff at Ogdensburg C.F. or Riverview C.F. discarded or otherwise interfered with Plaintiff's grievances. *See generally* Dkt. No. 50. Therefore, Magistrate Judge Peebles proceeded to address the Second Circuit's treatment of the availability of New York's IGP when the inmate does not receive a response to filed grievances.

**\*5** In *Williams*, an inmate-plaintiff allegedly gave a prison guard a grievance to file on his behalf, but it was never filed and the inmate was subsequently transferred and never received a response. *Williams*, 829 F.3d at 120-21. The Second Circuit addressed whether administrative remedies were "available" to the inmate-plaintiff and concluded that New York regulations do not clearly outline the process to appeal an unfiled and unanswered grievance. *See id.* at 124. As such, the Court held that "the grievance procedures that were technically available to [the plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859).

In contrast, the Second Circuit in *Cicio* found that when an inmate claimed he filed a written grievance with the IGRC, but the IGRC supervisor could not find a record of the grievance and the parties agreed the plaintiff never received a response, the situation was not so opaque that it became "incapable of use." *Cicio v. Wenderlich*, 714 Fed. Appx. 96, 97-98 (2d Cir. 2018). There, the Court found that "[w]hen a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal." *Id.*

Magistrate Judge Peebles appropriately reasoned that the facts of the present case fall somewhere in between *Williams* and *Cicio*. The IGP supervisors at both Ogdensburg C.F. and Riverview C.F. submitted declarations stating they could find no record of Plaintiff's grievances in their respective offices. Dkt. Nos. 73-3, 73-4. However, Plaintiff alleges that he handed the second grievance to the Ogdensburg C.F. grievance office, and the third grievance to a prison guard while in Riverview C.F. SHU. Dkt. No. 73-2 at 63-64. Plaintiff claims that he did not receive a response to either grievance, and simultaneously concedes that he made no attempt to follow up or otherwise appeal. Dkt. No. 73-2 at 61-64. Plaintiff's third grievance is further complicated by his transfer from Riverview C.F. SHU to Upstate C.F. SHU. Dkt. No. 73-2 at 147-49.

Although Plaintiff's first, untimely grievance was clearly insufficient to exhaust his administrative remedies, the Court is unable to come to the same conclusion with respect to the second and third grievances. The Court agrees with Magistrate Judge Peebles' acknowledgment that whether administrative remedies were available is a somewhat nebulous issue in light of *Cicio* and *Williams*, as well as the specific facts of this case. Therefore the Court finds that Magistrate Judge Peebles' correctly determined Defendants' summary judgment motion cannot be granted with regard to the alleged January 2016 and July 7, 2016 grievances on this procedural basis.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect only to the grievance allegedly filed in October 2015 regarding the medical treatment rendered by Dr. Chalom on July 30, 2015. As such, Plaintiff's claim as to his first grievance is dismissed for his failure to exhaust.

**C. Deliberate Indifference**

Britt v. Carberry, Slip Copy (2019)

2019 WL 2437912

For a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the accused prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious deprivation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted).

### 1. Sufficiently Serious Deprivation

**\*6** The sufficiently serious deprivation inquiry is the objective prong of the deliberate indifference standard. *See Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (citation omitted). Under this prong, relevant considerations include "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (other citation omitted). Further, the court may examine whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). As the Second Circuit has stated, the relevant inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition[.]" *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

In this case, Plaintiff's deliberate indifference claims generally arise out of a disagreement over the medical treatment Plaintiff received from Dr. Chalom and Nurse Penn while he was an inmate. *See* Dkt. No. 50. Standing alone, Plaintiff's disagreement "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz*, 549 Fed. Appx. 18, 21 (2d Cir. 2013); *see also Estelle*, 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim).

Nevertheless, Plaintiff also alleges he was denied adequate medical care. *See generally* Dkt. Nos. 50, 77. Although Plaintiff references suffering from "serious bacteria," "Methicillin-Resistant Staphylococcus Aureus" ("MRSA"),

and a "deadly infection," the record reflects he suffered from recurring cellulitis [3] and received treatment on each occasion that he requested medical assistance. Dkt. No. 50 at ¶¶ 13-15; Dkt. No. 74-1 at 25-26, 28, 30; Dkt. No. 77 at 8.

[3] "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty*, No. 10-CV-1568, 2012 WL 4026682, \*1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31 st ed. 2007)).

When Plaintiff requested medical attention while in custody in Ogdensburg C.F. on July 30, 2015 and January 26, 2016, Dr. Chalom examined him and prescribed him antibiotics for cellulitis. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30, 28; *see also* Dkt. No. 50 at 10. Although at varying points in the record Plaintiff contends otherwise, Plaintiff's medical records indicate Dr. Chalom did not provide any further medial treatment to Plaintiff. *See* Dkt. No. 50; Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. There is nothing in the record to suggest Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to Plaintiff. *See Estelle*, 429 U.S. at 107.

When Plaintiff requested emergency medical attention on June 29, 2016, Nurse Penn examined Plaintiff at Ogdensburg C.F. and aware of Plaintiff's impending transfer, then contacted medical staff at Riverview C.F. to examine Plaintiff upon his intake. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 25-26. Plaintiff concedes he was subsequently examined by a doctor at Riverview C.F. and given a prescription for antibiotics, which resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record indicates that Nurse Penn appropriately exercised her judgment to determine the method of care and treatment to be provided to Plaintiff, within the scope of her authority as a registered nurse. Dkt. No. 73-9 at 2; *see Estelle*, 429 U.S. at 107.

**\*7** Therefore, the Court agrees with Magistrate Judge Peebles' assessment that a reasonable fact finder would not conclude that Plaintiff's cellulitis was sufficiently severe as to support the first factor or objective test for deliberate medical indifference. The Court further finds Magistrate Judge Peebles correctly determined that even if a reasonable fact

finder could conclude Plaintiff's condition was sufficiently severe, no reasonable fact finder could conclude that Defendants' care was inadequate, or if in any way inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing and prison medical personnel have broad discretion to determine what method of care and treatment to provide to their patients. *See Estelle*, 429 U.S. at 107; *see also Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986).

### 2. Culpable State of Mind

The second prong of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. *Hathaway*, 37 F.3d at 66. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

In this case, the record shows Plaintiff's condition was addressed and Defendants did not turn a blind eye or fail to act while aware of a substantial risk of harm to Plaintiff's health or safety. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74 at 3-4, 25-26; *see generally* Dkt. No. 74-1; *see also* Dkt. No. 50 at 10. Therefore, the Court agrees with Magistrate Judge Peebles' conclusion that even if Plaintiff could satisfy the objective prong, no reasonable fact finder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect to Plaintiff's deliberate medical indifference claims.

### D. Due Process Claim

Defendants argue there is no genuine issue of material fact as to whether Plaintiff's ninety-day disciplinary confinement constituted an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Further, Defendants argue even if Plaintiff was deprived of a cognizable liberty interest, Plaintiff was afforded sufficient due process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. Plaintiff has not addressed Defendants' liberty interest argument, but contends he was deprived of procedural due process in connection with his disciplinary hearing held in July of 2016. *See* Dkt. No. 77.

### 1. Liberty Interest

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In *Sandin*, the Supreme Court held that although states may create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 483-84 (internal citations omitted).

**\*8** The prevailing view in the Second Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, \*6 (N.D.N.Y. Feb. 6, 2001). Accordingly, Magistrate Judge Peebles appropriately addressed whether Plaintiff's SHU confinement rose to the level of an atypical and significant hardship under *Sandin*. Dkt. No. 87 at 38-39.

The Second Circuit has not set a bright line rule on when confinement becomes atypical. "In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement ... and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of 101 days or less will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *see Colon v. Howard*, 215 F.3d 227, 231, 232

n.5 (2d Cir. 2000)). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

In the present case, at Plaintiff's July 2016 disciplinary hearing, Defendant Carberry found Plaintiff guilty and imposed a ninety-day SHU confinement. Dkt. No. 73-7 at ¶¶ 13, 14. As Plaintiff has alleged unusual conditions, the Court must address whether the record reflects that Plaintiff was subject to "conditions more onerous than usual" during his confinement. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citing *Colon*, 215 F.3d at 232-33 n.5 (2d Cir. 2000)). The Court must examine the conditions of confinement " 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Id.* at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

For the duration of Plaintiff's ninety-day disciplinary confinement, he was confined in Riverview C.F. SHU for the first sixteen days, and then in Upstate C.F. SHU for the remainder of the ninety days. Dkt. No. 73-2 at 147-49. Plaintiff alleges that in Riverview C.F. SHU, the shower walls and floors were dirty with mildew, there was a rodent infestation in his cell, and there was a light in his cell illuminated from 6:00 a.m. to 11:00 p.m. Dkt. No. 50 at 18. Plaintiff further alleged Upstate C.F. SHU had similar rodent issues. Dkt. No. 50 at 8; Dkt. No. 73-2 at 121-25. Plaintiff alleged these conditions resulted in weight loss, an inability to sleep, "severe migraines, dizziness, [and other] ailments, which included extreme fatigue and hallucination[s.]" Dkt. No. 50 at 18.

Although Plaintiff testified to the SHU conditions and alleges they were inferior to conditions "for the general pop[ulation] inmates[,]" "the record lacks any evidence of the conditions for other inmates in administrative confinement or in the general prison population." Dkt. No. 50 at 18; *Davis*, 576 F.3d at 135. Therefore, Magistrate Judge Peebles correctly concluded that without the necessary evidence in the record for the Court to determine if Plaintiff suffered an atypical and significant hardship during his confinement, the Court must assume Plaintiff was deprived of a liberty interest. Dkt. No. 87 at 41. Accordingly, the Court must proceed to analyze whether Defendants provided Plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearing. *Id.*

### 2. Procedural Safeguards

**\*9** The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

These due process requirements include procedural protections such as (1) written notice of the charges, (2) the opportunity to appear at a disciplinary hearing with a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns, (3) a written statement by the hearing officer explaining the decision and the reason for the action being taken, and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

### a. Written Notice

While Plaintiff acknowledged he received written notice of the charges against him in the form of a misbehavior report ("MBR") within the prescribed time of at least twenty-four hours prior to his disciplinary hearing, Plaintiff challenged the MBR as being too general to provide meaningful notice. Dkt. No. 50 at 6; *see* Dkt. No. 73-2 at 98. In reviewing this claim, Magistrate Judge Peebles correctly articulated that due process does not require "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct[,]" but rather only requires "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue[.]" *Sira*, 380 F.3d at 72. As Magistrate Judge Peebles correctly determined, the MBR provided Plaintiff sufficient notice under this standard because it included "specific facts" of his charged misconduct. Dkt. No. 87 at 44 (quoting Dkt. No. 73-7 at 9).

### b. Opportunity to Present Witnesses

In the second amended complaint, Plaintiff alleged Defendant Carberry, in her role as disciplinary hearing officer, denied

witness testimony that would have provided compelling evidence of his innocence. Dkt. No. 50 ¶ 17. Although a prisoner's right to call witnesses at a disciplinary hearing may be denied "on the basis of irrelevance or lack of necessity," the record indicates Plaintiff's request for inmates Drepaul and Green to testify was not denied. *See* Dkt. No. 73-7 at 6, 16; *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (citations omitted). Instead, Drepaul refused to testify, saying "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Further, Defendant Carberry's hearing report reflected that Green did testify, but also indicated his testimony was not credible and that he stated he was in the yard at the time of the incident. Dkt. No. 73-7 at 27.

Therefore, this Court agrees with Magistrate Judge Peebles' determination that Plaintiff's claim is flatly contradicted by the record and that Defendant Carberry's failure to call Drepaul, a witness who refused to testify, does not violate Plaintiff's procedural due process rights. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, *5 (N.D.N.Y. Oct. 29, 2018); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, *7 (N.D.N.Y. Sept. 11, 2014) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses").

### c. Employee Assistant

**\*10** "Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). "New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing." *Id.* at 126 (citing 7 N.Y.C.R.R. §§ 251-4.1, 251-4.2). "The assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Id.* (quotation and other citation omitted). "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

In the present case, Plaintiff received an employee assistant, Defendant Sgt. McKinley, who relayed Plaintiff's requests

to the hearing office and executed an assistance form with him. Dkt. No. 73-8 at 2, 3, 6. Plaintiff alleged he requested additional information that was not listed on the executed assistance form or requested by Defendant Sgt. McKinley. *Id.*; Dkt. No. 73-2 at 94-98, 107. Upon review of Plaintiff's claim, Magistrate Judge Peebles correctly found, nothing in the record supports the notion that providing Plaintiff with this information would have impacted the outcome of the hearing. *Clyde*, 714 F. Supp. 2d at 437 (quoting *Pilgrim*, 571 F.3d at 206); s*ee, e.g., Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, *8 (N.D.N.Y. July 11, 2018); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been impacted, alleged inadequate assistance was harmless error not warranting denial of summary judgment). Accordingly, Defendants' motion for summary judgment is granted as to this claim.

### d. Impartial Hearing Officer

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing cases). Nevertheless, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* at 259 (citing cases). In addition to the greater flexibility accorded prison disciplinary hearing officers, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 447 (1985). Further, the inmate must demonstrate prejudice in connection with the alleged denial of due process by showing that it affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)) (other citations omitted).

In the second amended complaint, Plaintiff alleges that Defendant Carberry was not an impartial hearing officer and that she had predetermined the results of the hearing in an "arbitrary and capricious" and "bad-faith manner[.]" Dkt. No. 50 at ¶ 19. As Magistrate Judge Peebles correctly determined, Plaintiff's claim against Defendant Carberry is without merit. Although the hearing tape was so distorted that the Court was unable to review it, the Court was able to review other evidence in the record, including the hearing

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2437912

record sheet and Defendant Carberry's handwritten hearing report. Dkt. No. 73-7 at 11, 27-29. The Court finds that Magistrate Judge Peebles correctly concluded that Plaintiff's bare assertions with respect to Defendant Carberry's alleged bias are unsupported by these documents and the record as a whole, and as such, are insufficient to give rise to a dispute of material fact. *See generally* Dkt. No. 73-7; *see Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider*, No. 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016).

**\*11**  Accordingly, because no reasonable fact finder could conclude that Plaintiff's due process rights were violated, Defendants' motion for summary judgment is granted as to this claim.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, Magistrate Judge Peebles' March 22, 2019 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' March 22, 2019 Report and Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment (Dkt. No. 73) is **GRANTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's amended complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2437912

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Barksdale v. Frenya, Not Reported in F.Supp.2d (2012)

2012 WL 4107801

2012 WL 4107801
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Elijah BARKSDALE, Plaintiff,

v.

R.T. FRENYA, Correction Officer, Clinton
Correctional Facility; Curtis Drown, Correction
Hearing Officer, Clinton Correctional Facility,
Dale Artus, Superintendent, Clinton Correctional
Facility, and Brian Fisher, Commissioner of NYS
Department of Correctional Services, Defendants.

No. 9:10–CV–0831 (MAD/DEP).
|
Sept. 19, 2012.

**Attorneys and Law Firms**

Elijah Barksdale, New York, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, David L. Cochran, Esq., of Counsel, Albany, NY,
for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**INTRODUCTION**

*\*1* In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional and Community Supervision
("DOCCS"), claims that defendants violated his Eighth
and Fourteenth Amendment rights. Defendants' moved for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No.
44). Plaintiff did not oppose the motion. The motion was
referred to United States Magistrate Judge David E. Peebles
for a Report–Recommendation pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.3(c). Magistrate Judge
Peebles issued a Report and Recommendation (Dkt. No. 47)
recommending that the motion be granted in part and denied
in part. [1]

[1]    The Clerk is directed to append Judge Homer's
Report–Recommendation to this decision, and
familiarity is presumed.

Defendants filed specific objections to the Report–
Recommendation. (Dkt. No. 49). In view of the objections
and pursuant to 28 U.S.C. § 636(b)(1), this Court conducts
a *de novo* review of these issues. The Court reviews the
remaining portions of the Report and Recommendation for
clear error or manifest injustice. *See Brown v.. Peters,* 1997
WL 599355, at *\*2–3 (N.D.N.Y.) aff'd without op., 175 F.3d
1007 (2d Cir.1999).* After the appropriate review, "the court
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1).

**BACKGROUND**

**I. Factual Background**
As the parties do not object to Magistrate Judge Pebbles'
thorough recitation of the facts, the Court adopts the
"Background" and "Procedural History" as set forth therein.

**II. Report and Recommendation**
On December 2, 2011, defendants moved for summary
judgment arguing: (1) that defendant Fisher lacked personal
involvement; (2) plaintiff failed to exhaust his administrative
remedies; and (3) plaintiff did not possess a protected liberty
interest in remaining free from the challenged confinement.

On August 17, 2012, Magistrate Judge Peebles recommended
that the Court grant in part and deny in part defendants'
motion for summary judgment. Magistrate Judge Peebles
recommended that defendants' motion be granted as to
all claims against defendant Fisher based upon his lack
of involvement in the relevant conduct. Magistrate Judge
Peebles also concluded that plaintiff failed to exhaust
available administrative remedies with respect to his failure
to protect claim against Frenya. Magistrate Judge Peebles
recommended denying defendants' motion for summary
judgment and dismissal of plaintiff's procedural due process
claims against defendants Drown and Artus. Magistrate
Judge Peebles reasoned that defendants failed to sustain their
burden of demonstrating the lack of genuine issues of fact
surrounding whether plaintiff was deprived of a cognizable
liberty interest by virtue of his 120–day SHU confinement.

2012 WL 4107801

## III. Objections

Defendants Drown and Artus object to the portion of the Report–Recommendation that denied their motion for summary judgment and dismissal of plaintiff's procedural due process claims against them. Defendants argue that plaintiff failed to allege or demonstrate any genuine issue of material fact as to whether he suffered from an atypical and significant hardship.

## DISCUSSION

## I. Standard on Motion for Summary Judgment

 **\*2**  A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. See *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. See *Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. See *Giannullo v. City of N. Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U .S. 519, 520 (1972)) (other citations omitted).

The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan,* 289 F.Supp.2d at 295 (quoting *Traguth v. Zuck,* 710 F .2d 90, 95 (2d Cir.1983)).

## II. Due Process

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

As a threshold matter, an inmate asserting a violation of his right to due process must first establish that he had a protected liberty interest in remaining free from the confinement that he challenges and, if so, that the defendant deprived the plaintiff of that liberty interest without due process. *See Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Thus, to show that a liberty interest is sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that his resulting confinement or restraint creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and that the state has enacted a regulation or statute which grants inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at 484; *see also Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. See *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999); *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

2012 WL 4107801

**\*3** "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (citations omitted). In making such a determination, courts are required to examine the actual circumstances of confinement. *Id.*

In *Palmer v. Richards,* 364 F.3d 60 (2d Cir.2004), the Second Circuit held:

> [O]ur cases establish the following guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. Where the plaintiff was confined for an intermediate duration-between 101 and 305 days-"development of a detailed record" of the conditions of the confinement relative to ordinary prison conditions is required. In those situations, a district court must "make a fact-intensive inquiry," examining "the actual circumstances of SHU confinement" in the case before it without relying on its familiarity with SHU conditions in previous cases. Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law.

*Palmer,* 364 F.3d at 65 (internal citations omitted).

In cases involving confinement between 101 and 305 days, courts are required to develop a detailed factual record regarding the confinements in the SHU which may include "evidence of the psychological effects of prolonged confinement in isolation and the precise frequency of SHU confinements of varying durations." *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000). In the absence of a detailed record, courts have affirmed dismissal of due process claims only in cases where the period of time spend in the SHU was exceedingly short and there was no indication that the plaintiff endured unusual SHU conditions. *Palmer,* 364 F.3d at 66.

In this matter, plaintiff testified during his deposition as follows:

> Q. As a result of this TIER hearing, how long were you confined in SHU?

> A. For four and a half months. For four months on that incident.

> Q. Okay. Now, your complain says you were there for 120 days. Does that sound about right?

> A. Yes [ ... ].

> Q. Do you know how long you served in SHU just as a result of this incident?

> A. I think I did five months and change maybe.

*See* Pl. Dep. at p. 19.

Indisputably, plaintiff was confined to the SHU for 120 days in the SHU, thus placing him within the guideline governing intermediate durations of confinement. However, during his deposition, counsel did not pose any questions or elicit any answers from plaintiff involving the conditions of his confinement in SHU. Moreover, while defendants presented affidavits in support of their motion for summary judgment, the affidavits are devoid of any reference to plaintiff's actual conditions of confinement in the SHU. There is no detailed record or evidence regarding the conditions of confinement in the SHU and how those conditions compared to "the ordinary incidents of prison life".

**\*4** On a motion for summary judgment, defendants bear the burden of proof. "Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Palmer,* 364 F.3d at 65. Consequently, viewing the evidence in a light most favorable to the non-movant, as the Court must due, defendants' motion for summary judgment and dismissal of plaintiff's due process claim is denied. *See Green v. Herbert,* 677 F.Supp.2d 633, 636–637 (W.D.N.Y.2010). The Court has reviewed the cases cited by defense counsel which allegedly support defendants' arguments. However, the Court finds these cases unpersuasive as they pre-date the Second Circuit's ruling in *Palmer.*

Upon *de novo* review of the remainder of Magistrate Judge Peebles' findings, the Court accepts and adopts the Report–Recommendation.

It is therefore

**ORDERED** that:

2012 WL 4107801

1. The Report–Recommendation (Dkt. No. 47) is hereby adopted in its entirety.

2. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4107801

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5589350
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Donald BOWENS, Plaintiff,

v.

M.E. POLLOCK, et al., Defendants.

No. 06–CV–0457A(Sr).
|
Oct. 12, 2010.

**Attorneys and Law Firms**

Donald Bowens, Utica, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

*REPORT, RECOMMENDATION AND ORDER*

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to Title 28, United States Code, Section 636(b) (1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 19.

Plaintiff, proceeding *pro se,* commenced this action pursuant to Title 42, United States Code, Sections 1981, 1983, 1985 and 1986, alleging that defendants engaged in a conspiracy and violated his constitutional rights to free speech, access to the courts, equal protection and due process and subjected him to cruel and unusual punishment in retaliation for the performance of his duties as Secretary of the Groveland Correctional Facility ("Grove land"), Inmate Liaison Committee ("ILC"), during his incarceration at that facility. Dkt. # 1.

Currently before the Court are defendants' motions for summary judgment (Dkt. 31 and 51), and plaintiff's motion for summary judgment. Dkt. # 45. For the following reasons, it is recommended that defendants' motions be granted in part and denied in part and that plaintiff's motion be denied in its entirety.

*BACKGROUND*

Plaintiff arrived at Groveland in January 2004. Dkt. # 1, ¶ 23. Plaintiff signed a client participation contract for the Veterans Residential Therapeutic Program ("Veterans Program"), on April 8, 2004, and subsequently completed both the basic and after care portions of that program. Dkt. # 26, p. 106. The Veterans Program Conduct Guide provides, *inter alia:*

> Be reminded that *NO* pornographic materials, or gambling are allowed as a participant of this Program, or dorm resident.

Dkt. # 26, p. 104.

Following completion of the Veterans Program, plaintiff continued as a Clerk in the Veterans Program and remained in the Veterans Program Housing Unit. Dkt. # 1, ¶ 23. Plaintiff chose to volunteer as a Clerk so that he could keep his higher paying position as a Clerk in the Law Library, but understood that he would have the option of dropping his position in the Law Library should it become necessary for him to be paid as a Clerk in order to remain in the Veterans Program Housing Unit. Dkt. # 1, ¶ 24.

In February 2005, plaintiff was elected as the Veterans Program Representative to the ILC and in July 2005, he was elected Secretary of the ILC. Dkt. # 1, ¶ 25. In October 2005, the Chair of the ILC, inmate McDuffy, instructed plaintiff to speak to Sergeant Pollock, the ILC Staff Advisor, regarding the movie selection for November. Dkt. # 1, ¶ 26. When he was unable to locate Sergeant Pollock on October 13th and 14th, plaintiff typed two letters and placed them both under Sergeant Pollock's door, expecting that Sergeant Pollock would forward the second letter to Deputy Superintendent Bartlett. Dkt. # 26, p. 51. Plaintiff states that he did not send copies of these letters to anyone else. Dkt. # 26, p. 52.

The first letter requested that Sergeant Pollock "let the movie selection that was voted on by the inmate population and submitted for November, go unchanged." Dkt. # 1–2, p.9. The second letter was addressed to Deputy Superintendent Bartlett and advised that:

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 154 of 328
Bowens v. Pollock, Not Reported in F.Supp.2d (2010)
2010 WL 5589350

**\*2** It has come to the attention of the I.L.C. that D.O.C.S. has approved all movies that are listed in the Swank Catalog for all Correctional Facilities throughout the State of New York.

At this time the I.L.C. is respectfully requesting that they be provided with a Swank Movie Catalog. A Swank Catalog will increase the Population's viewing selection and assure that the selection[s] are in compliance with D.O.C.S., and Media review. Also, the I.L.C. is respectfully requesting that they be provided with a catalog of the movies that are available from the Dansville Block Buster Video Store.

Thank you for your time in this matter, and may we please hear from you soon.

Dkt. # 1–2, p. 10.

Sergeant Pollock explained that,

[o]n 10/18/05, I found two letters, on I.L.C. letterhead, that had been shoved underneath my office door in the Peterson Building. I reviewed the letters; one was a letter to me requesting that I rescind my decision to change the November movies that had been voted on by population. The second was a letter to DSP Bartlett requesting movie catalogs from two vendors. Both letters were photocopies and there was no cover letter. Inmate Bowens signed both. Bowens is the Secretary for the Inmate Liaison Committee.

I had Inmate Liaison Committee Chairman M. McDuffie [1] ... report to my office so I could ask what the memos were about. Inmate McDuffie had knowledge of the situation, but denied giving Inmate Bowens permission to send any letters. McDuffie stated that he delegated Bowens to talk to me, but not put anything in writing. There is a standing order from me that no letter from the I.L.C. can be sent out unless signed by the Chair or Vice–Chair. Further, I must review the letter and sign off first before it goes beyond the I.L.C. It appeared that the letters from Bowens were in violation of these orders. McDuffie asked if I could call Bowens to my office for further information.

[1]  The record in unclear whether the correct spelling of Inmate Liaison Committee Chairman's last name is McDuffie or McDuffy. Accordingly, it appears in this Report, Recommendation and Order as it appears in the documents in the record, either McDuffie or McDuffy.

When Inmate Bowens reported to my office, I asked him to sit down. Inmate McDuffie was still present. I asked what the memos were all about. I explained that I did not change the November listings, nor do I ever see the list. D. Petric, Senior Librarian, supervises the Movie program with permission from D.S.P. Bartlett. I also asked when was there ever a vote taken by population over the monthly movies. I asked how many inmates voted, where did they vote, etc? I do admit being assertive, but not hostile or irate. Inmate Bowens admitted that there had not been a vote. Just some inmates came up to him in the yard and suggested some films.

In regard to the memo to DSP Bartlett, Inmate Bowens then stated he had not yet sent it to her. I asked whether he had spoken to Mr. Petric about the movie catalogs and he admitted he had not. He could offer no explanation for not going through the chain of command. He stated he would give all copies of both memos to ILC Chair McDuffie. Both inmates were then sent on their way.

**\*3** Dkt. # 26, p. 124. Sergeant Pollock further explained that he

did take [the] memo issued by Bowens very seriously because it was a breach of protocol and additionally placed my creditability [sic] with the Inmate population at risk. As the Inmate Liaison Committee Staff Advisor, my creditability [sic] is what allows me to do my job effectively.

Dkt. # 26, p. 137.

On October 19, 2005, Sergeant Pollock explained that he was reviewing my notes and found that Inmate Bowens was residing in G–2 Dorm. The entire G–Block is reserved for inmates programmed into the V.R.T.P. program or the G–Block porters. Inmate Bowens was a full time paid Eve/Late Eve Law Library Clerk. Records reflected that he was a volunteer clerk for the V.R.T.P.

2010 WL 5589350

program. I spoke with Correction Counselor Strollo and confirmed that Inmate Bowens was not active in the Treatment Program. After Mr. Strollo and I spoke about the incident, he stated that there was no need for Inmate Bowens to reside in the block. I notified Captains' Office of my findings and they ordered him to be moved to another dorm to allow another inmate to begin the Treatment program. As a sergeant, I do not have the authority to make such a move on my own.

Dkt. # 26, p. 135. Captain Wilcox authorized plaintiff's move after Sergeant Pollock brought to his attention the fact that plaintiff was a volunteer clerk, explaining to plaintiff during the course of his Tier III hearing that it was his policy for inmates to be housed where they are programmed, and noting that,

> [a]ccording to Mr. Strollo you were not on the payroll but you were a volunteer. Now if you're a volunteer and [you are taking] bed space from an inmate that is supposed to be programmed there, I will move you ...

Dkt. # 26, pp. 12 and 14.

In response to plaintiff's grievance concerning his removal from the Veterans Program Housing Unit, Inmate Grievance Program Supervisor O'Brien responded that Captain Wilcox advised that,

> the Veteran's dorm is for those actively participating in the Veteran's Program. Facility records confirm that the grievant completed his active participation in the program on 10/2/05. It is not the policy of this facility to house inmates based upon their choice of volunteer service. The grievant was properly moved at the

discretion of security for facility needs. The space in the Veteran's dorm is correctly given to those actively in the program, for which a waiting list exists.

Dkt. # 26, pp. 156–158. Plaintiff complains that he was removed from a therapeutic housing environment of 34 inmates "to one of the most incident prone dorms in the facility" housing 60 inmates and that he was "moved from a single man cube to the top bunk in a double bunk area." Dkt. # 1, ¶ 53.

At approximately noon on October 19, 2005, Sergeant Pollock authored a misbehavior report charging plaintiff with a violation of Rule 113.15 (Contraband—Inmates shall not purchase, sell, loan, give, or exchange personally owned articles without authorization); Rule 113.22 (Contraband —Inmates shall not use or possess authorized articles in unauthorized areas); Rule 113.23 (Contraband—Inmates shall not be in possession of any article that is not authorized by the Superintendent or designee); Rule 116.10 (Inmates shall not lose, destroy, steal, misuse, damage or waste any type of State property); and Rule 180.17 (Unauthorized Legal Assistance). Dkt. # 26, p. 5. Sergeant Pollock described the incident as follows:

**\*4** On 10/19/05, C.O. R. Dickerson ordered D. Bowens ... to pack up his personal property to move to K–1. The inmate took the draft bags. A short time later the officer went to check on Bowens and could not locate him. The office [r] went to the basement V.R.T.P. Clerk's Office where Bowens was a volunteer clerk. Officer Dickerson found and checked a bag and found Bowen's personal legal work and some state office supplies. He then secured the office. A short time later, he found Inmate Bowens packing in his cube. The inmate finished and before leaving asked for access to the basement Clerk's office to get his personal draft bag. At that point the inmate was directed to complete his move. Officer Dickerson had the bag transport[ed] to the watch commander's office so I could investigate further. I found inmate Bowen's personal legal work, other inmate's legal work, law books (Jailhouse Lawyers Manual with the name "Jose" on the cover, Statsky Legal Thesaurus/ Dictionary with "Groveland Correctional/Main Library" crossed out with the initials "D.B." in it, NYS Homeless Veteran's Service Guide marked "Guidance Unit Main"; State owned office supplies [ ] tape, paper clips, folder

labels, wire bound spiral memo book, 3 pornographic magazines, lined [paper], photocopies of pornographic photos from the magazine, assorted blank paper, 12" ruler marked "Book Room—Clerk."

The VRTP Clerk's Office is a program area for the Guidance Unit. No personal property, especially legal work or pornographic materials are allowed. Further the inmate was not authorized to remove state-owned office supplies from any area and place them in his personal property except for a Mead Composition Book (09910) for use as the ILC Secretary. Inmate Bowens is a Eve/Lt Eve Law Library Clerk.

Dkt. # 26, pp. 5–6. C.O. Dickerson endorsed the misbehavior report. Dkt. # 26, p. 5. As part of his duties as Review Officer, defendant Irving Schoenacker received the misbehavior report. Dkt. # 53, ¶ 8. Initially, defendant Schoenacker determined that the misbehavior report was complete and stated a valid charge. *Id.* "Then, given the serious nature of plaintiff's alleged infractions, I determined that plaintiff should be entitled [sic] a Superintendent's hearing and coded the misbehavior report as a Tier III." *Id.* Plaintiff was not confined following issuance of the misbehavior report. Dkt. # 26, p. 10.

Sergeant Pollock informed Lt. Keller that:

> [o]n October 21, 2005, I again interviewed Inmate Bowens in my office. This was a follow-up to a ticket I wrote on Inmate Bowens concerning contraband he had in the V.R.T.P. Clerk's office that was discovered by R. Dickerson, C.O., the day of his move out of G–2. I explained the seriousness of the misbehavior report and that it would be a Tier III ticket and the possible dispositions. I then asked Inmate Bowens about other inmate law library clerks violating the condition of their assignments as law library clerks. Inmate Bowens denied any knowledge of any unauthorized activities in the Law Library. Serving Officer J. Martin contacted me during the interview and asked for me to send Inmate Bowens to C–School after I was done with him, so he could serve him his ticket.
>
> **\*5** Concerning the inmate's accusation on any note I allegedly authored to the Law Library officers stating that he could not work his assigned job, I do not recall writing any such note. I asked the officer covering the Activities Building today to look for such a note, all that could be found on this date is Bowens name scratched off the roster. I

have not spoken to any of the assigned Law Library officers at all about Inmate Bowens....

Dkt. # 26, p. 136. As part of the investigation into plaintiff's complaints, however, C.O. Bauman wrote:

> My only involvement in this matter is that I did work the law library on 10–21–05 and upon reporting to the law library at 3:00 p.m., I did find a note on my desk saying to not let inmate Bowens work in the law library until further notice per Sgt. Pollock. Inmate Bowens showed up for work and I told him to leave & not show up again until further notice.

Dkt. # 1–2, p. 12. C.O. Austin explained that,

> [o]n Oct. 24 ... 2005 I reported to my bid [sic] in the law lib. I opened the log book and there was a note inside that stated inmate Bowens ... was not allowed in the law library until after his hearing per Sgt. Pollock. I explained this to Bowens and told him he would be handled as if he were [keeplock] that if he needed any legal assistance he could drop me a tab stating what he needed for his hearing. He did not send me any tabs saying he needed help.

Dkt. # 1–2, p. 13.

Plaintiff appeared before the Program Committee on October 24, 2005. Dkt. # 1, ¶ 37. Sergeant Pollock explained that this was a scheduled appearance and that,

> [p]rior to his coming into the room, I did inform Mr. Lindsay, the Program Committee Chair[,] about Bowen's situation. As Chair, Mr. Lindsay decided that Inmate Bowens should be removed from the Law Library Clerk

position pending his hearing. This is a normal procedure, when a misbehavior ticket is written in an inmate's program area.

Dkt. # 26, p. 136. By Memorandum dated November 14, 2005, in response to plaintiff's complaints, S.C.C. Lindsay advised Inmate Grievance Supervisor O'Brien that plaintiff was,

scheduled for Program Committee on a routine basis due to his completion of Transitional Services Phase III.

Prior to his entry into the room, the Program Sergeant informed me that inmate Bowens ... had a misbehavior report pending. When inmate Bowens came into the room, I informed him that I wanted to review the misbehavior report. When we checked the misbehavior report we found that the Tier III misbehavior report contained three charges which involved his Program in the Law Library, where he was assigned as an administrative clerk. As program Chairperson I decided to remove him from the assignment until the misbehavior report had been resolved. If he is found not guilty of those charges, he will be restored to the law library, including back pay. If he is found guilty of those charges he will be rescheduled for Program Committee when the disciplinary sanctions are completed and re-Programmed to another assignment.

*6 Dkt. # 26, p. 146. Deputy Superintendent for Security Gerard Krempasky affirms that it was "standard procedure" to remove an inmate from his programming pending resolution of a disciplinary hearing where the misbehavior report involved allegations pertaining to that programming. Dkt. # 38, ¶ 7.

The Tier III hearing commenced on November 1, 2005 before Captain Wilcox. Dkt. # 26, p. 10. In response to plaintiff's concern that he needed an employee assistant, Captain Wilcox advised plaintiff that he could request documents during the course of the hearing and made arrangements for plaintiff to access the Law Library. Dkt. # 26, p. 16. Inmate assistance is not required when an inmate is not confined. Dkt. # 42, ¶ 6.

Plaintiff explained to Captain Wilcox that he was in possession of the *Jailhouse Lawyers Manual* because another inmate, Jose Marrero, put them on the [Veterans Program's] office desk Wednesday morning so that he could donate them to the Law Library. Dkt. # 26, p. 25. Inmate Marrero testified

that he brought the manual and its supplement to the office for plaintiff to drop off at the Law Library because he is getting ready to be released and rarely leaves his dorm so as to avoid any trouble before his release. Dkt. # 26, pp. 41–42. It was confirmed that inmate Marrero properly received the books through legal mail. Dkt. # 26, p. 58. Captain Wilcox informed plaintiff that inmate Marrero could not leave books with an inmate to donate, but was required to follow a process through the Dep. of Programs. Dkt. # 26, p. 25. Plaintiff responded that he had tried to find the appropriate procedure for an inmate wishing to donate books to the Law Library, but found none, and noted that he had only received the book the morning he was directed to move. Dkt. # 26, p. 26.

Plaintiff informed Captain Wilcox that he had checked the legal thesaurus out of the Law Library and Captain Wilcox confirmed that was so. Dkt. # 26, pp. 30 and 73. Plaintiff also stated that the ruler was inside a folder and that he would have removed it if he had been able to go though his bag inside the office because he understood that it would be considered contraband inside the K dorm. Dkt. # 26, p. 44. He explained that the file folders and file folder labels were in his draft bag because he used them in both the veterans office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Dkt. # 26, p. 30.

C.O. Dickerson testified that he went down to the basement in the office and observed a bag half full of property which contained contraband. Dkt. # 26, p. 44. C.O. Dickerson locked the door and confirmed the bag was plaintiff's when he asked C.O. Dickerson to unlock the door so he could get his bag. Dkt. # 26, p. 45. Sergeant Pollock testified that he considered the Playboy magazines contraband because pornography is forbidden in the veteran's residential treatment program dorm, as well as in any program areas, including the veteran's inmate clerk's office. Dkt. # 26, p. 56. Sergeant Pollock testified that plaintiff was a Volunteer Clerk in the Veterans Program and resided in the Veterans Program Housing Unit, which would subject him to the conditions of that housing unit. Dkt. # 26, p. 56. Sergeant Pollock confirmed that he believed the assorted legal papers of plaintiff and other inmates to be contraband because they were discovered in an area where they did not belong. Dkt. # 26, p. 57. Sergeant Pollock explained that although the wire bound memo pads were once issued to the ILC, "a revised memo came out making them contraband." Dkt. # 26, pp. 57–58.

*7 Sergeant Pollock spoke with the Veterans Program director, Mr. Strollo, and determined that plaintiff could

2010 WL 5589350

be moved as he had completed the program and was a volunteer clerk. Dkt. # 26, p. 60. Corrections Counselor Strollo perceived that Sergeant Pollock "was upset about what Mr. Bowens had done," but was handling the situation himself. Dkt. # 26, p. 89. Corrections Counselor Strollo testified that plaintiff was part of the Veterans Program and had been hired as a clerk in the Veterans Program. Dkt. # 26, p. 87. Corrections Counselor Strollo testified that inmates residing in the Veterans Program Housing Unit, regardless of whether they were a program participant or not, were not allowed to possess magazines such as Playboy. Dkt. # 26, p. 87. Corrections Counselor Strollo also testified that plaintiff was not allowed to take personal property, including legal work, into the clerk's office. Dkt. # 26, pp. 87–88.

Plaintiff conceded possession of the Playboy magazines, but testified that they were in his locker until he was directed to pack his belongings, at which time he attempted to put all his books, magazines, and papers into one bag. Dkt. # 26, p. 94. Similarly, plaintiff explained that his legal materials had been in his locker and was taken to the veterans office when he was directed to pack his bags so that all his books and papers would be in the same draft bag. Dkt. # 26, pp. 32–33. Plaintiff explained that the legal materials containing other inmates' names were draft pleadings available as reference materials in the Law Library and drafts of work he did for inmates as part of his duties as a clerk in the Law Library. Dkt. # 26, pp. 34–35. He conceded that he "must have grabbed too many files when he" retrieved his own possessions from the Law Library, adding that he would have returned them to their proper spot had he had a chance to go through his draft bag as he had planned. Dkt. # 26, p. 35. Plaintiff testified that he kept his veterans related material and books for a business course he was taking in the veterans office. Dkt. # 26, p. 33. He testified that the business class was sponsored by the Veterans Program and explained that he would work on the course work in the veterans office whenever he had free time, adding that he was never told he couldn't work on the business course in the Veterans Program office and assumed that he could "because it was all veteran's related stuff that I was doing." Dkt. # 26, p. 29. Plaintiff reiterated that the program director gave him the memo pads. Dkt. # 26, pp. 28–29.

Sergeant Pollock testified that he spoke with the Chair of the ILC, inmate McDuffy, about the letter and was informed that plaintiff had been instructed to speak to Sergeant Pollock, but had not been given authority to write a letter. Dkt. # 26, p. 64. Inmate McDuffy confirmed that he had told plaintiff to get in touch with Sergeant Pollock about the movies but never

told him to write to Deputy Superintendent Bartlett. Dkt. # 26, p. 79. Sergeant Pollock assumed that the letter addressed to Deputy Superintendent Bartlett had been sent. Dkt. # 26, pp. 68 and 81. Sergeant Pollock testified that as the ILC staff advisor, he maintained an open door policy with the Chair or the Vice Chair of the ILC. Dkt. # 26, p. 65. Sergeant Pollock challenged the content of the letter and testified that plaintiff admitted that there was no vote by the population. Dkt. # 26, p. 65. Sergeant Pollock testified that he was very disappointed by the way this issue was handled by plaintiff and that he reprimanded plaintiff because,

> **\*8** this letter brings up a question of
> my credibility to population and that
> I can't work efficiently and effectively
> as an ILC staff advisor if my credibility
> is at stake. Also that I had nothing to
> do with the movie selection.

Dkt. # 26, p. 66.

Sergeant Pollock testified that plaintiff was removed from his program at the library because he had completed the program and was scheduled for a program change. Dkt. # 26, p. 70. Sergeant Pollock sat on plaintiff's program committee. Dkt. # 26, p. 69. Sergeant Pollock also testified that he conferred with Mr. Lindsay and

> advised him that this inmate had a
> pending tier three that may [have]
> something to do with this program
> area and Mr. Lindsay determined that
> pursuant to facility procedure that he
> be removed pending the outcome of
> the hearing.

Dkt. # 26, p. 70. Sergeant Pollock explained that if plaintiff was found not guilty, he would be programmed back with back pay. Dkt. # 26, p. 71. Sergeant Pollock denied leaving any instructions denying plaintiff access to the Law Library. Dkt. # 26, p. 71.

Captain Wilcox found plaintiff guilty of unauthorized exchange based upon plaintiff's acceptance of the Jailhouse Lawyers Manual from inmate Jose Marrero; possession of

2010 WL 5589350

Playboy magazines in an unauthorized area; and misuse of state property based upon his use of office supplies designated for the Veterans Program in his capacity as clerk in the Law Library, but found plaintiff not guilty of possessing contraband and providing unauthorized legal assistance. Dkt. # 1–2, p. 39. In support of the disposition, Captain Wilcox relied upon

> the written report by Sgt. Pollock ... and his verbal testimony at this hearing that on the date of 10/19/05 while packing for a housing unit move, you were found to be in possession of items allowed in general population but not allowed in the housing unit you were in, possessed books belonging to another inmate and were using office supplies issued from one area of the facility in other areas. Your allegation that Sgt. Pollock issued the report as a form of retaliation was not substantiated.

Dkt. # 1–2, p. 40. Captain Wilcox imposed two months keeplock, with loss of commissary and phone privileges and confiscation of plaintiff's law books, thesaurus, homeless veterans dictionary, tape dispenser, paper clips, ruler and wire bound steno pads. Dkt. # 1–2, p. 39. Plaintiff was immediately transferred to Livingston Correctional Facility. Dkt. # 1–2, p. 44.

### DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

**\*9** A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### Title 42, United States Code, Section 1981

Title 42, United States Code, Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 160 of 328
Bowens v. Pollock, Not Reported in F.Supp.2d (2010)
2010 WL 5589350

licenses, and exactions of every kind, and to no other.

To establish a claim under Title 42, United States Code, Section 1981, a plaintiff must demonstrate that (1) the plaintiff is a member of a racial minority, (2) the defendants intended to discriminate on the basis of race, and (3) the discrimination concerns one of the statute's enumerated activities. *Brown v. City of Oneonta, New York,* 221 F.3d 329, 339 (2d Cir.2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001). "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated." *Albert v. Carovano,* 851 F.2d 561, 571–72 (2d Cir.1988) (internal citations omitted). Although direct evidence of discrimination is not necessary, a plaintiff must do more than cite to his mistreatment and ask the court to conclude that it must have been related to his race. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001).

"To support a claim of selective enforcement, [plaintiff] must allege purposeful and systematic discrimination by specifying instances in which they were singled ... out for unlawful oppression in contrast to others **similarly situated."** *Brown,* 221 F.3d at 573 (internal quotation omitted). While the circumstances need not be identical, there should be a reasonably close resemblance of facts and circumstances where the plaintiff seeks to draw inferences of discrimination by showing that he was similarly situated in all material respects to the individuals to whom he compares himself. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001).

**\*10** To establish retaliation, a plaintiff must show that he was (1) engaged in an activity protected under anti-discrimination statutes, (2) the defendant was aware of plaintiff's participation in the protected activity, (3) the defendant took adverse action against plaintiff based upon that activity, and (4) a causal connection existed between plaintiff's protected activity and the adverse action taken by defendant. *Id.* at 105.

As there is no evidence before the Court to suggest that plaintiff was disciplined or moved from his housing unit or removed from his prison work and volunteer assignment because of his race or because of his complaints of racial discrimination, or that similarly situated inmates of other races were treated preferentially to plaintiff, it is

recommended that plaintiff's claims pursuant to 42 U.S.C. § 1981 be dismissed.

## Title 42, United States Code, Section 1983

Title 42, United States Code, Section 1983 provides "a method for vindicating federal rights elsewhere conferred, including under the Constitution.' " *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010), *cert. denied,* —— U.S. – – – –, 131 S.Ct. 158, 178 L.Ed.2d 243, 2010 WL 2300385 (2010) (internal quotation omitted).

### Retaliation

Plaintiff alleges that his constitutional rights were violated in retaliation for his performance of his duties as Secretary of the ILC. Dkt. # 1, ¶ 21. Specifically, plaintiff complains that he was removed from his housing unit, issued a Tier III misbehavior report for infractions undeserving of such disciplinary procedures, removed from his job in the Law Library, denied access to the Law Library, subjected to loss of his personal legal work, and denied timely resolution of his grievances, all in retaliation for writing two letters regarding the inmate movie selection. Dkt. # 1.

A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (internal quotations and citations omitted). "Thus, if taken for both proper and improper reasons, state action may be upheld if

Bowens v. Pollock, Not Reported in F.Supp.2d (2010)

2010 WL 5589350

the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Moreover, the Court of Appeals has recognized that prisoners' claims of retaliation should be examined "with skepticism and particular care" given the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

**Housing Unit Transfer**

*11 To sustain a First Amendment retaliation claim, a prisoner must demonstrate that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the prisoner; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

Prisoners possess a substantive right to free and uninhibited access to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. *Davis v. Goord,* 320 F.3d 352–53 (2d Cir.2003); *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). Thus, plaintiff possessed a constitutional right to raise his concerns about the inmate movie selection and inmate access to movie selections to prison authorities.

Adverse action is defined objectively as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *Id.* Within a day of the discovery of the letters raising concerns about the inmate movie selection, Sergeant Pollock requested that plaintiff be removed from his housing unit. Dkt. # 26, p. 137. As a result, plaintiff alleges that he was removed from a therapeutic housing environment of 34 inmates "to one of the most incident prone dorms in the facility" housing 60 inmates and that he was "moved from a single man cube to the top bunk in a double bunk area." Dkt. # 1, ¶ 53. This is sufficient to satisfy the adverse action requirement.

The causal connection may be established by the contemporaneous timing of Sergeant Pollock's discovery of the letters and his request to Captain Wilcox that plaintiff be transferred. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (Causal connection may be established by demonstrating that the protected activity was close in time to the adverse action). In addition, Sergeant Pollock admitted that he took the memos "very seriously because it was a breach of protocol and additionally placed my creditability

[sic] with the Inmate population at risk." Dkt. # 26, p. 137. Moreover, the Veterans Program Director, Corrections Counselor Strollo, testified at plaintiff's disciplinary hearing that Sergeant Pollock showed him the letters and "was upset about what [plaintiff] had done." Dkt. # 26, pp. 68 and 88–89.

Whether plaintiff would have been transferred out of the housing unit absent Sergeant Pollock's distress over the letters authored by plaintiff is a question of fact which must be resolved by a jury, particularly in light of plaintiff's allegation that he understood that he would be afforded the option of dropping his higher paying position as a Paralegal in the Law Library should it become necessary for him to be paid as a Clerk in order to remain in the Veterans Program Housing Unit. Dkt. # 1, ¶ 24. Thus, it is recommended that Sergeant Pollock's motion for summary judgment be denied with respect to plaintiff's claim of retaliatory transfer from the Veterans Program Housing Unit.

**Misbehavior Report**

*12 Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the issuance of a false misbehavior report in retaliation for exercising a constitutional right is actionable under Title 42, United States Code, Section 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

For the same reasons set forth above with respect to the housing transfer, plaintiff has demonstrated that the letters raising concerns regarding inmate movie selection were protected activity. In addition to subjecting plaintiff to the prospect of discipline, the issuance of the misbehavior report by Sergeant Pollock caused plaintiff to be removed from his work assignment at the Law Library pending resolution of the disciplinary proceeding and excluded from the Law Library generally for the period between the issuance of the misbehavior report and the start of the disciplinary hearing, thereby satisfying the adverse action requirement.

As set forth above, the issuance of the misbehavior report authored by Sergeant Pollock within one day of his discovery of the letters raising concerns over the movie selection and Sergeant Pollock's admission that he took the memos "very seriously" and Corrections Counselor Strollo's testimony that Sergeant Pollock "was upset about what [plaintiff] had done"

is evidence of causal connection. Dkt. # 26, pp. 68, 88–89 and 137. In addition, Captain Wilcox commented at the hearing that plaintiff had not had a disciplinary ticket in five years. *See Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir.1995) (evidence of prior good behavior may be circumstantial evidence of retaliation). Finally, although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, he was cleared of more serious charges of providing unauthorized legal assistance and possession of unauthorized articles. *See Gayle*, 313 F.3d at 683 ("vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive.").

Although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, the Court finds a question of fact as to whether plaintiff would have been subjected to a misbehavior report for these infractions absent Sergeant Pollock's unhappiness over plaintiff's perceived breach of protocol in writing letters of concern regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be denied.

### Determination of Appropriate Disciplinary Tier

**\*13** Lieutenant Schoenacker's determination that the charges set forth in the misbehavior report were sufficiently serious as to warrant a Superintendent's hearing is not actionable. Even accepting for purposes of this motion that Sergeant Pollock authored the misbehavior report in retaliation for plaintiff's letters, there is no evidence that Lieutenant Schoenacker was aware of that fact or had any communication with Sergeant Pollock which would support the inference of conspiracy. Accordingly, it is recommend that this aspect of defendants' motion for summary judgment be granted.

### Removal from Law Library Job

New York law does not give a prisoner any statutory, regulatory or precedential right to a prison job. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir.1987). However, a claim for relief may be stated pursuant to Title 42, United States Code, Section 1983 "if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally

protected rights" such as the right to petition government for the redress of grievances. *Id.* Thus, plaintiff could not be removed from his work assignment in retaliation for his exercise of his right to question the selection of inmate movies.

The record reveals that the decision to remove plaintiff from his position within the Law Library was made by Senior Corrections Counselor Lindsay after Sergeant Pollock informed him of the pending misbehavior report. Dkt. # 26, pp. 137 and 146. Moreover, the record is uncontroverted that it was standard procedure to remove an inmate from his program pending resolution of disciplinary proceedings relating to an inmate's program. Dkt. # 26, pp. 137 and 146; Dkt. # 38, ¶ 7. There is no evidence to suggest that S.C.C. Lindsay was motivated by, or was even aware of, plaintiff's complaints regarding the inmate movie selection when he determined that plaintiff should be removed from his position in the Law Library until the disciplinary proceeding was resolved and no suggestion of any agreement between Sergeant Pollock and S.C.C. Lindsay to retaliate against plaintiff for the exercise of his right to complain about the inmate movie selection. *See Dawes*, 239 F.3d at 492 (allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983) ("Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983."). Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

### Timely Resolution of Grievances

Plaintiff alleges that the grievances he filed following the issuance of the misbehavior report were not resolved in a timely fashion and were not resolved in the order in which his grievances were received. Dkt. # 1, ¶ 73. As a result, plaintiff complains that he was denied evidence for use in his disciplinary hearing. Dkt. # 1, ¶ 75.

**\*14** The grievance process is not an appropriate vehicle for gathering evidence for use in a disciplinary proceeding. Moreover, as the Inmate Grievance Supervisor Bonnie O'Brien declares, there is no requirement or expectation that grievances will be handled in the order in which they are received, as some grievances require more time to investigate and resolve than others. Dkt. # 40, ¶ 9. In any event, plaintiff's grievances were resolved within three weeks of the filing

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 163 of 328
Bowens v. Pollock, Not Reported in F.Supp.2d (2010)
2010 WL 5589350

of the first grievance and were dismissed, negating any suggestion that an earlier resolution would have supported his arguments at the disciplinary hearing. There is no evidence to suggest any agreement between Sergeant Pollock and the inmate grievance committee to deny his grievances in retaliation for plaintiff's letters regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Access to the Courts**

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *accord Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "The right of access to the courts requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement ... not be impeded from presenting those defenses and claims for formal adjudication by a court." *Bourdon v. Loughren,* 386 F.3d 88, 96 (2d Cir.2004). Inmate access to the court must be "adequate, effective, and meaningful." *Bounds,* 430 U.S. at 822. To establish a violation of this right, an inmate must demonstrate "actual injury" by showing "that a non-frivolous legal claim had been frustrated or was being impeded" because of the inadequate access. *Lewis,* 518 U.S. at 353 (footnotes omitted).

Although the Court finds a question of fact as to whether Sergeant Pollock denied plaintiff access to the Law Library in retaliation for the letters concerning the inmate movie selection, this claim fails for lack of evidence of actual injury. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Due Process Claim**

To state a cognizable section 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004), *quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999).

**\*15** In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65. As a result, district courts are "required to examine the conditions of confinement in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (internal quotations omitted). The district courts are "required to examine the actual circumstances of confinement and to identify with specificity the facts upon which their conclusions are based." *Id.* at 134 (internal quotations omitted). A detailed factual record is required unless the period of time spent in SHU was exceedingly short—less than 30 days—and there is no indication that the plaintiff endured unusual SHU conditions. *Id.* at 135. "Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Id.* at 134.

As defendants have presented no evidence regarding typical conditions of keeplock confinement as compared to the general population and the actual conditions of plaintiff's keeplock confinement, the Court lacks a sufficient factual record upon which to assess whether plaintiff has demonstrated a liberty interest with respect to his keeplock confinement of two months. Accordingly, it is recommended that defendants' motion be denied on this ground.

**Sufficiency of Process**

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff v. McDonnell,* 418 U.S. 539, 570–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *see Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46.

**\*16**  Plaintiff complains that Captain Wilcox refused to recuse himself from conducting the hearing, denied plaintiff's request for an employee assistant, denied plaintiff's request for documents and was predisposed to a finding of guilt. Dkt. # 1. Contrary to plaintiff's allegations, the record establishes that Captain Wilcox conducted an impartial hearing. The evidence in the administrative record (hearing transcript) establishes that plaintiff's acceptance of a book from another inmate and thereafter, maintaining possession of that book after it could not be donated to the law library even though the other inmate was still at Groveland, was a clear violation of Sub Section 113.15 of the Standards of Inmate Behavior. Dkt. # 42, ¶ 14. In addition, the evidence clearly established that plaintiff was not allowed to possess the Playboy magazine in the dorm where he was housed pursuant to the Veteran's Residential Therapeutic Program Conduct Guide Sub Section Housing Unit K and therefore, was in violation of Sub Section 113.22, property in an unauthorized area. *Id.* Lastly, the evidence clearly supported the finding of plaintiff guilty of Sub Section 116.10, theft of state property. *Id.*

Plaintiff was found not guilty of the charges of contraband and unauthorized legal assistance, as Captain Wilcox found that there was not enough evidence available to show his culpability for these charges. *Id.* As discussed below, Captain

Wilcox's disposition was supported by evidence in the form of the misbehavior report, as well as the testimony of defendant Pollack, inmate McDuffy and Mr. Strollo. It is clear from the record that Captain Wilcox was impartial and unbiased in the conduct of the Tier III disciplinary hearing and clearly evaluated all of the evidence presented during the hearing, as demonstrated by the fact that he found plaintiff not guilty of several of the charges. Therefore, it is recommended that this portion of defendants' motion for summary judgment be granted.

**Sufficiency of the Evidence**

Regardless of plaintiff's explanation for why he was in possession of inmate Marrero's Jail House Lawyer's Manual, there is no dispute that inmate Marrero transferred possession of this book to plaintiff. Dkt. # 26, pp. 25–26, 41–42, 58. Thus, the evidence was sufficient to find plaintiff guilty of unauthorized exchange of personal property. Similarly, plaintiff does not dispute that he possessed pornographic magazines within the confines of the Veterans Program Housing Unit, in violation of the Veterans Program Conduct Guide. Dkt. # 1–3, p. 20. Finally, the evidence is sufficient to support a finding that plaintiff was using office supplies issued to the Veterans Program in the Law Library, as plaintiff testified at his disciplinary hearing that he used the supplies in the Veterans Office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Accordingly, it is recommended that this aspect of defendants' motion be granted.

**Employee Assistant and Request for Documents**

**\*17**  Plaintiff also complains that Captain Wilcox denied plaintiff's request for an employee assistant and denied plaintiff's requests for two unspecified documents to be used as evidence during the disciplinary hearing. Plaintiff requested an employee assistant to aid in the retrieval of two documents to support his defense. Captain Wilcox denied plaintiff's request pursuant to DOCS Directive 4932 Sub Section 251.4, 1, because plaintiff was not confined in segregated confinement while awaiting the Tier III disciplinary hearing and could have obtained the documents himself. Dkt. # 42, ¶ 6. An inmate's right to an employee assistant while being confined has been well established. *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). However, the right to an employee assistant does not extend to an inmate who is able to conduct his own investigative work. *Hameed v. Mann,* 57 F.3d 217 (2d Cir.1995).

2010 WL 5589350

Insofar as plaintiff claims that he was denied access to certain unspecified documents, as noted above, plaintiff was in a position to conduct his own investigative work. With respect to the two documents specifically discussed during the disciplinary hearing, one was a copy of the housing unit change form plaintiff thought was used when he was moved from G–2 form to K–1 dorm. However, because Captain Wilcox oversaw all movement within the facility and further, authorized all moves, Captain Wilcox explained that he did not use any move forms and thus, the document requested by plaintiff simply did not exist. The second document requested by plaintiff was a form to the law library program recommending that plaintiff be removed from his program assignment. During the hearing, plaintiff was given ample opportunity to produce the document. Moreover, once plaintiff was advised that he needed to obtain the document on his own, he never formally requested the document from Captain Wilcox. Notwithstanding the foregoing, Captain Wilcox determined that such document would be cumulative and duplicative because other evidence was presented during the hearing concerning plaintiff's removal from the law library program. For the foregoing reasons, the alleged denial of the employee assistant and failure to provide plaintiff with the requested documents does not constitute a denial of due process in the conduct of the Tier III disciplinary hearing. For the foregoing reasons, it is recommended that this portion of defendants' motion for summary judgment be granted.

**Equal Protection**

"The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1985), *citing Cleburn v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Id.* Alternatively, plaintiff may proceed on a "class of one" theory, in which case "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005), *overruled on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d. Cir.2008). Thus, in a "class of one" case, a plaintiff must establish that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of

a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.*

**\*18** Plaintiff cannot sustain a claim that Captain Wilcox denied him due process of law in finding plaintiff, but not inmate Marrero, guilty of unauthorized exchange because inmate Marrero was not subject to a misbehavior report and therefore, not before him for a disciplinary hearing. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay all claim that they lack the requisite personal involvement and therefore, plaintiff's claims against each of them should dismissed. In his complaint, plaintiff alleges that defendants Hunt, Kruppner, Krempasky and Bartlett each had personal knowledge that defendant Pollack issued a deprivation order and further that defendants Pollack and Lindsay conspired in retaliatory removal of plaintiff from his job in the law library, but did nothing. Dkt. # 1, ¶¶ 107–115. Plaintiff further claims that these defendants had knowledge that defendant O'Brien had obstructed and hindered plaintiff's grievances from going forward. *Id.* at ¶ 16. Moreover, plaintiff claims that defendant Hunt was responsible for appointing defendant Wilcox to serve as the hearing officer, notwithstanding the fact that he knew of defendant Wilcox's personal involvement in the removal of plaintiff from the

Veterans Residential Treatment Program and the dorm. *Id.* at ¶ 114.

There is nothing in the record before this Court to support a conclusion that Superintendent Hunt, Deputy Superintendents Kruppner, Krempasky and Bartlett and Lieutenants Keller and Kelsay were more involved than simply by virtue of the fact that they held supervisory positions within the prison chain of command. The fact that Superintendent Hunt issued two memos in response to plaintiff's claims of retaliation does not alter the analysis of whether he was sufficiently personally involved thereby requiring denial of his motion for summary judgment. Similarly, defendant Krempasky's review of the investigation which concluded that no wrongdoing had occurred does not require a finding that he was sufficiently personally involved. Both Lieutenant Keller's and Lieutenant Kelsay's involvement was limited to conducting the subject investigation. Dkt.36 and 37. Finally, defendants Bartlett and Kruppner neither participated in the investigation nor knew plaintiff. Dkt.34 and 39. Accordingly, because defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay were not sufficiently personally involved in the alleged constitutional deprivations, it is recommended that plaintiff's claims against each of them fail as a matter of law.

**Conspiracy—Title 42, United States Code, Section 1983**
**\*19** "To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds that violated the plaintiff's rights, privileges, or immunities secured by the Constitution or federal courts." *Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992) (internal quotation omitted). "To establish that a conspiracy existed plaintiff must demonstrate the defendants 'agreed' or 'reached an understanding' to violate his rights." *Id.* "Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983). As plaintiff does not allege and the record does not reflect any agreement among the defendants, summary judgment is appropriate with respect to plaintiff's vague allegations of conspiracy. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim be granted.

**Conspiracy—Title 42, United States Code, Section 1985(3)**
42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United states, the party so injured or deprived may have an action for the recovery of damages.

"The conspiracy must be motivated by racial or related class-based discriminatory animus." *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996). Other than plaintiff's speculative and conclusory allegations that defendants conspired to retaliate against the plaintiff in racially motivated ways, the complaint is devoid of any allegations of invidious discriminatory animous on the part of the defendants. Conclusory allegations are wholly insufficient to state a claim pursuant to section 1985(3). Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted.

**Conspiracy—Title 42, United States Code, Section 1986**
Title 42, United States Code, Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under Title 42, United States Code, Section 1985. *Graham,* 89 F.3d at 82. Thus, a section 1986 claim is contingent upon a valid section 1985 claim. *Id.* Because plaintiff fails to establish a cause of action pursuant to Title 42, United States Code, Section 1985, his claim pursuant to Title 42, United States Code, Section 1986 must also be dismissed. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim

Bowens v. Pollock, Not Reported in F.Supp.2d (2010)

2010 WL 5589350

pursuant to Title 42, United States Code, Section 1986 be granted.

### *CONCLUSION*

**\*20**  For the foregoing reasons, this Court recommends that:

1. Defendants' motion for summary judgment on plaintiff's claim pursuant to Title 42, United States Code, Section 1981 be granted;

2. Defendants' motion for summary judgment on plaintiff's retaliation claim (Housing Unit Transfer) be denied;

3. Defendants' motion for summary judgment on plaintiff's retaliation claim (Misbehavior Report) be denied;

4. Defendants' motion for summary judgment on plaintiff's retaliation claim (Determination of Appropriate Disciplinary Tier) be granted;

5. Defendants' motion for summary judgment on plaintiff's retaliation claim (Removal from Law Library Job) be granted;

6. Defendant's motion for summary judgment on plaintiff's retaliation claim (Timely Resolution of Grievances) be granted;

7. Defendants' motion for summary judgment on plaintiff's access to the courts claim be granted;

8. Defendants' motion for summary judgment on plaintiff's due process claim be denied;

9. Defendants' motion for summary judgment on plaintiff's sufficiency of due process (disciplinary hearing) be granted;

10. Defendants' motion for summary judgment on plaintiff's equal protection claim be granted;

11. Defendants' motion for summary judgment based on lack of personal involvement of defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay be granted;

12. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1983 be granted;

13. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted;

14. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1986 be granted; and

15. Plaintiff's motion for summary judgment be denied in all respects.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo,* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988). *Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

**\*21  SO ORDERED.**

**Bowens v. Pollock, Not Reported in F.Supp.2d (2010)**

2010 WL 5589350

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5589350

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1387460
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Arrello BARNES, Plaintiff,

v.

Anthony ANNUCCI, et al.,[1] Defendants.

[1]    Defendants' filings indicate that the correct
       spelling of defendant Ollies is Anthony Olles,
       the defendant sued as J. Whitford is John
       Whiteford, and Donald Venetozzi is Donald
       Venettozzi. *See* Dkt Nos. 97-7, 97-10, 97-12.
       Accordingly, the clerk of the court will
       respectfully be directed to modify the court's
       records to reflect the proper spellings of the
       names of these three defendants.

Civil Action No. 9:15-CV-0777 (GLS/DEP)
|
Signed 03/12/2019

**Attorneys and Law Firms**

ARRELLO BARNES, Pro Se, 00-A-0597, Elmira
Correctional Facility, P.O. Box 500, Elmira, NY 14902.

FOR DEFENDANTS: HON. LETITIA JAMES, New York
State Attorney General, OF COUNSEL: COLLEEN D.
GALLIGAN, ESQ., Assistant Attorney General, The Capitol,
Albany, NY 12224.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is a civil rights action brought by plaintiff Arrello
Barnes, who is proceeding *pro se* and *in forma pauperis*
("IFP"), pursuant to 42 U.S.C. § 1983, against several
individuals employed by the New York State Department
of Corrections and Community Supervision ("DOCCS").
Plaintiff alleges that his First and Fourteenth Amendments
rights were violated in connection with a series of incidents
that resulted in disciplinary proceedings being brought
against him while he was incarcerated at four different
correctional facilities operated by the DOCCS.

Currently pending before the court are cross motions brought
by the parties, both seeking the entry of summary judgment
in their favor. For the reasons set forth below, I recommend
that plaintiff's cross motion be denied, defendants' motion be
granted, and plaintiff's second amended complaint ("SAC")
be dismissed in its entirety.

I. BACKGROUND[2]

[2]    In light of the procedural posture of the case, the
       following recitation is derived from the record now
       before the court, with all inferences drawn and
       ambiguities resolved in the non-movant's favor.
       *See* Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir.
       2003). Because the parties have filed cross motions
       for summary judgment, the court draws "all factual
       inferences ... 'against the party whose motion is
       under consideration.' " Tindall v. Poultney High
       Sch. Dist., 414 F.3d 281, 283-84 (2d Cir. 2005)
       (quoting Boy Scouts of Am. v. Wyman, 335 F.3d
       80, 88 (2d Cir. 2003) ) (internal quotation marks
       omitted).

Plaintiff is a New York State prison inmate currently being
held in the custody of the DOCCS. *See generally* Dkt. No.
72; *see also* Dkt. No. 97-4 at 6. Although he is presently
confined in the Elmira Correctional Facility ("Elmira"),
the events giving rise to this suit transpired at various
points between 2011 and 2015, while plaintiff was held in
the Sullivan Correctional Facility ("Sullivan"), the Attica
Correctional Facility ("Attica"), the Clinton Correctional
Facility ("Clinton"), and the Great Meadow Correctional
Facility ("Great Meadow"). *See generally* Dkt. No. 72. Each
of the discrete incidents that give rise to this suit is more fully
described below.

A. The 2011 Assault and the 2012 Tier III Disciplinary
Hearing
On August 8, 2011, plaintiff's fellow inmate at Sullivan,
George Mims, was assaulted with a razor while he was
exercising in the West Yard of that facility. Dkt. No. 97-3 at
65; Dkt. No. 97-4 at 15. As a result of the incident, plaintiff
was issued an inmate misbehavior report ("MBR") on August
10, 2011 charging him with violating certain inmate behavior
rules. Dkt. No. 97-3 at 52; Dkt. No. 102-5 at 3; *see generally*
7 N.Y.C.R.R. § 270.2. Plaintiff has denied any role in the
assault, asserting that he was working in a different area of
the facility at the time the assault occurred. Dkt. No. 97-3 at
234 ("[W]hen this took place[,] I was at work").

Plaintiff was initially found guilty following a disciplinary hearing held on October 25, 2011 at Sullivan. Dkt. No. 97-3 at 58. That determination was ultimately revisited as a result of a court challenge, and a new hearing was ordered to address the charges associated with the stabbing of inmate Mims. Dkt. No. 97-3 at 58-59.

**\*2** Following the administrative expungement, a second hearing was conducted by defendant Raymond Coveny, a corrections captain, in August and September of 2012, while plaintiff was confined to Attica. Dkt. No. 97-3 at 231-92; Dkt. No. 97-9. In his SAC and his cross motion for summary judgment, plaintiff alleges that although he requested that Officer Connors, Officer Zarrias, and inmate Mims be called as witnesses at the second hearing, defendant Coveny denied each of those requests. Dkt. No. 72 at 9; Dkt No. 102-1 at 1; Dkt. No. 102-3 at 1. According to plaintiff,

> [defendant] Coveny told me 'I will not call officers to testify so they can contradict other officers' after [I] requested two [corrections officers] witnesses. He also refused George Mims to be a witness.[3]

Dkt. No. 102-1 at 1; *but see* Dkt. No. Dkt. No. 97-3 at 280, Dkt. No. 102-5 at 4.

[3]  Plaintiff appears to be referring to following statement made by defendant Coveny during the course of the second hearing:

> [O]kay, I am not missing your point and the point was made and I understand[.] [H]owever[,] I reviewed the video with the assistance [of] Lieutenant Maxwell and I am of the opinion that the person I saw in the video is you[.] Lieutenant Maxwell has testified that the person in the video is you[.] ... [S]o to have a staff member come and state that you[ ] weren't in the yard [when] I already have a staff member that [says] that you were[,] and I personally as the hearing officer have viewed the video and I am convinced that it is you that is in the video.... [they're] going to be denied [as] witnesses.

Dkt. No. 97-3 at 280; Dkt. No. 102-5 at 4.

The documentary evidence adduced by the parties reflects that although inmate Mims provided testimony at plaintiff's original disciplinary hearing, *see* Dkt. No. 97-4 at 23, he refused to testify at the second hearing. Dkt. No. 97-3 at 69. When inmate Mims was asked to specify why he refused to

testify, he stated, "[b]ecause I am not doing it." Id.; Dkt. No. 97-3 at 240-41; *see also* Dkt. No. 102-5 at 5. With respect to Officer Connors, when he was contacted, he indicated that he was not working on the date of the assault, and as a result, defendant Coveny denied plaintiff's request for his testimony as irrelevant. Dkt. No. 97-3 at 279; *see also* Dkt. No. 97-3 at 61. Despite plaintiff's allegation to the contrary, there is no indication in the record that plaintiff sought the testimony of Officer Zarrias at the second hearing.[4] *See generally* Dkt. No. 97-3 at 231-92.

[4]  It appears that plaintiff may be conflating the witness requests made in connection with his initial disciplinary hearing with the witness requests made in connection with his second hearing. *See* Dkt. No. 97-4 at 17.

On September 6, 2012, defendant Coveny dismissed one charge, but found plaintiff guilty of all remaining charges. Dkt. No. 97-3 at 49-50, 290-91. As a result, plaintiff was sentenced to two years of disciplinary special housing unit ("SHU") confinement, coupled with the corresponding loss of certain privileges. Dkt. No. 97-3 at 49.

**B. The 2013 "Return to Sender" Letter and the Tier III Disciplinary Hearing**

On January 24, 2013, a letter written by plaintiff to a female friend was returned to the mailroom at Attica, with the envelope having been marked "return to sender." Dkt. No. 97-7 at 2; *see also* Dkt. No. 97-3 at 101. Because "return to sender" mail is frequently used by gang members as a method to communicate within the facility and circumvent scrutiny, the letter was confiscated by prison personnel, who then asked defendant Anthony Olles, a corrections officer and member of the Crisis Intervention Unit ("CIU") at Attica, to review the correspondence to determine whether it contained prohibited gang material. Dkt. No. 97-7 at 1-3. Based upon his training and experience, defendant Olles determined that the "return to sender" letter contained gang codes associated with the Hunta Bloods, a subset of the larger Bloods gang, and issued plaintiff an MBR charging him with violating Rule 105.13.[5] Dkt. No. 97-3 at 100-08; Dkt. No. 97-7 at 3.

[5]  Rule 105.13 is part of Rule Series 105, which addresses an inmate's "Unauthorized Assembly or Activity." 7 N.Y.C.R.R. § 270.2(B)(6). Rule 105.13 provides that "[a]n inmate shall not engage in or encourage others to engage in gang activities or

2019 WL 1387460

meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material." 7 N.Y.C.R.R. § 270.2(B)(6).

**\*3** On January 29 and 30, 2013, a Tier III disciplinary hearing was held before defendant John Whiteford, a senior corrections counselor at Attica.[6] Dkt. No. 97-3 at 293-303; Dkt. No. 97-10 at 1-2. During the hearing, plaintiff requested the testimony of Officer Eric Kentzel,[7] whom plaintiff indicated would testify that plaintiff "did[ not] write that letter" and that "another inmate ... [was] throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 at 295-99, 301-02; Dkt No. 97-4 at 39, 44-45; Dkt. No. 97-10 at 2. Defendant Whiteford denied plaintiff's request, however, because there was no indication that Officer Kentzel had knowledge or information regarding the specific letter that led to the issuance of the MBR. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); Dkt. No. 97-10 at 2-3; Dkt. No. 102-1 at 1; Dkt. No. 102-3 at 1; *see also* Dkt. No. 72 at 10.

[6]     Plaintiff continues to assert in his cross-motion that defendant Whiteford violated his procedural due process rights because he was biased during the hearing. However, that claim was previously dismissed by the court, and it was not re-asserted in plaintiff's SAC. Dkt. No. 70 at 33 ("[D]efendant [Whiteford's] statement did nothing more than advise plaintiff that, if evidence was presented on the record that plaintiff violated rule 105.13, he would be found guilty."); *see also* Dkt. Nos. 72, 75.

[7]     The precise spelling of this officer's name is not clear from the record before the court. *See, e.g.*, Dkt. No. 97-1 at 4 ("Kenzel" and "Kinzel"); Dkt. No. 97-4 at 39 ("Kintzel"); Dkt. No. 97-10 at 2("Kentzel").

At the conclusion of the hearing, defendant Whiteford found plaintiff guilty as charged, and plaintiff was sentenced to one year of disciplinary SHU confinement, coupled with the loss of certain privileges. Dkt. No. 97-3 at 86; *see also* Dkt. No. 97-3 at 299-304.

C. The 2015 Conspiracy, Gang Material, Grievance, and the Tier III Disciplinary Hearing

On January 29, 2015, members of the CIU at Clinton received confidential information that inmate gang members, including plaintiff, were conspiring to assault security staff

at the facility. Dkt. No. 97-8 at 1-2. As a result of an investigation into the matter, Corrections Officer J. Hanson ("C.O. Hanson") issued plaintiff an MBR charging him with violating multiple inmate behavior rules including, *inter alia*, gang activity and threats on staff. Dkt. No. 97-3 at 116; *see generally* 7 N.Y.C.R.R. § 270.2.

After plaintiff was removed from his cell, defendant Richard J. Mahuta, a corrections officer assigned to the CIU, and another officer conducted a cell search. Dkt. No. 97-3 at 117; Dkt. No. 97-8 at 1-2. In his SAC, plaintiff accused defendant Mahuta of confiscating and discarding three of his religious head coverings. Dkt. No. 72 at 11-12. According to defendant Mahuta, during the course of that cell search, he did not remove or throw away any religious head coverings from plaintiff's cell. Dkt. No. 97-8 at 3. Plaintiff counters by alleging that two other inmates overheard defendant Mahuta state, "[i]sn't [plaintiff] a Blood? What is he doing with kufis?" prior to disposing of those head coverings.[8] Dkt. No. 72 at 12; Dkt. No. 97-4 at 56-57; *compare* Dkt. No. 97-8 at 3 *with* Dkt. No. 102-1 at 2; Dkt. No. 102-5 at 24-25.

[8]     A "kufi" is headgear that is associated with the Muslim religion. *Nicholas v. Tucker*, 89 F. Supp. 2d 475, 477 (S.D.N.Y. 2000).

However, during the cell search, defendant Mahuta discovered three handwritten pages of material that he believed to be prohibited gang material. Dkt. No. 97-8 at 3. Those three pages, along with three Bibles and other materials, were confiscated by defendant Mahuta, who had the materials placed inside a contraband locker for further review at a later time. Dkt. No. 97-8 at 3; Dkt. No. 97-3 at 413-14. Defendant Mahuta ultimately determined that only the three handwritten pages constituted prohibited gang material and issued plaintiff am MBR charging him with possession of that material. Dkt. No. 97-3 at 117.

1. Plaintiff's Tier III Disciplinary Hearing and Appeals

**\*4** Between February 5, 2015 and February 27, 2015, defendant Kenneth McKeighan, an industrial superintendent at Great Meadow, conducted a Tier III disciplinary hearing with respect to the two MBRs. Dkt. No. 97-5; Dkt. No. 97-6; *see also* Dkt. No. 97-3 at 116-117. At the hearing, plaintiff requested, *inter alia*, the testimony of his brother, Exondus Barnes who, plaintiff asserted, would testify that he was the author of the three handwritten pages of material confiscated

during the cell search. Dkt. No. 97-5 at 5; Dkt. No. 97-6 at 8, 17-18; *see also* Dkt. No. 97-3 at 115. Defendant McKeighan denied the request as irrelevant, however, because plaintiff was charged with possession of the materials, and thus the question of authorship was not relevant.[9] Dkt. No. 97-3 at 119; Dkt. No. 97-4 at 66-68; Dkt. No. 97-6 at 33-34; Dkt. No. 97-11 at 3.

[9]    Specifically, defendant Mahuta charged plaintiff with violating Rule 105.13 of the standards of inmate behavior. *See* footnote 5, *supra*; *see also* 7 N.Y.C.R.R. § 270.2(B)(6).

At the hearing, plaintiff also requested copies of the "call outs" or "yard go-arounds" for Clinton, contesting that those materials would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-6. Although defendant McKeighan initially reserved decision regarding plaintiff's request, he ultimately denied it after C.O. Hanson testified that no such document existed at Clinton. Dkt. No 97-6 at 4. Nonetheless, defendant McKeighan obtained "program sheets" for the relevant time, Dkt. No. 97-5 at 126-154, and compiled that information into a spreadsheet, which showed that plaintiff and his co-conspirators were in fact together on the evening of January 19, 2015.[10] Dkt. No. 97-5 at 218; *see also* Dkt. No. 97-6 at 18-19.

[10]    January 19, 2015 is a significant date because it is the day after prison officials at Clinton used force against a suspected Bloods gang member. Dkt. No. 97-8 at 2; Dkt. No. 97-11 at 2. Defendants theorize that plaintiff and fellow inmates attempted to plan the assaults on prison staff in retaliation for the use of force. Dkt. No. 97-5 at 36; Dkt. No. 97-11 at 2, 4.

Plaintiff also requested that video footage from Clinton's North Yard be provided at the hearing, arguing that it would show that he was not in the area during the relevant time, thereby undercutting the claims made by the confidential informant. *See, e.g.*, Dkt. No. 97-5 at 6, 11. Defendant McKeighan's denial of that request was two-fold. First, he noted that the video footage simply did not exist inasmuch as by the time the conspiracy had been uncovered, the video footage had been recorded over. Dkt. No. 97-3 at 397; Dkt. No. 97-5 at 6; Dkt. No. 97-6 at 3. Second, he noted that even if footage of the North Yard existed, that footage would have shown only a general view of the North Yard instead of focusing on any particular group of people, and he believed

the footage likely would have been "inconclusive." Dkt. No. 97-3 at 397; Dkt. No. 97-6 at 3, 10, 12.

At the conclusion of the hearing, defendant McKeighan found plaintiff guilty as charged. Dkt. No. 97-3 at 110-115. Plaintiff was sentenced to 910 days of disciplinary SHU confinement, coupled with the loss of certain privileges. Dkt. No. 97-3 at 110; *see also id.* at 114 ("Due to the nature of the entire incident and the fact your actions would have resulted in the injury to the staff and would have likely disrupted the entire facility and DOCCS in general, I have exceeded the recommended confinement guidelines considerably.").

Following the conclusion of the hearing, plaintiff filed a series of appeals challenging defendant McKeighan's determination. Dkt. No. 97-3 at 340-99; *see also* Dkt. No. 97-12 at 3. On May 12, 2015, defendant Donald Venettozzi, the Director for the DOCCS Special Housing/ Inmate Disciplinary Program, affirmed the finding of guilt, but reduced plaintiff's penalty from 910 days to twelve months of disciplinary SHU confinement. Dkt. No. 97-3 at 341-42; Dkt. No. 97-12 at 4.

**\*5** In addition to addressing one of his appeals to defendant Anthony Annucci, the Acting Commissioner of the DOCCS, *see* Dkt. No. 97-3 at 344, plaintiff also sent defendant Annucci a letter on April 1, 2015, complaining that his due process rights were violated at the hearing. Dkt. No. 97-3 at 348-49; Dkt. No. 97-13 at 2; *see also* Dkt. No. 102-1 at 2. Defendant Annucci did not respond to plaintiff's appeal or letter or undertake any investigation as a result of plaintiff's correspondence. Dkt. No. 97-13 at 2.

### 2. Plaintiff's Grievance

On February 20, 2015, plaintiff filed a grievance in connection with defendant Mahuta's cell search, stating

On 1/29/15, my cell [was] searched by [defendant] Mahuta at [Clinton] ..., and my letters, Bible, etc. were confiscated for review. After the paper [was] review[ed], I received a misbehavior report for only [three] papers. [T]he Bible, address book, etc., were [not deemed] gang material.

I did not receive[ ] my documents [back] as of yet.

Action requested: for my papers, bible, etc. to be return[ed] to me.

Dkt. No. 97-3 at 403 (errors in original); *see also* Dkt. No. 97-4 at 75. It appears that prison personnel were initially confused with respect to the nature of the relief plaintiff sought, as well as the location of plaintiff's property, because in initially denying plaintiff's grievance, the superintendent stated that "[t]he items in question were deemed to be contraband and as such were properly disposed of." Dkt. No. 97-3 at 404, 442. In his appeal of the grievance determination to the DOCCS Central Office Review Committee ("CORC"), plaintiff explained that he was seeking the return of only those materials that were determined not to constitute gang-related contraband. Dkt. No. 97-3 at 404-05. While plaintiff's appeal was pending before the CORC, the materials that he sought were returned to him, *see* Dkt. No. 97-3 at 400, 413, 418, 442, although plaintiff has denied ever having received those materials back from prison officials. Dkt. No. 97-4 at 77.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about June 25, 2015, by the filing of a complaint accompanied by an application for leave to proceed IFP and a motion for a preliminary injunction. Dkt. Nos. 1, 2, 4. Although plaintiff's original IFP application was denied by the court as incomplete, his subsequent motion for leave to proceed without prepayment of fees was granted. Dkt. Nos. 5, 6, 10.

By decision and order dated September 17, 2015, Senior District Judge Gary L. Sharpe denied plaintiff's motion for preliminary injunctive relief. Dkt. No. 10. In addition, he reviewed plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A and dismissed a number of claims and defendants from the action. *See generally id.*

On October 26, 2015, and prior to service upon defendants, plaintiff filed an amended complaint ("FAC"), which was accepted by Judge Sharpe because it was deemed "a pleading which reflects the [c]ourt's rulings in the [initial] order." Dkt. No. 17. In response to plaintiff's FAC, defendants filed a motion on September 21, 2016, seeking its dismissal for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 30.

On July 14, 2017, I issued a report, which recommended the dismissal of various claims and several defendants from the action. *See generally* Dkt. No. 70. In addition, in light of my recommendation that multiple claims and defendants be dismissed from the action, I further recommended that

plaintiff be afforded an opportunity to file a SAC. *Id.* at 41. Although neither party filed any objections to my report, before Judge Sharpe had an opportunity to review it, plaintiff availed himself of my recommendation and filed his SAC on July 24, 2017. Dkt. No. 72. On September 1, 2017, Judge Sharpe issued an order adopting my report and recommendation in its entirety. Dkt. No. 75.

**\*6** Plaintiff's SAC was referred to me for review to determine whether the deficiencies that were discerned in my July 14, 2017 report and recommendation had been cured by the filing of plaintiff's SAC. Dkt. No. 76. Following my review, I issued a report and recommendation on September 22, 2017, recommending that plaintiff's SAC be accepted for filing, but that various of plaintiff's claims be dismissed. Dkt. No. 76. By decision and order dated October 19, 2017, Judge Sharpe adopted my report and recommendation in its entirety over plaintiff's objections. Dkt. Nos. 77, 78. As a result of these rulings, the following four claims survived and proceeded to discovery: (1) Fourteenth Amendment procedural due process claim against defendants Coveny, Whiteford, and McKeighan; (2) First Amendment free speech claim against defendants Olles and Mahuta; (3) First Amendment free exercise claim against Mahuta; and (4) Fourteenth Amendment procedural due process claim against defendants Annucci and Venettozzi in their supervisory capacities. *See id.* at 3.

On January 23, 2018, following the close of discovery, defendants filed a motion for summary judgment, seeking dismissal of plaintiff's claims on various grounds, both procedural and on the merits. Dkt. No. 97. Plaintiff has opposed defendants' motion and cross moved for summary judgment in his favor. Dkt. No. 102. Defendants have submitted papers in opposition to plaintiff's motion and in further support of their motion. Dkt. No. 103. The parties' motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Failure to Exhaust Administrative Remedies [11]

[11] As will be seen, because I recommend that each of plaintiff's claims be dismissed, have elected not to address defendants' alternative argument that they are shielded by the doctrine of qualified immunity. Dkt. No. 97-4 at 31-33.

**\*7** Defendants contend that plaintiff failed to fully exhaust his administrative remedies with respect to his First Amendment free speech claim against defendants Olles and Mahuta and his First Amendment free exercise claim against Mahuta. Dkt. No. 97-14 at 12-15. As a result of plaintiff's failure, defendants argue, those claims must be dismissed. *Id.*; *see also* Dkt. No. 103 at 4-5. In his cross motion, plaintiff does

not acknowledge defendants' argument, instead focusing his opposition on the underlying merits of the First Amendment claims defendants Olles and Mahuta. *See generally* Dkt. No. 102.

### 1. Generally

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [12]

[12] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted) ).

In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints

2019 WL 1387460

regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [13] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

[13]     The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

**\*8** A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [14] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

[14]     Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted) ).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001) ) (internal quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [15] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

15    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams, 829 F.3d at 123 n.2.*

2. Analysis

**\*9** During his deposition, plaintiff testified that he had filed "a lot" of grievances during his time in DOCCS custody. Dkt. No. 97-4 at 71-72; *see* Dkt. No. 97-3 at 28-44. Although he did not believe that the number of grievances that he had filed reached the "triple digits," he speculated that it was approaching fifty to sixty grievances. Dkt. No. 97-4 at 72. Plaintiff expressed a general understanding that the use of the inmate grievance process was necessary to effectively "exhaust [his] remedies." Dkt. No. 97-4 at 78.

During his deposition, plaintiff was asked whether he had filed a grievance regarding the allegation that defendant Olles violated plaintiff's First Amendment right to free speech by his unjustified confiscation of plaintiff's "return to sender" letter in January of 2013. *See* Dkt. No. 72 at 9; Dkt. No. 97-4 at 72-73. In response, plaintiff indicated that he was unable to specifically recall whether he had, but that he did not "see why [he] would" have filed one. Dkt. No. 97-4 at 72-74. Because plaintiff effectively concedes that he did not file a grievance with respect to this incident, I can easily conclude that he failed to exhaust his administrative remedies prior to commencement.

With respect to plaintiff's free exercise and free speech claims against defendant Mahuta, both of which arise out of the January 29, 2015 search of plaintiff's cell, plaintiff acknowledged that he filed only one grievance arising out of that incident on February 20, 2015 (GM 59,129-15). Dkt. No. 97-3 at 403; Dkt. No. 97-4 at 75-76. According to that grievance,

On 1/29/15, my cell [was] searched by [defendant] Mahuta at [Clinton] ..., and my letters, Bible, etc. were confiscated for review. After the paper [was] review[ed], I received a misbehavior report for only [three] papers. [T]he Bible, address book, etc., were [not deemed] gang material.

I did not receive[ ] my documents [back] as of yet.

Action requested: for my papers, bible, etc. to be return[ed] to me.

Dkt. No. 97-3 at 403 (errors in original). When prison officials appeared to initially misapprehend which materials he sought to have returned, in an appeal to the CORC on August 24, 2015, plaintiff stated:

If you review the 1/29/15 [inmate misbehavior report], only 3 pages were confiscated, which was the only material I was found guilty on. The contraband list which stated my Bible, letters, phone book, etc. were being review which Dep. Brendel could verify. The review[ed] material was never charged on the misbehavior report.... [T]he I.G.R.C. staffs are merely covering up the fact that grievant['s] property was stolen.

Dkt. No. 97-3 at 404-05 (errors in original). Plaintiff's grievance and appeal to the CORC makes no mention of religious headwear. *See generally id.* Plaintiff's grievance also fails to indicate that he believed the seizure of the three pages of material was in violation of his First Amendment rights. *See generally id.* Instead, plaintiff's grievance solely seeks the return of those materials that prison personnel determined did not constitute gang-related material. *See generally id.*

Consistent with the objectives of the PLRA, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson, 380 F.3d at 697.* In determining whether exhaustion has been achieved, the standard for determining the sufficiency of an administrative grievance is analogous to that of notice pleading. *Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)* (citing *Johnson, 380 F.3d at 697*).

**\*10** Although it is "appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell, 446 F.3d at 310; see also Singh v. Lynch, 460 F. App'x. 45, 47 (2d Cir. 2012); Turner v. Goord, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005)* ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all

2019 WL 1387460

the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance."). Even affording plaintiff the appropriate lenity as a *pro se* litigant, plaintiff's grievance failed to describe any First Amendment concern arising out of defendant Mahuta's cell search.

Although it is true that "a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance," *Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at *4 (S.D.N.Y. Jan. 4, 2011) (citing *Espinal v. Goord*, 55 8 F.3d 119, 128 (2d Cir. 2009) ), I am unable to conclude that the sole grievance filed by plaintiff provided the facility with sufficient information to permit an investigation of his concerns regarding the disposal of religious headwear or the seizure of three pages of gang-related material.[16] Instead, it is clear from plaintiff's grievance that his primary concern was with securing the return of his non-gang related material. Dkt. No. 97-3 at 403-05. Accordingly, because plaintiff's grievance failed to provide the facility enough information to investigate his free speech and free exercise concerns, plaintiff's February 20, 2015 grievance was not sufficient to exhaust his administrative remedies prior to commencement of this action. *See, e.g., Dailey v. Fuller*, 15-CV-1051, 2016 WL 7732236 *7-*8 (Dec. 5, 2016) (Dancks, M.J.), *report and recommendation adopted by* (N.D.N.Y. Jan 11, 2017) (Sannes, J.); *Wright v. Potter*, No. 14-CV-01041, 2016 WL 5219997, at *5 (Jun. 28, 2016) (Dancks, M.J.), *report and recommendation adopted by* 2016 WL 5173283 (Hurd, J.) (N.D.N.Y. Sept. 21, 2016).

[16]     Copies of all unreported decisions have been appended for the convenience of the *pro se* plaintiff.

This, of course, does not end the court's inquiry with respect to exhaustion. Plaintiff, however, has not claimed that the IGP process was unavailable to him during the relevant times periods. To the contrary, the record evidence indicates that plaintiff was able to successfully navigate the grievance procedure while housed in a SHU at a different facility.

Accordingly, the undisputed facts in this case reveal that with respect to his First Amendment claims, plaintiff failed to fully comply with the IGP prior to the commencement of this action, despite his remedies remaining available to him at all relevant times. I therefore recommend that defendants'

motion for summary judgment on this basis be granted on this procedural basis.[17]

[17]     In light of this recommendation, I have elected not to address defendants' alternative argument on the merits.

### C. Due Process

Defendants contend that plaintiff was afforded adequate due process during the disciplinary proceedings conducted by defendants Coveny, Whiteford, and McKeighan. Dkt. No. 97-14 at 21-28. In his cross motion, plaintiff disagrees, and asserts that defendants' decisions deprived him of procedural due process in connection with each of his Tier III disciplinary hearings. *See generally* Dkt. No. 102.

### 1. Generally

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Much like their prior motions, defendants do not seek dismissal of any of plaintiff's due process claims on the basis that he was not denied a constitutionally significant liberty interest, *see generally* Dkt. No. 97-14 at 21-28, and as a result the court will not address that issue. Instead, defendants' argument is focused on whether plaintiff was deprived of a liberty interest without being afforded sufficient process. *See generally id.*

  **\*11**  The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1387460

2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing, *inter alia*, *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ). "A hearing officer may satisfy the standard of impartiality if there is *some evidence* in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in original) (quoting *Hill*, 472 U.S. at 455).

### a. Defendant Coveny

According to plaintiff, defendant Coveny violated his due process rights during the second hearing by improperly denying his request to call Officer Connors, Officer Zarrias, and inmate Mims as witnesses. Dkt. No. 72 at 9 (first cause of action); *see also* Dkt. No. 102 at 11. Although due process includes the "right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board," that right is not unfettered. *Ponte v. Real*, 471 U.S. 491, 495 (1985). An inmate's right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991).

In this case, after an exhaustive review of the record evidence, I conclude that no reasonable factfinder could conclude that defendant Coveny violated plaintiff's due process rights at the second hearing. First, with respect to plaintiff's alleged request to call Officer Zarrias, although it appears plaintiff did

call him as a witness for the initial hearing, there is no record evidence that plaintiff sought his testimony in connection with the second hearing. Dkt. No. 97-4 at 17-18; *see* Dkt. No. 97-9 at 3. Plaintiff cannot now turn his own lack of diligence into a constitutional deprivation. *See, e.g., Hasan Jamal Abdul Majid v. Henderson*, 533 F. Supp. 1257, 1273 (N.D.N.Y.) (Munson, C.J.) (concluding that due process was not violated where the inmate failed to request witnesses at or before the hearing), *aff'd mem.*, 714 F.2d 115 (2d Cir. 1982).

**\*12** In addition, although plaintiff requested testimony from inmate Mims, who had also testified at the initial hearing, that witness refused to provide testimony at the second hearing and declined to elaborate on the reasons for his refusal beyond "[b]ecause I am not doing it." Dkt. No. 97-3 at 69. Courts in this circuit have routinely held that a hearing officer's failure to call a fellow inmate who refuses to testify does not offend procedural due process. *See Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) (Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.").

Finally, with respect to the testimony of Officer Connors, the record reveals that plaintiff's request to call him as a witness was initially granted and defendant Coveny contacted him to "make arrangement for [his] testimony." Dkt. No. 97-3 at 234, 241. In response to being contacted to provide "confidential testimony" for the proceeding, however, Officer Connors indicated that "he was not working on the date of [the] alleged incident." Dkt. No. 97-3 at 279. As a result, defendant Coveny properly denied plaintiff's request based upon a finding that the officer could not provide relevant evidence. Dkt. No. 97-3 at 85; *see* Dkt. No. 97-9 at 2-3; *see also Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999). ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.").

Accordingly, because no reasonable factfinder could conclude that defendant Coveny violated plaintiff's procedural due process rights, I recommend that the claim against defendant Coveny be dismissed.

### b. Defendant Whiteford

Plaintiff alleges that defendant Whiteford violated his due process rights during the January 2013 disciplinary hearing when he denied his request to call Officer Kentzel as a witness. Dkt. No. 72 at 9-10 (third cause of action); *see also* Dkt. No. 102-1 at 1. According to plaintiff, Officer Kentzel would have testified that plaintiff did not write the "return to sender" letter and that there was another inmate that was "throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 295-99, 301-02; *see also* Dkt. No. 97-10 at 2.

During the disciplinary hearing, Sergeant O'Connell stated that he had compared the handwriting and signature on the "return to sender" letter with correspondence known to be written by plaintiff, and concluded that plaintiff was the author of the letter at issue. Dkt. No. 97-3 at 299-300. Sergeant O'Connell's testimony provided defendant Whiteford with a rational basis for concluding that Officer Kentzel's testimony would have been irrelevant or unnecessary. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); *see also* Dkt. No. 97-10 at 2-3. Defendant Whiteford believed that Officer Kentzel did not have "any knowledge of the actual letter at issue in the hearing and whether or not it had been authored by plaintiff." Dkt. No. 97-10 at 3.

Based upon the record evidence, no reasonable juror could find that defendant Whiteford violated plaintiff's due process rights by denying his request to call Officer Kentzel. *See Delee v. Hannigan*, 729 F. App'x 25, 31 (2018) ("[D]efendants had the right to refuse to hear irrelevant testimony from witnesses with no personal knowledge." (citing 7 N.Y.C.R.R. § 253.6(c); *Kingsley*, 937 F.2d at 30 (2d Cir. 1991) ); *see also Kalwasinski*, 201 F.3d at 109. I note moreover, courts have been cautioned not to "second guess" a hearing officer's decision to deny an inmate's witness requests where the hearing officer articulates a basis for his decision. *See Wolff*, 418 U.S. at 566 (explaining that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

**\*13** Because no reasonable factfinder could conclude that defendant Whiteford violated plaintiff's procedural due process rights by refusing to call Officer Kentzel, I recommend that the claim against him be dismissed.

### c. Defendant McKeighan

Plaintiff alleges that defendant McKeighan violated his due process rights in connection with the February 2015 disciplinary proceeding by (1) denying plaintiff's request to call his brother as a witness; (2) permitting the admission of fabricated evidence; and (3) denying plaintiff's request for video footage. Dkt. No. 72 at 10-11 (sixth cause of action); Dkt. No. 102-4 at 12.

First, when the search of plaintiff's cell uncovered three pages of gang-related material, plaintiff was charged with violating Rule 105.13 of the standards of inmate behavior, *see* Dkt. No. 97-3 at 182, which prohibits possessing gang-related material. Although plaintiff wished to call his brother to testify that he was the author of the three pages in question, defendant McKeighan determined that the testimony would be irrelevant in light of the fact that plaintiff was charged with possession—not authorship—of the material in question. Defendant McKeighan's decision to deny plaintiff's request to call his brother as a witness was well within the discretion of the hearing officer, and comports with procedural due process. *See Kalwasinksi*, 201 F.3d at 108-09.

Next, there is no merit to plaintiff's allegation that defendant McKeighan permitted the admission of evidence that was purportedly fabricated, and this allegation evinces plaintiff's misapprehension of the evidence that was provided pursuant to his own request. Plaintiff requested copies of what he referred to as "call outs" or "yard go-arounds" for Clinton which, he asserted, would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-6. After defendant McKeighan determined that no such documents existed, he instead obtained "program sheets" for the relevant period. Dkt. No. 97-5 at 126-154. Defendant McKeighan then compiled the information on the "program sheets" into a spreadsheet, so that he could readily ascertain whether plaintiff and his co-conspirators were together the evening of January 19, 2015. Dkt. No. 97-5 at 218; *see also* Dkt. No. 97-6 at 18-19. The undisputed evidence demonstrates that a meaningful effort was made to locate the information that plaintiff sought, although it was not in the precise form requested.

Finally, to the extent that defendant McKeighan denied plaintiff's request for certain video footage, the record is clear that the evidence did not exist inasmuch as it had been taped over in the normal course of business by the time

the conspiracy had been uncovered. Accordingly, because no reasonable factfinder could conclude that defendant McKeighan violated plaintiff's procedural due process rights, I recommend that the claim against him be dismissed.

### D. Supervisory Liability [18]

[18] If the above-described recommendation regarding plaintiff's due process claims is adopted by Senior District Judge Sharpe, there is no remaining underlying cause of action upon which to hold defendants Annucci and Venettozzi liable in their capacities as supervisors. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); *see also, e.g., Caimite v. Venettozzi*, 17-CV-0919, 2018 WL 6069418, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (Sharpe, J.). However, this ground has not necessarily been advanced by defendants in support of their motion for summary judgment. *See generally* Dkt. No. 97.

**\*14** Defendants argue that plaintiff's supervisory liability claim against defendant Annucci must be dismissed because there is no evidence that he was personally involved in the review or determination of plaintiff's appeals. Dkt. No. 97-14 at 29. Defendants further argue that plaintiff's supervisory liability claims against defendant Venettozzi must be dismissed because there is no proof that he was aware of any alleged underlying constitutional violation. Dkt. No. 97-14 at 30-31. Plaintiff asserts in his cross motion that defendant Annucci "did not remedy the wrong acts" and defendant Venettozzi "affirmed or modified" the procedural due process violations. *See generally* Dkt. No. 102.

#### 1. Supervisory Liability - Generally

It is well-established that a defendant cannot be liable under section 1983 solely by virtue of being a supervisor, " 'and [liability] cannot rest on respondeat superior.' " *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ); *see also Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly

participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. [19]

[19] Subsequent to issuance of the Second Circuit's decision in *Colon*, the Supreme Court addressed the question of supervisory liability in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Although the issue has been discussed, the Second Circuit has declined to squarely address the impact of *Iqbal* upon the categories of supervisory liability addressed in *Colon. See, e.g., Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citation and internal quotation marks omitted) ); *see also Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in [*Colon*,] ... [b]ut the fate of *Colon* is not properly before us[.]").

#### 2. Defendant Annucci

Plaintiff alleges that he wrote to defendant "Annucci, making him aware of the [c]onstitutional violations, conducted by his subordinates[,]" but that Annucci "failed to remedy the wrong." Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 12-14. This allegation is based upon plaintiff having addressed one of his amended appeals upon defendant Annucci, as well as one additional letter that he sent to defendant Annucci. Dkt. No. 97-3 at 344 (amended appeal dated March 9, 2015); Dkt No. 97-3 at 348-49 (letter dated April 1, 2015). There is no dispute that defendant Annucci did not respond to plaintiff's appeal or letter or undertake any investigation as a result of plaintiff's correspondence. Dkt. No. 97-13 at 2.

2019 WL 1387460

It is well settled that Annucci's failure to respond to plaintiff's amended appeal and letter, without more, is not sufficient to give rise to personal involvement under section 1983. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-0539, 2016 WL 5394752, at *22 (Aug. 25, 2016) (Peebles, M.J.*), report and recommendation adopted by* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.); *see also, e.g., Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter or complaint is insufficient to render an official personally liable."); *Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

**\*15** For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3. Defendant Venettozzi

With respect to defendant Venettozzi, plaintiff alleges that after learning of the violation of his due process rights through his appeal, defendant Venettozzi failed to remedy the wrong. Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 13. According to plaintiff, although he alerted defendant Venettozzi as to the constitutional violations by way of a series of appeals, defendant Venettozzi merely affirmed the disposition, while modifying the penalty. Dkt. No. 72 at 13; *see also* Dkt. No. 97-3 at 340-99.

Here, there is no genuine dispute of material fact that Venettozzi received and decided plaintiff's appeal in connection with the February 27, 2015 disciplinary determination that was issued by defendant McKeighan. *See generally* Dkt. No. 97-12. According to defendant Venettozzi,

> After reviewing the entire record of the hearing and considering all the grounds for overturning or modifying the determination asserted in plaintiff's appeal documents, I found that the hearing had been properly conducted, plaintiff had been provided constitutionally adequate

due process of law and sufficient opportunity to put on a defense, and the findings of the hearing officer were supported by the evidence. I affirmed the findings of guilt.

*Id.* at 3-4. As a result, defendant Venettozzi affirmed the finding of guilt, but reduced plaintiff's penalty from 910 days to twelve months of disciplinary SHU confinement. Dkt. No. 97-3 at 12, 341-42; Dkt. No. 97-12 at 4.

As defendants observe, upon plaintiff's appeal defendant Venettozzi did not identify any constitutional violations, including the failure to provide plaintiff with due process of law. Dkt. No. 97-14 at 30-31. Likewise, I have concluded that no reasonable factfinder could conclude that plaintiff's due process rights were violated. *See* Point III.C, *supra*. As a result, because no constitutional violation occurred, and there was no wrong to remedy, no supervisory liability can exist as against defendant Venettozzi. *See, e.g., Martin v. Oey*, No. 16-CV-00717, 2017 WL 6614680, at *10 (Nov. 28, 2017) (Dancks, M.J.), *report and recommendation adopted by* 2017 WL 6611575 (N.D.N.Y. Dec. 27, 2017) (McAvoy, J.); *Toole v. Connell*, No. 04-CV-0724, 2008 WL 4186334, at *1, 7 (N.D.N.Y. Sep. 10, 2008) (Kahn, J.) (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under section 1983); *Lighthall v. Vadlamudi*, 04-CV-0721, 2006 WL 721568, at *13 (N.D.N.Y. Mar. 17, 2006) (Mordue, J.) ("Since no constitutional violation occurred and there was no wrong to remedy, no supervisory liability exists."); *Rambaldi v. City of Mount Vernon*, 2003 WL 23744272, at *10 (S.D.N.Y. Mar. 31, 2003) (concluding that because there was no wrongful conduct, there were "no 'wrongs' to remedy" by the supervisory defendants).

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Venettozzi was personally involved in any of the constitutional deprivations giving rise to this action.

### IV. SUMMARY, ORDER, AND RECOMMENDATION

**\*16** According to plaintiff, following a series of incidents that resulted in disciplinary proceedings being brought against him, defendants violated his First and Fourteenth Amendments rights. Discovery having closed, defendants seek dismissal of plaintiff's claims on a variety of grounds,

2019 WL 1387460

while plaintiff has cross moved for the entry of summary judgment. Having carefully reviewed the record before the court, defendants are entitled to the entry of summary judgment dismissing all claims. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 97) be GRANTED, plaintiff's cross motion for summary judgment (Dkt. No. 102) be DENIED, and plaintiff's second amended complaint (Dkt. No. 72) is DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[20] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993). It is further hereby

[20]    If you are proceeding pro se and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Ollies to "Anthony Olles", defendant J. Whitford to "John Whiteford", and Donald Venetozzi to "Donald Venettozzi", as set forth in footnote number one; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2019 WL 1387460

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by BARNES v. ANNUCCI, 2nd Cir., April 11, 2019

2019 WL 1385297

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Arrello BARNES, Plaintiff,

v.

Anthony ANNUCCI et al., Defendants.

9:15-cv-777 (GLS/DEP)
|
Signed 03/27/2019

## Attorneys and Law Firms

FOR THE PLAINTIFF: Arrello Barnes, Pro Se, 00-A-0597, Upstate Correctional Facility, P.O. Box 2001, Malone, NY 12953.

FOR THE DEFENDANT: HON. LETITIA JAMES, OF COUNSEL: COLLEEN D. GALLIGAN, Assistant Attorney General, New York State Attorney General, The Capitol, Albany, NY 12224.

## ORDER

Gary L. Sharpe, U.S. District Judge

 **\*1**  On March 12, 2019, Magistrate Judge David E. Peebles filed an Order, Report, and Recommendation (R&R), which recommends that defendants' motion for summary judgment be granted, plaintiff *pro se* Arello Barnes' cross-motion for summary judgment be denied, and the second amended complaint be dismissed. (Dkt. No. 105 at 44-45.) Pending before the court are Barnes' objections to the R&R. (Dkt. No. 108.)

Barnes' objections are problematic for several reasons: they overlook or misapprehend the reasons supporting the recommendations in the R&R, they rehash arguments previously presented to and rejected by Judge Peebles, and they raise new arguments not presented to Judge Peebles with the initial briefing. For all of these reasons, Barnes' objections are properly classified as general and merit review of the R&R for clear error only. *See Almonte v. N.Y.S. Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at \*5-\*6 (N.D.N.Y. Jan. 18, 2006). After carefully considering the R&R and Barnes' objections, and finding no clear error — or error of any kind — the R&R, (Dkt. No. 105), is adopted in its entirety.

Accordingly, it is hereby

**ORDERED** that the Order, Report, and Recommendation (Dkt. No. 105) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 97) is **GRANTED**; and it is further

**ORDERED** that Barnes' cross-motion for summary judgment (Dkt. No. 102) is **DENIED**; and is further

**ORDERED** that Barnes' second amended complaint (Dkt. No. 72) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

## IT IS SO ORDERED.

## All Citations

Slip Copy, 2019 WL 1385297

2015 WL 5971077
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles WATSON, Petitioner,

v.

Anthony J. ANNUCCI, Acting Commissioner,
New York Department of Corrections and
Community Supervision,[1] Respondent.

[1]    Because Watson has been released from state prison, Anthony J. Annucci, Acting Commissioner, New York Department of Corrections and Community Supervision, is re-instated as Respondent. FED. R. CIV. P. 25(c).

No. 9:14–cv–00638–JKS.
|
Signed Oct. 14, 2015.

**Attorneys and Law Firms**

Jean Bernier, White Deer, PA, pro se.

Thomas B. Litsky, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior District Judge.

**\*1** Charles Watson, also known as Jean Bernier, a former New York state prisoner proceeding *pro se,* filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. On January 16,1992, a jury convicted Watson of first-degree robbery, second-degree robbery, second-degree criminal possession of a weapon, and third-degree criminal possession of a weapon, and the New York Appellate Division affirmed his conviction on appeal. *People v. Watson,* 205 A.D.2d 398, 613 N.Y.S.2d 613 (N.Y.App.Div.1994). At the time Watson filed his Petition and throughout briefing in this case, Watson was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Auburn Correctional Facility. The DOCCS's inmate locator

website (http://nysdoccslookup. doccs.ny.gov/, Department ID Number 03–A–2302), indicates that Watson was discharged from state custody on June 18, 2015, the maximum expiration date of his state sentence. The record before this Court indicates that Watson is now in the custody of the Federal Bureau of Prisons ("BOP") and incarcerated at FCI Allenwood (BOP Register Number 29463–054). Respondent has answered, and Watson has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On October 1, 2011, while in state confinement, Watson was charged with using drugs in violation of Institutional Rule 113.24. According to the report and accompanying documents, Watson was randomly selected to provide a urine sample that subsequently tested positive for THC.

On October 17, 2011, Hearing Officer Claude Schneider conducted a Tier III disciplinary hearing.[2] Officer Schneider read the misbehavior report into the record, and Watson pleaded not guilty to the charge. He acknowledged that he had been served prior to the hearing with a copy of the misbehavior report, the request for urinalysis form, the urinalysis test procedure forms, the test results, and Appendix C for the drug testing system. He also confirmed that he understood that he could present witnesses and evidence at the hearing and that he could make procedural objections and defenses that would be considered by the hearing officer. He further stated that he waived assistance during the hearing.

[2]    "Tier III hearings concern the most serious violations and may result in unlimited [special housing unit ("SHU") ] confinement (up to the length of the sentence) and recommended loss of 'good time' credits." *Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d Cir.1998).

When given the opportunity to make a statement, Watson indicated that, although his urinalysis request form listed the reason for his test as "random," it was the second time in two months that he had been subject to random urine testing and he had never previously been randomly tested during his 21 years of confinement. Watson requested documentation on the procedures used by the Albany Central Office for selecting inmates for random urinalysis testing as well as a list of inmates also asked to provide a urine sample. The hearing officer noted that some facilities may test more frequently than others but agreed to adjourn the hearing so that he could

contact the Albany office to see if the requested documents were available to be turned over to Watson.

**\*2** Roughly two hours later, the hearing was re-convened. Officer Schneider explained that he had contacted the Albany office and was told that inmates were not permitted to review the selection procedures used for random drug tests. Watson stated that he believed he was being harassed by prison staff and may have been deliberately subjected to the test. The hearing officer assured Watson that the test was ordered randomly through the Albany office and that prison staff had no control over the procedures utilized by the Albany office. Watson offered no further evidence or argument.

Shortly thereafter, Officer Schneider relied on the misbehavior report and the drug testing documents to find Watson guilty of drug use in violation of Rule 113.24. Officer Schneider imposed a penalty of 3 months' confinement in SHU, 3 months' loss of packages, 3 months' loss of commissary, and 3 months' loss of phone privileges. He also recommended 3 months' loss of good time credit.

Watson then filed a *pro se* administrative appeal to the Commissioner of the Department of Correctional Services ("DOCS"), arguing that he was denied the opportunity to properly formulate a defense when the hearing officer erroneously denied him the requested documentary evidence. On December 2, 2011, the hearing officer's disposition was affirmed.

On December 12, 2011, Watson, proceeding *pro se,* initiated an Article 78 proceeding in county court, challenging the result of his Tier III hearing. Upon the People's request, the county court ordered the petition transferred to the Appellate Division. In his brief to the Appellate Division, Watson renewed his claim that DOCCS improperly denied him access to copies of their Performance Review Function Manual and the October 7, 2011, list of inmates selected for random drug testing. [3] The Appellate Division affirmed the Tier III disciplinary determination in a reasoned opinion issued on July 3, 2013. *In re Watson v. New York State Dep't of Corr. & Comm. Supervision,* 971 N.Y.S. 578 (N.Y.App.Div.2013). The appellate court held that, to the extent Watson's claim could be construed as challenging the sufficiency of the evidence, such claim was meritless because the misbehavior reports, hearing testimony, and relevant documentation supported the drug use charge. *Id.* The court likewise rejected Watson's procedural claim, finding no basis to disturb the hearing court's ruling that Watson was not

entitled to copies of the Performance Review Function Manual and the list of inmates selected for random drug testing. Watson filed a *pro se* application for leave to appeal to the New York Court of Appeals the denial of his procedural claim, which was summarily denied on May 6, 2014. *In re Watson v. New York State Dep't of Corr. & Comm. Supervision,* 10 N.E.3d 191 (N.Y.2014). Watson timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on May 28, 2014.

[3]    Watson also sought declaratory relief and challenged the results of his Tier II hearing. Because those claims are not relevant to the instant Petition, they will not be further discussed.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Watson challenges his prison disciplinary determination, arguing that his due process rights were violated because he was denied the right to present a defense at his Tier III disciplinary hearing when the hearing officer refused his request for certain documentary evidence.

## III. STANDARD OF REVIEW

**\*3** Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke,* 562 U.S. 216, 131 S.Ct. 859, 863, 178 L.Ed.2d 732 (2011) (per curiam) (holding that it is of no federal concern whether

2015 WL 5971077

state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker,* 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello,* 552 F.3d 236, 239–40 (2d Cir.2009) (citing *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)); *cf. Wiggins v. Smith,* 539 U.S. 510, 530–31, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson,* 501 U.S. 722, 740, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Jimenez v. Walker,* 458 F.3d 130, 140 (2d Cir.2006) (explaining the *Harris–Coleman* interplay); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810–11 (2d Cir.2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 784–85, 178 L.Ed.2d 624 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez,* 458 F.3d at 145–46.

## IV. DISCUSSION

A. Mootness

*4 Article III, § 2 of the United States Constitution requires the existence of a case or controversy through all stages of federal judicial proceedings. This means that, throughout the litigation, the petitioner "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (citations omitted); *see also Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (citation omitted). Thus, a case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (internal quotation marks and citations omitted); *Lavin v. United States,* 299 F.3d 123, 128 (2d Cir.2002). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). "[I]f an event occurs during the course of the proceedings or an appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, [the court] ... must dismiss the case" as moot. *United States v. Blackburn,* 461 F.3d 259, 261 (2d Cir.2006) (citation and internal quotation marks omitted).

A petition for habeas corpus relief does not necessarily become moot when the petitioner is released from prison. Rather, the matter will remain a live case or controversy if there remains "some concrete and continuing injury" or "collateral consequence" resulting from the conviction. *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). In cases where the petitioner challenges the conviction itself, the Supreme Court "has been willing to *presume* the existence of collateral consequences sufficent to satisfy the case-or-controversy requirement" even if those collateral consequences "are remote and unlikely to occur." *United States v. Probber,* 170 F.3d 345, 348 (2d Cir.1999) (emphasis omitted) (quoting *Spencer,* 523 U.S. at 8). This presumption of collateral consequences has been justified on the theory that "most criminal convictions do in fact entail adverse collateral legal consequences," including deportation, enhancement of future criminal sentences, and certain civil disabilities such as being barred from holding certain offices, voting in state elections, and serving on a jury. *United States v. Mercurris,* 192 F.3d 290, 293 (2d Cir.1999) (quoting *Sibron v. New York,* 392 U.S. 40, 54–56, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).

However, courts within this Circuit have held that, unlike a challenge to an underlying criminal conviction, "a challenge to a disciplinary hearing which results in loss of good time does not presume collateral consequences and petitioner is therefore required to demonstrate a concrete injury in fact in order to avoid dismissal for failure to satisfy Article III's 'case or controversy' requirement." *Butti v. Fischer,* 385 F.Supp.2d 183, 186 (W.D.N.Y.2005); *see also Sullivan v. Graham,* No. 9:07–CV–0499, 2008 WL 2074047, at *1 (N.D.N.Y. May 14, 2008) (citing *Butti* for the proposition that "collateral consequences sufficient to satisfy the 'case or controversy' requirement of Article III, Section 2, of the Constitution are not presumed where the petition challenges only the loss of good time credits"). In the instant case, Watson's sentence has expired, he has been released from state prison, and his Petition fails to allege any collateral consequences related to his pre-release disciplinary conviction. Accordingly, Watson's claim is moot, and his Petition is denied on that ground. *C.f. Gutierrez v. Laird,* No. 05–CV–5135, 2008 WL 3413897, at *1 (E.D.N.Y. Aug.8, 2008) (finding § 2241 habeas petition moot where petitioner sought a credit for time served but was no longer in federal custody).

**B. Merits**

**\*5** Even if Watson's claim were not moot, he still would not be entitled to relief because the claim is without merit.

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."[4] *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

[4]    As a threshold matter, an inmate asserting a violation of his right to due process must first establish that he had a protected liberty interest in remaining free from the confinement that he challenges and, if so, that Respondent deprived the petitioner of that liberty interest without due process. *See Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). "[A] prisoner has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir.2013) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). It is not clear, however, if the 3–month period of SHU confinement imposed upon Watson is also sufficient to implicate a liberty interest. *See Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004) (finding that disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life" (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)). However, the Court need not decide that issue because it is well-settled that a prisoner charged with violating a prison regulation which could result in the loss of good time credit is entitled to minimal due process protections. *Wolff v. McDonnell,* 418 U.S. 539, 563–65, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Preiser v. Rodriguez,* 411 U.S. 475, 482, 487–88, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

To succeed under a due process claim based on the loss of good time credits, the petitioner must establish that: (1) he was not provided a written notice of the disciplinary charges at least twenty-four hours in advance of the hearing; (2) a nonneutral hearing body conducted the hearing; (3) he was not afforded the opportunity to present evidence and call witnesses; (4) he was not granted assistance to understand and prepare his defense; or that (5) the factfinder failed to provide a written statement of the evidence relied upon in making his decision and the reasons for the decision. *See Wolff,* 418 U.S. at 563–67. In his Petition before this Court, Watson alleges that his procedural due process rights were violated under the third element described above (right to present a case) because he was denied certain documentary evidence.

An "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 566. However, "a hearing officer does not violate due process by excluding irrelevant or unnecessary" evidence. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); *see also Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, *10 (S.D.N.Y.2002) ("[A]n inmate's right

2015 WL 5971077

to present documentary evidence in his defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his case[,][e]ven when documents are relevant and obtainable.").

In this case, Watson requested copies of the procedures used to select inmates for random drug testing as well as the actual list of inmates selected for random drug testing generated on October 7, 2011. He does not, however, challenge the results of the drug test. He alleges only that the requested documents would have enabled him to argue that he was selected for drug testing out of malice and retaliation. But whether Watson was randomly or purposefully selected to provide a urine sample has no bearing on whether he violated Institutional Rule 113.24 by using drugs.[5] Thus, the requested documents were not relevant and thus properly excluded from the disciplinary hearing. And because the proffered evidence did not challenge his culpability at the incident, Watson cannot show that its exclusion prevented him from presenting his case. *See Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

[5]    To the extent Watson's Petition may be construed to raise a claim that his due process rights were violated by the prison's alleged failure to comply with the DOCCS's procedures regarding random drug testing, such claim is insufficient to establish a violation of Watson's right not to be deprived of liberty without due process of law. The violation of state procedural rules or safeguards does not in itself constitute deprivation of due process, where the process actually provided nevertheless is permissible under the Constitution. *See, e.g., Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) ("Federal constitutional standards rather than state statutes define the requirements of procedural due process." (quoting *Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987)).

      Moreover, it is well-settled New York law that, where the hearing officer's determination of guilt is based only on the result of the urinalysis tests, sufficient evidence supports the determination of guilt, and a defendant may not challenge the source that served as the basis upon which to commence the investigation. *Cf. Mitchell v.*

*Selsky,* 252 A.D.2d 639, 675 N.Y.S.2d 197, 198 (N.Y.App.Div.1998) ("[I]t was unnecessary for the Hearing Officer to assess the reliability of the confidential informant inasmuch as the determination of petitioner's guilt was not dependent upon the confidential information but merely provided the suspicion prompting the request for petitioner's urine sample[.]"). This rule is not inconsistent with federal due process. The United States Supreme Court has held that, because confrontation and cross-examination "present greater hazards to institutional interests" due to their "inherent danger and the availability of adequate bases of decision without them," such matters (as opposed to the limited right to call witnesses) are left "to the sound discretion of the officials of state prisons." *Baxter v. Palmigiano,* 425 U.S. 308, 321–22, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Indeed, Watson fails to allege any facts suggesting that his urinalysis drug test was unreasonable, *see, e.g., Thompson v. Souza,* 111 F.3d 694, 702–03 (9th Cir.1997) (outlining factors to determine if non-random drug testing through urinalysis constitutes a reasonable search under the Fourth Amendment), and Watson does not cite, and this Court is not aware of, any Supreme Court authority granting a state prisoner habeas relief based on a defense that the prisoner was purposefully rather than randomly selected for a drug test, the failure of which led to a disciplinary infraction.

**\*6** An inmate who was properly denied access to documentary evidence at a disciplinary hearing may nonetheless be entitled to relief. "Although [the right to documentary evidence] can give way to legitimate concerns over institutional safety ... an inmate is still entitled to some explanation of the basis for a hearing officer's denial of the inmate's request for ... items of evidence." *Loret v. Selsky,* 595 F.Supp.2d 231, 234 (W.D.N.Y.2009); *see also Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) ("prison officials may be required to explain, in a limited manner, the reason ... why requested evidence was excluded or denied" (quoting *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985))). The record here indicates that, during a break in the proceeding, the hearing officer informed Watson that he had contacted the proper authorities in Albany and was told that he was not permitted to give Watson a copy of the random drug testing list or procedures. The hearing

2015 WL 5971077

officer stated that Watson's drug test had been ordered based upon the computer-generated list but that, pursuant to internal guidelines, the list and procedures could not be provided. The hearing officer thus gave Watson a reasonable explanation for his refusal to turn over the documents. Accordingly, Watson cannot prevail on any claim that he was denied due process due to an inability to present his case.


## V. CONCLUSION

Watson's Petition is moot and without merit.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c);

*Banks v. Dretke,* 540 U.S. 668, 705, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller–El,* 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R.APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.


**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5971077

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

2017 WL 9511168
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael J. ALLEN, Plaintiff,

v.

H. GRAHAM, et al., Defendants.

9:16-CV-47 (GTS/ATB)
|
Signed 09/26/2017

**Attorneys and Law Firms**

MICHAEL J. ALLEN, pro se.

AIMEE M. PAQUETTE, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge. In this civil rights action, plaintiff alleges that, on several occasions between July 2014 and December 2014, multiple staff and officials at Auburn Correctional Facility ("Auburn") retaliated against plaintiff for his work on the Inmate Liason Committee ("ILC"), by using excessive force during pat frisks, sexually assaulting and humiliating him during strip frisks, fabricating a weapons possession charge, and imposing disciplinary sanctions against him. (Dkt. No. 1, Compl.).

On April 12, 2016, Judge Suddaby dismissed a number of plaintiff's other claims. (Dkt. No. 6). The following claims survived initial review: (1) Eighth Amendment excessive force, sexual assault, and/or failure to protect claims against defendants Gifford [1], Chuttey, Manna [2], Gilmore, Zirbel [3], and Graham; (2) Fourth Amendment unreasonable search claims against defendants Gilmore, Gifford, and Chuttey; (3) Fourteenth Amendment due process claims against defendants Vasile, Graham, and Venettozzi arising from a December 9, 2014 disciplinary hearing determination and appeals therefrom; (4) First Amendment retaliation claims against defendants Chuttey, Gifford, Manna, Gilmore, Connor, Steinberg, Cornell, and Vasile; and (5) conspiracy

claims against defendant Chuttey, Manna, Gifford, Gilmore, and Vasile. (Dkt. No. 6, at 40; Dkt. No. 8, at 3 n.2).

1    In his complaint, plaintiff alternatively identified this correctional officer as "Greffin," "Giffin," or "Griffin" (Dkt. No. 6, at 4 n.3). The parties now agree that he was referring to defendant Gifford. (Dkt. No. 57-4, Ex. A to Paquette Decl., at 41).

2    In his complaint, plaintiff identified this correctional officer as "Mannon," (Compl. at 5). In response to this motion, defense counsel reported that this individual's last name is spelled "Manna," so this court will adopt the correct spelling. (Def. Br. at 8 n.2).

3    In his complaint, plaintiff identified this correctional officer as "Zeke." (Compl. at 5). Plaintiff advised the court prior to service of the summons that this defendant's name is actually Zirbel. (Dkt. No. 18).

Presently before the court is the remaining defendants' motion for summary judgment on all these claims pursuant to Fed. R. Civ. P. 56. (Dkt. No. 57). Plaintiff has responded in opposition to the motion, and defendants filed a reply memorandum of law. (Dkt. Nos. 63, 64). For the reasons set forth below, this court will recommend granting the motion for summary judgment in part, and denying it in part.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**\*2** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 191 of 328

S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

## II. Compliance with Local Rules

As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. No. 169-1). Although plaintiff has responded to the Statement of Material Facts filed by Defendants (Dkt. No. 63-2, "Pl.'s Statement of Disputed Factual Issues"), his response does not follow the mandate of L.R. 7.1(a)(3). Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/ or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Instead, plaintiff has submitted a list that does not correspond to the defendants' statement, and only identifies issues that plaintiff believes cannot be resolved on summary judgment. (Dkt. No. 63-2, at 2-6).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the local rule provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the consequences of failing to respond to the motion. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

Exercising this court's discretion, I will not withhold the leniency typically afforded pro se litigants at this juncture. Therefore, this report-recommendation is based upon an assiduous review of the entire summary judgment record, including plaintiff's memorandum of law, his supporting affirmation, and the accompanying exhibits.

Plaintiff should not interpret this court's leniency with respect to this motion as approval of his disregard for the applicable local rules. This court reminds plaintiff that his pro se status is not a license to avoid the procedural requirements imposed on all civil litigants. *See Faretta v. Calif.*, 422 U.S. 806, 834 n.46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."). Future pleadings that disregard the local rules may not be afforded this same leniency.

## III. Relevant Facts and Contentions [4]

[4] For purposes of this motion, this court will view all ambiguities or inferences to be drawn from the facts in the light most favorable to plaintiff. *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).

**\*3** At all times relevant to the complaint, plaintiff was confined at Auburn, where he served as a representative on the ILC. (Compl. at 6). In this role, plaintiff collected complaints from the prison population and forwarded them to defendant Graham, who was Auburn Superintendent. (Dkt. No. 63, Pl. Decl., ¶ 4).

### A. July 25, 2014 Incident

On July 13, 2014, plaintiff sent the monthly agenda for the upcoming July 30, 2014 ILC meeting to defendants Graham and Chuttey. (Compl. at 9). The first item on the agenda was discussion of an allegedly improper pat-frisk technique used by certain Auburn correctional officers, which involved "coming up behind inmates and grabbing them by the wrist and forcing them to the wall and making them open their mouth." (*Id.*)

On July 25, 2017, defendant Gifford entered plaintiff's cell, grabbed him by the wrist, and "forcefully dragged [him] out [of his] cell and put [him] on the company bars." (Pl. Decl. ¶ 9). He was then taken for a urinalysis test, while unidentified officers "vandalized" his cell. (*Id.*) Plaintiff alleges that during this interaction, defendant Gifford asked him, "your

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

[*sic*] a I.L.C. rep. Why Captain Chuttey messing with you for?" (*Id.*; Compl. at 10).

**B. July 30, 2014 Incidents**
On July 30, 2014, plaintiff raised the inmate complaints about the pat-frisk technique at the ILC meeting, and identified defendant Manna as one of the officers who was violating DOCCS policy. (Pl. Decl. ¶ 10). Defendant Graham and defendant Chuttey were at the meeting. After the ILC meeting that day, defendants Gifford, Manna, and Gilmore "aggressively approached" plaintiff in the recreation yard, along with three other unidentified correctional officers. (Pl. Decl. ¶ 11). Defendant Gifford grabbed plaintiff by the wrist, forcefully dragged him to the wall, and told plaintiff to open his mouth. (Pl. Decl. ¶ 11; Compl. at 10). He then roughly pat-frisked plaintiff. (*Id.*) Plaintiff alleges that defendant Manna and Gilmore threatened plaintiff when the pat-frisk was finished. According to plaintiff, defendant Manna told him, "We're doing our job and protecting ourself [*sic*] just in case of a inmate [*sic*] try to attack us and you just came here and you trying to change policies and that's going to cause a big problem between you and us ... I'll set you up with a weapon or write you up for assault on staff and that won't look good at the Parole Board." (*Id.*)

A short time later, defendant Gilmore ordered plaintiff to leave the yard and escorted plaintiff into a small room located on C&D Block. (Pl. Decl. ¶ 12; Compl. at 10). Defendants Manna and Gilmore were already in the room, along with four other unidentified correctional officers. (Pl. Decl. ¶ 12; Compl. at 11). Defendant Gifford then ordered plaintiff to remove his clothes. (*Id.*) Plaintiff estimated that he stood naked for approximately ten minutes while defendants Manna, Gifford, and Gilmore made "sexual ribald comments and threats." (*Id.*) Plaintiff alleged that defendant Gifford repeatedly touched plaintiff's penis with his nightstick, and told plaintiff that "Your dick is real small for a blackman [*sic*]." (*Id.*)

While this was going on, defendant Gilmore ordered plaintiff to open his mouth six times, and laughed each time. (Pl. Decl. ¶ 13; Compl. at 11). When plaintiff complied with these orders, defendant Gilmore told plaintiff, "See. You don't have a problem opening your mouth." (*Id.*) Plaintiff interpreted this statement as a reference to the complaints that he raised during the ILC meeting. (Pl. Decl. ¶ 13). Defendant Manna was even more specific in referring to plaintiff's complaints about the pat-frisk policy, telling plaintiff that, "Captain Chuttey told us to conduct searches like that and we will [continue] to do

so and you can't change shit. And if you file any grievance it will disappear and we will kill you in here." (Pl. Decl. ¶ 14; Compl. at 11).

**\*4** In light of the threats to frame him for assault or to kill him, plaintiff did not file a grievance related to the July 25 or July 30 incidents. (Pl. Decl. ¶ 16). However, he did send letters to Governor Andrew Cuomo and the DOCCS Inspector General. (*Id.*) He also reported the July 30 sexual assault to mental health staff, who provided the information to Auburn officials. (Pl. Decl. ¶ 17).

**C. October 7, 2014 Incident**
In September 2014, an investigator from the Inspector General interviewed plaintiff as well as defendants Chuttey, Manna, Gilmore, and Gifford. (Pl. Decl. ¶ 18; Compl. at 12). At the September 29, 2014 ILC meeting, defendant Chuttey threatened to retaliate against plaintiff for complaining to the Inspector General, and for his continued presence on the ILC. (Pl. Decl. ¶ 20; Compl. at 12).

On October 7, 2014, defendant Gilmore stopped plaintiff for a pat-frisk. (Pl. Decl. ¶ 21; Compl. at 12-13). Plaintiff alleges that defendant Gilmore grabbed plaintiff forcefully by the wrist, told him to open his mouth, and dragged plaintiff to the wall to assume a pat-frisk position. (Pl. Decl. ¶ 21; Compl. at 13) While plaintiff was facing the wall, defendant Gilmore started "punching his [fists] together in an [intimidating] manner," while defendant Zirbel stood nearby and laughed. (*Id.*) Defendant Gilmore then conducted the pat frisk in what plaintiff considered an "inappropriate manner" that included caressing his chest, and repeatedly groping plaintiff's genitals and buttocks. (*Id.*) When plaintiff complained that the pat-frisk was being conducted in an inappropriate manner, defendant Gilmore warned him that he could receive a ticket for assault on staff, and that "[W]e do what we want because we're untouchable and I don't care what you tell I.G. about me, I'll still be here tomorrow touching on your sweet ass." (Pl. Decl. ¶ 22; Compl. at 13).

**D. November 25, 2014 Incident**
On November 14, 2014, plaintiff was reelected to a position on the ILC. (Pl. Decl. ¶ 29; Compl. at 14). On November 25, 2014, defendants Steinberg and Connors conducted a strip frisk of plaintiff. (Pl. Decl. ¶ 33; Compl. at 14-15). Following the strip frisk, defendant Steinberg issued plaintiff a misbehavior report for weapons possession. (Pl. Decl. ¶ 33). Defendant Steinberg reported that he found a gray knife

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 193 of 328

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

made out of sharpened plastic in plaintiff's sock. (Compl. at 15). Plaintiff claimed that defendant Steinberg planted the weapon on him, and then told plaintiff "You overstepped your boundaries. Didn't [defendant Chuttey] tell you not to run [for reelection to the ILC]?" (Compl. at 15). Defendant Connors also told plaintiff, "You like to help these scumbups with your ILC crap and inform on my officers.... Let [sic] see who's going to help you. You should've listen to [Chuttey] when he told you not to run." (Pl. Decl. ¶ 33). Plaintiff also alleges that defendants made a number of other self-incriminating statements in the days following the incident. (Pl. Decl. ¶ 35, 37-38).

### E. December 2014 Disciplinary Hearing
Defendant Vasile presided over plaintiff's disciplinary hearing related to the weapons possession charge, and found him guilty on December 9, 2014. (Compl. at 17-23). Plaintiff was sentenced to sixteen months in the special housing unit ("SHU") with a sixteen month loss of privileges, and twelve months of recommended good time loss. (Compl. at 23). Defendant Graham and defendant Venettozzi denied plaintiff's subsequent appeals, but reduced his SHU confinement to five months. (Compl. at 24-25).

## IV. Exhaustion of Administrative Remedies

### A. Legal Standards
**\*5** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. See Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing Porter v. Nussle, 534 U.S. 516, 532 (2002) ). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. Id. at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004). Defendants bear the burden of proving the affirmative defense of failure to exhaust. Williams v. Priatno, 829 F.3d 118, 122 (2d Cir. 2016).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must

complete the administrative review process in accordance with the applicable state rules. Jones, 549 U.S. at 218-19, 127 S.Ct. 910 (citing Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In Woodford, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." Id. § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. Id. § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. Id. §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. See Brownell v. Krom, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing Hemphill v. State of New York, 380 F.3d 680, 686 (2d Cir. 2004) ). The Hemphill inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. Id.

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " Riles v. Buchanan, 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting

2017 WL 9511168

*Ross*, ––– U.S. ––––, 136 S.Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel—are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ––– U.S. ––––, 136 S.Ct. at 1858.

## B. Application

### 1. July 25, 2014 Incident

**\*6** Defendants argue that plaintiff failed to exhaust the DOCCS administrative grievance process for any of his claims associated with the July 25, 2014 pat-frisk. (Dkt. No. 57-2, "Def. Mem. of Law", at 23). Plaintiff admits that he did not file a grievance for this incident, but argues that he legitimately feared for his life if he pursued ordinary administrative remedies, due to defendants' threats. (Pl. Decl. ¶ 16).

Under *Ross*, threats or intimidating by prison employees may render administrative remedies unavailable. *Ross*, ––– U.S. ––––, 136 S.Ct. at 1860. The Second Circuit has stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a 'similarly situated individual of ordinary firmness' have deemed them available." *Hemphill*, 380 F.3d 680, 688 (2d Cir. 2004). A "generalized fear of retaliation" is insufficient to excuse a failure to exhaust. *See Smith v. Costello*, No. 9:15-CV-401 (BKS/DJS), 2017 WL 1155811, at *4 (N.D.N.Y. March 3, 2017) (Rep't-Rec), *adopted*, 2017 WL 1155813 (N.D.N.Y. March 27, 2017) (collecting cases).

Specific threats of retaliation may reasonably deter an inmate from filing a grievance, particularly when the threats follow an assault. *See, e.g., Hemphill*, 380 F.3d at 688 (remanding for determination of availability of administrative remedies where officer threatened to retaliate against the plaintiff if he filed a complaint). Here, plaintiff has alleged that he was sexually assaulted and threatened five days after the July 25, 2014 incident, and warned not to file any grievances. (Pl. Decl. ¶ 14; Compl. at 11). The same correctional officer, defendant Gifford, was involved in both incidents. Plaintiff has alleged more than a "generalized fear of retaliation" that raises a sufficient question of material fact as to whether administrative remedies were available to him. This question of fact is sufficient to overcome defendants' motion for

summary judgment on exhaustion grounds, with regard to the July 25, 2014 incident.

Defendants argue that plaintiff's alleged fears are inconsistent with his correspondence to Governor Cuomo and DOCCS Commissioner Annucci, and his complaints to mental health staff. (Def. Br. at 11). However, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority...." *Hemphill*, 380 F.3d at 689. Therefore, plaintiff's attempts to circumvent the ordinary grievance process do not necessarily contradict his claims that he feared that defendants would follow through on threats to frame him for misconduct or cause him harm.

### 2. July 30, 2014 Incident

Defendants also argue that plaintiff failed to exhaust his administrative remedies with respect to his Eighth Amendment claims arising from the July 30, 2014 incident. As described above, the alleged threats made by defendants during the strip frisk, and plaintiff's alleged fear for his safety, raise a sufficient question of fact as to whether administrative remedies were available to him. Therefore, this court recommends that defendants' motion for summary judgment on exhaustion grounds with regard to the July 30, 2014 incident be denied.

In addition, defendants' exhaustion argument ignores the amended DOCCS policy, effective May 15, 2014, that specifically excludes sexual abuse and sexual harassment complaints from the three-tiered grievance process. *See Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *3-4 (W.D.N.Y. March 14, 2016) (summarizing amended DOCCS policy). Plaintiff included a copy of DOCCS Directive 4040, as an exhibit to his response to this motion. (Dkt. No. 63-3, at 50-67). That exhibit, although dated January 20, 2016, includes the same language quoted in *Henderson*:

**\*7** The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a) ), **an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the Prison Litigation Reform Act**

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 195 of 328

**(PLRA) exhaustion requirement** (42 U.S.C. § 1997e(a) ) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below. For purposes of PREA Standards (28 C.F.R. § 115.52) and the exhaustion requirement, any allegation concerning an incident of sexual abuse or sexual harassment (see Department Directives #4027A, "Sexual Abuse Prevention & Intervention—Inmate-on-Inmate," and #4028A, "Sexual Abuse Prevention & Intervention —Staff-on-Inmate") shall be deemed exhausted if official documentation confirms that:

(1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b) ); or to the Department's Office of Special Investigations; or

(2) A third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

(*Id.* at 52) (emphasis added).

Plaintiff's response to this motion includes mental health treatment notes documenting that plaintiff "was seen on a referral after he wrote a letter to MHU alleging that he was sexually assaulted." (Dkt. No. 63-3, at 42). The letter was received by MHU on August 1, 2014, and indicates that the watch commander "was notified on that date per PREA regulations." (*Id.*) Those notes certainly suggest that "official documentation" confirms that plaintiff reported the July 30, 2014 sexual assault to Auburn facility staff, raising an additional question of fact with regard to exhaustion. Therefore, this court finds that there is an additional ground to recommend denial of defendants' motion for summary judgment on exhaustion grounds with respect to the July 30, 2014 sexual assault claim. Because DOCCS created this exception solely for sexual abuse and sexual harassment claims, plaintiff's complaint to mental health staff would not exhaust other claims arising from the July 30, 2014 incident, such as an Eighth Amendment excessive force claim. Those claims would still be subject to the three-tiered grievance process, unless it was unavailable, as described above.

### 3. October 7, 2014 Incident

With regard to the October 7, 2014 incident, defendants admit that plaintiff exhausted the administrative grievance process with respect to his claims against defendant Gilmore, who performed the pat-frisk. (Dkt. No. 57-12, Hale Decl., Ex. B.) Defendants argue, however, that plaintiff never mentioned defendant Zirbel in any of the grievance documents, and thus did not exhaust his claim that defendant Zirbel failed to intervene. (Def. Mem. of Law at 18).

This argument is not persuasive. A grievant is not required to identify the parties against whom he is grieving, but he is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs., tit. 7 § 701.7(a)(1) ). The PLRA's exhaustion requirement requires that prison officials be afforded the time and opportunity to address a complaint internally. "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697 (finding the PLRA exhaustion requirement was "not dissimilar to the rules of notice pleading"). Therefore, the relevant question for the court is "whether [the] plaintiff's grievance sufficiently alerted the prison officials that he was alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance." *Peele v. Donah*, Case No. 9:15-CV-317 (GTS/TWD), 2016 WL 4400473, at *5 (N.D.N.Y. June 14, 2016) (citation omitted).

**\*8** In his grievance, plaintiff identified the time and location of defendant Gilmore's pat-frisk. (Dkt. No. 57-12, Hale Decl., Ex. B at 5). As a result of the grievance, the matter was forwarded to the Inspector General's office for further review and investigation. (*Id.* at 6). At the time of the March 4, 2015 CORC decision, the Inspector General's case was still open. (*Id.* at 2). Based on the documents filed in connection with this motion, this court cannot conclude that officials with DOCCS or Auburn had no opportunity to investigate whether any other correctional officers, such as defendant Zirbel, witnessed and/or could have intervened in the alleged sexual assault. Therefore, this court recommends denial of defendant Zirbel's motion for summary judgment on exhaustion grounds.

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

### 4. November 25, 2014 Incident
### and December 2014 Hearing

Defendants contend that plaintiff's failure to exhaust the three-tiered grievance process precludes claims related to the November 24, 2014 incident and the resulting disciplinary hearing on December 9, 2014. However, the administrative grievance process is inapplicable to plaintiff's Fourteen Amendment due process claims against defendants Vasile, Graham, and Venettozzi that adverse witnesses were coached prior to their testimony; that favorable evidence was suppressed; that plaintiff was not allowed to call all of his witnesses; and that the hearing officer was biased. (Compl. at 17-23). Complaints about the handling of a disciplinary hearing by corrections officials are non-grievable under applicable regulations because there is a separate administrative appeal process for disciplinary actions. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.3(e)(1); Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009). Plaintiff has demonstrated that he appealed the hearing determination to defendant Graham, and appealed the superintendent's determination to defendant Venettozzi. (Dkt. No. 63-3, at 140, 145-174). Plaintiff therefore properly exhausted his administrative remedies with respect to his due process claims, by appealing the result of each hearing. Davis, 576 F.3d at 132-33.

The ordinary grievance process applied to all of plaintiff's other claims related to the November 25, 2014 incident and the December 2014 disciplinary hearing. See Dabney v. Pagano, 604 Fed.Appx. 1, 4 (2d Cir. 2015). Plaintiff commenced this process, but did not complete it. For example, plaintiff filed Grievance Number AUB-66310-14 on November 28, 2014, alleging that defendants Gilmore, Cornell, and Steinberg planted a weapon on him in retaliation for prior complaints. See Dkt. No. 57-13, Hale Decl., Ex. C at 1. On the grievance form, plaintiff wrote, "It don't matter, they already violated my rights and I'm heading straight into federal court. Just send me back a copy of this complaint." (Id.) DOCCS records do not show that plaintiff completed the three-tiered process for this grievance. (Dkt. No. 57-10, Hale Decl., ¶ 13).

Plaintiff also filed Grievance Number AUB-66332-14, alleging that defendants Chuttey, Gilmore, Steinberg, Cornell, and Connors conspired to plant the knife in retaliation for his previous complaints. (Dkt. No. 63-3, at 113-114). This grievance was dated December 1, 2014, and stamped

received by Auburn I.G.R.C. on December 8, 2014. (Id. at 113, 126 S.Ct. 2378). At the start of his disciplinary hearing on those charges, plaintiff filed Grievance Number AUB-66331-14, alleging that his hearing officer, defendant Vasile, had conspired with Chuttey, Gilmore, Steinberg, Cornell, and Connors to find him guilty of the weapons charge. (Dkt. No. 63-3, at 115). This grievance was dated December 2, 2014, and stamped received by Auburn I.G.R.C. on December 8, 2014. (Id.)

Given the nature of plaintiff's allegations, both conspiracy grievances were referred directly to defendant Graham, as superintendent, in accordance with DOCCS regulations. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.8. (Pl. Decl. ¶ 42). Plaintiff concedes that, pursuant to the same regulations, defendant Graham had twenty-five days to respond to the grievance. (Id.) Because the time to respond begins to run from the date that the grievance is received, the response was due by January 2, 2013. See N.Y. Comp. Codes R. & Regs., tit. 7 § 701.8 (f). On December 23, 2014, before the superintendent's time to respond to either grievance had expired, plaintiff sent a letter requesting that the two matters be appealed to CORC. (Dkt. No. 63-3, at 116). On December 28, 2014, plaintiff sent his own letter to CORC, requesting that it hear his appeals on Grievances Number AUB-66331-14 and AUB-66332-14 for exhaustion purposes. (Id. at 117-118, 126 S.Ct. 2378). CORC acknowledged this request but advised plaintiff to utilize the standard appeal procedure through his IGP supervisor. (Id. at 121). Defendant Graham issued his grievance determinations on January 7, 2015, and found that there was no evidence to support plaintiff's allegations. (Id. at 123). There is no indication that plaintiff appealed the Superintendent's actual determinations.

**\*9** By prematurely filing his appeals due to the Superintendent's perceived non-response to his grievances, plaintiff did not properly exhaust his administrative remedies. See, e.g., Aikens v. Jones, No. 12-CIV-1023 (PGG), 2015 WL 1262158, at \*4 (S.D.N.Y. March 19, 2015) (appeal was not properly submitted to superintendent because it was filed before IGRC's time to respond had expired). An untimely or otherwise procedurally defective administrative appeal does not satisfy the PLRA's exhaustion requirements. Aiken, 2015 WL 1262158, at \*4 (collecting cases). Plaintiff's letter to CORC also did not comply with DOCCS regulations. See Bennett v. Wesley, No. 11 Civ. 8715 (JMF), 2013 WL 1798001, at \*5 (S.D.N.Y. April 29, 2013) (granting defendants summary judgment where plaintiff attempted to

2017 WL 9511168

appeal by filing a letter, and did not use the proper appeal form).

Plaintiff, who has expressed his familiarity with the DOCCS grievance process, has not demonstrated that the administrative process was confusing or unavailable to him with respect to these claims. *See Giano,* 380 F.3d at 676, 679 (excusing failure to file a grievance regarding retaliation claims because inmate reasonably misinterpreted DOCCS regulations to mean that his only administrative recourse was to appeal his disciplinary conviction); *see also Reynoso v. Swezey,* 238 Fed. Appx. 660, 663 (2d Cir. 2007) (where plaintiff filed a grievance with respect to the retaliation claim, but failed to appeal the denial to CORC, his failure to exhaust was not excused in light of evidence of his awareness that the grievance process was the appropriate administrative remedy). Therefore, this court recommends granting defendants' summary judgment motion with regard to plaintiff's claims related to the November 27, 2014 incident and the December 7, 2014 disciplinary hearing for failure to exhaust administrative remedies, except for the remaining Fourteenth Amendment due process claims described above.[5]

[5]    Judge Suddaby had previously dismissed plaintiff's due process claim that he was denied adequate employee assistance during the December 7, 2014 disciplinary hearing. (Dkt. No. 6, at 23).

### V. Dismissal for Failure to State a Claim

#### A. Legal Standards

In addition to their exhaustion arguments, defendants have also argued that plaintiff has not stated constitutional claims for relief. Because many of the same legal standards apply, I will summarize the general analysis for these type of claims at the outset. I will then address the specific claims arising from each incident.

#### 1. Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation omitted); *Hudson,* 503 U.S. at 9, 112 S.Ct. 995. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 995 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*10** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The Supreme Court has recently re-emphasized that the "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather whether the force was applied in a good faith effort to restore discipline, or whether it was applied maliciously to cause harm, regardless of the seriousness of the injury. *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010).

In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir. 2003). The extent of the injury may be considered as one factor in determining whether the use of force could plausibly have been thought "necessary" in a particular situation. *Wilkins,* 559 U.S. at 40, 130 S.Ct. 1175. The extent of the injury may also give some indication of the amount of force applied and may ultimately be considered in determining damages if appropriate. *Id.*

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 198 of 328

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

### 2. Sexual Assault

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015). "[A] single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." *Id.* However, allegations of verbal threats of sexual assault are not sufficient to state a constitutional violation under 1983. *See Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *19, n. 10 (N.D.N.Y. Sept. 6, 2013) (finding allegations that the defendant threatened sexual assault, without allegations of actual abuse, failed to state a cognizable claim under 1983).

### 3. Failure to Protect

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, **and** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The plaintiff must show that prison officials **actually knew of and disregarded** an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S.Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

### 4. Unreasonable Body Search

While inmates do not retain the full range of constitutional rights that unincarcerated individuals enjoy, they do retain "some Fourth Amendment rights upon commitment to a correctional facility." *Bell v. Wolfish*, 441 U.S. 520, 558-60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Courts assessing an inmate's claim that officers infringed his or her Fourth Amendment rights must first determine whether the inmate

has exhibited "an actual, subjective expectation of bodily privacy;" and second, "whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights." *Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992).

**\*11** In each case, "[t]he test of reasonableness under the Fourth Amendment requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails." *Bell*, 441 U.S. at 559, 99 S.Ct. 1861. As the Second Circuit recently reiterated, "inmates retain a limited right of bodily privacy under the Fourth Amendment." *Harris v. Miller*, No. 14-1957, 818 F.3d 49, 2016 WL 963904, at *10 (2d Cir. Mar. 15, 2016).

Thus, where an isolated search is challenged as unreasonable, "courts typically apply the standard set forth in [*Bell*]" in determining the reasonableness of the search. *Harris*, 818 F.3d 49, 58 (courts should assess reasonableness in light of the four Bell factors: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted.").

In some cases, an inmate's Eighth Amendment right to be free from cruel and unusual punishment may be implicated by the search. *Harris*, 818 F.3d 49, 64. To state a cognizable Eighth Amendment claim, the plaintiff must allege that the defendant acted with a subjectively culpable state of mind, and that the conduct was objectively "harmful enough" or "sufficiently serious" to reach constitutional dimensions. *Id.* at *10-11, 112 S.Ct. 995 (citing *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) ).

### 5. Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett, 343 F.3d at 137* (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett, 343 F.3d at 137*. Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 & n. 21 (S.D.N.Y. 2011)* (collecting cases).

### 6. Due Process

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001)*. In *Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)*, the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

 *12 The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in keeplock or a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz, 230 F.3d 14, 23 (2d Cir. 2000)*; *Colon v. Howard, 215 F.3d 227, 234 (2d Cir. 2000)*. Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards, 364 F.3d 60, 64-66 (2d Cir. 2004)*.

A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon, 215 F.3d at 231* (finding that a prisoner's liberty interest was infringed by 305-day confinement). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—... a district court must "make a fact-intensive inquiry," ... examining "the actual circumstances of SHU confinement" in the case before it...." *Palmer v. Richards, 364 F.3d at 64-65*

(citations omitted). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest. However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards, 364 F.3d at 65* (citations omitted).

### B. Application

#### 1. July 25, 2014 Incident

Although plaintiff considered the July 25, 2014 search of his cell to be retaliatory, and his urinalysis test to be "illegal," he also concedes that "... I have no constitutional protection in retaliatory cell searches or urine testing." (Pl. Decl. ¶ 19). Instead, plaintiff argues that his constitutional rights were violated when defendant Gifford "rushed up in his cell and grabbed the plaintiff by the wrist and forcefully dragged the plaintiff out his cell [sic] and put him on the company bars," at the direction of defendant Chuttey. (Compl. at 10).

To the extent that plaintiff is claiming that excessive force was used to remove him from his cell on July 25, 2014, this court recommends that defendant Gifford be granted summary judgment. Plaintiff's description of defendant Gifford's actions reflect a *de minimis* use of force, and plaintiff has not alleged any injury that resulted from the forcible removal from his cell.

Although plaintiff has demonstrated temporal proximity between the cell search and defendant Chuttey's alleged receipt of the ILC agenda, this court also recommends that defendants Gifford and Chuttey be granted summary judgment as to plaintiff's retaliation claims arising from the July 25, 2014 incident. None of the alleged mistreatment rises to the level of an adverse action. As discussed above, the level of force used to remove plaintiff from his cell was *de minimis*. In addition, a single urinalysis test does not rise to the level of an adverse action that would deter an inmate from asserting his rights. *See Bumpus v. Canfield, 495 F.Supp.2d 316, 327 (W.D.N.Y. 2007)* ("urine tests are a fact of prison life ..., and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances."). Likewise, retaliatory cell searches are not actionable under § 1983. *See Walker v. LaValley, No. 9:12-CV-807 (TJM/*

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 200 of 328

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

CFH), 2014 WL 4744735, at *14 (N.D.N.Y. Sept. 23, 2014) (collecting cases). Plaintiff has not alleged that any of his property was confiscated or damaged during the search. *See Toliver v. City of New York,* No. 10-CIV-5806, 2013 WL 6476791, at *7 (S.D.N.Y. Dec. 10, 2013) (the confiscation or destruction of property may give rise to a retaliation claim). Therefore, even if plaintiff could show a retaliatory motive, he has not demonstrated an adverse action occurred on July 25, 2014 that would support a retaliation claim.

### 2. July 30, 2014 Incidents

**\*13** Plaintiff has alleged that defendant Gifford used excessive force when he conducted his initial pat-frisk on July 30, 2014 in a rough manner. (Pl. Decl. ¶ 11; Compl. at 10). He also alleges that, a short time later, plaintiff was forced to strip off his clothes and stand naked while defendant Gifford repeatedly touched plaintiff's genitalia with a nightstick, and mocked him along with defendants Manna and Gilmore. (Pl. Decl. ¶ 12-15; Compl. at 11-12). During this purported strip frisk, the defendants made statements indicating that plaintiff was being mistreated in retaliation for his complaints about Auburn's pat frisk policies. (Pl. Decl. ¶ 13-14; Compl. at 12). Although defendant Chuttey was not present during these incidents, plaintiff contends that defendant Chuttey had ordered the abuse. Defendants contend that none of these allegations state a § 1983 claim.

Although plaintiff described the initial pat frisk as "rough," his description does not rise to the level of harm or malice contemplated by the Eighth Amendment. *See Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir. 1997) (a "small number of incidents in which [the inmate] allegedly was verbally harassed, touched, and pressed against without his consent" were not, in isolation not taken together, objectively serious enough to invoke the protections afforded under the Eighth Amendment; *Caldwell v. Crossett,* No. 9:09-CV-576 (LEK/RFT), 2010 WL 2346337, at *3 (N.D.N.Y. May 24, 2010) (claim that corrections officer grabbed plaintiff's testicles during a pat-frisk causing serious pain around his groin area failed to allege a violation of the Eighth Amendment based upon claims of sexual abuse or excessive force). Therefore, this court recommends that defendant Gifford's motion for summary judgment be granted with respect to the July 30, 2014 excessive force claim.

Defendants Gifford, Manna, and Gilmore have not shown that they are entitled to summary judgment on any of plaintiff's

other claims arising from the July 30, 2014 incident. [6] A correctional officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to humiliate the inmate, violates the Eighth Amendment. *Crawford,* 796 F.3d 252, 257 (2d Cir. 2015). Taking plaintiff's allegations as true for the purpose of this motion, defendant Gifford's repeated touching of plaintiff's genitalia with his nightstick and mocking comments would serve no other purpose but to humiliate plaintiff. A strip search which was intended to humiliate or harass plaintiff would violate even the limited Fourth Amendment protections afforded inmates. Likewise, if defendants Manna and Gilmore were in the room and witnessed such abusive actions by defendant Gifford, their failure to intervene gives rise to a constitutional claim. [7] The alleged statements made during the incident also support plaintiff's contention that the correctional officers were retaliating against him for complaining about Auburn's pat-frisk practices. [8]

[6]     This court notes that plaintiff has not alleged any physical injury resulting from the July 30, 2014 incidents, but claimed that he suffered "psychological pain and anguish." (Compl. at 36-37). The PLRA prohibits compensatory damage awards for an inmate's mental or emotional injury without a prior showing of physical injury. 42 U.S.C. § 1997e(e). Plaintiff may still recover nominal or punitive damages for these claims. *Thompson v. Carter,* 284 F.3d 411, 417-18 (2d Cir. 2002).

[7]     In this case, plaintiff alleges that defendants Manna and Gilmore not only witnessed the sexual abuse on July 30, 2014, but participated in mocking and taunting plaintiff.

[8]     In their motion, defendants generally raised qualified immunity as an additional ground for summary judgment. (Def. Br. at 41). The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To the extent that defendants are invoking qualified immunity with respect to the July 30,

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 9511168

2014 incidents, this court recommends denial of summary judgment on that ground as well.

**\*14** However, this court recommends granting defendant Chuttey's motion for summary judgment on plaintiff's retaliation claim related to the July 30, 2014 incident. Defendant Chuttey was not present at any point during the alleged pat frisk or sexual assault on July 30, 2014. The complaint includes a statement by defendant Manna that "Captain Chuttey" had instructed them to conduct pat-frisks by grabbing inmates by the wrist and forcing them to open their mouth. (Pl. Decl.¶ 14). Plaintiff has not offered any support for his conclusion that defendant Chuttey ordered, or was even aware of, the alleged retaliatory assault. Plaintiff's speculative conclusion that it must have been ordered by defendant Chuttey is insufficient to survive a motion for summary judgment.

### 3. October 7, 2014 Incident

Plaintiff has alleged that defendant Gilmore used excessive force and sexually assaulted him during a pat-frisk on October 7, 2014, when plaintiff was leaving the A-block at Auburn. (Pl. Decl. ¶ 21; Compl. at 13). He further alleged that defendant Zirbel witnessed this mistreatment and did not intervene. (*Id.*) Both defendant Gilmore and defendant Zirbel have moved for summary judgment for failure to state a claim.

This court recommends that both defendants' motions for summary judgment be granted, with respect to the October 7, 2014 incident. Plaintiff's description of the pat-frisk does not rise to the level of excessive force or sexual assault. *See Boddie,* 105 F.3d at 861; *Caldwell,* 2010 WL 2346337, at \*3. Plaintiff has also not supported his conclusion that the pat-frisk, which took place as plaintiff was moving between cell blocks, had no penological purpose and was instead intended to gratify defendant Gilmore's sexual desire or humiliate plaintiff. *See Crawford,* 796 F.3d at 257. Because plaintiff has not shown that defendant Gilmore's action rose to the level of a constitutional violation, it follows that plaintiff has not stated a claim against defendant Zirbel for failure to intervene.

### 4. December 2014 Disciplinary Hearing (Due Process Claims)

Defendant Vasile sentenced plaintiff to sixteen months in the Special Housing Unit ("SHU"), but defendant Graham reduced this sentence on appeal to five months SHU

confinement. (Dkt. No. 68-3, at 140). Given the intermediate duration of ultimate disciplinary sentence, a fact-intensive inquiry is necessary to determine whether a liberty interest arose from "atypical or significant" hardships imposed while plaintiff was in SHU. *Palmer,* 364 F.3d at 64-65.

In plaintiff's response to the defendants' motion for summary judgment, he outlines the deprivations that he allegedly suffered for the time that he was in SHU, at both Auburn and Upstate. (Pl. Decl. ¶¶ 71-77). While housed in Auburn SHU, plaintiff was housed next to a mentally ill inmate who continuously banged on his wall, preventing plaintiff from sleeping. (*Id.* ¶ 71). This inmate also threw feces into plaintiff's cell, causing him to vomit. (*Id.*) During the approximately fifty days that plaintiff was housed in Auburn SHU, he was unable to exercise and developed back pain. (*Id.* ¶ 72). When he was transferred to Upstate SHU, he was not allowed to have his reading glasses, which left plaintiff unable to read legal work, mail, and other written material. (*Id.* ¶ 74). Plaintiff was denied a pillow, which caused his neck to stiffen up and exacerbated his back pain. (*Id.* ¶ 75). Plaintiff also alleged that the conditions at Upstate SHU, which he described as "the worst SHU ever made," caused him to become depressed and consider suicide. (*Id.* ¶¶ 73-74). His SHU confinement also made him ineligible for a selective college program available for inmates. (Id. at ¶ 77).

As defendants point out in their reply, many of these alleged deprivations are "normal SHU conditions." (Dkt. No. 69 at 2). *See Smith v. Costello,* No. 9:15-CV-401, 2017 WL 1155811, at \*6 (N.D.N.Y. Mar. 3, 2017) (discussing "normal" SHU conditions including limited access to personal materials, personal hygiene items, exercise, mail, legal documents, and programs) (Rep't-Rec.), *adopted,* 2017 WL 1155813 (Mar. 27, 2017); *Jackson v. Goord,* No. 06-CV-6172, 2011 WL 4829850, at \*14 (noise that made it difficult to sleep was not an atypical and significant hardship). Others, including those the alleged impacts on plaintiff's physical and mental health, may or may not be "normal" for SHU. Defendants have not offered any evidence regarding SHU conditions at Auburn or Upstate. Therefore, there is an outstanding question of fact as to whether defendants deprived plaintiff of a liberty interest.

**\*15** This outstanding question of fact does not preclude summary judgment for defendants in this case. Even assuming that plaintiff had a liberty interest, a review of the record demonstrates that plaintiff received adequate due process at his December 7, 2014 hearing. Plaintiff's due process challenge relies upon four allegations against

2017 WL 9511168

defendant Vasile, that he: (1) refused to allow witness testimony favorable to plaintiff; (2) suppressed evidence favorable to plaintiff; (3) coached witnesses to elicit false testimony; and (4) was generally biased against plaintiff and had pre-decided his guilt. (Pl. Decl. ¶¶ 52-66). None of these allegations are supported by the record.

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F.Supp.2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence) ). An inmate's due process right to witnesses is only violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte*, 471 U.S. at 497, 105 S.Ct. 2192.

At the December 2014 hearing, defendant Vasile questioned sixteen witnesses, including inmates. When he excluded witnesses requested by plaintiff, defendant Vasile provided plaintiff an explanation for his determination. For example, he explained that he had excluded the testimony of one correctional officer upon learning that he had not been in the vicinity of the incident. (Dkt. No. 57-9, at 142). He also excluded two inmate witnesses who refused to testify. (*Id.*, at 140). Likewise, defendant Vasile denied plaintiff's request for testimony from an investigator with the Inspector General's office when he determined that this unidentified individual was not present during the incident. (*Id.*, at 138). This exclusion of testimony deemed irrelevant or unnecessary does not violate due process. *Kawalinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citing *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) ); *Chavis v.vonHagn*, No. 02-CV-119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009).

Plaintiff's argument that defendant Vasile should have reviewed security video leading up to the incident does not raise a due process issue. As he explained during the hearing, defendant Vasile concluded that there was no relevant video footage available. (Dkt. No. 57-9, at 16). Instead, defendant Vasile heard testimony from sixteen witnesses, including inmates and correctional officers. The constitutional standard for sufficiency of evidence in a prison disciplinary hearing

is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004) (citing *Superintendent v. Hill*, 472 U.S.445, 454 (1985) ). As the hearing officer, defendant Vasile was authorized to make an independent assessment of all the evidence. *See Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *11 n.25 (N.D.N.Y. Aug. 5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), (Rep.-Rec.), *adopted*, 2010 WL 3762016, at *1 (N.D.N.Y. Sept. 20, 2010).

Plaintiff's allegations that defendant Vasile coached witnesses are based entirely on his speculation that the hearing officer, who knew many of the correctional officer witnesses, met with them outside plaintiff's presence. Plaintiff's own subjective belief that defendant Vasile was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989); *Clyde v. Schoellkopf*, 714 F.Supp.2d 432, 437-38 (W.D.N.Y. 2010). It is well settled "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.*

**\*16** The record demonstrates that plaintiff was afforded advance written notice of the charges against him, and an opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. At the close of the hearing, defendant Vasile issued a written statement explaining that he relied upon the written misbehavior report, Auburn correctional officer testimony, and confidential testimony from mental health staff to make his determination. (Dkt. No. 57-9, at 147-49). Vasile also explained that he discounted testimony favorable to plaintiff that was offered by four inmates, because the statements conflicted with each other. (*Id.* at 148). Defendant Vasile's determination at the December 2014 hearing was thus supported by "some" evidence, and therefore satisfied due process. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Vasile be granted. Summary judgment on these claims should also be granted with respect to defendants Graham and Venettozzi, because their only involvement was to review plaintiff's appeals of a disciplinary hearing that this court has found comported with due process.

2017 WL 9511168

## VI. **Personal Involvement (Defendant Graham)**

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* See also *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk*, 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011) ). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Plaintiff has alleged that defendant Graham had knowledge of the improper pat-frisk and other practices by the correctional officers, because plaintiff had brought them to the Superintendent's attention during ILC meetings. (Compl. at 6, 9). If this court adopts the recommendations in this report, plaintiff's only surviving claims will all relate to the July 30, 2014 incidents. Even if defendant Graham had knowledge of improper pat-frisk practices at Auburn, that would not demonstrate personal involvement in the July 30, 2014 incidents. In addition, the records including in plaintiff's opposition to this motion demonstrate that defendant Graham announced staff measures to enforce relevant pat-frisk policies and had encouraged inmates to file grievances when correctional officers violated those policies. (Dkt. No. 63-3, at 36). Therefore, this court recommends that defendant Graham's motion for summary judgment be granted as to plaintiff's remaining claims, for lack of personal involvement.

**\*17 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 57) be **GRANTED AS TO DEFENDANTS GRAHAM, CHUTTEY, VASILE, CONNORS, CORNELL, STEINBERG, ZIRBEL, and VENETTOZZI**, and that all of plaintiff's claims against those defendants be **DISMISSED**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment be **DENIED AS TO DEFENDANTS GIFFORD** [9], **GILMORE, and MANNA** [10] with respect to the Eighth Amendment sexual assault and failure to intervene claims, plaintiff's Fourth Amendment unreasonable search claim, and plaintiff's First Amendment retaliation claim arising from the July 30, 2014 incidents**, and it is

[9]     Also listed as defendant "Greffin" on the docket.

[10]    Listed as defendant Mannon on the docket.

**RECOMMENDED**, that defendants' motion for summary judgment be **GRANTED** with respect to all other claims against defendants **GIFFORD, GILMORE, and MANNA**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health*

*& Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9511168

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 5957742

2017 WL 5957742
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael J. ALLEN, Plaintiff,

v.

H. GRAHAM, Super., Auburn Corr. Fac.; chuttey,
Capt., Auburn Corr. Fac.; Lt. Joseph Vasile, Hearing
Officer, Auburn Corr. Fac., f/k/a Lieutenant Vasite;
Theodore Connors, Sgt., Auburn Corr. Fac., f/k/a
Connor; Gifford, Corr. Officer, Auburn Corr. Fac., f/
k/a Greffin; Manna, Corr. Sgt., Auburn Corr. Fac.,
f/k/a Mannon; Cornell, Corr. Officer, Auburn Corr.
Fac.; Steinberg, Corr. Officer. Auburn Corr. Fac.;
Zirbel, Corr. Officer, Auburn Corr. Fac. f/k/a Zeke;
D. Venettozzi, Director of S.H.U.; and Gilmore,
Corr. Officer, Auburn Corr. Fac., Defendants.

9:16-CV-0047 (GTS/ATB)
|
Signed 12/01/2017

**Attorneys and Law Firms**

MICHAEL J. ALLEN, 91-A-4771, Attica Correctional
Facility, Box 149, Attica, New York 14011, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: AIMEE
M. PAQUETTE, ESQ., The Capitol, Albany, New York
12224, Attorney General of the State of New York, Counsel
for Defendants.

**DECISION and ORDER**

HON. GLENN T. SUDDABY, Chief United States District
Judge

 **\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Michael J. Allen ("Plaintiff") against
the eleven above-captioned employees of the New York
State Department of Corrections and Community Supervision
("Defendants"), are (1) United States Magistrate Judge
Andrew T. Baxter's Report-Recommendation recommending
that Defendants' motion for summary judgment be granted in
part and denied in part, and (2) Plaintiff's Objections to the
Report-Recommendation. (Dkt. Nos. 65, 67.) For the reasons

set for the below, the Report-Recommendation is accepted
and adopted in its entirety.

**I. RELEVANT BACKGROUND**

 **A. Magistrate Judge Baxter's Report-
Recommendation**
Generally, in his Report-Recommendation, Magistrate Judge
Baxter rendered the following six findings of fact and
conclusions of law: (1) to the extent that Defendants argue
that Plaintiff's claims should be dismissed for failure to
exhaust its available administrative, the Court should reject
that argument with regard to all of those claims (due to the
presence of admissible record evidence creating a genuine
dispute of material fact) except for Plaintiff's claims related
to the incident of November 24, 2014, and the disciplinary
hearing of December 9, 2014, which should be dismissed
for failure to exhaust; (2) both Plaintiff's Eighth Amendment
excessive force claim against Defendant Gifford and his First
Amendment retaliation claim against Defendants Gifford and
Chuttey arising from the pat-frisk and cell-search incident of
July 25, 2014, should be dismissed for failure to establish a
claim; (3) with regard to Plaintiff's claims rising from the pat-
frisk and strip-frisk of July 30, 2014, his Eighth Amendment
sexual assault claim, his Eighth Amendment failure-to-
intervene claim, his Fourth Amendment unreasonable-search
claim, and his First Amendment retaliation claim against
Defendants Gifford, Manna, and Gilmore, should remain
pending in this action, but his Eighth Amendment excessive
force against Defendant Gifford and his First Amendment
retaliation claim against Defendant Chuttey should be
dismissed for failure to establish a claim; (4) Plaintiff's Eighth
Amendment excessive force and sexual assault claims against
Defendant Gilmore and his Eighth Amendment failure-to-
intervene claim against Defendant Zirbel arising from the
pat-frisk of October 7, 2014, should be dismissed for failure
to establish a claim; (5) Plaintiff's Fourteenth Amendment
due process claims against Defendants Vasile, Graham, and
Venettozzi arising from Plaintiff's disciplinary hearing and
subsequent confinement in a Special Housing Unit ("SHU")
should be dismissed for failure to establish a claim; and
(6) Plaintiff's supervisory liability claims Defendant Graham
regarding the sole remaining claims in this action (i.e.,
those arising from the incidents of July 30, 2014) should be
dismissed for failure to establish his personal involvement in
those incidents. (Dkt. No. 65, at Parts IV-VI.)

2017 WL 5957742

### B. Plaintiff's Objections to the Report-Recommendation

**\*2** Generally, in his Objections, Plaintiff asserts four arguments. (Dkt. No. 67.)

First, with regard to Magistrate Judge Baxter's recommendation that the Court dismiss Plaintiff's claims related to the incident of November 24, 2014, and the disciplinary hearing of December 9, 2014, for failure to exhaust, Plaintiff argues that Magistrate Judge Baxter erred by failing to inquire into whether administrative remedies were available to Plaintiff with regard to those incidents, which they were not for the following reasons: (a) despite the fact that he prematurely sent Auburn Correctional Facility Inmate Grievance Program ("IGP") Supervisor Cheryl Parmiter an appeal regarding his grievance on December 24, 2014 (i.e., before Defendant Graham's response to his grievance was due on January 2, 2015), the Auburn Correctional Facility IGP sent him a letter indicating it had received (and was thus processing) his appeal on January 5, 2015, thus rendering the appeal timely; (b) despite the foregoing fact, the Auburn Correctional Facility IGP failed to forward the appeal to the Central Office Review Committee ("CORC"); (c) to make matters worse, due to his transfer to Upstate Correctional Facility on January 16, 2015, Plaintiff did not receive Defendant Graham's (belated) denial of January 7, 2015, until February 19, 2015; (d) although Plaintiff received a reply from Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP") Director Karen Bellamy on February 20, 2015, that reply was intentionally backdated as having been sent on January 8, 2015 (i.e., when Plaintiff was still at Auburn Correctional Facility), but addressed to Plaintiff at Upstate Correctional Facility (which he did not leave for until January 16, 2015), indicating it was fraudulent; (e) on February 23, 2015, Plaintiff timely appealed Defendant Graham's denial by sending a letter to IGP Supervisor Parmiter, as instructed by IGP Director Bellamy, a copy of which was received by Acting Commissioner Anthony Annucci, but never responded to by Ms. Parmiter; and (f) on April 25, 2015, Plaintiff again attempted to appeal Defendant Graham's denial by sending a letter to IGP Director Bellamy, who also refused to respond to the letter. (*Id.*)

Second, with regard to Magistrate Judge Baxter's recommendation that the Court dismiss Plaintiff's Fourteenth Amendment due process claim against Defendant Vasile, Plaintiff argues that Magistrate Judge Baxter erred by failing to address (a) the relevancy of the requested testimony

of an investigator in the Inspector General's Office at the hearing, despite the fact that he was not present during the incident in question, (b) the lack of assistance of Defendant Vasile (as the hearing officer) in identifying and locating the investigator, and (c) whether Defendant Vasile's denial of Plaintiff's request was alternatively supported by the fact that the testimony would have been unduly hazardous to institutional safety or correctional goals. (*Id.*)

Third, with regard to Magistrate Judge Baxter's recommendation that the Court dismiss Plaintiff's claims against Defendant Gilmore and Zirbel arising from the pat-frisk of October 7, 2014, Plaintiff argues that Magistrate Judge Baxter erred by (a) recommending the dismissal of Plaintiff's Eighth Amendment sexual assault claim against Defendant Gilmore in light of the sexual comments made by Gilmore (as well as Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Zirbel), and (b) failing address Plaintiff's First Amendment retaliation claim against Defendant Gilmore arising from the incident. (*Id.*)

**\*3** Fourth, and finally, with regard to Magistrate Judge Baxter's recommendation that the Court dismiss Plaintiff's supervisory liability claims Defendant Graham (i.e., arising from the incidents of July 30, 2014), Plaintiff argues that Magistrate Judge Baxter erred by failing to apply or even mention the "deliberate indifference" avenue of supervisory liability to Plaintiff's claims against Defendant Graham (especially his failure-to-intervene claim). (*Id.*)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 207 of 328

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 5957742

established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

1     *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2     *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P.

72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*4**  When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

3     *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at \*1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at \*3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at \*4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4     *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections

2017 WL 5957742

are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, the Court can find no clear error in the parts of the Report-Recommendation to which Plaintiff did not specifically object: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, those portions of the Report-Recommendation are accepted and adopted for the reasons stated therein.

With regard to those parts of the Report-Recommendation to which Plaintiff did specifically object, the Court can find no error in the parts of the Report-Recommendation challenged by any of Plaintiff's four objections.

Before discussing Plaintiff's four objections, the Court finds that a preliminary observation is appropriate: although various portions of the Report-Recommendation recommend that claims be dismissed "for failure to state a claim," and although a failure to state a claim under Fed. R. Civ. P. 12(b)(6) may support a grant of a motion for summary judgment under Fed. R. Civ. 56, the Court does not construe any of the above-referenced portions of the Report-Recommendation as being based a failure-to-state-a-claim analysis (which, of course, is restricted to the four corners of a complaint) but based on a failure-to-*establish*-a-claim analysis (i.e., an analysis of whether the non-movant has adduced admissible record evidence to avoid the entry of summary judgment against the non-movant). *See Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir. 1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."); *Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

**\*5** Turning to Plaintiff's four objections, with regard to the first objection (i.e., concerning exhaustion of administrative remedies), the Court finds that this objection relies on an incorrect assertion that the Auburn Correctional Facility Inmate Grievance Resolution Committee's ("IGRC") act of sending him on January 5, 2015, a copy of his appeal dated December 23, 2014, stamped "Received" as of December 29, 2014, in some way states or reasonably suggests (especially to an experienced grievant such as Plaintiff, who should know better) that the IGRC was therefore "processing" his premature appeal. (Dkt. No. 63, Attach. 3, at 119 [Plf.'s Ex. 23].) Indeed, Plaintiff's argument (which is bereft of a citation to admissible record evidence establishing that the IGRC sent him a cover letter dated anytime after January 2, 2015, when Defendant Graham's decision was due) hinges on the unsupported assertion that a premature administrative appeal must be held in abeyance pending the issuance of the decision from which the appeal is taken.

Nor does Plaintiff's first objection successfully rely on DOCCS IGP Director Karen Bellamy's purportedly "fraudulent" letter of January 8, 2015. For the sake of brevity, the Court will set aside the possibility that Director Bellamy knew on January 8 that Plaintiff would soon be transferred to Upstate Correctional Facility, or the possibility a prior version of the letter was addressed and mailed to Plaintiff at Auburn Correctional Facility and, after being returned to the IGP due to Plaintiff's transit to Upstate Correctional Facility, was revised so as to insert a new address but retain the original date. (Dkt. No. 63, Attach. 3, at 121 [Plf.'s Ex. 25].) The Court will also set aside the conspicuous omission from Plaintiff's affidavit that the copy of Defendant Graham's denial of January 7, 2015, which he received on February 20, 2015, was the *first* copy of that letter that he had seen between January 7, 2015, and February 20, 2015. (Dkt. No. 63, Attach. 1, at ¶ 47 [Plf.'s Affid.].) More important is the fact that, after Defendant Graham's denial was not received by Plaintiff on January 2, 2015, the deadline for Plaintiff's appeal immediately started running. 7 N.Y.C.R.R. § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC."); *cf.* 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.4 (N.D.N.Y. March 31, 2010) [collecting cases]. The fact that Plaintiff subsequently received an untimely decision does not somehow exempt him from this rule: he could have, and should have, filed an appeal after January 2, 2015.

Allen v. Graham, Not Reported in Fed. Supp. (2017)

2017 WL 5957742

With regard to Plaintiff's second objection (i.e., concerning Plaintiff's Fourteenth Amendment due process claim against Defendant Vasile), the Court finds that this objection consists simply of a reiteration of an argument previously asserted in his underlying opposition memorandum of law. (*Compare* Dkt. No. 67, at "Second Objection" [Plf.'s Obj.] *with* Dkt. No. 63, Attach. 1, at 19-20 [attaching pages "16" and "17" of Plf.'s Opp'n Memo. of Law].) As a result, the portion of the Report-Recommendation challenged by Plaintiff's second objection is entitled to only a clear-error review, which it easily survives.

In the alternative, this portion of the Report-Recommendation survives a *de novo* review. In particular, Plaintiff's second objection presumes that the investigator from the Inspector General's Office would have testified at Plaintiff's disciplinary hearing that, during his investigation, the investigator determined that Defendants Chuttey, Manna, Gilmore and/or Gifford actually took wrongful actions against Plaintiff, and that they did so because of one or more complaints made by Plaintiff to the Inspector General's Office. The record contains no admissible evidence that the investigator actually would have so testified. (*See, e.g.,* Dkt. No. 63, at ¶ 58 [Plf.'s Affid., assuming without explanation that investigator would have offered such testimony]; *accord,* Dkt. No. 57, Attach. 9, at 23-25, 138-39 [attaching pages "17," "18," "19," "132" and "133" of Discip. Hrg. Tr.].) The mere evidentiary value of the investigator's hearing testimony might have been to support the temporal proximity between Plaintiff's complaint to the Inspector General's Office and the adverse action purportedly taken against him. However, temporal proximity is just one factor in determining whether protected speech caused adverse action (for purposes of a retaliation claim). Moreover, Plaintiff had a full and fair opportunity at his disciplinary hearing to testify that he had complained to the Inspector General's Office before the adverse action taken against him; and, even if that testimony had been corroborated by that of an investigator from the Inspector General's Office, the hearing officer was free to find that the charges against Plaintiff were not caused by his complaint but by his own wrongful conduct. Finally, 16 other witnesses had already testified at the hearing. For all of these reasons, the Court has trouble finding that the denial by Defendant Vasile was not "logically related to preventing undue hazards to ... correctional goals," *see Ponte v. Real,* 471 U.S. 491, 497 (1986) (internal quotation marks omitted), specifically, preventing disciplinary hearings from exceeding reasonable limits through the introduction of testimony from "witnesses" whose possess little, if any, personal knowledge of relevant facts.

**\*6** With regard to Plaintiff's third objection (i.e., concerning Plaintiff's claims against Defendant Gilmore and Zirbel arising from the pat-frisk of October 7, 2014), the Court finds that this objection conveniently glosses over the fact that the alleged sexual assault by Defendant Gilmore occurred during an isolated pat-frisk as Plaintiff was moving between cell blocks (i.e., a time that pat-frisks generally serve a penological purpose). Moreover, the nature of the alleged sexual assault is distinguishable from the one that allegedly occurred during the strip search of Plaintiff on July 30, 2014. More specifically, at most, Plaintiff has established that, during the pat-frisk on October 7, 2007, Defendant Gilmore made a few callous and/or offensive remarks while caressing Plaintiff's chest and repeatedly groping Plaintiff's genitals and buttocks.[5] Numerous district courts in the Second Circuit have found similar such physical conduct to not rise to the level of an Eighth Amendment violation.[6] This has been the case even when defendants made inappropriate remarks during the pat-frisk.[7] Simply stated, while the conduct Plaintiff describes is unprofessional, it does not violate the Eighth Amendment.

[5]    (Dkt. No. 63, at ¶ 21, 23, 25 [Plf.'s Affid.]; Dkt. No. 63, Attach. 3, at 70 [Plf.'s Ex. 12, attaching grievance]; Dkt. No. 57, Attach. 4, at 45-49 [Plf.'s Depo. Tr.]; Dkt. No. 1, at ¶¶ 44-47 [Plf.'s Verified Compl.]; Dkt. No. 63, Attach. 3, at 68-69 [Plf.'s Ex. 11, attaching Rodney Bailey's Affidavit] ).

[6]    *See, e.g., Caldwell v. Crossett,* 09-CV-0576, 2010 WL 2346337, at *1, 3 (N.D.N.Y. May 24, 2010) (Treece, M.J.) (dismissing Eighth Amendment sexual-assault claim based incident in which defendant grabbed plaintiff's testicles during a pat-frisk, exchanged words with plaintiff, and then grabbed plaintiff's testicles again, before plaintiff attended a visit), *adopted by* 2010 WL 2346330 (N.D.N.Y. June 9, 2010) (Kahn, J.); *Garcia v. Watts,* 08-CV-7778, 2009 WL 2777085, at *1, 7 (S.D.N.Y. Sept. 1, 2009) (dismissing Eighth Amendment sexual-assault claim based on two episodes of sexual contact, including incident in which defendant grabbed plaintiff's buttocks during a pat-down before plaintiff entered a counselor's office); *Young v. Poff,* 04-CV-0320,

2017 WL 5957742

2006 WL 1455482, at *4 (W.D.N.Y. May 22, 2006) (dismissing Eighth Amendment sexual-assault claim based on incident in which defendant groped plaintiff during a pat-frisk); *Moncrieffe v. Witbeck*, 97-CV-0253, 2000 WL 949457, at *1, 6 (N.D.N.Y. June 29, 2000) (Mordue, J.) (dismissing Eighth Amendment sexual-assault claim based on incident in which defendant felt plaintiff's genitals and rear during a pat-frisk, and another incident in which a second defendant repeatedly felt plaintiff's genitals during a pat-frisk); *Williams v. Keane*, 95-CV-0379, 1997 WL 527677, at *1, 11 (S.D.N.Y. Aug. 25, 1997) (dismissing Eighth Amendment sexual-assault claim based on incident in which defendant fondled plaintiff's chest, reached inside plaintiff's pants, and felt plaintiff's testicles during a pat-frisk after a metal detector was set off as plaintiff left the mess hall); *Friedman v. Young*, 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (dismissing Eighth Amendment sexual-assault claim based on incident in which defendant fondled plaintiff's genitals and anus during a pat-down before plaintiff left his cell).

7    *See, e.g., Amaker v. Fischer*, 10-CV-0977, 2014 WL 8663246, at *3 (W.D.N.Y. Aug. 27, 2014) (recommending the dismissal of Eighth Amendment sexual-assault claim based on a pat-frisk in which defendant "rub[bed] plaintiff's penis, fondl[ed] and squeez[ed] plaintiff's buttocks and [ran] his index finger across plaintiff's anus," while making inappropriate remarks to plaintiff), *adopted by* 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015); *Sharpe v. Taylor*, 05-CV-1003, 2009 WL 1743987 at *10 (N.D.N.Y. March 26, 2009) (Suddaby, J.) (dismissing Eighth Amendment sexual-assault claim based on allegations that defendant sexually harassed plaintiff and fondled plaintiff's anus while plaintiff was being processed into the SHU); *Allan v. Woods*, 05-CV-1280, 2008 WL 724240, at *9 & n.8 (N.D.N.Y. March 17, 2008) (Mordue, C.J.) (rejecting Eighth Amendment sexual-assault claim based on incident in which defendant allegedly "fondled plaintiff during a pat frisk and complimented plaintiff's genitals"); *Davis v. Castleberry*, 364 F. Supp. 2d 319, 320-22 (W.D.N.Y. 2005) (dismissing Eighth Amendment sexual-assault claim based on incident in which defendant grabbed plaintiff's penis while making a callous remark during a pat-frisk before

plaintiff entered the exercise yard); *Montero v. Crusie*, 153 F. Supp. 2d 368, 373, 375 (S.D.N.Y. 2001) (dismissing Eighth Amendment sexual-assault claim based on several incidents in which defendant squeezed plaintiff's genitalia during pat-frisks, and offered plaintiff privileges in exchange for sexual favors).

 *7    Furthermore, the Court finds that, based on the evidence in the record, such a solitary pat-frisk (even when accompanied by callous and/or offensive remarks) does not even rise to the level of adverse action for purposes of a First Amendment retaliation claim. *See Amaker v. Fischer*, 10-CV-0977, 2014 WL 8663246, at *3 (W.D.N.Y. Aug. 27, 2014) (recommending the dismissal of First Amendment retaliation claim for lack of adverse action where defendant allegedly sexually assaulted plaintiff during a pat-frisk by "rubbing plaintiff's penis, fondling and squeezing plaintiff's buttocks and running his index finger across plaintiff's anus," while defendant criticized plaintiff for writing grievances), *adopted by* 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015).

Finally, with regard to Plaintiff's fourth objection (i.e., concerning the personal involvement of Defendant Graham), this objection presumably refers to the fifth avenue of supervisory liability, namely, the exhibition of deliberate indifference to the rights of an inmate by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Regardless of whether or not this is Plaintiff's intent, he is incorrect that Magistrate Judge Baxter failed to apply the correct standard. Plaintiff has failed to point to admissible record evidence establishing that Defendant Graham received information indicating the occurrence of the incidents of July 30, 2014, either before they occurred or as they were occurring. In any event, Defendant Graham announced staff measures to enforce relevant pat-frisk policies and encouraged inmates to file grievances when corrections officers violated those policies.

For all of these reasons, the Court adopts the Report-Recommendation in its entirety.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 65) is **ACCEPTED and ADOPTED in its entirety**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 57) is <u>**GRANTED in part**</u> and <u>**DENIED in part**</u>, such that all of Plaintiff's claims be <u>**DISMISSED**</u> **except** the following claims, which shall **SURVIVE** Defendants' motion:

(1) Plaintiff's Eighth Amendment sexual assault claim against **DEFENDANTS GIFFORD, GILMORE,** and **MANNA**, arising from the incidents of July 30, 2014;

(2) Plaintiff's Eighth Amendment failure-to-intervene claim against **DEFENDANTS GIFFORD, GILMORE,** and **MANNA**, arising from the incidents of July 30, 2014;

(3) Plaintiff's Fourth Amendment unreasonable search claim against **DEFENDANTS GIFFORD, GILMORE,** and **MANNA**, arising from the incidents of July 30, 2014;

(4) Plaintiff's First Amendment retaliation claim asserted against **DEFENDANTS GIFFORD, GILMORE,** and **MANNA**, arising from the incidents of July 30, 2014; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff for purposes of trial only; any appeal shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a pretrial conference with counsel will be scheduled in this action, at which time the Court will schedule a date for trial. The parties are directed to appear at that pretrial conference with settlement authority.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5957742

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)
|
Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**
N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-A-9212, Five
Points Correctional Facility, Caller Box 119, Romulus, NY
14541.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, 615 Erie Boulevard West,
Suite 102, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Ass't
Attorney General, Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Ronnie Cole has commenced this action
asserting civil rights claims arising out of his confinement in
the custody of the New York State Department of Corrections
and Community Supervision ("DOCCS") pursuant to 42
U.S.C. § 1983. Plaintiff's claims, which are multi-faceted,
arise out of events occurring at two separate DOCCS
facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For the
reasons set forth below, I recommend that defendants' motion
for summary judgment be granted in part, but otherwise
denied.

I. BACKGROUND [1]

[1]     The record herein contains few undisputed facts.
        Plaintiff and defendants disagree on many of
        the events that transpired and provide conflicting
        accounts of the circumstances surrounding the
        relevant incidents. In light of the procedural posture
        of the case, the following recitation is derived
        from the record now before the court, with all
        inferences drawn and ambiguities resolved in the
        plaintiff's party's favor. *Terry v. Ashcroft*, 336
        F.3d 128, 137 (2d Cir. 2003). To the extent
        that plaintiff's deposition testimony is at odds
        with his memorandum of law or submissions in
        his statement of facts, the court will follow the
        rule that "a party may not create an issue of
        fact by submitting an affidavit in opposition to
        a summary judgment motion that, by omission
        or addition, contradicts the affiant's previous
        deposition testimony." *Raskin v. Wyatt Co.*, 125
        F.3d 55, 63 (2d Cir. 1997).

Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff is
serving a sentence for robbery, possession of stolen property,
criminal possession of a weapon, and promoting prison
contraband. Dkt. No. 45-15 at 1. Plaintiff's claims, however,
arise out of his previous confinement at the Walsh Regional
Medical Unit ("Walsh") and the Upstate Correctional Facility
("Upstate"). [3] *Id.* at 2.

[2]     Citations to page numbers refer to the pagination
        generated by CM/ECF, not the page numbers
        generated by the parties.

[3]     Upstate is a maximum security prison comprised
        exclusively of special housing unit ("SHU") cells
        in which inmates are confined for twenty-three
        hours each day, primarily for disciplinary reasons.
        *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL
        31040370, at \*4 n.11 (S.D.N.Y. Sept. 12, 2002).

A. Use of Force Incidents at Walsh
On October 29, 2013, defendant Corrections Officer Anthony
M. Durante entered plaintiff's room to conduct a strip frisk
of plaintiff and a search of his area. Dkt. No. 29-1 at 15. [4]
At the time, plaintiff was in his pajamas and seated in his
wheelchair. Dkt. No. 45-3 at 27. Plaintiff maintains that

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 213 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

defendant Sergeant John A. Wagner followed Durante into plaintiff's room in the E-Wing and blocked the door. [5] *Id.* Plaintiff asserts that he attempted to comply with Durante's orders and began to unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

[4]     The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

[5]     Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

**\*2** Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff. [6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

[6]     That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

[7]     Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

B. <u>Facts Related to Plaintiff's Medical Treatment at Walsh</u> [8]

[8]     In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. <u>Dkt. No. 48</u>. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; <u>Dkt. No. 54-1 at 4</u>. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; <u>Dkt. No. 54-1 at 5</u>. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." <u>Dkt. No. 45</u>-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. <u>Dkt. No. 45</u>-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. <u>Dkt. No. 54-1 at 5</u>. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 214 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

[9]    The record does not indicate what prescribed medications were administered.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

C. Facts Related to Medical Treatment at Upstate
Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented

with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

1. Medications and Supplies
**\*4** From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 215 of 328

(an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. *Id.* Plaintiff refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

**\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges.[11] Dkt. No.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 216 of 328

45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] *Id.* at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

[11]  The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[12]  Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

**\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.,* and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 217 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[13]     All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit. [14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed to "fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639063, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 218 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).

14      Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross,* 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross,* the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross,* 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross,* the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno,* ___ F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams,* plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at \*2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/ or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross,* the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams,* 2016 WL 3729383, at \*5-6. Although not the centerpiece of its decision in *Williams,* the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at \*7.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 219 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

### 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that

he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

[15]    The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

**\*10**  Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 220 of 328

the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. See *Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff

did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

### C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis*. Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

[16]    This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 221 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh. [17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

[17]    The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 222 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an

excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

1. Legal Standard Governing
Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 223 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition

significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 224 of 328

treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

### 2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted,* 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

### a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids. [18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

[18] Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

*16 While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods*, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at *13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke*, No. 87-CV-7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct. 21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 225 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord,* 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord,* 2012 WL 3104884, at *7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue,* No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at *12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison,* 518 F.Supp.2d 560, 573

n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally*

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at *5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical

indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights. [19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

[19]     Defendants have not submitted any argument in response to this claim.

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings. [20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 227 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

20  Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post.*

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 79-80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin.*

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that

confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

21  In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 228 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

> [22]   Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

#### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman*, 808 F.2d at 953.

#### b. November 2013 Hearing

##### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin*, 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne*, 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 229 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing.[23] *Id.* Under these circumstances, the Second Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

[23] That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne*, in which it stated:

> It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU thirteen days after the six – month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

> *Horne*, 155 F. 3d at 31, n. 4.

**\*21** In this matter, as in *Horne*, the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne*, it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff

claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

#### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky*, 487 F.Supp.2d 349, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation.[24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing."

*Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

24    Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

**\*22** Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at \*13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

### bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at \*1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a

hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 CIV. 1926, 2008 WL 2986497, at \*5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling*, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at \*8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia Wolff*, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see Ponte*, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 231 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson,* 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle,* 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi,* 764 F.3d at 230 (quoting *al-Kidd,* 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky,* No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse,* 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly,

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 232 of 328
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

### H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the

protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at \*8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

#### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 233 of 328
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

25    The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' "[26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

26    In their motion, defendants do not dispute that plaintiff suffered adverse actions.

*26 Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante,

which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I.* For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 234 of 328

3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

 *27 I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I*. These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a

lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

[27]   The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

I. Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 235 of 328
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 236 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

#### 4. Defendants Danforth and Sharma

**\*29** Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

#### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters

from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

#### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 237 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

K. ADA Claims [28]

[28]    Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

**\*30**  Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See Pa. Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.,* 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.,* No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole*

*II*"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord,* 2009 WL 2601369, at \*8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State United Teachers,* 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire,* 715 F.3d 402, 414 (2d Cir. 2013); *McKithen v. Brown,* 481 F.3d 89, 105 (2d Cir. 2007), *cert denied,* 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 238 of 328

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

**\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is, whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought

and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also* Ierardi v. *Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.). [29]

[29]    To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have

continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33**    To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 240 of 328

by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante.[30]

[30]    As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

*34 Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

2016 WL 5394752

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5394752

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Lopez v. Whitmore, Not Reported in F.Supp.3d (2015)

2015 WL 4394604

KeyCite Yellow Flag - Negative Treatment

Distinguished by Morehouse v. York, N.D.N.Y., January 7, 2016

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/ATB).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

**\*1** Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, *see* Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. No. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

**\*2** Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–Recommendation for clear error. *See Glaspie v. N.Y.C. Dep't*

Lopez v. Whitmore, Not Reported in F.Supp.3d (2015)
Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 243 of 328
2015 WL 4394604

*of Corr.*, No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at *1, 2010 U.S. Dist. LEXIS 131629, at *2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato*, 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended

his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1]. Defendants did not submit a reply.

[1]    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

## *DISCUSSION*

### I. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party

satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin,* 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Exhaustion of Administrative Remedies

 *4  Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2]. (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for

these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

[2]    Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

### A. Legal Standards

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the

applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion.[4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

[3]    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[4]    See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

**B. Application**
Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.). Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating

Lopez v. Whitmore, Not Reported in F.Supp.3d (2015)

2015 WL 4394604

to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8).

[5]     Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8). If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

[6]     The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level,

including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, \*2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at \*8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010

WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

**\*7** During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies **before** filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. Neal v. Goord, 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in Neal, plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." Id., 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." Id.

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff has exhausted his administrative remedies as to the due process issue. See Chavis v. Goord, No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing

Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. See Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); see also Lebowohl v. Heart Attack Grill LLC, 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. See, e.g., Murray v. Fischer, No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at *2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); Emory v. New York, No. 11–CV–1774, 2013 WL 1881009, at *3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their

"voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at *4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

### B. Legal Standards
In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

### C. Application
Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

#### 1. Adequacy of Assistance at the Hearing
Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help

2015 WL 4394604

plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

### 2. Use of OMH Information

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,*

429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven

2015 WL 4394604

witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

[7]  The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at \*11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of

personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at \*4–7 (N.D.N.Y. Jan.25, 2011) (Rep't– Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt Nos. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the

district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/RFT), 2014 WL 1292281, *16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at *4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–CV–595, 2014 WL 3809129, *5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.' " *Id.,* 2014 WL 3809129, *6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394604

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3909694

2010 WL 3909694
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwayne JOY, Plaintiff,

v.

State of NEW YORK; Brian Fischer, individually and
as Commissioner of the New York State Department
of Correctional Services; County of Onondaga; and
Agents of the County of Onondaga, Defendants.

No. 5:09–CV–841 (FJS/ATB).
|
Sept. 30, 2010.

**West Codenotes**

**Recognized as Unconstitutional**

McKinney's Correction Law § 24

**Attorneys and Law Firms**

Carroll & Carroll Lawyers, P.C., Woodruff Lee Carroll, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Office of the New York State Attorney General, Kelly L. Munkwitz, AAG, of Counsel, Albany, NY, for Defendant New York State and Defendant Brian Fischer.

Onondaga County Law Department, Karen Ann Bleskoski, Esq., of Counsel, Syracuse, NY.

**MEMORANDUM–DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. INTRODUCTION**

**\*1** On July 23, 2009, Plaintiff filed this action under 42 U.S.C. § 1983 alleging violations of his civil rights resulting from the administrative imposition of post-release supervision and his subsequent arrest for violating the terms of his supervision. In addition to these federal Constitutional claims, Plaintiff alleges violations of section 8–B of the Court of Claims Act, false imprisonment, *prima facie* tort, and New York State constitutional violations.

Currently before the Court is Defendant New York State's and Defendant Brian Fischer's ("State Defendants") motion to dismiss and Defendant Onondaga County's and Defendants Agents of Onondaga County's ("County Defendants") motion for a more definite statement.

**II. BACKGROUND** [1]

[1]     Unless noted otherwise, the parties do not dispute the facts.

Plaintiff was convicted of Burglary and Grand Larceny, for which he served a determinate New York State prison term of seven years. At the conclusion of his sentence, Plaintiff was placed on post-release supervision. The New York State sentencing court did not impose a period of supervised release at the time of judgment. Pursuant to New York Penal Law § 70.45(1), the Department of Correctional Services ("DOCS") "administratively imposed" post-release supervision, which was mandated as part of every determinate sentence.

While on post-release supervision, Plaintiff violated the terms of his release *on* three separate occasions and was subsequently returned to custody. Plaintiff was released from custody after a successful New York State habeas corpus proceeding. Plaintiff now brings this civil rights action seeking recompense for the allegedly illegal imposition of post-release supervision and the periods of incarceration resulting from his violations of the terms of his illegally-imposed post-release supervision.

**III. DISCUSSION**

**A. State Defendants' motion to dismiss**

***1. Standard of review for a Rule 12(b)(6) motion***
A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the legal sufficiency of the non-movant's pleading, using as a backdrop a pleading standard which is particularly unexacting in its requirements. *See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering a pleading's legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend

to legal conclusions. *See Ashcroft v. Iqbal,* ––– U.S. ––––, –––– – ––––, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc. .,* 282 U.S. 147, 152–53 (2d Cir.2002)).

**\*2** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id* . (quoting [*Twombly,* 550 U.S.] at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929).

### *2. Plaintiffs claims against Defendant State of New York and Defendant Fischer in his official capacity*

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 90–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It is well-settled that states are not "persons" under section 1983 and, therefore, that statute does not abrogate a state's Eleventh Amendment immunity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Moreover, this immunity extends to state agencies and state officials sued in their official capacities. *See Mancuso v. N.Y. State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996) (quotation omitted).

In the present matter, although Plaintiff does not oppose the State Defendants' motion to dismiss Defendant New York State on Eleventh Amendment immunity grounds, he does oppose the dismissal of Defendant Fischer in his official

capacity. This argument has no merit because the case law is well-established that Plaintiff cannot sue Defendant Fischer in his official capacity.

Accordingly, the Court grants the State Defendants' motion to dismiss Defendant New York State and Defendant Fischer in his official capacity.

### *3. Plaintiffs section 1983 claims against Defendant Fischer in his individual capacity*

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed. 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619. 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

#### *a. Personal involvement*

**\*3** Personal involvement in the alleged constitutional violation is a prerequisite to finding a supervisory official liable under section 1983. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (quotations omitted). A supervisory official is personally involved in the violation of a plaintiff's constitutional rights if he (1) directly participates in the infraction; (2) fails to remedy the wrong after learning of the violation; (3) creates, or allows to continue, an unconstitutional practice; or (4) is grossly negligent in the management of subordinates who caused the violation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

Here, Plaintiff has not sufficiently alleged that Defendant Fischer was personally involved in the alleged violation of his rights. The only allegation in Plaintiff's complaint that

could be considered to allege Defendant Fischer's personal involvement states that

> [s]aid actions were a policy of the State of New York and the Department of Corrections and said agents of the State of New York:
>
> (a) after learning of the violation through a report or appeal[,] defendants failed to remedy the wrong:
>
> (b) they created the policy or custom under which the unconstitutional practices occurred, or allowed such policy [or] custom to continue;
>
> (c) defendants were grossly negligent in managing subordinates who caused the unlawful condition or event.
>
> (d) opposed the lawful release of the Defendant [sic] until they commenced a habeas corpus proceeding
>
> (e) acted recklessly and intentionally in disregard of the Plaintiffs Constitutional rights in allowing and pursuing the aforesaid as a policy of the State of New York.

*See* Complaint at ¶ 17.

These allegations, although clearly demonstrating Plaintiffs counsel's understanding of the prerequisites to establishing personal involvement, are insufficient to survive a motion to dismiss. In *Iqbal,* the plaintiff's complaint alleged that the defendants " 'knew of, condoned and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race and/or national origin and for no legitimate penological interest.' " *Iqbal,* 129 S.Ct. at 1951 (quotation omitted). Dismissing the complaint. the Supreme Court held that such bare allegations "amount to nothing more than a 'formulaic recitation of the elements[.]' " *Id.*

In the present matter, Plaintiff has not satisfactorily alleged that Defendant Fischer was personally involved in the conduct concerning the revocation of Plaintiff s post-release supervision. First, Plaintiff does not allege that Defendant Fischer knew that Plaintiff had been arrested for a post-release supervision violation. Second, there is no allegation that Defendant Fischer was involved in the parole revocation hearing that ultimately led to Plaintiff's incarceration. Although Plaintiff could argue that the parole board violated his constitutional rights by incarcerating him for violating conditions of his post-release supervision which a sentencing judge did not impose, parole boards are

absolutely immune from liability for their decisions. *See King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999) (quotation and other citation omitted). Third, Plaintiff does not allege that DOCS or DOCS personnel had the authority to release Plaintiff once he was incarcerated.

**\*4** As such, the Court grants the State Defendants' motion to dismiss the claims against Defendant Fischer for lack of personal involvement. [2]

2    Alternatively, the Court grants the State Defendants' motion to dismiss the claims against Defendant Fischer on the ground that he is entitled to qualified immunity.

On August 6, 1988, the New York state legislature enacted "Jenna's Law," a statute that ended indeterminate sentences for criminal defendants convicted of violent felonies. *See* N.Y. Penal Law § 70.02. Jenna's Law also imposed a schedule of mandatory terms of post-release parole supervision for certain violent felony offenders. *See id.* at § 70.45(1).

Due to the mandatory nature of the post-release supervision that Jenna's Law created. New York state courts often neglected to declare on the record what the defendant's post-release supervision obligations would be. In such cases, DOCS would administratively impose the postrelease supervision on the defendant so that his sentence would comply with the law. as was the case here.

For several years, New York state courts routinely upheld the administrative imposition of this mandatory post-release supervision. *See, e.g., Deal v. Goord,* 8 A.D.3d 769, 769–70, 778 N.Y.S.2d 319 (3d Dep't 2004) (citing *People v. Lindsey,* 302 A.D.2d 128, 129, 755 N.Y.S.2d 118 (3d Dep't 2003), *lv. denied* 100 N.Y.2d 583, 764 N.Y.S.2d 394, 796 N.E.2d 486 (2003)) (other citations omitted). On June 9, 2006, however, the Second Circuit held that DOCS' administrative imposition of post-release supervision violated the Constitution's Due Process Clause. *See Earley v. Murray,* 451 F.3d 71 (2d Cir.2006), *reh'g denied,* 462 F.3d 147 (2d Cir.2006), *cert. denied,* 551 U.S. 1159, 127 S.Ct. 3014, 168 L.Ed.2d 752 (2007).

After the Second Circuit's decision in *Earley,* the New York state courts continued to rule that

post-release supervision was an automatic part of a sentence subject to Jenna's Law and noted that, because DOCS was "only enforcing, not imposing, a part of petitioner's sentence which was automatically included by statute, they have not performed any judicial function. making prohibition an unavailable remedy." *Garner v. N.Y.S. Dep't of. Corr. Servs.,* 39 A.D.3d 1019, 1019 (3d Dep't 2007) (citation omitted); *see also People v. Thomas,* 35 A.D.3d 192, 193–94, 826 N.Y.S.2d 36 (1st Dep't 2006) (citation omitted). Even though *Earley* was decided on June 9, 2006. it was not until April 29, 2008, that the New York State Court of Appeals held that the New York Criminal Procedure Law did not permit the administrative imposition of post-release supervision. *See Garner v. N.Y.S. Dep't of Corr. Servs.,* 10 N.Y.3d 358, 363, 859 N.Y.S.2d 590, 889 N.E.2d 467 (2008); *People v. Sparber,* 10 N.Y.3d 457, 460–61, 859 N.Y.S.2d 582, 889 N.E.2d 459 (2008) (citation omitted). After the New York Court of Appeals' decisions, on June 30, 2008, the New York legislature passed N.Y. Corrections Law § 601–d, creating a procedure by which individuals who had post-release supervision administratively imposed could be re-sentenced so that their sentences would comply with Jenna's Law. This law, for the first time, imposed on Defendant Fischer and DOCS an obligation to, and provided a means by which DOCS could, petition the state sentencing court to correct an improperly imposed sentence to include post-release supervision. *See* N.Y. Corr. Law § 601–d.

Considering the state courts' confusion over the law, it cannot be said that, during the relevant time period, any right that Plaintiff may have had was a clearly established one of which a reasonable person would have known. Plaintiff was released from prison and placed on his administratively-imposed post-release supervision on June 28, 2006. Thereafter. Plaintiff was released from his term of incarceration from his post-release supervision violations on May 27, 2008. *See* Affidavit of Woodruff Lee Carroll dated November 2, 2008 ("Carroll Aff."), at ¶ 5. As the case law makes clear, the implications of *Earley* and the impact that it would have

on prisoners in Plaintiff's position was a source of great confusion. As such, Defendant Fischer is entitled to qualified immunity. *See Rodriguez v. Fischer,* No. 08–CV–4662. 2010 WL 438421, *6 (E.D.N.Y. Feb.3, 2010) (applying qualified immunity defense to DOCS officers who incarcerated the plaintiff for violations of an administratively-imposed post-release supervision because New York courts continued to uphold the practice even after *Earley* was decided, allowing the defendants to rely on a presumptively-valid state statute (citations omitted)); *see also Ruffins v. Dep't of Corr. Servs.,* 701 F.Supp.2d 385, 408 (E.D.N.Y.2010) (same).

### 4. Plaintiffs state-law claims against Defendant Fischer

In addition to Plaintiffs federal claims, he asserts several New York state-law claims, including (1) unjust conviction and imprisonment pursuant to section 8–b of the New York State Court of Claims Act; (2) false imprisonment; (3) *prima facie* tort; and (4) New York State constitutional violations. *See* Complaint at 3–6. Defendant Fischer claims that section 24 of the New York State Correction Law bars these state-law claims.

Section 24 of the New York State Correction Law provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Corr. Law § 24.

Essentially, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in state courts. *See Cepeda v. Coughlin,* 128 A.D.2d 995, 997, 513 N.Y.S.2d 528 (3d Dep't 1987). "In applying pendent jurisdiction, federal courts are bound to apply state

Joy v. New York, Not Reported in F.Supp.2d (2010)

2010 WL 3909694

substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiffs right to bring a state claim in state court, a federal court exercising pendant jurisdiction ... must follow the state'sjurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* (citation omitted).

In 2009, the United States Supreme Court held that section 24, to the extent that it relegates to the New York State Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause and is, therefore, unconstitutional. *See Haywood v. Drown,* ––– U.S. ––––, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear section 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy." *Id.* at 2117 (footnote omitted).

Although the *Haywood* decision found section 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under section 1983—a federal statute. *See id.* at 2117–18. After *Haywood,* the courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state-law claims against DOCS officials. *See, e.g., Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WI. 502762, *18 (N.D.N.Y. Feb. 8, 2010) (quoting *May v. Donneli,* 9:06–cv–437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.); *see also Tafari v. McCarthy,* No. 9:07–CV–654, –––F.Supp.2d––––, 2010 WL 2044705, *51 (N.D.N.Y. May 24, 2010) (citations omitted).

 **\*5** Since Plaintiffs allegations against Defendant Fischer clearly fall within the scope of his duties as Commissioner of DOCS, the Court finds that it does not have jurisdiction to hear these pendent state-law claims and, therefore, grants the State Defendants motion to dismiss these claims. *See May,* 2009 WL 3049613, *5 (citations omitted).

## B. County Defendants' motion for a more definite statement

Pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, the County Defendants move for a more definite statement of the complaint. *See* Dkt. No. 10–1 at 1. First, the County Defendants claim that it is impossible to determine whether any or all of Plaintiff's claims are time barred because Plaintiff fails to allege any dates on which the alleged

violations occurred. *See id.* at 2. Second, they assert that they cannot determine who or what agency allegedly placed Plaintiff on post-release supervision, the term of Plaintiff's sentence upon which he bases his allegations of illegal post-release supervision, and which agency allegedly imprisoned him after he violated the terms of his post-release supervision. *See id* The County Defendants assert that it is impossible to tell what role, if any, they played in the alleged violations. *See id.* In response, Plaintiff does not appear to oppose the County Defendants' motion but asserts that the documents/ information are in Defendants' control and that, therefore, he cannot "particularize accurately without them." *See* Dkt. No. 13 at 1.

It is unclear how Plaintiff can hold the County Defendants liable for any of the alleged constitutional and statutory violations. The only allegation in the complaint that directly relates to the County Defendants states that "[s]aid Onondaga County repeated[ly] placed the plaintiff on post sentence supervision and continued to enforce said post sentence supervision long alter they knew or ought to have known that they were prohibited from doing so under federal law." *See* Complaint at ¶ 18.

Section 70.45 of the New York State Penal Law states that the "board of parole shall establish and impose conditions of post-release supervision" for persons sentenced to determinate prison sentences. *See* N.Y. Penal Law § 70.45(3). Moreover, section 500–c of the New York State Correction Law provides that the county officer responsible for administering the county's correctional facilities "shall not be held personally liable for receiving or detaining any person under and in accordance with a commitment issued by a judicial officer; nor shall he. without lawful authority, let any such person out of jail." N.Y. Corr. Law § 500–c(4). Further, the law states that, "[n]otwithstanding any other provision of law, in the county of Onondaga all of the provisions of this section shall equally apply in any case where the sheriff is holding a person under arrest, for arraignment, prior to commitment, as if such person had been judicially committed to the custody of the sheriff and such person may be held in the Onondaga county jail." *Id.* § at 501–c(6).

 **\*6** First, the State, not the County, is responsible for the imposition and enforcement of postrelease supervision. Further, to the extent that Plaintiff may allege that the County Defendants violated his rights by incarcerating him pursuant to a State Parole detainer, section 501–c renders the County immune from any liability. Moreover, Plaintiffs

2010 WL 3909694

counsel has admitted that he believes that the County is not a proper party to this action. *See* Reply Affidavit of Karen A. Bleskoski sworn to November 4, 2009 ("Bleskoski Aff."), at Exhibit "D." Finally, as in *Iqbal*. Plaintiffs complaint against the County Defendants is nothing more than a mere "formulaic recitation" of the required elements. *See Iqbal,* 129 S.Ct. at 1951. Plaintiff provides nothing more than mere conclusory allegations and, significantly, omits what county agency or individual was involved in his alleged constitutional violations, when they allegedly violated his rights, and how it was that the County Defendants placed him on post-release supervision when such supervision is statutorily delegated to the State.

Accordingly, the Court denies the County Defendants' motion for a more definite statement as moot and, *sua sponte,* dismisses the action against the County Defendants as merit less.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the State Defendants' motion to dismiss is **GRANTED;** and the Court further

**ORDERS** that all claims against the County Defendants are **DISMISSED** *sua sponte;* and the Court further

**ORDERS** that the County Defendants' motion for a more definite statement is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3909694

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2789615
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derek A. DEAL, Plaintiff,

v.

Todd YURACK and Paul Almstead,[1] Defendants.

[1]    Defendant Paul Almstead, who is alleged to
       have been a corrections lieutenant at the
       Oneida Correctional Facility during the times
       relevant to plaintiff's claims, was mistakenly
       named by the plaintiff in his complaint as
       "Paul Armstead." Because it now appears that
       the proper spelling of this defendant's name is
       Almstead, I request that the clerk of the court
       revise his records accordingly.

No. 9:04-CV-0072 (LEK/DEP).
|
Sept. 24, 2007.

**Attorneys and Law Firms**

Derek A. Deal, pro se.

Hon. Andrew Cuomo, Attorney General of the State of New
York, Jaime Irene Roth, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-
Recommendation filed on August 31, 2007 by the Honorable
David E. Peebles, United States Magistrate Judge, pursuant
to 28 U.S .C. § 636(b) and L.R. 72.3 of the Northern District
of New York. Report-Rec. (Dkt. No. 79). After ten days from
the service thereof, the Clerk has sent the entire file to the
undersigned, including the objections by Plaintiff Derek Deal
and Defendants Todd Yurack and Paul Almstead, which were
each filed on September 17, 2007. Plntf's Objections (Dkt.
No. 83); Defts' Objections (Dkt. No. 84).

It is the duty of this Court to "make a de novo determination
of those portions of the report or specified proposed findings

or recommendations to which objection is made." 28 U.S.C.
§ 636(b). "A [district] judge ... may accept, reject, or modify,
in whole or in part, the findings or recommendations made
by the magistrate judge." *Id.* This Court has considered the
objections and has undertaken a de novo review of the record
and has determined that the Report-Recommendation should
be approved for the reasons stated therein.

Accordingly, it is hereby
**ORDERED,** that the Report-Recommendation (Dkt. No. 79)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Plaintiff's Motion for leave to amend his
Complaint (Dkt. No. 71) is **DENIED;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment
(Dkt. No. 69) is **GRANTED IN PART,** in that Plaintiff's
procedural due process claim and assault and battery causes
of action, as well as the portion of Plaintiff's retaliation
claim related to the January 18, 2003 misbehavior report
be **DISMISSED,** but **DENIED IN PART,** in that Plaintiff's
excessive force claims against Defendant and retaliation
cause of action against Defendant Almstead, related to the
issuance of the February 2 and February 3, 2003 misbehavior
reports remain pending for trial; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Derek Deal, a New York State prison inmate who
is proceeding *pro se* and *in forma pauperis,* has commenced
this action pursuant to 42 U.S.C. § 1983 against certain
corrections workers assigned to the prison facility in which
he was located at the relevant times, alleging deprivation
of his civil rights. In his complaint, plaintiff maintains
that he was assaulted by one of the named defendants
and verbally harassed by others, and that in retaliation for
having complained regarding the matter he was subjected
to further harassment and verbal abuse and endured other
forms of recrimination, leading to two disciplinary hearings
and sixty days of disciplinary keeplock confinement. Plaintiff

2007 WL 2789615

further alleges that during the course of those disciplinary proceedings he was deprived of procedural due process.

**\*2** Currently pending before the court are cross-motions filed by the parties. The motion process was initiated by the defendants with the filing of a motion seeking the entry of summary judgment dismissing plaintiff's claims on a number of bases. Plaintiff has opposed that motion and cross-moved for leave to file an amended complaint in which, *inter alia,* he seeks to add claims against seven newly-named defendants. For the reasons set forth below, I recommend that defendants' motion be granted, in part, and that plaintiff's procedural due process claims, state law causes of action, and portions of his retaliation cause of action be dismissed, but that their motion otherwise be denied. Turning to plaintiff's motion, I recommend that his application for leave to amend be denied, principally in light of the current status of the action and the amount of time which has elapsed since the commencement of suit.

I. *BACKGROUND* [2]

[2]     In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at \*2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

At the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). [3] The events giving rise to plaintiff's claims have, as their genesis, an incident which occurred on January 17, 2003. On that date, plaintiff was summoned to the officers' station by defendant Todd Yurack, a corrections officer at the facility. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 1. Following an initial conversation, during which defendant Yurack asked the plaintiff what was wrong with his face, Yurack ordered Deal to accompany him outside onto a small porch area enclosed with steel mesh bars; once there, Yurack grabbed the plaintiff around the neck, shoving him into a brick wall. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 2. As Yurack continued to squeeze the plaintiff's neck, making it difficult for him to

breathe, he pulled Deal to an adjacent brick wall, causing him to scrape his hand and elbow. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 2. During the course of the incident Yurack stated to the plaintiff "don't f__k with me while you are on this dorm[,]" adding "I could put you in the box anytime I want to." Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 3.

[3]     While plaintiff was released on parole from DOCS custody in March of 2004, after the events giving rise to his claim transpired, he was re-arrested in May of 2005 and is once again a DOCS inmate. Roth Aff. (Dkt. No. 69-14) Exh. A at pp. 86-87.

Following the incident, plaintiff was taken to the prison infirmary where he was examined, and photographs of his injuries were taken. Amended Complaint (Dkt. No. 5) ¶ 8; Plaintiff's Aff. (Dkt. No. 76) ¶ 6. A report of that examination, which was conducted by Registered Nurse Lori Cook, reveals that plaintiff's injuries included a skin abrasion on the right elbow, a red mark on the right side of the neck, scrapes on the fingers, and scratches on the shoulder, upper arm and wrist. [4] Cook Aff. (Dkt. No. 69-13) ¶ 6; *see also* Roth Aff. (Dkt. No. 69-14) Exh. A at pp. 49-50. No bleeding was reported, and Nurse Cook noted that plaintiff refused medical treatment for his injuries, other than to accept Bacitracin. *Id.*

[4]     In his complaint, plaintiff describes the injuries resulting from the incident as "superficial." Amended Complaint (Dkt. No. 5) ¶ 8(b).

**\*3** On January 22, 2003 plaintiff lodged a grievance, complaining of defendant Yurack's assault. Following an investigation, which did not yield evidence supporting plaintiff's version of the events, that grievance was denied by the acting superintendent at Oneida. [5] Yurack Aff. (Dkt. No. 69-11) ¶¶ 4-5, Exh. A.

[5]     The record does not disclose whether the plaintiff pursued an appeal of that determination to the DOCS Central Office Review Committee ("CORC").

During the relevant time period, plaintiff was issued three separate misbehavior reports for violating prison rules. The first of those, issued on January 18, 2003, accused Deal of smoking in the bathroom. Amended Complaint (Dkt. No. 5) ¶ 10. Two days later plaintiff admitted the violation, apparently during a tier hearing conducted by Corrections Lieutenant

Deal v. Yurack, Not Reported in F.Supp.2d (2007)

2007 WL 2789615

Santos.[6] *Id.* Plaintiff's disciplinary record lists the sanction associated with that guilty plea as "counsel." *See* Roth Aff. (Dkt. No. 69-14) Exh. C; *see also* Amended Complaint (Dkt. No. 5) ¶ 10(b).

[6]    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998). The record is unclear as to which of these levels applies to the January 20, 2003 hearing.

On January 28, 2003, plaintiff was instructed to go to the tier office, where he was questioned by Corrections Lieutenant Paul Almstead regarding the alleged assault by Officer Yurack. Amended Complaint (Dkt. No. 5) ¶ 11; Plaintiff's Aff. (Dkt. No. 76) ¶ 10. During that meeting, after inquiring about the incident, defendant Almstead attempted to convince the plaintiff to withdraw his grievance regarding the assault. Plaintiff's Aff. (Dkt. No. 76) ¶ 10.

Plaintiff was again taken to the tier office on the following day at which time, at the directive of defendant Almstead, he was locked in a cell next to the tier hearing room. Amended Complaint (Dkt. No. 5) ¶ 12; Plaintiff's Aff. (Dkt. No. 76) ¶ 11. Plaintiff was later removed from the cell and brought before defendant Almstead, who verbally harassed and threatened Deal, stating in substance that in light of the plaintiff's actions Almstead was going to instruct corrections officers at the facility to issue misbehavior reports to him. Amended Complaint (Dkt. No. 5) ¶ 12; Plaintiff's Aff. (Dkt. No. 76) ¶ 11.

On February 2, 2003 plaintiff was issued a second misbehavior report, also for smoking in an unauthorized area, this time by Corrections Officer Velardi. Amended Complaint (Dkt. No. 5) ¶ 13; Plaintiff's Aff. (Dkt. No. 76) ¶ 13. Plaintiff attributes the issuance of that misbehavior report to retaliatory motives, based upon his proclaimed innocence of the charge and defendant Almstead's earlier statement regarding his

instruction to corrections officers to issue misbehavior reports to the plaintiff. Plaintiff's Aff. (Dkt. No. 76) ¶ 14. A tier hearing was subsequently conducted regarding the incident on February 3, 2003, with defendant Almstead presiding as the hearing officer. Amended Complaint (Dkt. No. 5) ¶ 14; Plaintiff's Aff. (Dkt. No. 76) ¶¶ 16-17. Plaintiff maintains that at that hearing he was not properly advised of his rights, and was denied the opportunity to call witnesses on his behalf, and that the hearing officer was biased against him. Amended Complaint (Dkt. No. 5) ¶ 14; Plaintiff's Aff. (Dkt. No. 76) ¶¶ 16-17. At the close of the hearing plaintiff was found guilty of the violation charged and a penalty of thirty days of keeplock confinement, with a corresponding loss of recreation, package, commissary, and telephone privileges, was ordered, the hearing officer noting that "past dispositions of a less severe nature have been unsuccessful in convincing [the plaintiff] not to smoke in undesignated areas." Almstead Aff. (Dkt. No. 69-9) Exh. A at 6. Hearing Officer Almstead's determination was upheld on appeal to the facility superintendent.[7] *See* Amended Complaint (Dkt. No. 5) Exh. C; *see also* Roth Aff. (Dkt. No. 76) Exh. C.

[7]    Plaintiff alleges that in addition to these sanctions imposed during this and a subsequent disciplinary hearing resulting in further SHU disciplinary confinement, he also forfeited good time credits.

**\*4** During the course of the February 2, 2003 hearing, plaintiff challenged defendant Almstead's impartiality and interrupted the proceedings in an effort to voice various objections. Almstead Aff. (Dkt. No. 69-9) ¶ 5 and Exh. A at p. 6; *see also* Amended Complaint (Dkt. No. 5) ¶¶ 15-16. After warning Deal that if he continued to engage in that conduct he would be issued a misbehavior report for refusing a direct order, without success, defendant Almstead instructed Corrections Officer Hodge to prepare and issue a misbehavior report setting forth a new charge based upon the discrepancies. Almstead Aff. (Dkt. No. 76) ¶ 5 and Exh. A.

A third tier hearing was conducted on February 6, 2003, with Corrections Lieutenant Santos presiding, to address this latest disciplinary charge, resulting in a finding of guilt and a penalty which included an additional thirty days of keeplock confinement, with a corresponding loss of privileges. Roth Aff. (Dkt. No. 69-14) Exh. C. That determination was upheld on appeal to the office of the facility's superintendent. *See id.;* Deal Aff. (Dkt. No. 76) ¶ 18. As a result of the latter two disciplinary proceedings, plaintiff was placed in the

Deal v. Yurack, Not Reported in F.Supp.2d (2007)

2007 WL 2789615

special housing unit ("SHU") at Oneida for a period of sixty days, and additionally was removed from the Alcohol and Substance Abuse Treatment ("A.S.A.T.") program.[8] Amended Complaint (Dkt. No. 5) ¶ 16; Deal Aff. (Dkt. No. 76) ¶ 18.

[8]　In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (citing 7 NYCRR pts. 253, 254, and 301). The conditions typically experienced by inmates confined in an SHU include two showers per week; one hour of outdoor exercise per day; unlimited legal visits; one non-legal visit per week; access to counselors; access to sick call; cell study programs; and access to library books. *Husbands v. McClellan,* 990 F.Supp. 214, 218 (W.D.N.Y.1998) (citing 7 NYCRR pt. 304).

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 21, 2004. Dkt. No. 1. Following a finding by the court that plaintiff's initial complaint failed to satisfy the applicable pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, *see* Dkt. No. 4, plaintiff submitted an amended complaint, filed on March 10, 2004. Dkt. No. 5. In his complaint, as amended, plaintiff has asserted claims under the First, Eighth and Fourteenth Amendments to the United States Constitution, alleging the use of excessive force, retaliation, and procedural due process violations stemming from the disciplinary hearings conducted, and additionally interposing pendent state law tort claims of assault and battery. Named as defendants in plaintiff's complaint, *inter alia,* are Corrections Officer Yurack and Corrections Lieutenant Almstead.[9]

[9]　Plaintiff's amended complaint also named Corrections Sergeant Beverly as a defendant. Plaintiff's claims against that defendant, however, were subsequently dismissed as a result of a report and recommendation issued by me on December 6, 2004, addressing a motion on defendant Beverly's behalf seeking dismissal of plaintiff's complaint for failure to state a cause of action upon which relief may be granted, Dkt. No. 21, and a subsequent order issued by District Judge Lawrence E. Kahn on April 28, 2005 accepting that recommendation in its entirety. Dkt. No. 26.

On November 30, 2006, following the completion of pretrial discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 69. In their motion, defendants argue that 1) plaintiff's Eighth Amendment excessive force claims are legally deficient in that the assault allegedly perpetrated by defendant Yurack did not rise to a level of constitutional significance, either objectively or subjectively; 2) plaintiff's pendent tort law claims are barred by N.Y. Correction Law § 24; 3) plaintiff has failed to allege a cognizable retaliation claim, in that he cannot establish either adverse action taken by defendants or a nexus between the adverse action alleged and his protected activity; 4) plaintiff's procedural due process claims are deficient, both because he did not experience a liberty deprivation sufficient to trigger the protections of the Fourteenth Amendment and because, in any event, he received the full panoply of due process rights guaranteed; 5) plaintiff's procedural due process claims are barred under *Heck and Balisok;*[10] and 6) in any event defendants are entitled to qualified immunity. Plaintiff has responded in opposition to the motion by affidavit, memorandum and supporting documents all filed on March 22, 2007. Dkt. No. 76.

[10]　This portion of defendants' motion is predicated upon the Supreme Court's decisions in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997).

*5 In addition to opposing defendants' summary judgment motion, by motion filed on November 30, 2006 plaintiff has requested permission to file a second amended complaint adding various claims, including against additional defendants not named in his original and first amended complaints. Dkt. No. 71. By letter brief filed on December 18, 2006, defendants have opposed that motion. Dkt. No. 73.

The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[11] *See also* Fed.R.Civ.P. 72(b).

[11]　As a non-dispositive matter, plaintiff's motion for leave to amend would ordinarily fall within my jurisdiction pursuant to the reference made by the court to me as the assigned magistrate judge. *See Rubin v. Valicenti Advisory Servs., Inc.,* 471 F.Supp.2d 329, 333 (W.D.N.Y.2007). In light of the

2007 WL 2789615

fact that I am issuing a report and recommendation addressing defendants' summary judgment motion, which is dispositive and thus exceeds my non-consensual jurisdiction, however, I have chosen to cast my determination regarding plaintiff's motion for leave to amend in the form of a recommendation to the district judge.

### III. *DISCUSSION*

#### A. *Motion To Amend*

Plaintiff's motion implicates not only Rules 15(a) and 21 of the Federal Rules of Civil Procedure, both of which, as will be seen, prescribe a fairly generous standard to be applied in connection with such motions, but additionally-since the established deadline for the filing of such motions has long since expired under the applicable scheduling order entered in the case-Rule 16 of the Federal Rules of Civil Procedure, which is significantly more exacting in its requirements.

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted based upon the procedural circumstances of the case-something which is not applicable in this action-a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be freely granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); *Elma R.T. v. Landesmann Int'l Mktg. Corp.,* No. 98 CIV 662, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that such leave should be granted freely and amendment is typically permitted, where a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then allowing amendment would be an act of futility which should not be countenanced. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances which may entitle the pleader to relief, futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A .,*

875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

**\*6** Generally speaking, while any delay in making a motion to amend pleadings must be weighed as a factor in deciding whether or not to grant the motion, delay in and of itself will not ordinarily suffice as a reason to deny the motion. *Phaneuf v. Tenneco, Inc.,* 938 F .Supp. 112, 115 (N.D.N.Y.1996) (Hurd, J.). A court must weigh any good cause shown for the delay in moving against any indication of dilatoriness of the moving party which results in last minute surprise and the inability of opposing party to address the newly added material. *Id.* When considering the issue of prejudice to the nonmoving party, a court may properly find that the longer the period of unexplained delay, the less that should be required of the nonmoving party in terms of a showing of prejudice. *Id.*

Plaintiff's motion for leave to add new defendants also implicates Rule 21 of the Federal Rules of Civil Procedure. That rule authorizes a court, "on motion of any party or of its own initiative at any stage of the action and on such terms as are just ..." to order the addition of parties to an action. Fed.R.Civ.P. 21; *see City of Syracuse v. Onondaga County,* 464 F.3d 297, 308 (2d Cir.2006). The provision also permits joinder "of a person, who through inadvertence, mistake, or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *Oneida Indian Nation of New York State v. County of Oneida,* 199 F.R.D. 61, 72 (N.D.N.Y.2000) (McCurn, S.J.) (quoting, *inter alia, United States v. Hansel,* 999 F.Supp. 694, 697 (N.D.N.Y.1998)). A decision as to whether to permit joinder under Rule 21 is informed by the same general principles as those which govern motions for leave to amend under Rule 15(a). *See, e.g., id.* at 72-73 (citing *Expoconsul Int'l, Inc. v. A/E Sys., Inc.,* 145 F.R.D. 336, 337 (S.D.N.Y.1993)).

Overlaid against the standard typically governing motions for leave to amend and to join parties in this instance is Rule 16(b) of the Federal Rules of Civil Procedure. *See Kassner v. 2nd Ave. Delicatessen, Inc.,* --- F.3d ----, 2007 WL 2119769, at *8-10 (2d Cir. July 24, 2007). A scheduling order was issued in this case on November 23, 2004 establishing, *inter alia,* a deadline of January 30, 2005 for making non-dispositive motions, specifically defined within that order to include motions to join parties or to amend pleadings. *See* Dkt. No. 20 at 1-2. A party may obtain relief from such a scheduling order deadline only upon a showing of good cause. Fed.R.Civ.P. 16(b); *see Kassner,* 2007 WL 2119769, at *8. Despite this

Deal v. Yurack, Not Reported in F.Supp.2d (2007)

2007 WL 2789615

requirement, plaintiff has offered nothing in support of his motion, which was filed more than a year and a half after the passage of the controlling deadline, which even approaches a level sufficient to establish such good cause. Indeed, in his papers the plaintiff evinces his longstanding awareness of the identities of the proposed new defendants and the facts giving rise to his allegations against them, yet despite this offers virtually no justification for the delay in seeking leave to amend.

*7 Even if the court were to overlook this fatal deficiency under Rule 16 and apply the more liberal standard associated with Rules 15(a) and 21, I would nonetheless recommend against the granting of the application. Plaintiff's motion seeks leave to assert claims against seven additional defendants not previously sued in the case. While defendants have argued, with at least facial plausibility, the futility of the claims sought to be added against those seven individuals, the far greater concern is one of prejudice and undue delay. Discovery in this case, having been extended on several occasions at plaintiff's request, is now virtually completed and the case is well into the dispositive motion phase. This action has been pending for three and a half years. Under these circumstances it would be both manifestly unfair to the defendants, and an imprudent exercise of this court's discretion, to prolong the matter and overlook the undue and unexplained delay in plaintiff seeking leave to amend at this late stage. See, e.g., MacDraw, Inc. v. CIT Group Equip. Financing, Inc., 157 F.3d 956, 962 (2d Cir.1998) (affirming district judge's denial of leave to amend complaint where plaintiff inexplicably delayed the motion until the action was pending for several years and discovery was closed, and defendants would be unduly prejudiced); Sly Magazine, LLC v. Weider Publications L.L.C., 241 F.R.D. 527, 532-33 (S.D.N.Y.2007) (denying leave to file amended complaint to add twelve new parties where plaintiff provided no explanation for delay, discovery had closed, dispositive motion practice was imminent, and undue prejudice would thus result to the defendant). Accordingly, I recommend that plaintiff's motion for leave to amend be denied.

B. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552

(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999)* (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

*8 When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Excessive Force Claim*

The centerpiece of plaintiff's complaint is his claim against defendant Yurack, alleging his use of excessive force which, in turn, set in motion a series of ensuing events allegedly

2007 WL 2789615

resulting in further constitutional violations. Arguing that the use of force alleged by plaintiff was *de minimis,* and Deal's injuries suffered were legally insignificant, defendants assert their entitlement to judgment as a matter of law dismissing the excessive force claim. [12]

[12]  Plaintiff also asserts that he was verbally harassed by both defendants Yurack and Almstead, as well as other prison officials. "It is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation." *Zimmerman v. Seyfert,* No. 03-CV-1389, 2007 WL 2080517, at *28 (N.D.N.Y. July 19, 2007) (McAvoy, J.) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) and *Ramerizz v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably

perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

**\*9** Seizing upon acknowledgment by the plaintiff that the injuries suffered by him at the hands of defendant Yurack were "minor" and "superficial", defendants allege that they are entitled to dismissal of plaintiff's excessive force claim as a matter of law, based upon Deal's failure to satisfy the objective element of the controlling test. The record now before the court, however, reveals that at least according to the plaintiff, he was assaulted by defendant Yurack, without provocation, on the date in question. The record also substantiates that plaintiff experienced some sort of incident on that date, causing him injuries which required medical attention. *See* Dkt. No. 68 (filed under seal); *see generally* Cook Aff. (Dkt. No. 69-13). The fact that Deal suffered injuries requiring medical attention distinguishes this case from others in which the lack of injury has justified the entry of summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002). Under these circumstances it would be inappropriate to find, objectively, as a matter of law that plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

Turning to the subjective element, as defendants argue, to prevail, plaintiff must establish defendant Yurack acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline

Deal v. Yurack, Not Reported in F.Supp.2d (2007)

2007 WL 2789615

or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

**\*10** *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [13] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

[13]   It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

In this instance defendant Yurack has submitted an affidavit denying summoning the plaintiff to the officer's desk or making a physical or verbal attack against him. Yurack Aff. (Dkt. No. 69-11) ¶ 5. Given this denial and their assertion that there are no witnesses, nor any evidence, to support plaintiff's version of the facts, defendants invite the court to find as a matter of law that defendant Yurack did not

act with a sufficiently culpable state of mind. Because such a determination would entail encroachment upon the prerogative of the factfinder and require the court to make a credibility determination inappropriate for a motion on summary judgment, I decline that invitation and instead recommend against the granting of summary judgment on this issue, finding the existence of genuine issues of material fact with respect to the subjective elements as well, requiring resolution at trial and precluding the entry of judgment on plaintiff's excessive force claim at this juncture.

   D. *Pendent State Law Tort Claims*

In his complaint, plaintiff has asserted pendent state law tort claims of assault and battery against plaintiff Yurack. Defendants argue that plaintiff's state law claims for assault and battery are subject to dismissal, as they are precluded by section 24 of the N.Y. Correction Law. [14]

[14]   That statute provides, in relevant part, that
      [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
      N.Y. Correct. Law § 24(1).

Section 24 protects employees of state correctional facilities from claims for damages in state or federal courts arising out of actions taken in the scope of their employment, and in the discharge of their duties. *See* N.Y. Correct. Law § 24; *see also Ierardi v. Sisco,* 119 F.3d 183, 186-87 (2d Cir.1997); *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996) (holding that section 24 applies to federal courts as well). The statute is designed to allow corrections officers to maintain safety and security at their facilities at their discretion, without fear of exposure to inmate lawsuits. *Ierardi,* 119 F.3d at 187; *Arteaga v. State,* 72 N.Y .2d 212, 218-20, 532 N.Y.S.2d 57, 60-62 (1988) (discussing policies behind immunity).

According to the New York Court of Appeals, if an act is done "while the servant [is] doing his [or her] master's work, no matter how irregularly, or with what disregard of instructions," it is performed within the scope of employment. *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979) (citations omitted). Consistent with this precept,

various courts have held that a correctional officer who uses force while on duty is acting within the scope of employment, and therefore is entitled to the protections of section 24.[15] *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dept' 1987) (excessive force by correctional officer was within scope of employment when in response to assault by inmate in course of duty); *see also Boyd v. Selmer,* 842 F.Supp. 52, 57 (N.D.N.Y.1994) (McAvoy, J.); *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, J.); *Wright v. Kelly,* No. 950CV-0688H, 1998 WL 912026, at *3 (N.D.N.Y. Oct. 16, 1998). The proper remedy in a federal court for inmates who feel they have excessive force claims is under section 1983, not through the assertion of tort claims precluded by section 24 of the state Correction Law. *Arteaga,* 72 N.Y.2d at 221, 532 N.Y.S.2d at 62.

15   I am somewhat hesitant to summarily recommend dismissal of plaintiff's state law claims in this instance, as I think that the Third Department might well view plaintiff's claims differently. Among the *Riviello* factors to be weighed in determining scope of employment are the extent of departure from normal methods of performance and whether the act was one that was reasonably foreseeable. *Riviello,* 47 N.Y.2d at 303, 418 N.Y.S.2d at 302.

   *Cepeda v. Coughlin,* relied upon by state and federal cases alike, partially considered plaintiffs' provocation of the excessive force in holding that state claims are precluded under Correction Law § 24, suggesting that a different result might obtain if, as I am required to assume for purposes of this motion, the force upon plaintiff was unprovoked. 128 A.D.2d 995, 996, 513 N.Y.S.2d 528, 530 (3d Dep't 1987); *see also Murray v. Reif,* 36 A.D.3d 1157, 1168, 828 N.Y.S.2d 669, 670 (3d Dep't 2007) (reversing lower court's conclusion on motion to dismiss, noting that if plaintiff's allegations of unprovoked assault by corrections officer were true, it cannot be concluded that defendant was acting within the scope of his employment under N.Y. Correction Law § 24).

   In *Sharrow v. State,* when considering the State's duty to indemnify under Public Officers Law § 17, the Third Department specifically distinguished its holding in *Cepeda* on the grounds that unjustified force is such a substantial departure from correctional officers'

goal of maintaining order, discipline, and control that the State could not possibly be required to indemnify correctional officers for such unnecessary force. 216 A.D.2d 844, 845, 628 N.Y.S.2d 878, 880 (3d Dep't 1995). Indeed, under *Sharrow,* based on the fourth and fifth *Riviello* factors, plaintiff's claim would seem to involve conduct which is outside the scope of employment.

New York courts have not explicitly addressed this argument in the context of section 24, however, and federal courts both here and in the Western District which have encountered the issue since *Sharrow* have held otherwise. *Heyliger v. Gebler,* --- F.Supp.2d ----, No. 06-CV-6220, 2007 WL 2153235, at *2 (W.D.N.Y. July 24, 2007); *Boyd v. Selmer,* 842 F. Su pp. 52, 57 (N.D.N.Y.1994) (McAvoy, J.); *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, J.); *Wright v. Kelly,* No. 950CV-0688H, 1998 WL 912026, at *3 (W.D.N.Y. Oct. 16, 1998). Without clear contrary guidance from the Second Circuit, New York Court of Appeals, or Third Department, I feel constrained under principles of *stare decisis* to recommend dismissal of plaintiff's state law claims.

**\*11** Based upon the foregoing, I recommend that defendants' motion for summary judgment dismissing plaintiff's state law claims of assault and battery under section 24 of the N.Y. Correction Law be granted.

   E. *Retaliation*

In addition to complaining of the use of excessive force against him, plaintiff also asserts a claim of retaliation, in violation of the First Amendment, alleging that in response to his complaints regarding defendant Yurack's actions prison officials retaliated against him through the issuance of multiple misbehavior reports. Defendants contend that plaintiff's retaliation claim is subject to dismissal as a matter of law.

At the outset it should be noted that "claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such claims as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). For this reason, "courts must approach

prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty,* 713 F.2d at 13), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes,* 239 F.3d at 492. If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). As can be seen, evaluation of a claim of retaliation is a particularly fact-laden exercise, since such claims generally revolve around both the engaging in protected conduct, as well as establishment of a nexus between that conduct and an adverse action ultimately taken by the defendants.

In their motion, defendants concede that plaintiff's filing of a grievance on January 22, 2003 addressing defendant Yurack's actions is properly regarded as protected activity under the First Amendment. Defendants' Memorandum (Dkt. No. 69-3) at 11. Similarly, defendants do not seriously assert that the issuance of misbehavior reports does not constitute adverse action sufficient to satisfy the second element of the governing test. *See id.; see also Wells v. Wade,* No. 96 Civ. 1627, 2000 WL 1239085, at *3-4 (S.D.N.Y. Aug. 31, 2006). The focus of defendants' motion is upon the nexus requirement, with defendants arguing that no reasonable factfinder could conclude that the issuance of misbehavior reports to the plaintiff was the result of retaliatory animus stemming from the Yurack grievance.

*\*12* Undeniably, the January 18, 2003 misbehavior report predated plaintiff's grievance against defendant Yurack, and thus could not have been caused by retaliatory animus stemming from that grievance. [16] To this limited extent,

defendants are entitled to summary judgment with regard to plaintiff's retaliation claim.

[16]    Although listed in plaintiff's amended complaint as a relevant event, Deal does not appear to press this incident as one of the bases for his retaliation claim, undoubtedly owing to this fact.

The remaining two misbehavior reports, issued on February 2, 2003, for smoking in the bathroom, and on February 3, 2003, for refusal to obey a direct order by contrast, occurred relatively shortly after the filing of plaintiff's grievance regarding corrections officer Yurack. This factor, particularly in view of the lack of any evidence of disciplinary action against the plaintiff from the time he entered the prison system in 1999 until the first misbehavior report on January 18, 2003, at a minimum could well support an inference that retaliatory animus prompted the issuance of the second and third misbehavior reports. *See generally Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (noting that "the temporal proximity of an alleged retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation"); *see also Lewis v. Blazejewski,* No. 03-CV-943S, 2007 WL 542117, at *5 (W.D.N.Y. Feb. 16, 2007) (Skretny, D.J. and Schroeder, M.J.). When, coupled with the statement attributed to defendant Almstead, to the effect that he was going to instruct prison officials to issue misbehavior reports to the plaintiff, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim as it relates to the February 2, 2003 and February 3, 2003 misbehavior reports.

*F. Due Process*
In his complaint, plaintiff also contends that he was denied procedural due process during the course of the disciplinary hearings conducted with regard to his misbehavior reports. Defendants now seek dismissal of that due process claim, based both upon the lack of any showing that plaintiff experienced a liberty deprivation sufficient to trigger the Fourth Amendment's due process protections, and because in any event the record reveals that he received due process during the course of the relevant disciplinary hearings.

2007 WL 2789615

To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a constitutionally significant liberty interest under the circumstances now presented, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's SHU confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted based upon the lack of a showing that he experienced a cognizable liberty interest deprivation.

*\*13* Atypicality in a *Sandin* inquiry is normally a question of law .[17] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[18] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[17]  In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[18]  While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n.5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

In his complaint and opposing motion papers, plaintiff asserts that he served sixty days of disciplinary confinement in the Oneida SHU as a cumulative result of the two disciplinary hearings. Plaintiff makes no further showing, however, regarding the conditions of his disciplinary confinement, and specifically does not allege that during that time he was subjected to conditions more severe than those ordinarily associated with such SHU confinement. It is well-established that absent a greater showing, disciplinary confinement of such a modest duration does not rise to a level of constitutional significance necessary to support a procedural due process claim under the Fourteenth Amendment. *See Colon,* 215 F.3d at 231-32. Accordingly, I recommend that plaintiff's procedural due process claim be dismissed as deficient as a matter of law, and find it unnecessary to examine whether Deal was afforded procedural due process during the course of the disciplinary proceedings at issue.

*G. Heck and Edwards*

In their motion, defendants argue that plaintiff's procedural due process claims are barred under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). *See* Defendants'

Memorandum (Dkt. No. 69-3) at 20-21. That argument is raised in view of the fact that the disciplinary hearings at issue appear to have resulted in a combination of sanctions which included the loss of good time credits, and those determinations were not set aside through applicable, internal channels before this action was commenced. In his response to defendants' motion, plaintiff asserts that he does not challenge the duration of his confinement, nor does he seek a restoration of good time credits. Under these circumstances, plaintiff has satisfied the requirements of *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), thus permitting this court to adjudicate the section 1983 claims directed toward his disciplinary hearings notwithstanding his failure to succeed in overturning the results of those hearings.

### H. *Qualified Immunity*

As an alternative basis for dismissing plaintiff's claims against them, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at *20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> **\*14** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Qualified immunity analysis involves a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

As can be seen, the first inquiry in the qualified immunity algorithm is to determine whether a constitutional violation has occurred. Since in this case I have found defendants entitled to summary judgment with regard to certain of plaintiff's claims, leaving intact his excessive force claim and the portion of his retaliation cause of action associated with the second and third misbehavior reports issued to him during the relevant time period, those claims are the appropriate focus of the qualified immunity analysis.

The right under the First Amendment of a prisoner to be free from unlawful retaliation was well-established at the time in dispute. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes,* 239 F.3d at 492; *Collins v. Goord,* 438 F.Supp.2d 399, 421 (S.D.N.Y.2006) (citing, *inter alia, Gill* ). Similarly, the Eighth Amendment's proscription against the use of excessive force was equally ensconced and well-defined in 2003. *See Hudson,* 503 U.S. at 5, 112 S.Ct. at 998; *Boddie,* 105 F.3d at 862. Whether the defendants maintained a good faith belief that their actions did not violate these clearly established rights depends upon the resolution of fact issues similar to those identified as precluding the entry of summary

judgment on the merits of plaintiff's retaliation and excessive force claims. As such, I find that the court is not currently positioned to determine defendants' entitlement to qualified immunity from suit, and thus recommend against granting defendants summary judgment dismissing plaintiff's claims against them on this basis.

## IV. *SUMMARY AND RECOMMENDATION*

*15 Plaintiff's complaint in this action contains an amalgamation of constitutional and state law claims, all of which relate to or stem from the alleged use of excessive force by defendant Yurack against the plaintiff. Having thoroughly reviewed the record now before the court, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendant Yurack, as well as the retaliation claims asserted with regard to the misbehavior reports issued to the plaintiff on February 2, 2003 and February 3, 2003. I do find, however, that plaintiff's state tort law claims of assault and battery are subject to dismissal based on N.Y. Correction Law § 24, and that plaintiff's procedural due process cause of action is deficient as a matter of law, and thus recommend that summary judgment be entered dismissing those claims.

Turning to plaintiff's application for permission to amend his complaint in order to assert claims against several defendants not previously named or appearing in the action, I conclude that the interests of justice warrant denial of that motion, both because the governing deadline for amending pleadings and joining parties under the court's case management scheduling order has passed and plaintiff has offered nothing to establish good cause for overlooking the lateness of his motion, and in any event the factors normally informing the analysis

of whether to permit amendment of pleadings and joinder of parties counsel against the amendment. Based upon the foregoing it is hereby

RECOMMENDED that plaintiff's motion for leave to amend his complaint and join additional defendants (Dkt. No. 71) be DENIED; and it is further

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 69) be GRANTED, IN PART, and that plaintiff's procedural due process claim and assault and battery causes of action, as well as the portion of plaintiff's retaliation claim related to the January 18, 2003 misbehavior report, be DISMISSED, but that defendants' motion otherwise be DENIED and that plaintiff's excessive force claims against defendant Yurack and retaliation cause of action against defendant Almstead related to the issuance of the February 2 and February 3, 2003 misbehavior reports remain pending for trial.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within *TEN* days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 2789615

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 271 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

2015 WL 4126326
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Douglas AMES, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION; Correction Officer James Stevens;
Correction Officer David Smith; Correction
Officer Thomas Schunk; Correction
Officer Patrick Mcintyre; Correction Officer Thomas
M. Hobart; Correction Officer Shane King;
Lieutenant Christopher Mcdermott; Sergeant
Paul Morris; and Correction Officers John
Does in their individual capacities, Defendants.

No. 9:12–cv–01487 (MAD/RFT).
|
Signed March 23, 2015.
|
Filed March 24, 2015.

**Attorneys and Law Firms**

Orrick, Herrington & Sutcliffe LLP, J. Peter Coll, Jr., Esq., Silvia A. Babikian, Esq., of Counsel, New York, NY, for Plaintiff.

Office of the New York, State Attorney General, Rachel M. Kish, AAG, Adrienne J. Kerwin, AAG, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

## I. INTRODUCTION

 **\*1**  Plaintiff commenced this civil rights action in September 2012, alleging that his constitutional rights were violated while he was incarcerated at Coxsackie Correctional Facility. See Dkt. Nos. 1, 26. Plaintiff alleges six claims, including that: (1) Defendant Correction Officers Stevens, Smith, Schunk, McIntyre, Hobart, and King together with Defendant Lieutenant McDermott and Defendant Sergeant Morris

(collectively "Defendant Correction Officers") retaliated against him for exercising his First Amendment rights; (2) Defendants Smith, King, and Morris violated his Eighth Amendment through the use of excessive force; (3) Defendant Correction Officers conspired to deprive Plaintiff of the equal protection of the laws; (4) Defendant New York State Department of Corrections and Community Supervision ("DOCCS") should reverse disciplinary action against Plaintiff and expunge his records; (5) Defendants Smith, King, and Morris committed an assault and battery under state common law; and (6) Defendant Correction Officers violated the New York Constitution. See Dkt. No. 26. On May 1, 2014, Defendants filed a motion to dismiss and a motion for summary judgment pursuant to Rules 12(b)(6) and Rule 56(a) of the Federal Rule of Civil Procedure, respectively. See Dkt. No. 48 at 1.

## II. BACKGROUND

Plaintiff was an inmate at Coxsackie Correctional Facility ("Coxsackie") from November 2007 through June 2010. See Dkt. No. 48–4 at 47. [1] During that time, he worked at the Coxsackie law library as an administrative clerk from March 31, 2008 through June 8, 2008, a paralegal assistant from June 9, 2008 through March 22, 2009, a clerk typist from July 27, 2009 through December 27, 2009, and a paralegal assistant from February 1, 2010 through June 13, 2010. See Dkt. No. 48–4 at 49–50. Plaintiff left his law library positions twice for disciplinary reasons. See id. Plaintiff received the following misbehavior reports while at Coxsackie: (1) six misbehavior reports issued by Defendant Stevens dated July 27, 2009, August 18, 2009, August 20, 2009, October 26, 2009, November 30, 2009, and December 8, 2009 (see Dkt. Nos. 48–4 at 71, 95, 100, 111; 48–5 at ¶ 7); (2) two misbehavior reports issued by Defendant McIntyre, both dated August 14, 2009 (see Dkt. No. 48–4 at 76, 83); (3) one misbehavior report issued by Defendant Hobart dated August 25, 2009 (see Dkt. No. 48–5 at ¶ 7); (4) one misbehavior report issued by Defendant Schunk dated December 15, 2009 (see Dkt. No. 48–4 at 117); and (5) one misbehavior report issued by Defendant Smith dated May 17, 2010 (see id. at 124).

[1]     To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

2015 WL 4126326

Plaintiff filed an inmate grievance complaint dated December 8, 2009 related to retaliatory misbehavior reports. *see id.* at 20. This grievance complaint was denied at the highest level of administrative review on March 3, 2010. *see id.* at 19. Plaintiff filed an inmate grievance complaint dated December 17, 2009 related to false misbehavior reports by Defendant Schunk, and it was also denied at the highest level of administrative review on February 17, 2010. *see id.* at 23–25. Plaintiff filed an inmate grievance complaint on January 3, 2010 related to Defendant McDermott's comments during Plaintiff's Tier II hearing on December 22, 2009. *see id.* at 9. This complaint was denied on appeal to the highest level of administrative review on March 10, 2010. *see id.* at 11. Plaintiff filed an inmate grievance complaint on May 24, 2010 related to the alleged excessive use of force by Defendant Smith, and the complaint was denied at the highest level of administrative appeal on September 8, 2010. *See* Dkt. No. 52–30 at 2.

**\*2** Currently before the Court is Defendants' motion to dismiss and motion for summary judgment to dismiss this action in its entirety against all Defendants.

## III. DISCUSSION

### A. Standard

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim on which relief can be granted. In order to state a sufficient claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft* 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2004); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must identify those portions of the record which demonstrates that there is no genuine issue of material fact. *See Celotex,* 477 U.S. at 323. When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Chambers,* 43 F.3d at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Chambers,* 477 U.S. at 324 (citing Fed.R.Civ.P. 56(c), (e)). In assessing whether any such issues of material fact exist within the record, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (other citations omitted).

**\*3** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *see Baum v. N. Ducthess Hosp.,* 764 F.Supp.2d 410, 416 (N.D.N.Y.2011).

### C. Analysis

#### 1. First Amendment Retaliation

2015 WL 4126326

Plaintiff claims that Defendant Correction Officers unlawfully retaliated against him for exercising his constitutional rights to file grievances, provide legal assistance to inmates, and write complaints reporting abuse of other inmates and, therefore, violated his First Amendment rights. *See* Dkt. No. 26 at ¶¶ 85–89. Plaintiff claims that Defendant Correction Officers retaliated by filing false misbehavior reports, useing excessive force, and making verbal threats. *See* Dkt. No. 26 at ¶¶ 38, 45, 47, 49–51, 53–56, 58, 60–61, 66–67, 74. Defendants move to dismiss these claims under Rule 12(b)(6) and, ostensibly, under Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 48. Defendants make three arguments that, as a matter of law, Plaintiff's claims of retaliation fail. Defendants argue that there is not a constitutional right to be free from false misbehavior reports, that the legal assistance provided by Plaintiff to other inmates is not protected speech, and that it is speculative that the misbehavior reports are causally connected to Plaintiff's protected speech or conduct. *See* Dkt. No. 48–1 at 8.

Initially, the Court notes that prisoner claims for First Amendment retaliation are approached "with skepticism and particular care" because the claims are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (acknowledging that "virtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act"). To state a claim of First Amendment retaliation, the plaintiff must show he engaged in constitutionally protected speech or conduct, that the defendant took an adverse action against him, and that there is a causal connection between the two. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004); *Dawes,* 239 F.3d at 492.

Not every act engaged in by a plaintiff qualifies as constitutionally-protected speech or conduct. *See Coleman v. Beale,* 636 F.Supp.2d 207, 211 (W.D.N.Y.2009) (stating that general advice to another inmate on the mechanics of an appeal was not constitutionally protected conduct); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008). However, the filing of a grievance by a prisoner against correction officers is conduct and speech that is constitutionally "protected by the First Amendment's guarantee of the rights to free speech and to petition the government for a redress of grievances." *Coleman,* 636 F.Supp.2d at 211; *see Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Also, a prisoner's statement that he or she

intends to file a grievance is constitutionally protected speech. *See Coleman,* 636 F.Supp.2d at 211.

**\*4** Although Defendants conclude that providing legal assistance to other inmates is not constitutionally protected conduct, this Court has held otherwise. *See Anderson v. Lapolt,* No. 9:07–CV–1184, 2009 WL 3232418, \*7–8 (N.D.N.Y. Oct.1, 2009) (finding that the plaintiff stated a facially valid retaliation claim where the protected speech alleged was the authorized legal assistance provided to other inmates); *Auleta v. LaFrance,* 233 F.Supp.2d 396, 399–402 (N.D.N.Y.2002) (stating that the plaintiff had standing to argue that retaliatory acts taken against him were unconstitutional even though the acts interfered with another inmate's right to petition the courts). Accordingly, Plaintiff's retaliation claim based upon his protected act of providing legal assistance to other inmates is not legally insufficient.

The adverse action taken in retaliation against Plaintiff must be the type of action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493); *see also Gill,* 389 F.3d at 381 (clarifying that adverse action in the prison context is defined objectively). Defendants argue that, as a matter of law, Plaintiff does not have a constitutional right to be free from false misbehavior reports. *See* Dkt. No. 48–1 at 6. While Defendants are generally correct on the face of this statement, it is not determinative in the context of a First Amendment retaliation claim. *See Lee v. O'Harer,* No. 9:13–CV–1022, 2014 WL 7343997, \*7 (N.D.N.Y. Dec.23, 2014) (stating that "[a]ny adverse action taken by [the] defendant in retaliation for the exercise of a constitutional right ... states a viable constitutional claim"). There is no requirement that the retaliatory act rise to the level of a constitutional violation and, therefore, Defendants' contention that Plaintiff does not have a constitutional right to be free from false misbehavior reports does not have any bearing on whether Defendants unlawfully retaliated against Plaintiff. *See Davis,* 320 F.3d at 352; *Dawes,* 239 F.3d at 491 (citing *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

The causal nexus between the protected speech or conduct and the retaliation must be specifically pleaded. *See Dolan v. Connolly,* No. 13 Civ. 5726, 2014 WL 1876524, \*10 (S.D.N.Y. May 8, 2014), report and recommendation adopted by 2014 WL 3057973 (S.D.N.Y. June 27, 2014). The "allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.'

" *See Davis,* 320 F.3d at 354 (quoting *Dawes,* 239 F.3d at 492). Several factors have previously been used to evaluate whether a causal nexus has been sufficiently pleaded, which include the following: " '(1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary records of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive.' " *Dolan,* 2014 WL 1876524, at *10 (quoting *Davidson v. Bartholome,* 460 F.Supp.2d 436, 444 (S.D.N.Y.2006); *see also Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995).

**\*5** Here, Plaintiff has failed as a matter of law to sufficiently state First Amendment retaliation claims against Defendants Smith, King, and Morris. Plaintiff contends that, on May 17, 2010, Defendant Smith used excessive force against him and that Defendants King and Morris were present. *See* Dkt. No. 26 at ¶¶ 71–74. Plaintiff alleges "[u]pon information and belief, C.O. Smith was acting on behalf of C.O. Stevens, and also to prevent [Plaintiff] from engaging in the activities of a jailhouse lawyer" by using excessive force and filing a misbehavior report on May 17, 2010. *See id.* Plaintiff does not make any similar allegations of retaliation by Defendants King or Morris and, therefore, failed to state claims against them. *See id.* Plaintiff's allegation that Defendant King said, "If it was me I would have beat you up worse," as he was escorting Plaintiff to the hospital is also insufficient to state a valid retaliation claim. *See Islam v. Goord,* No. 05 Civ. 7502, 2006 WL 2819651, *5 (S.D.N.Y. Sept.29, 2006) (stating that verbal threats are not sufficient retaliatory acts); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005). The Court dismisses the claims of First Amendment retaliation against Defendants King and Morris.

Plaintiff's claim that, upon his belief, Defendant Smith was acting on behalf of Defendant Stevens is entirely speculative, and Plaintiff does not offer any further support for this belief. *See* Dkt. No. 26 at ¶ 74. There are no allegations that Defendants Smith and Stevens had communicated about Plaintiff prior to May 17, 2010. Further, Plaintiff did not specify a protected act that Defendant Smith was retaliating against. *See Dolan,* 2014 WL 1876524, at *9. The Court finds that the facts, as alleged, are insufficient to establish an inference that Defendant Smith acted in retaliation of Plaintiff's grievances against Defendant Stevens.

Plaintiff also claims that, upon information and belief, Defendant McIntyre retaliated against Plaintiff for filing

grievances against Defendant Stevens by filing false misbehavior reports against him twice on August 14, 2009. *See* Dkt. No 26 at ¶ 47. Plaintiff does not provide any further facts about Defendant McIntyre's motivation or knowledge related to Defendant Stevens. *see id.* Plaintiff also does not reference any dates of protected speech or conduct related to Defendant McIntyre's alleged retaliation. *see id.* Likewise, Plaintiff claims that Defendant Hobart issued a misconduct report on August 25, 2009. *see id.* at ¶ 53. Allegedly, Defendant Hobart said to Plaintiff, "Officer Stevens told me to write you up, so I did." *see id.* No further context for this statement was provided by Plaintiff. Even assuming that Defendant Hobart made that statement, the Court finds it does not establish a causal connection where Plaintiff has not identified any specific grievance or other speech that Defendant McIntyre was retaliating against. *See Dolan,* 2014 WL 1876524, at *9. The Court finds that the amended complaint against Defendants McIntyre and Hobart failed to plead a specific protected act or any causal connections between Plaintiff's protected speech or conduct and the filing of misconduct reports by Defendants McIntyre and Hobart.

**\*6** Although it is not raised in Defendants' motion, the Court *sua sponte* finds, in the alternative, that Plaintiff's claims against Defendants McIntyre and Hobart are barred by the three-year statute of limitations applicable to First Amendment retaliation actions under Section 1983 in New York. *See Smith v. New York City Dep't of Educ.,* 524 Fed. Appx. 730, 732 (2d Cir.2013). The dates of the alleged retaliatory conduct, August 14, 2009 and August 25, 2009, and the dates of the hearings, August 24, 2009 and September 9, 2009, are all outside of three years from September 28, 2012, the commencement of this action (*see* Dkt. No. 1). *See Smith,* 524 Fed. Appx. at 732. Defendants McIntyre and Hobart each filed one misconduct report against Plaintiff. *See* Dkt. No. 26 at ¶¶ 47, 53. Each of these retaliatory acts, as alleged, were discrete actions, and there is no basis to apply the continuing violation doctrine. *See Smith,* 524 Fed. Appx. at 732.

As for Plaintiff's First Amendment retaliation claims against Defendants Schunk and McDermott, the Court finds that the amended complaint plausibly alleges these claims. Plaintiff alleges that, on December 15, 2009, inmate Dashawn Andrews was being beaten in an adjacent cell. *See* Dkt. No. 26 at ¶ 59. When Defendant Schunk walked past, Plaintiff told him that he intended to write a complaint to the inspector general about the abuse. *See id.* A statement of intention to write a complaint has been found to be protected speech.

*See* Coleman, *636 F.Supp.2d at 211* (stating that the intention to file a grievance was constitutionally protected speech). Plaintiff contends that in retaliation for stating his intention to complain to the inspector general about inmate abuse, Defendant Schunk filed a misbehavior report against him. *see id.* at ¶ 60. On December 17, 2009, Defendant McDermott presided over Plaintiff's Tier II hearing. *See id.* Plaintiff was sentenced to thirty days of keeplock. *See id.* Plaintiff asked Defendant McDermott why he was being punished based upon false reports, and Defendant McDermott allegedly replied, "That's what happens when you talk to I.G. about my officers." *see id.* at ¶ 61. Contrary to the Defendants' contentions, the Court finds that Plaintiff has alleged facts to identify protected speech, retaliatory actions of Defendants Schunk and McDermott, and a causal connection between Plaintiff's speech and those Defendants' actions. Further, Defendants are not entitled to summary judgment because material questions of fact exist as to Plaintiff's retaliation claim against Defendants Schunk and McDermott.

Plaintiff claims that Defendant Stevens was the main actor in retaliating against him. *See* Dkt. No. 26 at ¶ 3. Plaintiff claims that Defendant Stevens retaliated against him for filing grievances on his own behalf and the legal assistance he provided to other inmates. *see id.* As addressed above, Defendants unsuccessfully argue on their motion to dismiss that Plaintiff does not have a constitutional right to be free from false misbehavior reports and that providing legal assistance to other inmates is not constitutionally protected speech as a matter of law. Defendants' final argument as to Defendant Stevens is that the causal connection between Defendant Stevens misbehavior reports and Plaintiff's protected conduct is speculative. *See* Dkt. No. 48–1 at 6.

 **\*7** While Plaintiff is correct that the filing of grievances on his own behalf is a protected First Amendment right (*see* Davis, *320 F.3d at 352–353*), Plaintiff has failed to state or identify any specific grievances that he has filed on his own behalf prior to the start of Defendant Stevens retaliatory conduct on July 27, 2009 through December 8, 2009. Plaintiff briefly references that Defendant Stevens was the subject of an earlier grievance filed by Plaintiff but no other facts about dates or allegations of the grievance were alleged. *See* Dkt. No. 26 at ¶¶ 3, 36. There are also no other references to any grievances filed by Plaintiff in the record until his grievance dated December 8, 2009, which is after Defendant Stevens alleged retaliatory conduct had ceased. *See* Dkt. No. 26 at ¶ 79. The Court finds that Plaintiff has not identified a

grievance on his own behalf that could have caused Defendant Stevens' retaliatory conduct. The causal connection between the filing of an unidentified and undated grievance to six false misbehavior reports is too speculative to plausibly state a retaliation claim. *See* Lee, *2014 WL 7343997, at \*9* (stating that "[i]t is impossible for [the defendant] to retaliate for a grievance that would not be filed for six days"); Dolan, *2014 WL 1876524, at \*9*. That part of Plaintiff's retaliation claim against Defendant Stevens is dismissed.

However, Plaintiff claims that he assisted another inmate with filing a grievance against Defendant Stevens in the Summer of 2009, which was an instigating factor for Defendant Stevens to file six misconduct reports against Plaintiff between July 27, 2009 and December 8, 2009. *See* Dkt. No. 26 at ¶¶ 3, 33, 36, 43, 58. Plaintiff also claims that Defendant Stevens interfered with the legal assistance that he was providing to another inmate in the law library on August 20, 2009. *See* Dkt. No. 26 at ¶ 51. This providing legal assistance also contributed to Defendant Stevens' retaliatory conduct, according to the amended complaint. *See* Dkt. No. 26 at ¶¶ 51, 54–58. The Court finds that Plaintiff has plausibly alleged Defendant Stevens retaliated against him for providing legal assistance to other inmates. Defendants do not make any argument that summary judgment should be granted to Defendant Stevens and, thus, Defendants failed to meet their burden in establishing that there are no material questions of fact that relate to Defendant Stevens' alleged retaliation. *See* Fed. R. Civ. P 56(a), (c).

### 2. Eighth Amendment

Defendants seek to have Plaintiff's claim for violation of the Eighth Amendment dismissed because Plaintiff failed to exhaust his claim as required by the Prison Litigation Reform Act of 1996 ("PLRA"). *See* Dkt. No. 48–1 at 12–15. The PLRA "requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action." Brooks v. Rock, *No. 9:11–cv–1171, 2014 WL 1292232, \*8 (N.D.N.Y. Mar.28, 2014)*. Grievance No. CX–15885–110 for an assault that allegedly took place on May 17, 2010 was denied by the Inmate Grievance Program Central Office Review Committee ("CORC") on September 8, 2010. *See* Dkt. No. 52–30 at 2. This final determination by the CORC on Plaintiff's grievance was the final step in the exhaustion process. *See* Dkt. No. 52–20 at 14. Moreover, as it relates to the exhaustion of administrative remedies, it is of no consequence that Defendants King and Morris were not specifically named within Plaintiff's grievance. *See* Varela v. Demmon, *491 F.Supp.2d 442, 449 (S.D.N.Y.2007)*. The Court

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 276 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

finds that Plaintiff has exhausted his administrative remedies under the PRLA.

**\*8** Substantively, Plaintiff contends that Defendants Smith, King and Morris used excessive force against him in violation of the Eighth Amendment. *See* Dkt. No. 26 at ¶¶ 90–94. The Eighth Amendment prohibits cruel and unusual punishment. *Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). As applied to claims of excessive force, the Supreme Court has stated that the appropriate inquiry is "whether the measure taken inflicted unnecessary and wanton pain and suffering." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)); *see Hudson,* 503 U.S. at 5. To state a claim for use of excessive force, Plaintiff must establish both an objective and a subjective component as set forth by the courts. *See Hudson,* 503 U.S. at 8; *Brooks,* 2014 WL 1292232, at \*13.

The subjective component evaluates the wantonness of the force used and "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 321 (quoting *Johnson,* 481 F.2d at 1033); *see Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). There are several factors that may be consider when evaluating the nature of a correction officer's use of force, including (1) the need for the application of force, (2) the relationship between that need and the force actually used, (3) the severity of the injury sustained, (4) the threat that could reasonably be perceived by the correction officer, and (5) if there was any effort to temper the severity of the force use. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321. "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321.

The objective component asks "if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation ." *Hudson,* 503 U.S. at 8 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To determine whether an action is harmful enough to violate the Eighth Amendment, we must look to the " 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to

form the basis of an Eighth Amendment violation.' " *Hudson,* 503 U.S. at 9 (quoting *Wilson,* 501 U.S. at 298). "[T]he Eighth Amendment [ ] ... does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *See Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (quoting *Hudson,* 503 U.S. at 10 (internal quotations and citations omitted).

**\*9** Weighing all facts and drawing all inferences in Plaintiff's favor, the record supports a reliable inference of wantonness and unnecessary infliction of pain. According to Plaintiff's testimony, Defendant Smith came to retrieve and escort Plaintiff to the deputy superintendent on May 17, 2010. *See* Dkt. No. 26; 48–3 at 101. Plaintiff and another inmate were being escorted together to a common area to be frisked for weapons. *See* Dkt. No. 48–3 at 103. Correction Officer Bogardis, Defendant King, Defendant Morris, and two other unknown officers were present in this common area, although these individuals were all seated around a desk and not in the immediate area in front of or behind Plaintiff. *see id.* at 104, 108, 112. Defendant Smith put his hand in front of Plaintiff's face and said, "Next time you hurry up. You too slow." *see id.* at 104. In a loud voice, Plaintiff told Defendant Smith, "Get your hand out of my face," and Defendant Smith replied, "You lucky that's all I'm doing." *see id.* at 105. As described by Plaintiff, either simultaneously with or shortly after his statement to Defendant Smith, Plaintiff raised both hands, turned, and took two steps away from him. *see id.* at 104, 106. Defendant Smith then landed one, closed-fisted punch to the side of Plaintiff's head and took Plaintiff face down to the ground in a bear hug. *see id.* at 104, 107, 110.

While holding Plaintiff down flat with his knee on the small of the back, Defendant Smith was given handcuffs from Defendant Morris. *see id.* at 110. Plaintiff's arms were pulled behind him and handcuffed by Defendant Smith. *see id.* After Plaintiff was handcuffed, Defendant Smith said, "Take that to federal court." *see id.* Plaintiff did not sustain any further physical assault or battery. *see id.* at 110–11. No other correction officer moved or caused injury to him throughout the incident. *See id.* Plaintiff described that the force of the hit was painful when it occurred, but he did not have any residual pain, bruising, or swelling. *See id.* at 117. Pursuant to protocol, Plaintiff was brought for a medical evaluation because there was force used against an inmate, but he told the nurse that he was not injured and did not require any medical treatment. *See id.* at 116–17. Defendant Smith testified that Plaintiff abruptly swung his left hand and arm toward Defendant Smith at head level,

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 277 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

and, in reaction, Defendant Smith moved his head backwards and struck Plaintiff. *See* Dkt. No. 52–23 at 8. The movement of Plaintiff's hand was fast enough that Defendant Smith perceived that Plaintiff was attempting to strike him. *See id.* at 9.

After an examination of the relevant factors to assess if Defendant Smith acted with malicious and sadistic intent to harm Plaintiff, the Court finds that there is a material question of fact to be determined by a jury. The event described by Plaintiff supports a reasonable inference that Defendant Smith acted with sadistic and malicious intent, and, accordingly, Defendants' motion for summary judgment dismissing this claim must be denied. *See Whitley,* 475 U.S. at 322 (stating that the evidence must "support a reliable inference of wantonness in the infliction of pain" to go to a jury); *Brooks,* 2014 WL 1292232, at *14.

**\*10** Additionally, Defendants argue that Plaintiff has not alleged Defendant King used any force against Plaintiff. The Court agrees with Defendants. Plaintiff does not allege any force-related actions by Defendant King in his amended complaint or during his deposition testimony describing the events on May 17, 2010. *See* Dkt. Nos. 26; 48–3. According to Plaintiff's alleged facts, Defendant King escorted Plaintiff for medical evaluation and said, "Yeah, if it was me, I would have beat you up worse." *See* Dkt. Nos. 26; 48–3 at 112. Actions brought under Section 1983 require personal involvement of the defendant "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights ." *Blyden,* 186 F.3d at 264. Plaintiff does not allege that Defendant King ever personally used force against Plaintiff and, therefore, the Court finds that Plaintiff fails to state a cause of action against Defendant King for excessive use of force in violation of the Eighth Amendment. *See Montero v. Crusie,* 153 F.Supp.2d 368, 37576 (S.D.N.Y.2001).

Defendants argue that Plaintiff has also failed to allege facts that Defendant Morris used any force against Plaintiff on May 17, 2010. *See* Dkt. No. 48–1. In opposition, Plaintiff claims that Defendant Morris' personal involvement related to his role as a supervisor. *See* Dkt. No. 52. Defendant Morris was a sergeant in May 2010 and was the direct supervisor of Defendants Smith and King on May 17, 2010. *See* Dkt. No. 52–25 at 22–24. Defendant Morris was on the other side of the room (approximately twenty by thirty feet in size) from where Defendant Smith used force against Plaintiff. *see id.* at 54, 57, 76. Defendant Morris does not have any specific recollection of the use of force. *see id.* at 50–64.

A supervisory official may not be held liable solely on the ground that they held a position of authority. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citation omitted). However, supervisory personnel may satisfy the personal involvement requirement if:

> (1) The defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873.

Personal involvement is a question of fact and must be satisfied as to each individual defendant. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation omitted). "A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Rivera v. Fischer,* 655 F.Supp.2d 235, 237 (W.D.N.Y.2009). By Plaintiff's factual account, Defendant Morris did not have any direct involvement in the actual punch by Defendant Smith, (*see* Dkt. No. 48–3 at 110) and Plaintiff does not direct the Court to any support in the record that there was a custom or policy or practice created by Defendant Morris or gross negligence in his management of Defendant Smith that was related to the use of force. Plaintiff does not allege that Defendant Morris gave authorization for Defendant Smith's use of force. *See Johnson,* 481 F.2d at 1034. Further, a single incident of excessive force is not the type of wrong that could be remedied by Defendant Morris after a report. *See, e.g., United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 588–89 (2d Cir.1974) (finding a question of fact as to whether

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 278 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

the defendant should have known the plaintiff was unlawfully confined and failed to act). Therefore, the Court also finds that Plaintiff failed to state a claim of excessive force against Defendant Morris, directly or as a supervisor of Defendant Smith.

### 3. *42 U.S.C. § 1985(3)*

**\*11** Plaintiff's third cause of action is against Defendant Correction Officers for a conspiracy to deprive Plaintiff of the equal protection of the laws under 42 U.S.C. § 1985(3).

To state a claim for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must allege four elements: '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'

*Dolan,* 2014 WL 1876524, at \*12 (quoting *United Bhd. of Carpenters and Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)); *see Vega v. Artus,* 610 F.Supp.2d 185, 204 (N.D.N.Y.2009). To state a sufficient claim on the second element, "[t]he conspiracy must be motivated by racial or related class-based discriminatory animus." *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996); *see Vega,* 610 F.Supp.2d at 204; *Martin v. New York State Dep't of Corr. Servs.,* 115 F.Supp.2d 307, 316 (N.D.N.Y.2000) (explaining that the Supreme Court defined the language of requiring intent to deprive of the equal protection of the laws to mean " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971))). "In this context, 'class-based animus' encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex." *Vega,* 610 F.Supp.2d at 204 (quoting *Martin,* 115 F.Supp.2d at 316 (internal quotations omitted)). " '[T]he statute should extend beyond its racial boundaries only when a class has been afforded suspect or quasi-suspect classification or when Congress has provided the class special protection.' " *Vega,* 610 F.Supp.2d at 204 (quoting *Martin,* 115 F.Supp.2d at 316).

In the present case, Plaintiff asserts that the conspiracy against him was motivated by his status as a jailhouse lawyer, which he claims is a class that has been subject to discriminatory

class-based animus. *See* Dkt. No. 26 at ¶¶ 97–98. The courts have previously determined that the class of jailhouse lawyers is not a protected class under 42 U.S.C. § 1985(3). *See Dolan,* 2014 WL 1876524, at \*13 (citing *Webster v. Fischer,* 694 F.Supp.2d 163, 196 (N.D.N.Y.2010), *aff'd,* 398 Fed. Appx. 683 (2d Cir.2010)). Plaintiff has failed to make out a prima facie conspiracy case under 42 U.S.C. § 1985(3) because jailhouse lawyers are not a protected class.

Alternatively, the Court finds that Plaintiff's § 1985(3) conspiracy claim is barred by the intra-corporate conspiracy doctrine. The intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978), "posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Jefferson v. Rose,* 869 F.Supp.2d 312, 317–18 (E.D.N.Y.2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2,* 798 F.Supp.2d 443, 461 (E.D.N.Y.2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 466 (E.D.N.Y.2011) (citation omitted); *see also Vega,* 610 F.Supp.2d at 206 (holding that the intra-corporate conspiracy doctrine applies to DOCCS employees). Here, the Defendant Correction Officers were all employees of DOCCS during the relevant time periods, and, accordingly, the Court dismisses this claim. *See* Dkt. Nos. 52–5 at 11; 52–6 at 14; 52–9 at 8; 52–17 at 7; 52–23 at 14; 52–21 at 16–17; 52–25 at 6–7.

### 4. *11th Amendment*

**\*12** In Plaintiff's fourth cause of action, he seeks declaratory relief from Defendant DOCCS only. *See* Dkt. No. 26 at ¶ 102. Specifically, Plaintiff seeks to have those disciplinary actions taken against him, set forth in his complaint, reversed and expunged from his records. *See id.* The Eleventh Amendment, as interpreted by the Supreme Court, provides that states and their agencies may not be sued by private individuals in federal court for damages or injunctive relief without their consent. *See Bd. of Trs. of Univ. of Alabama v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Kozaczek v. New York Higher Educ. Servs. Corp.,* No. 1:10–cv–107, 2011 WL 3687379, \*2 (D.Vt. Aug.23, 2011)

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 279 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

(stating that a claim against a state agency is barred by the Eleventh Amendment because the state is the real party in interest). Defendant DOCCS is a New York State agency that has immunity under the Eleventh Amendment. *See Rother v. Dep't of Corr. and Cmty. Supervision,* 970 F.Supp.2d 78, 89–90 (N.D.N.Y.2013).

Plaintiff maintains that Defendant DOCCS has waived its sovereign immunity by engaging in affirmative conduct during litigation, including producing witnesses, engaging in substantial discovery, and answering interrogatories. *See* Dkt. No. 52 at 19–20. Certainly, states may waive their privilege to Eleventh Amendment immunity by voluntarily appearing in this Court or making a "clear declaration" that it submits to this Court's jurisdiction. *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675–76, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Close v. State,* 125 F.3d 31, 36 (2d Cir.1997); *Rother,* 970 F.Supp.2d at 90. There was no such affirmative action taken by Defendant DOCCS in this case. To the contrary, Defendant DOCCS asserted their Eleventh Amendment immunity as an affirmative defense within their answers. *See* Dkt. Nos. 25, 32.

To establish waiver by litigation, as alleged by Plaintiff, Defendant DOCCS had to engage in litigation conduct that would require the Court to find a waiver " 'to avoid inconsistency, anomaly, and unfairness.' " *In re Charter Oaks Assocs.,* 361 F.3d 760, 767 (2d Cir.2004) (quoting *Lapides v. Bd. of Regents of the Univ. Sys.,* 535 U.S. 613, 620, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). Defendant DOCCS appearance in this action and engagement in litigation does not impliedly waive its Eleventh Amendment immunity. *See Conrad v. Perales,* 92 F.Supp.2d 175, 183–85 (W.D.N.Y.2000). The declaratory relief sought by Plaintiff from Defendant DOCCS is barred, and the Court dismisses this claim for lack of subject matter jurisdiction.

### 5. State common-law and state constitutional claims

Plaintiff asserts a claim for assault and battery under New York common law against Defendants Smith, King, and Morris, as well as claims for violations of the New York State Constitution against Defendants Stevens, Smith, Schunk, McIntyre, Hobart, King, McDermott, and Morris. *See* Dkt. No. 26 at ¶¶ 103–08. Defendants argue that all of Plaintiff's state law claims against Defendant Correction Officers in their individual or personal capacities are barred pursuant to New York Correction Law § 24. *See* Dkt. No. 48 at 10–11.

**\*13** In pertinent part, the New York statute provides that:

1. No civil action shall be brought in any court of the state ... against any officer or employee of the department ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correction Law § 24. It is well settled that when this Court exercises pendent jurisdiction over a state cause of action, it must apply the substantive state law. *See Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted) (explaining that the plaintiff's state law claims must be dismissed because "a federal court acts essentially as a state court in addressing pendent state law claims"); *Parris v. New York State Dep't of Corr. Servs.,* 947 F.Supp.2d 354, 365 (S.D.N.Y.2013); *Joy v. State,* No. 5:09–CV–841, 2010 WL 3909694, \*4 (N.D.N.Y. Sept. 30, 2010). Section 24 of New York Correction Law governs substantive rights; it is not procedural. *See Baker,* 77 F.3d at 15; *Joy,* 2010 WL 3909694, at \*4 (stating New York Correction Law § 24 is still viable as to state causes of action in federal court despite being found to be in violation of the Supremacy Clause as it relates to Section 1983 claims).

In opposition to Defendants' motion, Plaintiff argues that this statute does not offer immunity protection in this case because Defendants' acts were not performed within the scope of their employment. *See* Dkt. No. 52 at 24–25. The Court does not agree. An employee's actions are deemed to be within the scope of their employment when "the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997) (citations omitted) (quoting *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979)) (explaining that even where employees "exhibit human failings and perform negligently or otherwise than in an authorized manner," their actions do not necessarily excuse an employer under the doctrine of respondeat superior).

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 280 of 328

Ames v. New York Dept. of Corrections and Community..., Not Reported in...

2015 WL 4126326

For purposes of New York Correction Law § 24, the courts have looked to the following factors to determine whether actions fall within the actor's scope of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

**\*14** *Ierardi,* 119 F.3d at 187 (quoting *Riviello,* 47 N.Y.2d at 303, 418 N.Y.S.2d 300, 391 N.E.2d 1278).

In the present case, Defendant Correction Officers were employed by DOCCS, and Plaintiff does not claim that any encounters at issue took place while any Defendants were not on duty as correction officers. *See* Dkt. No. 26. The actions of writing misbehavior reports and controlling the movements of prisoners fall squarely within Defendants' responsibilities of "maintaining order and security in correctional facilities and protecting the safety of inmates and employees." *Arteaga v. State,* 72 N.Y.2d 212, 217, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988); *see also Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, *18 (N.D.N.Y. Feb.8, 2010). The alleged inappropriate filing of misconduct reports and excessive use of force during the movement of Plaintiff within the facility were not departures great enough to remove Defendant Correction Officers' actions from within the scope of their employment. *See Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, *10 (N.D.N.Y. Sept.24, 2007); Crump, 2010 WL 502762, at *18. Likewise, these actions, as alleged, are generally foreseeable in the execution of Defendant Correction Officers' duties. *See Riviello,* 47 N.Y.2d at 304, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (stating that where the tortious conduct is a natural incident of employment, it can be generally foreseeable); *Cepeda,* 128 A.D.2d at 996, 513 N.Y.S.2d 528. "While they may allege constitutional deprivations and actions exceeding the scope of a correction[ ] officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit

for pendent state law claims against correction[ ] officers in their individual capacities." *Crump,* 2010 WL 502762, at *18. The Court finds that Plaintiff's pendent state claims are barred by New York Correction Law § 24. Accordingly, the Court dismisses these claims for lack of subject matter jurisdiction.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 48) is **GRANTED** with regard to (1) Plaintiff's Eighth Amendment claim of malicious use of force against Defendants King and Morris, (2) Plaintiff's claim for conspiracy to deprive Plaintiff of the equal protection of the laws under 42 U.S.C. § 1985(3), (3) Plaintiff's claim for declaratory relief against Defendant DOCCS, (4) Plaintiff's claim for assault and battery under New York common law, (5) Plaintiff's claim for violations of the New York Constitution, and (6) Plaintiff's First Amendment Retaliation claim against Defendants Smith, McIntyre, Hobart, King, and Morris; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 48) is **DENIED** with regard to (1) Plaintiff's Eighth Amendment claim of malicious use of force against Defendant Smith and (2) Plaintiff's First Amendment retaliation claim against Defendants Stevens, Schunk, and McDermott;[2] and the Court further

[2]      Plaintiff's case continues against Defendants Stevens, Schunk, McDermott, and Smith.

**\*15 ORDERS** that the following claims are **DISMISSED with prejudice** from this action: (1) Plaintiff's Eighth Amendment claim of malicious use of force against Defendants King and Morris, (2) Plaintiff's claim for conspiracy to deprive Plaintiff of the equal protection of the laws under 42 U.S.C. § 1985(3), (3) Plaintiff's claim for declaratory relief against Defendant DOCCS, (4) Plaintiff's claim for assault and battery under New York common law, (5) Plaintiff's claim for violations of the New York Constitution, and (6) Plaintiff's First Amendment Retaliation claim against Defendants Smith, McIntyre, Hobart, King, and Morris; and the Court further

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 281 of 328
**Ames v. New York Dept. of Corrections and Community..., Not Reported in...**
2015 WL 4126326

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4126326

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

2016 WL 6638182
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith MCDAY, Plaintiff,

v.

Correction Officer D. BUSHEY, et al., Defendants.

9:14-CV-997 (GLS/ATB)
|
Signed 08/10/2016

**Attorneys and Law Firms**

KEITH McDAY, Plaintiff pro se.

DENISE P. BUCKLEY, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** Currently before this court is a motion for partial summary judgment [1] by defendants LaValley and Mendofik, seeking dismissal of plaintiff's claims for failure to protect and inadequate medical care as set forth in his civil rights complaint. (Dkt. No. 49). Plaintiff filed a response in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 59, 60). The motion has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe, United States District Judge. For the reasons stated below, this court will recommend granting defendants' motion for partial summary judgment, and dismissing all claims against defendants LaValley and Mendofik.

[1]     Defendants D. Bushey and M. Liberty were named only in plaintiff's excessive force claim, and have not moved for summary judgment.

**I. Facts**

**A. Plaintiff's Complaint**
In his complaint, plaintiff alleges that on April 2, 2013, defendants Bushey and Liberty used excessive force while escorting plaintiff, who was then incarcerated at Clinton Correctional Facility ("Clinton"), from the mess hall after

a Clinton employee accused him of stealing food. (Compl. ¶ 9-11). During the escort, plaintiff alleges that defendants ordered him to stop and place his hands up against a wall. (Compl. ¶ 12). Plaintiff states that "[s]uddenly and without provocation," defendant Bushey punched plaintiff in the face with a closed fist, and defendant Liberty tripped plaintiff, causing him to fall to the floor. (Compl. ¶¶ 14-15). According to plaintiff, defendants Bushey and Liberty then handcuffed him, and while plaintiff was face down on the floor, defendants Bushey and Liberty "stood up and started stomping and kicking [him] repeatedly all over [his] body." (Compl. at ¶ 16).

Plaintiff states that after this incident, he "was rushed to the Clinton prison infirmary," where he was examined by defendant Mendofik, who was employed as a nurse at Clinton. (Compl. ¶ 21). Plaintiff alleges that defendant Mendofik "filled out several reports indicating the injuries she allegedly observed on my body" but "did not tend to any of my injuries." (Compl. ¶ 21-22). After being seen by defendant Mendofik, plaintiff was escorted to the Special Housing Unit ("SHU"). During his SHU confinement, plaintiff "continually asked correction officers and medical staff ... for emergency medical attention because of the injuries and pain I was suffering." (Compl. ¶ 31). Plaintiff also "submitted multiple sick call slips requesting to see a doctor," but received no response. (Compl. ¶ 33).

On April 7, 2013, plaintiff submitted an inmate grievance complaint regarding the alleged excessive use of force and denial of medical care. (Compl. ¶ 35). Plaintiff alleges that his grievance informed defendant LaValley, the superintendent of Clinton, that plaintiff "suffered serious injuries and faced a substantial risk of harm and yet [LaValley] ignored that risk by failing to take reasonable steps to abate the harm." (Compl. ¶ 42). After an investigation by Clinton staff, defendant LaValley denied plaintiff's grievance on April 24, 2013. (Dkt. No. 49-8 at 39). Plaintiff appealed to the Central Office Review Committee ("CORC"), and the CORC upheld defendant LaValley's determination on August 28, 2013. (Dkt. No. 49-8 at 34).

**B. Defendants' Exhibits**
**\*2** In support of their summary judgment motion, defendants have submitted: declarations from Clinton staff, including defendant LaValley; plaintiff's medical records, including photographs taken at the time of plaintiff's April 2, 2013 medical examination by defendant Mendofik; and the transcript from plaintiff's April 15, 2013 disciplinary hearing

2016 WL 6638182

related to the April 2, 2013 mess hall dispute. (Dkt. Nos. 49-8, 49-9, 49-12, 50, 50-1). Rather than detail all the evidence at the outset, the court will discuss the relevant information below as necessary for the court's analysis of the summary judgment motion. (Dkt. No. 49-8 at 39).

Defendants have also filed the transcript of plaintiff's November 12, 2015 deposition. (Pl.'s Dep., Dkt. No. 49-6). Plaintiff argues that this transcript is inadmissible evidence because defendants did not provide adequate notice of the date and time of his deposition as required by F.R.C.P. 30(b)(1). Plaintiff also argues that defendants violated this court's scheduling order (Dkt. No. 17 at 4), by not providing fifteen days advance notice prior to the deposition. (Pl.'s Decl. at ¶ 7, Dkt. No. 59). Upon review of the record, this court concludes that plaintiff's argument lacks merit.

On September 9, 2015, defendants notified plaintiff that his deposition was scheduled for September 24, 2015. (Dkt. No. 60-2). Plaintiff objected because defendants had not filed a notice of compliance with the court, and defendants agreed to reschedule the deposition after doing so. (Dkt. Nos. 25-27). Defendants subsequently provided notice that plaintiff's deposition would be held on October 23, 2015, but plaintiff objected because he had not received all documents responsive to his discovery requests. (Dkt.Nos. 29, 60-3). With my permission, defendants sent plaintiff the requested documents by overnight mail and rescheduled plaintiff's deposition to be held "within the month." (Dkt. No. 29-30). Defendants described the delay as intended to "ensure that [plaintiff] has received the enclosures and he has had an opportunity to review same prior to his deposition." (Dkt. No. 29). Plaintiff did not object to defendants' request at that time.

Plaintiff's deposition was held on November 12, 2015, more than fifteen days after defendants sent the requested discovery materials. Plaintiff attended the deposition and only objected once during his testimony, when he felt intimidated by one of the correctional officers in the room. (Dep. at 46-53). Plaintiff never mentioned the imprecise deposition notice until his response to defendants' motion for summary judgment. Accordingly, plaintiff waived any irregularity in the notice by failing to object in a timely fashion, and his deposition testimony is admissible. *See Cerami v. Robinson,* 85 F.R.D. 371, 372 (S.D.N.Y. 1980); *see also* F.R.C.P. 32(d)(1) ("An objection to an error or irregularity in a deposition notice is waived unless promptly served in writing on the party giving notice.").

Plaintiff also objects to the admissibility of the Declaration of Charles Simpson, a nurse administrator at Clinton who offered his interpretation of plaintiff's medical records and the adequacy of plaintiff's medical treatment in support of defendants' motion for summary judgment. (Dkt. No. 49-10). Plaintiff argues that defendants failed to timely disclose this non-party as an expert witness, and that Mr. Simpson's testimony is hearsay. (Dkt. No. 59, at ¶ 9-25). Plaintiff also contends that Mr. Simpson's declaration misstates plaintiff's medical records. (*Id.*, at ¶ 22). Defendants submitted a supplemental declaration of Mr. Simpson to correct some of these misstatements. (Dkt. No. 60-5). In light of plaintiff's objections, and the reliable documentary evidence available from plaintiff's certified medical records (Dkt. No. 50-1), this court did not consider Mr. Simpson's declaration (Dkt. No. 49-10) or his supplemental declaration (Dkt. No. 60-5) when making this report and recommendation.

## II. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin,* 467 F.3d at 272.

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

## III. **Failure to Protect**

Plaintiff alleges that defendant LaValley, the superintendent at Clinton at the time of the alleged excessive force incident, was aware of "the known pattern of physical abuse and use of excessive force by defendants D. Bushey and M. Liberty on inmates at Clinton, including plaintiff" and acted with deliberate indifference to a substantial risk of serious harm by failing to "take disciplinary or other action" against the correctional officers. This conclusory allegation is insufficient to support plaintiff's Eighth Amendment failure to protect claim against defendant LaValley.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, **and** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials **actually knew of and disregarded** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

### B. Application

In this case, defendant LaValley clearly did not directly participate in the alleged excessive force incident. Plaintiff also recognizes that defendant LaValley, as superintendent, cannot be held responsible for the alleged assault merely because of his supervisory role at the time of the incident. (Pl.'s Br. at 17-18). Instead, plaintiff contends that defendant LaValley was aware of a pattern of mistreatment of inmates by defendants Bushey and Liberty, and that the superintendent's failure to intervene or discipline the correctional officers put plaintiff at risk. (Compl. ¶ 47). This theory is entirely premised upon plaintiff's recollection that defendants Bushey and Liberty had assaulted an inmate in a neighboring cell approximately two weeks prior to his incident, and that a month earlier, the same correctional officers had beaten up a "guy with mental problems." (Dep. 49-6, at 80). Plaintiff offers no evidence that a pattern or history of inmate mistreatment existed, or that defendant LaValley was aware of it. Such conclusory allegations are insufficient to support a finding that a reasonable fact-finder could conclude that defendant Lavalley had actually learned of a real threat to plaintiff and failed to intervene prior to the April 2, 2013

use of force. *Povoski v. Artus*, No. 9:11-CV-120 (DNH/DEP), 2014 WL 1292219, at *22 (N.D.N.Y. Mar. 28, 2014) (granting summary judgment to defendants on vague claim that supervisors were made aware of potential harm "numerous times through numerous channels"); *Kearney v. Goord*, No. 09-CV-679(Sr), 2011 WL 1260076, at *5-6 (W.D.N.Y. Mar. 4, 2011) (general allegations of "complaints of illegal behavior on the part of facility staff" were insufficient to show that supervisors failed to protect inmate).

**\*4** There is no evidence to support plaintiff's claim that defendant LaValley was aware of the purported risk presented by defendants Bushey and Liberty prior to the incident on April 2, 2013. Plaintiff admits that he never spoke with defendant LaValley while housed at Clinton, and that the only time he communicated with the superintendent was in his grievance, filed after the use of force. (Dep. at 143). Plaintiff did not allege that either correctional officer had mistreated him prior to April 2, 2013, or that he had ever complained about their behavior towards him. (Dep. at 82-83).

Plaintiff's argument that other inmates had made legitimate complaints of mistreatment by defendant Bushey and Liberty is also unsupported, because there are no records of any inmate grievances of excessive force being upheld against either correctional officer. Defendants filed the Declaration of John Shipley, the Director of the Bureau of Labor Relations ("BLR") for DOCCS, whose responsibilities include administration of the employee disciplinary program and the evaluation of misconduct reports filed against correctional officers. (Dkt. No. 49-11, at ¶¶ 2-8). Mr. Shipley stated that his office searched its files and found no "founded employee disciplinary grievances"[2] related to the use of force by defendants Bushey and Liberty between April 2, 2008 and April 2, 2013. (Dkt. No. 49-11, at ¶ 9-12).

2      Mr. Shipley defined "founded employee disciplinary grievances" as "(1) any grievance that disputed a Notice of Discipline that was sustained at the initial administrative level and did not lead to further proceedings (i.e., settlement or arbitration); and (2) any grievance that disputed a Notice of Discipline that was sustained following settlement or arbitration. (Dkt. No. 49-11, at ¶ 10).

Plaintiff argues that he would be better able to respond to defendants' partial motion for summary judgment if he had been provided **all** inmate grievances filed against defendants Bushey and Liberty, not merely "founded

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

employee disciplinary grievances." [3] (Dkt No. 59, ¶ 29-35). This court finds that plaintiff would still be unable to support his failure to protect claims against defendant LaValley, even if plaintiff were able to show that other inmates had filed grievances against the correctional officers. A supervisory official cannot be liable for a constitutional violation merely because he received a grievance or complaint from an inmate and referred the grievance to another individual for investigation. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official); *see also Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Thus, even if there were evidence that other inmates had submitted complaints to the superintendent about defendants Bushey and Liberty, plaintiff would still not meet his burden to show that defendant LaValley had actual knowledge of and disregarded a risk to plaintiff's health and safety. Accordingly, this court recommends granting defendant LaValley's motion for summary judgment with respect to plaintiff's failure to protect claim.

[3]  This court has already decided this issue. On December 9, 2015, plaintiff filed a motion to compel defendant's production of "all grievances, complaints, or other documents ... concerning mistreatment of inmates by defendants Bushey and Liberty." (Dkt. No. 31-1, at ¶ 7). After a hearing, this court narrowed the scope of plaintiff's discovery request after defendants provided proof that a search of BLR files would be less burdensome than a search of all inmate grievance records and that BLR files would contain "records pertaining to all sustained charges of excessive force against security personnel referred to it by DOCCS' Office of Special Investigations ("OSI"), including allegations of excessive force made by inmates and people who are not inmates." (Dkt. Nos. 40, 41-1). My February 1, 2016 order

resolving the discovery dispute was made "without prejudice to the future assertion by counsel, if any of plaintiff's claims survive substantive motions and counsel is appointed to assist plaintiff in connection with a trial, of properly-framed discovery requests relating to other prior complaints of the alleged use of improper or excessive force against inmates by defendants Bushey and Liberty..." (Dkt. No. 40 at 2).

## IV. Medical Care – Deliberate Indifference

### A. Legal Standards

**\*5** In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir.

2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

**\*6** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### B. Application

Plaintiff makes two separate claims of medical indifference. First, he alleges that defendant Mendofik did not adequately evaluate and treat his injuries immediately after the April 2, 2013 use of force incident and did not refer him to a physician. (Compl. at ¶ 30). Second, he alleges that defendant LaValley exercised deliberate indifference to plaintiff's serious medical needs while plaintiff was housed in SHU. (Compl. at ¶ 42). This court recommends that defendants be granted summary judgment on all of plaintiff's medical indifference claims.

### 1. Defendant Mendofik

#### a. Objective Element

The record shows that plaintiff saw defendant Mendofik for medical treatment only one time while at Clinton, immediately after the alleged excessive use of force on April 2, 2013. (Dkt No. 50-1, at 77-79). Plaintiff also testified during his deposition that he only saw defendant Mendofik once. (Dep. at 142). After examining plaintiff, defendant Mendofik prepared an "Offender Injury Report" and a "Use of Force Report." (Dkt. No. 50-1, at 77-79). She listed plaintiff's injuries as (1) a bruise at the top of his head, (2) an abrasion to the right lateral head, (3) scratches to his right upper back, (4) a scratch to his left lower back, (5) a swollen lip, (6) a "skin

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

nick" on his left knee, (7) a swollen left pinky finger, (8) a skin tear between the third and fourth finger on his left hand, and (9) an approximately ten inch scratch to his right forearm. (Dkt. No. 50-1, at 77).

Nurse Mendofik's description of plaintiff's injuries are consistent with the photographs taken just before her examination. (Dkt. No. 50). During his deposition, plaintiff recalled that the photographs were taken "as soon as I came" to the infirmary. (Dep. at 98). Plaintiff agreed that the photographs showed cuts and swelling, but testified that he believed that the photographs did not capture other undiagnosed injuries, such as internal bleeding. (Dep. at 109-110). He has also repeatedly argued that defendants Bushey and Liberty were "experts," who made sure that they did not leave any external marks on plaintiff's body, despite inflicting serious injuries. (Dep. at 81-82, 105). The court is required to resolve all ambiguities and draw all factual inferences of favoring the non-movant, but "even a pro se litigant cannot defeat a motion for summary judgment through mere allegations or conclusory statements unsupported by facts." *See Simpson v. Oakes*, 640 Fed.Appx. 86, 88 (2d Cir. March 1, 2016) (citing *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). Therefore, this court concludes that there is no genuine issue of material fact with regards to plaintiff's injuries when he was examined by defendant Mendofik. These types of minor, temporary injuries have been held not to constitute serious medical needs as a matter of law.

*7 For example, in *Bradley v. Rell*, 703 F. Supp. 2d 109 (N.D.N.Y. 2010), the court held that plaintiff's allegations that he suffered a headache and blurry vision, swelling and bruising around his head, and an abrasion to his right lower leg, extreme headaches, and psychological problems, were insufficient for a rational fact finder to conclude that his injuries were sufficiently serious to constitute a serious medical need. *Id.* at 121-22 (collecting cases); *see also Lewis v. Havernack*, No. 12-CV-31 (GLS/DEP), 2013 WL 1294606, at *9 (N.D.N.Y. Jan 23, 2013) (Rep't-Rec.) (holding that injuries to plaintiff's upper cheeks and lower eyelid resulting from being punched are "minor injuries, which are not sufficiently serious to state a deliberate indifference claim under the Eighth Amendment) (collecting cases), *adopted*, 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013); *Sledge v. Fein*, 11 Civ. 7450, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) (noting that courts have "held that terrible and extreme headaches and swelling do not satisfy the objective component of an Eighth Amendment claim"); *Latouche v.*

*Tompkins*, No. 09-CV-308 (NAM/RFT), 2011 WL 1103022, at *14 (N.D.N.Y. Mar. 4, 2011) (Rep't-Rec.) (finding that a 4-5 centimeter bruise, a 2-3 centimeter cut, and a scratch on plaintiff's face and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), *adopted*, 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (holding that two black eyes, bruising in kidney area, kick marks and open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain") (collecting cases); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (explaining that soreness, pain in and a lump behind ear, lump on back of head, abrasions on nose and knuckle, and bruising to back, ribs and legs do not constitute a serious medical condition); *Hickey v. City of New York*, 01-CV-6506, 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs); *Rodriguez v. Mercado*, 00-CV-8588, 2002 WL1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (finding that bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness did not constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment).

The court finds that plaintiff cannot demonstrate that he suffered from "a medical condition that significantly affect[ed] his] daily activities;" or that he suffered from "chronic and substantial pain" at the time of the infirmary visit. *Chance*, 143 F.3d at 702 (citation omitted). Plaintiff's injuries were simply not conditions "of urgency, [ ] that may produce death, degeneration or extreme pain," and were not serious medical needs. *Hathaway*, 99 F.3d at 553.

### b. Subjective Element

Because plaintiff could not satisfy the objective element of the deliberate indifference standard, the court need not address whether defendant knew that plaintiff faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." However, given the lack of a serious injury, and the treatment that plaintiff did receive, it is unlikely that defendant Mendofik could possibly have acted with subjective recklessness.

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

Plaintiff alleges that defendant Mendofik did not ask him any questions about his physical health, but also admits that he did not tell her that he was in pain, or offer any other information about his physical condition. (Dep. at 95-97). Plaintiff contends that defendant Mendofik should have taken a number of steps to assess and treat his injuries, including checking his vital signs, providing him medication, [4] and scheduling him to see a physician. (Compl. at ¶ 23-28). Any disagreement that plaintiff has with defendant Mendofik's medical decisions cannot be the basis for an Eighth Amendment claim. *See Simpson*, 640 Fed.Appx. at 88 (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1988); *Hernandez v. Keane*, 341 F.3d 137, 149 (2d Cir. 2003)). Likewise, plaintiff's contention that defendant Mendofik failed to follow DOCCS treatment rules and policy does not state a constitutional claim. *See Dixon v. Goord*, 224 F. Supp. 2d 739, 744-45 (S.D.N.Y. 2002) (violations of state law or regulations in themselves do not state a viable section 1983 claim); *see also Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990). Therefore, this court recommends granting defendant Mendofik's motion for summary judgment with respect to plaintiff's medical care claim.

[4]    Plaintiff testified that after the incident he received some pain medication, "ibuprofen or Tylenol," from Clinton medical staff, but it is unclear if defendant Mendofik was involved. (Dep. at 112-114).

### 2. Defendant LaValley

#### a. Objective Element

**\*8**  After his initial examination by defendant Mendofik, plaintiff was housed in SHU at Clinton. While there, he alleges that he felt pain in his head and hands, but "nothing was as excruciating" as the "sharp pain, excruciating pain" in his lower back. (Dep. 116-118). According to plaintiff's testimony, this back pain was so severe after he was first brought to SHU that he "[c]ouldn't move for a few days." (Dep. at 117-118). Plaintiff testified that it was "about three days" before he was able to get out of bed and get a cup of water, and about two weeks before he was fully able to walk again. (Dep. at 117). Plaintiff was housed in Clinton SHU for approximately one month after the incident, and claims that he was never permitted to see a doctor during that time. (Dep. at 110).

It is unclear how much plaintiff's back pain actually limited his mobility, since he was able to write and submit a sick call request form on April 3, 2013, his first day of SHU confinement. (Dkt. No. 59-1 at 25-26). However, in the absence of contradictory medical evidence, and construing the facts in the light most favorable to the plaintiff, this court will conclude that the allegations raise a genuine issue of material fact as whether plaintiff's back pain, which rendered him immobile for several days while housed in SHU, was a sufficiently serious medical need. *See Guarneri v. Bates*, No. 9:05-CV-444 (GLS/DRH), 2008 WL 686809, at \*5-6 (N.D.N.Y. Mar. 10, 2008) (allegations that plaintiff's shoulder injury rendered him immobile raised an issue of material fact); *Harris v. Westchester County Dep't of Corr.*, No. 06-Civ-2011 (RJS), 2008 WL 953616, at \* (S.D.N.Y. Apr. 3, 2008) (allegation that injury to lower back rendered plaintiff immobile for a period of time raised an issue of material fact).

#### b. Subjective Element

Even accepting the fact that plaintiff's immobilizing back pain was sufficiently serious, the evidence still shows that defendant LaValley did not act with deliberate indifference to plaintiff's serious medical needs. Plaintiff testified that he had never spoken with defendant LaValley about his medical condition or need for treatment while in SHU. (Dep. at 143). Likewise, defendant LaValley had no recollection of any personal contact with plaintiff during his incarceration at Clinton. (Dkt No. 49-12, LaValley Decl., at ¶ 13).

Plaintiff did submit an inmate grievance on April 7, 2013 that alleged excessive use of force by defendants Bushey and Liberty, as well as the failure of multiple correctional officers and medical staff to respond to his sick call requests for medical attention while he was housed in SHU. [5] (Compl. at ¶ 35; Dkt. No. 49-8 at 38). The grievance alleges that plaintiff had suffered "serious injuries" as a result of the use of force, but does not mention the immobility or excruciating pain described in the complaint or provide any further detail. (Dkt. No. 49-8, at 38). In response to the grievance, defendant LaValley had a designated security supervisor investigate the matter. Plaintiff testified that he was interviewed by this designee, but refused to provide any additional information to him. (Dep. at 144).

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 289 of 328

McDay v. Bushey, Not Reported in Fed. Supp. (2016)

2016 WL 6638182

5      Plaintiff has not identified any individuals who failed to respond to his requests, and has not named them as parties to this lawsuit.

Defendant LaValley's April 23, 2013 grievance determination noted plaintiff's refusal to answer questions, and the denial of plaintiff's allegations by Clinton staff. (Dkt. No. 49-8, at 39). Finding no malfeasance on the part of staff and no evidence to support plaintiff's allegations, defendant LaValley denied the grievance. (*Id.*). Plaintiff appealed that determination to CORC, but the only injury or medical condition mentioned in the appeal was "bleeding from head wounds." (Dkt. No. 49-8, at 39).

**\*9** Plaintiff has not provided any support for his assertion that defendant LaValley knew and disregarded a significant risk to plaintiff's health or safety. Plaintiff's grievance, his only attempt at advising defendant LaValley of his medical condition, does not provide any details about his actual medical condition. Plaintiff admits that he refused to provide any information during the investigation of that grievance. Even after defendant LaValley had made his determination regarding plaintiff's grievance and plaintiff submitted an administrative appeal, the only injury that plaintiff identified as "serious" was bleeding from the cuts and scratches on his head. No rational fact-finder could conclude that defendant LaValley acted with "deliberate indifference" to plaintiff's medical needs when he had no knowledge of them, and plaintiff made no attempt to communicate those needs to him. Therefore, this court recommends granting defendant LaValley's motion for summary judgment with respect to plaintiff's medical care claim. [6]

6      Defendants LaValley and Mendofik have also included an argument, addressing their claim of qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because I have found no constitutional violation, I need not address qualified immunity.

**V. Medical Care – State Law Claims**

In addition to his Eighth Amendment claims for medical indifference, plaintiff also alleges tort claims of medical negligence and ministerial neglect under New York State law against defendant Mendofik. (Compl. at ¶ 50). This claim is barred by state law. New York Corrections Law § 24(2) requires that state law claims for damages against any officer or employee of DOCCS for acts performed within the scope of their employment must be brought as claims against the State of New York in the New York State Court of Claims. This provision, by its plain terms, precludes the assertion of the state law tort claims of medical negligence and ministerial neglect against defendant Mendofik in any other court, including the federal court. *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996) (finding that Corrections Law Section 24 bars state law claims raised in federal court); *Brown v. Dep't of Corr. Svcs.*, No. 09-CV-949S, 2011 WL 2182775, at \*9 (W.D.N.Y. June 2, 2011) (applying *Baker* to state law medical negligence claim against DOCCS employees). Therefore, this court recommends granting defendant Mendofik's motion for summary judgment with respect to all of plaintiff's state law claims.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for partial summary judgment (Dkt. No. 49) be **GRANTED** and that all of plaintiff's claims against defendants LaValley and Mendofik be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: August 10, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6638182

2013 WL 717915
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry EPPS, Plaintiff,

v.

The CITY OF SCHENECTADY, John
Doe, individually and in his capacity as
an employee of The City of Schenectady,
New York Police Department, Defendants.

No. 1:10–CV–1101 (MAD/CFH).
|
Feb. 27, 2013.

**Attorneys and Law Firms**

Henry Epps, Schenectady, NY, pro se.

Bailey, Kelleher & Johnson, P.C., Washington Avenue Extension, William C. Firth, Esq., Nannette R. Kelleher, Esq., of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### INTRODUCTION

**\*1** Plaintiff commenced the within action pursuant to 42 U.S.C. § 1983 claiming that defendants The City of Schenectady and John Doe ("defendants") violated his constitutional rights on November 6, 2009. In addition, plaintiff asserted state law causes of action for battery and negligence.[1] When the action was commenced, plaintiff was represented by counsel. On February 23, 2012, Magistrate Judge Homer relieved Grasso & Breedlove as attorneys of record. Plaintiff is now proceeding *pro se.* Presently before the Court is defendants' motion summary judgment and dismissal of plaintiff's complaint pursuant to Fed.R.Civ.P. 56. (Dkt. No. 19).

1    This action was originally commenced in New York State Supreme Court, County of Schenectady. On September 16, 2010, defendants removed the

action based on 28 U.S.C. § 1331 and 42 U.S.C. § 1983. (Dkt. No. 1).

### BACKGROUND[2]

2    The facts set forth in this section are taken from: (1) the Complaint; (2) the Answer; (3) defendants' Statement of Material Facts; and (4) the exhibits and evidence submitted by defendants in support of the Motion for Summary Judgment. The facts, as discussed herein, are for the relevant time period as referenced in the complaint.

On November 6, 2009, at approximately 2:00 p.m., plaintiff consumed a few alcoholic beverages at his home. Sometime between 3:00 p.m. and 4:00 p.m., plaintiff walked, less than a half mile, to an apartment at 824 Grant Avenue to visit with a friend, Francine Holiday. When plaintiff arrived at the apartment, Ms. Holiday indicated that she needed food. Plaintiff walked back to his home to retrieve some food, then to a store to purchase beverages. Plaintiff returned to Ms. Holiday's apartment. Plaintiff remained at the apartment for approximately twenty minutes. Ms. Holiday then attempted to leave the apartment but plaintiff refused to allow her to leave. Ms. Holiday "pushed" past plaintiff to leave and ran down the street yelling that she intended to contact the police. Plaintiff left Ms. Holiday's apartment and returned home. Shortly after arriving at his home, two police officers appeared at plaintiff's residence and placed plaintiff under arrest. One officer displayed a badge numbered "128" and during plaintiff's deposition, he identified the police officer as Officer Schonewald.[3] The officers told plaintiff he was being arrested for harassment. The officers handcuffed plaintiff, behind his back, and placed him in a police cruiser and transported plaintiff to the police station for processing.

3    Plaintiff has not identified the second police officer.

At approximately 5:00 p.m., plaintiff arrived at the police station and was escorted to the booking area. The handcuffs were removed and plaintiff was asked to remove his shoes and strings from his sweatpants. Plaintiff was asked a series of questions by the booking officer. There is a factual dispute with regard to what happened when plaintiff was asked to leave the booking area. Plaintiff claims that "just prior to leaving the booking area", Officer Schonewald reapplied the handcuffs behind his back. Plaintiff alleges that Officer Schonewald became "boisterous" and belligerent and began cursing at plaintiff. Plaintiff alleges that Officer Schonewald

"yanked the handcuff chains" and "pushed" him while still in the booking area. Plaintiff did not fall or come into contact with any objects.

Defendants contend that after questioning was complete, Officer Chris Haigh, stated, "Henry, let's go" but plaintiff refused to comply with Officer Haigh's verbal commands to accompany him out of the booking area. Officer Schonewald overheard the exchange. Upon receiving no response to his third request, defendants claim that the officer then placed a hand on each of plaintiff's sides (above his waist) to escort plaintiff from the booking area. Defendants claim that handcuffs were not reapplied while plaintiff was in the booking area. [4]

[4]     Defendants allege that video footage annexed to the motion for summary judgment supports their version of the events. The video footage is discussed *infra.*

**\*2** Later that day, plaintiff was arraigned at the police station and then transported to the Schenectady County Correctional Facility. Plaintiff was sentenced to thirty days of incarceration. During his incarceration, plaintiff experienced pain in his hand but did not request or receive medical attention. On or about November 24, 2009, after serving twenty days, plaintiff was released. The next day, plaintiff claims that he sought medical attention at Ellis Hospital for an injury to his right hand/wrist. Plaintiff had three subsequent visits at Schenectady Regional Orthopedic Associates, P.C.

On August 28, 2012, defendants filed the within motion seeking summary judgment and dismissal of plaintiff's complaint. Defendants claim that: (1) plaintiff's § 1983 claim for excessive force and state law battery claim must be dismissed because the force used and injury sustained were *de minimis;* (2) all claims against John Doe must be dismissed due to plaintiff's failure to identify and serve said defendant; (3) plaintiff's § 1983 claim against the City fails to state a cause of action; (4) plaintiff's negligence is subject to dismissal because it is based upon intentional conduct; and (5) all causes of action against all defendants must be dismissed based upon video evidence. (Dkt. No. 19).

## DISCUSSION

### I. Standard on Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. See *id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.* "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012).

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.,* 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56(c). In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). These determinations are within the sole province of the jury. *Id.*

**\*3** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp .2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro

se litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* 2001 WL 527484, *2 (S.D.N.Y.2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

Here, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1. Local Rule 7.1(a)(3) states:

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3) (emphasis in original). Plaintiff has failed to properly respond to defendants' Statement of Material Facts, thus, the Statement will be accepted as true to the extent that the facts are supported by evidence in the record. *See Orraca v. Pilatich,* 2008 WL 4443274, at *3 (N.D.N.Y.2008); *see also N.Y. Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc .,* 426 F.3d 640, 648–49 (2d Cir.2005) (the Court deemed the properly supported allegations in the defendant's L.R. 7.1 Statement admitted for the purposes of the motion).

## II. *De Minimis*

Defendants argue that, assuming that the incident occurred as plaintiff described, the application of force was "so extraordinarily minimal" that it did not rise to the level of force necessary to constitute excessive force under the Fourth Amendment or battery under New York State Law. [5]

[5]  While plaintiff does not articulate the basis for his excessive force claim, defendants correctly note that the Fourth Amendment controls. *See Bonilla v. Jaronczyk,* 354 F. App'x 579, 581 (2d Cir.2009) (claims of excessive force "in the course of an arrest" should be analyzed under the Fourth Amendment).

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010). To succeed on a Fourth Amendment excessive force claim, a plaintiff must show the amount of force used was objectively unreasonable. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) ("In determining whether the force used by a police officer was reasonable, the court must ... consider the perspective of the officer at the time of the arrest, taking into account the fact that the officer may have been required to make a split-second decision"); *see also Rodriguez v. Vill. of Ossining,* 2013 WL 154334, at *4 (S.D.N.Y.2013) (citations omitted) (on an excessive force claim, a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable).

**\*4**  "[N]ot every push or shove, [ ... ] violates the Fourth Amendment, and several courts in this Circuit have required plaintiffs to allege more than a *de minimis* use of force to succeed on their excessive force claims." *LaFrance v. Bemben,* 2013 WL 132702, at *3–4 (E.D.N.Y.2013) (citation omitted). "Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness [,] ... minor discomfort[,] ... and two superficial scratches with a cut inside the mouth." *Lemmo v. McKoy,* 2011 WL 843974, at *5 (E.D.N.Y.2011). While "the extent of the injury suffered ... is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim." *Ortiz v. Pearson,* 88 F.Supp.2d 151, 160 (S.D.N.Y.2000). "While [a plaintiff] [may] not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in

assessing whether the force used was excessive, the failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987).

Here, plaintiff admitted at his deposition that during his twenty days of incarceration, he did not make any complaints of any injury or pain to any medical personnel at the correctional facility. However, plaintiff testified that he experienced pain during his first night at the correctional facility. Plaintiff testified that he sought treatment the day after his release at Ellis Hospital for injuries to his hand/wrist. Plaintiff also treated three times with orthopedic specialists. Defendants contend that the certified medical records do not support plaintiff's timeline or treatment for the injuries allegedly sustained in the subject incident. Defendants also dispute the severity of plaintiff's alleged injury noting that records reflect a "contusion". Given this factual disputes and viewing the facts in the light most favorable to the plaintiff, the Court cannot say as a matter of law that plaintiff's alleged injuries are *de minimis. See Sash v. U.S.,* 674 F.Supp.2d 531, 539–540 (S.D.N.Y.2009) (although the plaintiff's immediate injuries turned out to be minor, the Court cannot find them *de minimis* as a matter of law).

Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's excessive force claim and battery claim, on this issue, is denied.

### III. Failure to Identify and Serve John Doe

In the alternative, defendants argue that all of plaintiff's claims against the "John Doe" defendant must be dismissed because plaintiff failed to timely and properly identify and serve the John Doe defendant.

"Using 'Doe' in place of specifically naming a defendant does not serve to sufficiently identify the defendant." *Coward v. Town and Vill. of Harrison,* 665 F.Supp.2d 281, 300–302 (S.D.N.Y.2009) (citation omitted). "Courts typically resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.' " *Id.* (citations and quotations omitted). "Where a plaintiff 'has had ample time to identify' a John Doe defendant, [ ... ] the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant". *Id.* (citations omitted).

**\*5** Here, it has been two and a half years since plaintiff commenced this action. In August 2010, plaintiff filed the complaint in state court. On June 5, 2012, plaintiff was deposed and positively identified only Officer Schonewald, by name. Plaintiff has failed to amend his complaint or serve any officer. Plaintiff submitted opposition to defendants' motion but did not explain why he has failed to serve the alleged responsible officer. Plaintiff simply states, "It has been made clear by the defendant's moving papers who actually caused my injury. As such, there is no prejudice to the defendant because the defendant has now been properly identified". Defendants disagree and argue that plaintiff misidentified the officers during his deposition. Indeed, defendants contend that Officer Haigh, not Officer Schonewald, directed plaintiff to leave the booking area. Regardless, plaintiff misunderstands his burden and the legal ramifications of his failure to identify and serve the proper defendant. Despite years of litigation, plaintiff does not explain why he did not amend his complaint to assert a claim against the officer allegedly responsible and further, why he failed to serve the officer once he was able to positively identify the proper defendant. *See Burns v. Trombly,* 624 F.Supp.2d 185, 197–198 (N.D.N.Y.2008) (collecting cases) (after two years of litigation, the *pro se* plaintiff failed to identify the John Doe defendants, thus, the plaintiff's claims against the John Doe defendants were dismissed without prejudice due to Plaintiff's failure to name or serve those defendants). All discovery is complete and thus, plaintiff's failure to identify the "John Doe" defendant mandates dismissal. *Keesh v. Artuz,* 2008 WL 3166654, at \*2 (S.D.N.Y.2008) (citing *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997)); *see also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005) (the plaintiff's request to amend the complaint after discovery was completed was denied as the plaintiffs were provided with ample time to attempt to identify the John Doe defendants).

### IV. Failure to State a Claim

Defendants also contend that plaintiff's 1983 claims against the City of Schenectady are subject to judgment as a matter of law because plaintiff failed to plead that the alleged deprivation of rights was the result of a municipal policy or custom. Moreover, even assuming plaintiff properly articulated a policy and further assuming that the incident amounted to excessive force, defendants claim that dismissal is nonetheless appropriate because a single incident of unconstitutional activity is not actionable. Plaintiff has failed to respond to this argument.

2013 WL 717915

A municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978); *see also Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir.2004). To state a Section 1983 claim against a municipality based on the actions of employees below the policymaking level, a plaintiff must plead "three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Batista v. Rodriquez,* 702 F.2d 393, 397 (2d Cir.1983)). Under *Monell,* to prevail against municipal defendants a plaintiff must demonstrate that the governmental entity had an unconstitutional or unlawful policy, and that the policy caused or was the moving force behind the violation of plaintiff's rights.

**\*6** In this matter, plaintiff's § 1983 claims against the City of Schenectady fail as a matter of law because the complaint is completely devoid of any fact alleging that plaintiff was injured as a result of the defendant's policy, custom or practice or actions of an employee with final policymaking authority. *Lawrence v. Town of Brookhaven Dep't of Housing, Community Development & Intergovernmental Affairs,* 2007 WL 4591845, at \*19 (E.D.N.Y.2007) (the plaintiff offered no explanation in her opposition papers for her failure to plead such required facts); *see also McGaw v. City of N.Y.,* 1993 WL 148959, at \*3 (S.D.N.Y.1993) (the municipal defendants were additionally entitled to summary judgment because the plaintiff has failed to plead the existence of any unconstitutional or unlawful policy, custom, or practice on the part of the City of New York or the Police Department as required for § 1983 liability under *Monell* ). Thus, defendants' motion for summary judgment and dismissal of plaintiff's 1983 claims against the City of Schenectady is granted. *See Pooler v. Hempstead Police Dep't,* 2012 WL 4060743, at \*4 (E.D.N.Y.2012) (court awarded summary judgment in favor of County because the plaintiff made no allegations regarding a municipal policy, practice or custom in his complaint).

## V. Negligence Cause of Action
Defendants contend that plaintiff's negligence cause of action is subject to dismissal and summary judgment because it is duplicative of plaintiff's excessive force/battery claims. Defendants argue that plaintiff cannot assert that defendants' conduct was intentional and at the same time claim that it was negligent. Plaintiff has not responded to this argument.

"New York has adopted the view that, 'once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.' " *Morgan v. Nassau County,* 2009 WL 2882823, at \*19 (E.D.N.Y.2009) ("[s]ince plaintiff has alleged facts supporting a claim for assault and battery, he may not also base a claim of negligence on the same conduct"). If the plaintiff alleges intentional conduct in support of a claim for excessive force or battery, he may not also base a claim for negligence on that same conduct. *Glowczenski v. Taser Int'l Inc.,* 2010 WL 1936200, at \*7 (E.D.N.Y.2010) (citation omitted) ("to the extent that the negligence claims are duplicative of the false arrest, excessive force, or battery counts, or are based on intentional conduct, they should not (and will not) go to the jury"). If allegations may be read as asserting negligence, as a basis for liability for constitutional torts, the assertions must fail because negligence cannot be a basis for liability for constitutional torts. *Rafter v. Bank of Am.,* 2009 WL 691929, at \*10 (S.D.N.Y.2009) (citing *inter alia Daniels v. Williams,* 474 U.S. 327 (1986)).

In plaintiff's Third Cause of Action, he alleges:

> **\*7** The plaintiff restates every allegation contained in paragraphs "1" through "17".
>
> That on or about November 6, 2009 the plaintiff was caused to suffer personal injuries as a result of the negligence of the defendant, the City, its agents, servants and/or employees.

In the complaint, plaintiff describes defendants' conduct as, "forcibly yanking on plaintiff's handcuffs". Plaintiff also claims that defendants "yanked" and "shoved" plaintiff and that their actions were "willful and intentional". Plaintiff contends that defendants acted with the intent to violate his rights. Based upon plaintiff's own allegations, the claim of negligence cannot survive. Accordingly, on the facts currently before this Court, defendants' motion for summary judgment on plaintiff's negligence claim is granted.

## VI. Video Evidence
In the alternative, assuming the court does not award summary judgment based upon the arguments above, defendants claim that a video recording captured the events that transpired at the police station on November 6, 2009 and that a review of the tape demonstrates that the incident that is the subject of this action did not occur. Defendants included a DVD copy of the video with the motion herein together with

2013 WL 717915

an affidavit from Ed Barbagelata, a lieutenant with the City of Schenectady Police Department, attesting to its authenticity. Plaintiff does not specifically challenge the authenticity of the tape. Plaintiff states, "I am unable to view the video as I do not have the required video player" and therefore, he is "not aware [ ... ] whether this video has been altered or modified in any way".

The Court has attempted to review the DVD several times using several different means. The DVD is unreadable.[6] As the Court has already determined that defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, for the reasons set forth above, this issue is moot.

[6] On February 19, 2013, the Court contacted defense counsel to advise that the DVD was unreadable. Counsel did not resubmit any further DVD to the Court or to plaintiff.

### CONCLUSION

It is hereby

ORDERED that defendants' motion for summary judgment and dismissal of plaintiff's excessive force and battery claims (Dkt. No. 19) based upon the argument that the force did not

rise to the level of force necessary to constitute excessive force under the Fourth Amendment or battery under New York State Law is **DENIED;** it is further

ORDERED that defendants' motion for dismissal of plaintiff's claims against defendant "John Doe" (Dkt. No. 19) is **GRANTED** without prejudice; it is further

ORDERED that defendants' motion for summary judgment and dismissal of plaintiff's 1983 claims against the City of Schenectady (Dkt. No. 19) is **GRANTED;** it is further

ORDERED that defendants' motion for summary judgment and dismissal of plaintiff's negligence claim (Dkt. No. 19) is **GRANTED,** it is further

ORDERED that defendants' motion for summary judgment and dismissal of plaintiff's complaint based upon video evidence (Dkt. No. 19) is **DENIED.**

**\*8** The Clerk is directed to close the case.

IT IS SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2013 WL 717915

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Case 9:18-cv-00077-GLS-TWD     Document 111     Filed 03/06/20     Page 296 of 328

2018 WL 4554499
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Martin J. ROTHSCHILD, Plaintiff,
v.
John DOE #1 et al., Defendants.

9:14-cv-1343 (GLS/DEP)
|
Signed 09/21/2018

**Attorneys and Law Firms**

FOR THE PLAINTIFF: OF COUNSEL: CRISTEN M. MENDOZA, ESQ., JOHN C. CHERUNDOLO, ESQ., Cherundolo Law Firm, PLLC, AXA Tower One 17th Floor, 100 Madison Street, Syracuse, NY 13202, OF COUNSEL: MARTIN P. DUFFEY, ESQ., Cozen, O'Connor Law Firm, 1650 Market Street, Suite 2800, Philadelphia, PA 19103.

FOR THE DEFENDANTS: John Does #1-6, Jane Does #1-2, Unknown Named Employees of Elmira Correctional Facility, and Unknown Named Employees of Clinton Correctional Facility, NO APPEARANCE, Officer Damon Lamphier, Officer Joseph Cavaluzzi, Joyce Carver-Jordan, Steven Racette, Richard Adams, Peter A. Braselmann, Paul Harriman, Vonda L. Johnson, Irene Walker, Charles R. Simpson, Jill Northrop, and Nurse Waldron, HON. BARBARA D. UNDERWOOD, New York State Attorney General, OF COUNSEL: COLLEEN D. GALLIGAN, Assistant Attorney General, The Capitol, Albany, NY 12224, Irwin Lieb, Napierski, Vandenburgh Law Firm, OF COUNSEL: DIANE LUFKIN SCHILLING, ESQ., EUGENE D. NAPIERSKI, ESQ., 296 Washington Avenue Extension, Albany, NY 12203.

MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, Senior District Judge

**I. Introduction**

*1 Plaintiff Martin J. Rothschild commenced this action under 42 U.S.C. § 1983 against numerous defendants allegedly employed or contracted by the New York State Department of Corrections and Community Supervision (DOCCS). (Compl., Dkt. No. 1.) Rothschild alleges that defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. (3d Am. Compl., Dkt. No. 92.) Pending is defendant Dr. Irwin Lieb's motion for summary judgment, (Dkt. No. 109), and the remaining defendants' (hereinafter "DOCCS defendants") motion for summary judgment, (Dkt. No. 107). DOCCS defendants also move to disqualify Rothschild's experts. (Dkt. No. 121 at 3-5). [1] For the reasons that follow, Dr. Lieb's motion is granted, and DOCCS defendants' motion is granted in part and denied in part.

[1]     Also pending is Rothschild's request for oral argument. (Dkt. No. 117.) As it is squarely within the court's discretion not to avail itself of oral argument, see *Katz v. Morgenthau*, 892 F.2d 20, 22 (2d Cir. 1989); N.D.N.Y. L. R. 7.1(h), the request is denied.

**II. Background**

**A. Facts** [2]

[2]     Unless otherwise noted, the facts are not in dispute.

*1. Elmira Correctional Facility*
On November 18, 2013, Rothschild was received into DOCCS' custody at the Elmira Correctional Facility (hereinafter "Elmira"). (Defs.' Statement of Material Facts (SMF) ¶ 1, Dkt. No. 107, Attach. 1.) The same day, a nurse reviewed Rothschild's medical chart; she noted his history of elevated lipids and Crohn's disease [3]; and she ordered medications and laboratory tests, the results of which were normal. (*Id.* ¶¶ 5, 7.) On November 21, defendant Dr. Peter A. Braselmann conducted a reception physical of Rothschild, found no abnormalities, and ordered a slew of tests, the results of which were normal. (*Id.* ¶¶ 8-9.)

[3]     Crohn's Disease is "a chronic granulomatous inflammatory disease of unknown etiology, involving any part of the gastrointestinal tract from mouth to anus, but commonly involving the terminal ileum with scarring and thickening of the bowel wall; it frequently leads to intestinal obstruction and fistula and abscess formation and has a high rate of recurrence after treatment."

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 297 of 328

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Dorland's Illustrated Medical Dictionary 480 (28th ed. 1994).

On December 5, complaining of a flare-up of his Crohn's disease, Rothschild was seen by a nurse at sick call. (*Id.* ¶ 10.) He contends that on December 5 and 6 he reported urological symptoms of uncontrolled urination and the inability to urinate "to his medical providers." (Pl.'s SMF ¶¶ 9-10, Dkt. No. 115, Attach. 4.) Rothschild also contends that defendant Jill Northrop, a nurse,[4] ordered a blood test on December 5. (Pl.'s SMF ¶ 12.) He asserts that his blood was drawn for that purpose on December 9, and the results, dated December 10, found no abnormalities and indicated that " 'no action is required at this time.' " (*Id.* ¶¶ 16, 20.)

[4]    Rothschild contends that Northrop was a nurse practitioner. (3d Am. Compl. ¶ 13.) DOCCS defendants admit only that she is a nurse. (Dkt. No. 99 ¶ 8.) As there is no material difference for purposes of the instant motion, the court simply refers to her as a nurse.

**\*2**  Rothschild maintains that between December 5 and 11, he told several corrections officers at Elmira, including defendant Officer Joseph Cavaluzzi, that "he was having severe urological symptoms, that he needed to be seen, and that he was not allowed to go up to the infirmary." (*Id.* ¶ 15.) He contends that he made verbal requests to corrections officers to go to the infirmary on December 11, and he "believes" that defendant Officer Damon Lamphier was one of them. (*Id.* ¶¶ 25-26.) Rothschild requested sick call that afternoon, a nurse came to his cell with ibuprofen, and he was taken to the infirmary around 5:00 P.M. (Defs.' SMF ¶¶ 12-14.) That evening, he was transported to the emergency department of a local hospital and treated for urinary retention. (*Id.* ¶ 16.) Rothschild was diagnosed with urinary retention caused by a blockage in the bladder and a bladder diverticulum[5] and was catheterized. (*Id.* ¶ 18.)

[5]    A diverticulum is "a circumscribed pouch or sac of variable size occurring normally or created by herniation of the lining mucous membrane through a defect in the muscular coat of a tubular organ." Dorland's Illustrated Medical Dictionary 500 (28th ed. 1994).

Rothschild returned to Elmira with a Foley catheter.[6] (*Id.* ¶ 19.) On December 12, he was admitted to the infirmary in connection with a urinary tract infection (UTI) and bladder retention, and Dr. Braselmann cared for him. (*Id.* ¶ 22.) Dr.

Braselmann prepared an emergency request for consultation referring Rothschild to Dr. Alan Angell, the doctor who treated him at the local hospital, and requested that he be seen at a urology clinic the next day. (*Id.* ¶ 24.) Rothschild avers that, following a December 13 consultation with Dr. Angell, it was noted in his chart to change his catheter monthly. (Pl.'s SMF ¶ 38.)[7] On December 23, Dr. Braselmann referred Rothschild to Dr. Angell for a further consultation for urinary retention. (Defs.' SMF ¶ 28.) In January and February 2014, Rothschild was seen by Dr. Angell for, among other things, urological procedures. (*Id.* ¶¶ 29-32.) Rothschild contends that his catheter was changed on January 17, 2014 and again on February 27. (Pl.'s SMF ¶¶ 40, 45.)

[6]    A Foley catheter is "a catheter that is held in position in the urethra" and "retained in the bladder by a balloon inflated with air or liquid." Dorland's Illustrated Medical Dictionary 279 (28th ed. 1994).

[7]    Rothschild also contends that, following a February 18, 2014 appointment with Dr. Angell, it was noted in his chart to change his catheter every four weeks. (Pl.'s SMF ¶ 44.)

### 2. Clinton Correctional Facility

On March 3, 2014, Rothschild was transferred to Clinton Correctional Facility (hereinafter "Clinton"). (Defs.' SMF ¶ 37.) He states that his assigned healthcare provider was defendant Dr. Richard Adams, (Pl.'s SMF ¶ 47), who he maintains was responsible for ordering his monthly catheter changes, (*id.* ¶ 66).

On April 29, Rothschild advised a nurse that he had been experiencing nausea and vomiting for three days, abdomen pain, and foul-smelling urine with blood. (Defs.' SMF ¶ 56.) The nurse requested a consultation through Telemed, which is used for remote consultations with a physician when one is not available at Clinton. (*Id.* ¶¶ 57-58.) A doctor provided the Telemed consultation, prescribed medicine including an antibiotic, and admitted Rothschild to the infirmary. (*Id.* ¶¶ 59-60.) Defendant Dr. Vonda L. Johnson examined Rothschild the next day, diagnosed him with a UTI, and ordered various treatments including a change in antibiotics. (*Id.* ¶¶ 61-64.)

On May 1, Dr. Johnson again examined Rothschild and ordered that he continue intravenous fluids, antibiotics, and monitoring. (*Id.* ¶¶ 65-66.) That day, defendant Nurse Rebecca Waldron monitored his vital signs during her shift in

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 298 of 328

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

the infirmary. (*Id.* ¶ 67.) She noted that Rothschild's catheter was functioning properly and there were no signs of infection. (*Id.* ¶¶ 68-69.) On May 2, Dr. Johnson again examined Rothschild and found that he was feeling well and wanted to go back to his cell. (*Id.* ¶ 70.) Specifically, she examined his catheter and found it intact, functioning properly, and draining clear yellow urine. (*Id.* ¶ 71.) [8]

[8]    Rothschild states that, on April 30, Dr. Johnson ordered a "urinary analysis culture and sensitivity" to identify the bacteria in his urine. (Pl.'s SMF ¶ 85.) He also states that the results did not come back until May 3, a day after he was discharged from the infirmary, and Dr. Johnson did not review the results. (*Id.* ¶¶ 86, 88-90.)

**\*3**  Rothschild states that on May 14, 2014, he "was caused" to undergo a catheter change because his catheter line "had rotted out and fell out of his body." (Pl.'s SMF ¶ 91.) He asserts that "[w]hile under the care of Dr. Adams," for the two months between his March 3 arrival at Clinton and May 14, his catheter was not changed. (*Id.* ¶ 71.)

On July 15, 2014, Nurse Waldron changed Rothschild's catheter. (Defs.' SMF ¶ 77.) He states that it took thirty to forty minutes and caused excruciating pain, and upon insertion of the catheter he felt pressure in his bladder and was unable to walk. (Pl.'s SMF ¶ 94.) He adds that upon saying that the catheter did not feel right, he was told by a corrections officer that " 'it's not supposed to feel normal' " and to " 'get the hell out of here.' " (*Id.*) Ten days later, Dr. Adams examined Rothschild and found no residual symptoms of his prior UTI. (Defs.' SMF ¶ 79.)

On the afternoon of July 31, defendant Nurse Irene Walker saw Rothschild in the Clinton emergency department for an emergency sick call. (*Id.* ¶ 81.) He reported the following: he thought he was having a UTI; bleeding and leaking around his catheter; and severe pain. (*Id.*) After examining Rothschild, Nurse Walker noted the following: his catheter irrigated easily; there were no signs of blood or urinary leakage where the catheter was inserted or in his underwear; and the urine in his leg bag was a clear amber color without odor. (*Id.* ¶ 82; Pl.'s SMF ¶ 103.) Based on her examination, Nurse Walker found that his condition was non-emergent and directed him to follow up at the regular sick call in the morning. (Defs.' SMF ¶ 83.)

Later that night, defendant Nurse Paul Harriman saw Rothschild for another emergency sick call. (*Id.* ¶ 85.) He reported having bladder spasms, cramping, chills, and feeling like he had an infection. (*Id.* ¶ 87.) Nurse Harriman called the on-call doctor, Dr. Adams, and reported Rothschild's complaints. (*Id.* ¶ 90.) Nurse Harriman also communicated his findings that Rothschild's vital signs were normal except for an elevated heart rate, and he did not have a temperature or kidney pain. (*Id.* ¶¶ 88-90.) Dr. Adams prescribed an antibiotic to be administered at that time and advised Rothschild to follow up with a doctor the next morning. (*Id.* ¶ 91.) The next morning, Rothschild was seen by a nurse practitioner and transported to an outside hospital for further care. (*Id.* ¶ 97.) He contends that he was diagnosed with an acute UTI. (Pl.'s SMF ¶ 125.) He also maintains that he was transferred to an intensive care unit of an outside hospital for treatment of septic shock, (*id.* ¶ 128), returned to the Clinton infirmary on August 8, and was discharged from the infirmary on August 11, (*id.* ¶ 131).

### *3. Dr. Lieb*

In his third amended complaint, Rothschild alleges that Dr. Lieb was, at all relevant times, "employed by and/or contracted to perform medical services for inmates on behalf of Clinton ... and/or ... DOCCS." (3d Am. Compl. ¶ 22.) Regarding Dr. Lieb, Rothschild contends the following. After he was transferred to Clinton, Rothschild saw Dr. Lieb for a urological consultation on March 20, 2014. (Pl.'s SMF ¶¶ 9-10, Dkt. No. 114, Attach. 4 at 5-6) ("Pl.'s Lieb SMF"). Dr. Lieb did not make any recommendations in Rothschild's treatment plan regarding maintenance of his catheter, nor did he put in any orders directing that his catheter or leg bag be changed. (*Id.* ¶ 22.) [9]

[9]    There are a number of additional facts asserted by the parties that are not mentioned because they are not material.

### B. Procedural History

**\*4**  Rothschild filed his complaint on November 4, 2014. (Compl.) Subsequently he filed an amended complaint, (Am. Compl., Dkt. No. 52), and a second amended complaint, (2d Am. Compl., Dkt. No. 66). Dr. Lieb filed a motion to dismiss on April 21, 2015, (Dkt. No. 44), which the court denied, (Dkt. No. 90). Thereafter Rothschild filed his third amended complaint, (3d Am. Compl.), which is the operative pleading. Rothschild's sole claim is for deliberate indifference to serious medical needs under the Eighth Amendment and

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 299 of 328

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Section 1983. (*Id.* ¶ 1.) After discovery, the pending motions were filed.

## III. Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. Discussion

### A. John Doe, Jane Doe, and Unknown Defendants

In his third amended complaint, Rothschild includes, as defendants, John Does (#1-4), Jane Does (#1-2), Unknown Named Employees of Elmira Correctional Facility, and Unknown Named Employees of Clinton Correctional Facility. (3d Am. Compl. at 1-4.)

Rothschild previously identified certain Doe defendants and was granted permission to file his third amended complaint. (Dkt. No. 83, Attach. 9 at 1; Dkt. No. 89.) Now, at summary judgment, discovery is closed, and Rothschild has had ample time and opportunity to identify and serve the remaining Doe and Unknown defendants. He has not. Thus dismissal of these defendants without prejudice is appropriate. *See Delrosario v. City of New York*, No. 07 Civ. 2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *Keesh v. Artuz*, No. 97 Civ. 8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008), *aff'd sub nom. Allah v. Michael*, 506 F. App'x 49 (2d Cir. 2012).

### B. DOCCS Defendants' Motion for Summary Judgment

DOCCS defendants move for summary judgment on two basic grounds: (1) Rothschild cannot establish a prima facie case as a matter of law, and (2) DOCCS defendants are shielded by qualified immunity. (Dkt. No. 107, Attach. 29 at 2, 16-18.)

#### 1. Deliberate Indifference to Serious Medical Needs

To show that prison medical treatment was so inadequate as to constitute "cruel or unusual punishment" prohibited by the Eighth Amendment, Rothschild must prove that DOCCS defendants' acts or omissions amounted to "deliberate

indifference to [a] serious medical need[ ]." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Such a claim includes both an objective and a subjective component. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

The objective component asks whether the alleged deprivation of medical care was "sufficiently serious," a standard that "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (internal quotation marks and citation omitted). Among the relevant factors for determining whether a serious medical need exists are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted).

With respect to the subjective component, a defendant "must act with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66. That is, the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003). However, a defendant's medical malpractice absent culpable recklessness does not meet the subjective requirement. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Likewise, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703.

#### 2. Qualified Immunity

**\*5** "Qualified immunity shields [defendants] from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). Prisoners have a clearly established constitutional right to medical care. *See Ruiz v. Blanchette*, 529 F. App'x 33, 35-36 (2d Cir. 2013); *Petrazzoulo v. U.S. Marshals Serv.*, 999 F. Supp. 401, 409-10 (W.D.N.Y. 1998). The question, then, is whether it was objectively reasonable for DOCCS defendants to believe that

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

their actions were lawful at the time. *See Coons v. Casabella*, 284 F.3d 437, 440 (2d Cir. 2002).

*3. Defendants Joyce Carver-Jordan, Steven Racette, Paul Harriman, and Charles R. Simpson*

DOCCS defendants argue that defendant Joyce Carver-Jordan retired from DOCCS in 2009, years prior to Rothschild's incarceration, and therefore cannot be liable. (Dkt. No. 107, Attach. 29 at 10.) They also argue that defendants Steven Racette and Charles R. Simpson cannot be liable because they were not personally involved in Rothschild's medical treatment, (*id.* at 11, 14), and there is no support for a claim against Nurse Harriman, (*id.* at 15-16). In his response, Rothschild does not oppose summary judgment as to Carver-Jordan, Racette, Simpson, or Harriman. (Dkt. No. 115, Attach. 5 at 23.) Thus, summary judgment is granted as to those four defendants.

*4. Officer Lamphier and Officer Cavaluzzi*

DOCCS defendants argue that Rothschild cannot establish a prima facie for deliberate indifference against Officer Lamphier or Officer Cavaluzzi. (Dkt. No. 107, Attach. 29 at 7-8.) Rothschild argues that they are liable under the theory that they denied him access to needed medical care. (Dkt. No. 115, Attach. 5 at 13-14.) The court agrees with DOCCS defendants.

Rothschild asserts that he "believes" that he made a verbal request to Officer Lamphier to go to the infirmary on December 11, 2013. (Pl.'s SMF ¶ 26.) "This unsubstantiated belief is insufficient to defeat summary judgment." *Cavanaugh v. County of Nassau*, No. 13–CV–3389, 2015 WL 5794211, at *6 (E.D.N.Y. Sept. 30, 2015) (internal citations omitted); *see Gleason Works v. Oerlikon Geartec, AG*, 141 F. Supp. 2d 334, 341 (W.D.N.Y. 2001) ("[A] belief is insufficient ... to survive a motion for summary judgment[.]") (internal quotation marks and citation omitted).

In response to Officer Cavaluzzi's declaration, in which he attests that he was not aware that Rothschild had any specific medical problems, (Dkt. 107, Attach. 5 ¶ 15), Rothschild "asserts that he informed [Officer] Cavaluzzi of certain specific medical problems during the time he was housed [at] ... Elmira," (Dkt. No. 115, Attach. 4 at 5, ¶ 36). The only evidence supporting this is Rothschild's deposition testimony that he told Officer Cavaluzzi about his "symptoms" and he needed to be seen in the infirmary. (Dkt. No. 107, Attach. 17 at 106.) [10] This is insufficient because Rothschild's claim

"lacks sufficient factual specificity to create a triable issue." *Colon v. Coughlin*, 58 F.3d 865, 874 n.8 (2d Cir. 1995). For instance, Rothschild does not state what symptoms he told Officer Cavaluzzi about or when he told him. *See id.*; *Richards v. Goord*, No. 9:04-CV-1433, 2007 WL 201109, at *14 (N.D.N.Y. Jan. 23, 2007).

[10]    Rothschild also testified that he "did mention it to [Officer Cavaluzzi] ... that [he] was having these symptoms, but the most acute of the symptoms were occurring when other [corrections officers] were there," which cuts against his claim. (Dkt. No. 107, Attach. 17 at 107.)

**\*6**   Even if Rothschild told Officer Cavaluzzi that he was having "severe urological symptoms, that he needed to be seen, and that he was not allowed to go up to the infirmary," (Pl.'s SMF ¶ 15), [11] there is nothing in the record to infer that Officer Cavaluzzi should have appreciated that Rothschild had a serious medical need. *See Larkins v. Cayuga County*, No. 9:13–CV–219, 2014 WL 4760064, at *8 (N.D.N.Y. Sept. 24, 2014). And it is undisputed that, on December 11, 2013, a nurse came to Rothschild's cell with ibuprofen, and he was taken to the infirmary around 5:00 P.M. (Defs.' SMF ¶¶ 12-14.) Rothschild's failure to specify what he told Officer Cavaluzzi, and when he said it in relation to when he was treated, leaves his claim lacking. Based on this record, no reasonable factfinder could conclude that Officer Cavaluzzi was deliberately indifferent. *See Wilson v. Yussuff*, No. 14–CV–3684, 2015 WL 77433, at *4 (E.D.N.Y. Jan. 6, 2015).

[11]    The support for this adduced fact is dubious. At his deposition, Rothschild testified that corrections officers, including Officer Cavaluzzi, "came to realize that [he] had been very sick and [he] had a lot of problems and [he] would talk to them on and off just in general about the fact that [he] was having problems *with the treatment*." (Dkt. No. 107, Attach. 17 at 55 (emphasis added).) Not only does this concern Rothschild's treatment —which necessarily would have occurred after he was taken to the infirmary—but even if such testimony could be interpreted as supporting the claim against Officer Cavaluzzi, it does not cure Rothschild's insufficient factual specificity.

*5. Dr. Braselmann and Nurse Northrop*

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Case 9:18-cv-00077-GLS-TWD     Document 111     Filed 03/06/20     Page 301 of 328

DOCCS defendants argue that Dr. Braselmann and Nurse Northrop were not personally involved and therefore cannot be liable. (Dkt. No. 107, Attach. 29 at 8-10). Rothschild counters that his urinary retention was obvious such that they had the requisite knowledge of the substantial risk to him. (Dkt. No. 115, Attach. 5 at 8-13.) The court agrees with DOCCS defendants.

Rothschild's claim as to Dr. Braselmann and Nurse Northrop suffers from a fatal flaw: he offers no evidence that they knew of his urological symptoms, let alone that they had the requisite knowledge of substantial risk. Instead, Rothschild states that between December 5 and 6, 2013, he "reported [his] urological symptoms *to his medical providers*." (Pl.'s SMF ¶ 10 (emphasis added).) He also states that between December 5 and December 11, he told several corrections officers that he was having severe urological symptoms. (*Id.* ¶¶ 15, 25.) But there is no evidence that Dr. Braselmann or Nurse Northrop were notified of his symptoms. *See Larkins,* 2014 WL 4760064, at *8 (granting summary judgment where defendants were unaware plaintiff was suffering from a condition requiring urgent medical care).

Indeed, on November 21, 2013, Dr. Braselmann conducted a physical of Rothschild and found no abnormalities, and laboratory results were also normal. (Pl.'s SMF ¶¶ 4, 8.) The blood test taken by Nurse Northrop to determine if Rothschild was having a Crohn's disease flare-up also found no abnormalities. (*Id.* ¶¶ 11-12, 16, 20.)[12] After that, Rothschild offers nothing to suggest that Dr. Braselmann or Nurse Northrop had anything to do with him before he was taken to the emergency department of a local hospital. (*Id.* ¶¶ 24-32.)

[12]   Rothschild argues that Nurse Northrop recognized the initials on the laboratory report as belonging to Dr. Braselmann, which Dr. Braselmann denied. (Pl.'s SMF ¶¶ 6, 18-23.) But it is of no consequence because Rothschild agrees that the results found no abnormalities. (*Id.* ¶ 20.) Given the lack of factual support for Rothschild's claim, Dr. Braselmann's credibility is irrelevant. (Dkt. No. 115, Attach. 5 at 12 n.4.)

**\*7** Rothschild also argues that, after the blood test results found no abnormalities, neither Dr. Braselmann nor Nurse Northrop "took any other steps to fully examine [him] or otherwise treat his condition." (Dkt. No. 115, Attach. 5 at 11.) But "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703; *Rodriguez v. Conway,* 827 F. Supp. 2d 211, 213 (W.D.N.Y. 2011) (granting summary judgment where "[a]ll that the record shows ... is that plaintiff subjectively believes that more should have been done for him"); *Burgos v. Alves,* 418 F. Supp. 2d 263, 265 (W.D.N.Y. 2006) (granting summary judgment where "[w]ith the benefit of hindsight, plaintiff simply contends that [defendants] should have done more sooner"). Rothschild's citation to *Burton v. Lynch,*[13] (Dkt. No. 115, Attach. 5 at 10-11), is readily distinguishable because, in that case, the plaintiff prisoner advised the defendant doctor that he had elbow pain, and the doctor refused to examine his elbow. Here, Rothschild cannot establish that Dr. Braselmann or Nurse Northrop were even aware of his urological symptoms, as explained above.

[13]   664 F. Supp. 2d 349 (S.D.N.Y. 2009).

Even if Rothschild had established a prima facie case against Dr. Braselmann and Nurse Northrop, they would nonetheless be entitled to qualified immunity. That is, given the care that Dr. Braselmann and Nurse Northrop rendered under the circumstances, as well as their lack of awareness of Rothschild's urological symptoms, it was objectively reasonable for them to believe that their actions did not violate Rothschild's rights. *See Hathaway,* 37 F.3d at 67.

*6. Dr. Adams*

Rothschild argues that Dr. Adams is liable for two different events: his failure to change Rothschild's catheter, (Dkt. No. 115, Attach. 5 at 14-17), and his failure to admit Rothschild to the infirmary on July 31, 2014, (*id.* at 21-22). The court agrees with DOCCS defendants that Rothschild's claim regarding the events of July 31 fails as a matter of law. (Dkt. No. 107, Attach. 29 at 11-12.) But Rothschild's claim regarding Dr. Adams' failure to change his catheter survives summary judgment.

*a. Monthly Catheter Changes*

Rothschild contends that Dr. Adams was responsible for ordering his monthly catheter changes, (Pl.'s SMF ¶¶ 38, 44, 60,[14] 66, 68), and he was aware that patients with a Foley catheter are at a high risk of getting infections, (*id.* ¶ 64). Rothschild also maintains that from his arrival at Clinton on March 3, 2014 until May 14, his catheter was not changed. (*Id.* ¶ 77.)[15] On May 14, Rothschild states that he "was caused

2018 WL 4554499

to undergo a Foley catheter change because his catheter line had rotted out and fell out of his body." (*Id.* ¶ 91.) He argues that this caused, in late April 2014, nausea, vomiting, abdominal pain, foul-smelling urine with blood, rigors, and general malaise. (*Id.* ¶¶ 76, 79-80; Dkt. No. 115, Attach. 5 at 2.)

[14]  Rothschild's citation for this proffered fact is incorrect. However, he testified at deposition that he told Dr. Adams that he had a Foley catheter that needed to be changed monthly. (Dkt. No. 107, Attach. 17 at 72.)

[15]  DOCCS defendants contend that his catheter was changed on March 30. (Dkt. No. 107, Attach. 29 at 4.) This is a factual dispute not appropriately resolved at summary judgment. Further, even if DOCCS defendants are correct, the period of time between March 30 and May 14 is still greater than a month.

DOCCS defendants' argument that Rothschild has not established a claim against Dr. Adams regarding his catheter is unavailing. (Dkt. No. 121 at 8-9.) They merely dispute the facts that Rothschild has adduced and argue that "the record is completely devoid of any proof that Dr. Adams subjectively believed that not changing [Rothschild]'s catheter ... would put [him] at risk of serious harm." (*Id.* at 9.) However, that ignores the facts discussed in the preceding paragraph.

Rothschild has demonstrated that a reasonable jury could find that Dr. Adams' was deliberately indifferent to a serious medical need. It cannot be said as a matter of law that Rothschild's catheter rotting out and falling out of his body —combined with nausea, vomiting, abdominal pain, foul-smelling urine with blood, rigors, and general malaise—is not sufficiently serious. *See Chance*, 143 F.3d at 702. It also cannot be said as a matter of law that Dr. Adams did not act with a sufficiently culpable state of mind. *See Hathaway*, 37 F.3d at 66. Rothschild has adduced facts such that a reasonable jury could find that Dr. Adams failed to act while he was actually aware of a substantial risk that serious harm to Rothschild would result. *See Salahuddin v. Goord*, 467 F.3d 264, 280 (2d Cir. 2006). As a matter of law on this record, Rothschild's proof does not suggest mere medical malpractice without culpable recklessness, *see Hernandez*, 341 F.3d at 144, or mere disagreement over the proper treatment, *see Chance*, 143 F.3d at 703.

**\*8**  At this juncture, Dr. Adams is not entitled to qualified immunity either. [16] It would not be objectively reasonable for Dr. Adams to believe that, as the healthcare provider responsible for Rothschild's monthly catheter changes, failing to order them was constitutionally tolerable. *See Hathaway*, 37 F.3d at 67.

[16]  DOCCS defendants did not make a qualified immunity argument specific to Dr. Adams. (Dkt. No. 107, Attach. 29 at 16-18.) Rather, he was included in their general argument for qualified immunity. (*Id.*)

### b. July 31, 2014

Rothschild's claim against Dr. Adams as it pertains to the events of July 31, 2014 does not survive summary judgment. That day, Dr. Adams was told, by telephone, that Rothschild was complaining of bladder spasms, discomfort, chills, and had been experiencing symptoms for ten hours. (Pl.'s SMF ¶ 118.) He was also told that Rothschild's vital signs were normal except for an elevated heart rate, and he did not have a temperature or kidney pain. (*Id.*) Dr. Adams prescribed an antibiotic to be administered at the time and advised Rothschild to follow up with a doctor visit in the morning. (*Id.* ¶ 119.) The next day, Rothschild was diagnosed with an acute UTI, was admitted to the infirmary, and was eventually transported to an outside hospital. (*Id.* ¶¶ 124-127.)

Rothschild contends that, despite concern about his rapid pulse rate, Dr. Adams failed to order a sample of his urine or order a laboratory urinalysis. (Dkt. No. 115, Attach. 5 at 20.) He also argues that he should have been admitted to the infirmary and/or an outside hospital on July 31. (*Id.* at 22.) But, as noted, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. Rothschild's belief that more should have been done for him is insufficient to establish a viable claim. *See Rodriguez*, 827 F. Supp. 2d at 213. With the benefit of hindsight, he simply contends that Dr. Adams should have done more sooner, which fails as a matter of law. *See Burgos*, 418 F. Supp. 2d at 265.

And, even if such a claim were viable, Dr. Adams is entitled to qualified immunity as to July 31. For the reasons explained by DOCCS defendants, (Dkt. No. 107, Attach. 29 at 11-12), it was objectively reasonable for Dr. Adams to believe that his

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 303 of 328
Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)
2018 WL 4554499

actions did not violate Rothschild's rights. *See Hathaway*, 37 F.3d at 67.

### 7. *Dr. Johnson*

DOCCS defendants argue that Dr. Johnson was not personally involved in any alleged violation. (Dkt. No. 107, Attach. 29 at 12-14.) Rothschild's claim against Dr. Johnson is based on her failure to change or order a change for his catheter during his April 29 to May 2 infirmary admission. (Dkt. No. 115, Attach. 5 at 16-18.) The court agrees with DOCCS defendants.

Importantly, Rothschild states that Dr. Adams, as his healthcare provider, was responsible for ordering monthly catheter changes. (Pl.'s SMF ¶ 66.) He makes no such statement concerning Dr. Johnson. This dooms Rothschild's sole theory of liability against her—that she failed to change his catheter.

Rothschild argues that the risk posed by a failure to change his catheter was obvious. (Dkt. No. 115, Attach. 5 at 16-17.) He specifies that "it is standard practice and common sense to change a patient's catheter line upon the patient's presentation with an acute [UTI]." (*Id.* at 16 (internal quotation marks and citation omitted).) But this ignores the undisputed facts. On April 30, Dr. Johnson examined Rothschild and found that he was in no acute distress, his catheter was intact, and it was draining. (Defs.' SMF ¶ 62.) She ordered continued intravenous fluids, close monitoring, and various tests. (*Id.* ¶ 63.) Dr. Johnson also changed Rothschild's antibiotic and added another antibiotic. (*Id.* ¶¶ 63-64.) She examined him again on May 1 and May 2. (*Id.* ¶¶ 65, 70.) On May 2, prior to his discharge from the infirmary, Rothschild was feeling well, had a good appetite, was in no apparent distress, and wanted to go back to his cell. (*Id.* ¶ 70.) She also examined his catheter again and found it intact and functioning properly. (*Id.* ¶ 71.) [17] Thus, Rothschild's argument that there was an obvious risk rings hollow. He merely disagrees over the proper treatment, which is insufficient. *See Chance*, 143 F.3d at 703; *Rodriguez*, 827 F. Supp. 2d at 213; *Burgos*, 418 F. Supp. 2d at 265.

[17]    Dr. Johnson asserts that she did not believe a catheter change was necessary because it was intact and draining well. (Defs.' SMF ¶ 73.) Rothschild denies this fact but fails to cite any evidence that Dr. Johnson did not so believe. (Dkt. No. 115, Attach. 4 at 9.) In any event, as explained above, Rothschild

does not state that Dr. Johnson was responsible for his catheter changes, and the risk was not obvious.

**\*9** Further, even if Rothschild established his claim against Dr. Johnson, she would nonetheless be entitled to qualified immunity. That is, given the care that Dr. Johnson rendered under the circumstances, as well as the lack of any evidence that she was responsible for changing his catheter, it was objectively reasonable for her to believe that her actions were constitutionally permissible. *See Hathaway*, 37 F.3d at 67.

### 8. *Nurse Waldron*

Rothschild argues that Nurse Waldron is liable for her conduct in changing his catheter. (Dkt. No. 115, Attach. 5 at 18-19.) The court agrees with DOCCS defendants that this claim fails as a matter of law. (Dkt. No. 107, Attach. 29 at 14-15.)

Rothschild contends that Nurse Waldron "took approximately thirty (30) to forty (40) minutes to force the new [catheter] line in and caus[ed] excruciating pain." (Pl.'s SMF ¶ 94.) Rothschild also "felt pressure in his bladder, was not able to walk, and verbally expressed that [the catheter] 'did not feel right'," (*id.*), and he filed a grievance concerning her conduct, (*id.* ¶ 95). [18]

[18]    Rothschild states that a corrections officer told him that "it's not supposed to feel normal" and to "get the hell out of here." (Pl.'s SMF ¶ 94.) But the corrections officer's actions have no bearing on Nurse Waldron's liability. Rothschild also states that Nurse Waldron was aware that it was important to look for signs and symptoms of infection. (*Id.* ¶ 98.) But he makes no allegation that he had any signs or symptoms of infection when Nurse Waldron treated him. Indeed, he was examined by Dr. Adams ten days later and makes no mention of signs or symptoms then either. (*Id.* ¶ 99.)

Even if Rothschild has adequately established a serious medical need, [19] he has failed to meet the subjective prong of the deliberate indifference standard. "[A]llegations of negligence or error amounting to medical malpractice are insufficient to sustain a claim of deliberate indifference under [S]ection 1983." *Nisvis v. N.Y.S. Dep't of Correctional Servs.*, No. 11 Civ.2004, 2013 WL 4757839, at *5 (S.D.N.Y. Sept. 4, 2013) (collecting cases). Moreover, "where a plaintiff has not alleged that a medical professional 'knowingly and intentionally rendered improper treatment, [his] asserted dissatisfaction with the treatment itself is insufficient to

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 304 of 328

support the subjective prong of deliberate indifference.' " *Id.* (quoting *Jones v. Mack*, No. 08 Civ. 6089, 2012 WL 386269, at *5 (S.D.N.Y. Feb. 3, 2012) ). So here.

[19]    The court need not and does not reach this issue.

Moreover, even if Rothschild could establish a claim against Nurse Waldron, she is entitled to qualified immunity. It was objectively reasonable for her to believe that her changing of Rothschild's catheter was not constitutionally violative, even if she did not change it correctly. *See Hathaway*, 37 F.3d at 67. Rothschild makes no allegation that he told Nurse Waldron that he was experiencing excruciating pain, bladder pressure, or inability to walk, and in fact he agrees that her nursing note documents that the change was without issue. (Pl.'s SMF ¶ 96.)[20]

[20]    Rothschild states that he verbally expressed that his catheter " 'did not feel right,' " but it is unclear whether he did so to Nurse Waldron. (Pl.'s SMF ¶ 94.) In any event, he makes no allegation that he verbally expressed anything about pain, pressure, or inability to walk.

*9. Nurse Walker*

DOCCS defendants argue that Rothschild's claim against Nurse Walker is insufficient as a matter of law. (Dkt. No. 107, Attach. 29 at 15.) Rothschild contends that he has adduced enough facts for a jury to be able to conclude that she was deliberately indifferent to a serious medical need. (Dkt. No. 115, Attach. 5 at 20, 21.) The court agrees with DOCCS defendants.

**\*10**    On July 31, Rothschild told Nurse Walker that he was " 'bleeding and leaking' " around his catheter. (Pl.'s SMF ¶ 100.) She examined him and noted that his catheter "irrigated easily and good return, flow back [sic]." (*Id.* ¶ 103.) She also checked the tip of his penis and his underwear and found no signs of bleeding or leaking. (*Id.*) Based upon her examination, Nurse Walker found that Rothschild's condition was non-emergent and directed him to follow up at the regular sick call the following morning. (Defs.' SMF ¶ 83.)

Rothschild's theory of liability is based on actions that Nurse Walker did not take. (Dkt. No. 115, Attach. 5 at 20, 21.) He contends that she did not attempt to contact a physician or nurse practitioner; did not note his vital signs in her nursing note; and did not do a dipstick analysis. (*Id.*) But Rothschild's subjective belief that more should have been done for him is

insufficient, *see Rodriguez*, 827 F. Supp. 2d at 213; *Burgos*, 418 F. Supp. 2d at 265, and "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703.

And, even if Rothschild could establish a claim against Nurse Walker, she is entitled to qualified immunity. It was objectively reasonable for her to believe that, when she examined Rothschild, found his condition non-emergent, and directed him to follow up the next morning, she was not violating Rothschild's rights. *See Hathaway*, 37 F.3d at 67.

**C. Dr. Lieb's Motion for Summary Judgment**

Dr. Lieb argues that Rothschild has failed to establish a deliberate indifference claim against him. (Dkt. No. 109, Attach. 11 at 3-4.) Rothschild counters that Dr. Lieb is liable for failing to change his catheter or put orders in place for it to be changed. (Dkt. No. 114, Attach. 5 at 4-7.) The court agrees with Dr. Lieb.

Rothschild's claim against Dr. Lieb suffers from the same fatal flaw as his claim against Dr. Johnson—he adduces no evidence that it was Dr. Lieb's responsibility to change his catheter. Rothschild asserts that Dr. Adams, as his healthcare provider, was responsible for ordering monthly catheter changes. (Pl.'s SMF ¶ 66.) But he makes no such assertion concerning Dr. Lieb. In fact, although Rothschild's medical chart noted that his catheter should be changed monthly, (Pl.'s Lieb SMF ¶ 4), at the March 20, 2014 appointment at issue, Dr. Lieb told Rothschild that he did not have his chart and "didn't know what his circumstances were." (*Id.* ¶ 13).[21]    Rothschild mentioned, to Dr. Lieb, a discussion about a possible surgical procedure that he had with a prior doctor, and self-catheterization may have been discussed. (*Id.* ¶¶ 15-16.) But Rothschild does not state that he mentioned anything about a catheter change to Dr. Lieb.[22]

[21]    Dr. Lieb was not always provided with medical charts for inmate patients. (Pl.'s Lieb SMF ¶ 12.)

[22]    In fact, Dr. Lieb's report of consultation for the March 20 appointment noted that "at the time [he] saw [Rothschild], he had a cath[eter] in, *placed on 2/27* with leg bag." (Pl.'s SMF ¶ 52 (emphasis added).) Thus, it had not been a month since Rothschild's last catheter change, and there was at least a week's time before the catheter had to be changed.

Case 9:18-cv-00077-GLS-TWD Document 111 Filed 03/06/20 Page 305 of 328

Rothschild v. Doe #1, Not Reported in Fed. Supp. (2018)

2018 WL 4554499

Additionally, Rothschild's argument that the substantial risk to his health resulting from a failure to change his catheter was obvious to Dr. Lieb, (Dkt. 114, Attach. 5 at 5), is belied by the record. Rothschild fails to offer facts suggesting that Dr. Lieb was exposed to information concerning his monthly catheter change and must have known about it, such that a reasonable trier of fact could find that Dr. Lieb had the requisite knowledge. *See Farmer*, 511 U.S. 842-43. Indeed, as explained in the preceding paragraph, the facts indicate that Dr. Lieb did not have Rothschild's chart and Rothschild did not tell him of his monthly catheter changes. Dr. Lieb's general awareness that patients with a Foley catheter are at a higher risk of infections, (Pl.'s Lieb SMF ¶ 23), does not render the risk specific to not changing Rothschild's catheter obvious to Dr. Lieb.

 **\*11** Furthermore, assuming that Rothschild has established a claim against Dr. Lieb, he too is entitled to qualified immunity.[23] It was the responsibility of Rothschild's healthcare provider, Dr. Adams, (Pl.'s Lieb SMF ¶ 66), to order monthly catheter changes, not Dr. Lieb. He told Rothschild that he did not have his chart, and there is nothing to indicate that he knew that Rothschild's catheter needed to be changed. (Pl.'s Lieb SMF ¶ 13). And, even if he somehow knew of the monthly requirement, Dr. Lieb's notes indicate that Rothschild's catheter had been changed less than a month prior. *See supra* n.22. It was thus objectively reasonable for Dr. Lieb to believe that he acted in a constitutionally lawful manner. *See Hathaway*, 37 F.3d at 67.

[23] Although Dr. Lieb did not specifically raise the argument, the court has the "power to grant summary judgment *sua sponte* ... based upon the defense of qualified immunity." *Doyle v. Coombe*, 976 F. Supp. 183, 187 (W.D.N.Y. 1997), *aff'd*, 159 F.3d 1346 (2d Cir. 1998).

### D. Motion to Disqualify Rothschild's Experts

DOCCS defendants' reply brief in support of their motion for summary judgment includes an argument that Rothschild's experts should be disqualified. (Dkt. No. 121 at 1-5.) They argue that Rothschild failed to comply with Rule 26(a)(2)(B) and his expert proof lacks a reliable foundation.

(*Id.*) For the reasons stated in Rothschild's surreply, (Dkt. No. 124),[24] DOCCS defendants' motion to disqualify Rothschild's experts is denied with leave to renew in connection with trial.

[24] The court granted Rothschild's request to file a surreply. (Dkt. No. 123.)

### V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that DOCCS defendants' motion for summary judgment (Dkt. No. 107) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **DENIED** as to the claim against Dr. Richard Adams regarding Rothschild's catheter (3d Am. Compl. ¶ 101) and as to the motion to disqualify Rothschild's experts (Dkt. No. 121 at 1-5); and

> **GRANTED** in all other respects, with the dismissal of the Doe and Unknown defendants being without prejudice; and it is further

**ORDERED** that Dr. Lieb's motion for summary judgment (Dkt. No. 109) is **GRANTED**; and it is further

**ORDERED** that the Clerk terminate every defendant from this action except for Dr. Richard Adams; and is further

**ORDERED** that this case is now deemed trial-ready and a trial scheduling order will be issued in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4554499

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5197230
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brian MACK, Plaintiff,

v.

Sergeant Ronald G. WOOD II, John Doe
Correction Officers # 1-3, Defendants.

9:17-CV-1146 (BKS/ATB)
|
Signed 07/26/2019

**Attorneys and Law Firms**

BRIAN MACK, Plaintiff, pro se.

CHRISTOPHER J. HUMMEL, Asst. Attorney General for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Brenda K. Sannes,
United States District Judge. Plaintiff commenced this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
that employees of the New York State Department of
Correctional and Community Services ("DOCCS") violated
his constitutional rights during his confinement at Clinton
Correctional Facility ("Clinton"). (Complaint ("Compl.")
at 1-4, Dkt. No. 1).[1] Specifically, plaintiff alleges that
on May 23, 2016, defendants Wood and John Doe
Correctional Officers #1-3 participated in physically and
sexually assaulting plaintiff, in violation of his First and
Eighth Amendment Rights. (Amended Complaint ("Am.
Compl.") at 10-12, Dkt. No. 39). Presently before the
court is defendant Wood's motion for 1) dismissal of the
amended complaint as against the unidentified "John Doe"
defendants, and 2) partial summary judgment on plaintiff's
First Amendment retaliation claim. (Dkt. No. 65). Plaintiff
has responded in opposition to the motion. (Dkt. Nos. 69, 70).
For the reasons set forth below, this court will recommend
dismissing the amended complaint as against the unidentified
"John Doe" defendants, and will further recommend denying
summary judgment on plaintiff's First Amendment retaliation
claim against defendant Wood.

[1] Plaintiff amended his complaint on September
6, 2018, following the withdrawal of plaintiff's
counsel. (Dkt. Nos. 24, 25, 39). Substantively,
plaintiff's claims in the amended complaint are
identical to those in the original. (Dkt. Nos. 1, 39).

### BACKGROUND

#### I. Relevant Facts and Contentions

##### A. Plaintiff's Contentions

At all times relevant to this action, plaintiff was an inmate at
Clinton under the care and custody of DOCCS. (Dkt. No. 39
at ¶ 6). According to plaintiff, the underlying assault occurred
on May 23, 2016, as approximately 8:30 a.m., as plaintiff
was leaving the mess hall after breakfast. (*Id.*). At that time,
plaintiff was informed by an unidentified correctional officer
that defendant Wood "needed to speak" with plaintiff. (*Id.* at
¶ 6-8). Plaintiff waited in place until defendant Wood arrived,
at which time he took plaintiff into a nearby stairwell. (*Id.* at
¶ 9-11).

Upon entering the stairwell, defendant Wood proceeded to
close the door and "violently shove[ ]" plaintiff into the wall,
pin his face to the wall, and yell in his ear, "You need to
min[d] your fucking business nigger; this is not Downstate
Correctional Facility; we will kill your nigger ass here in
Clinton; the Superintendent wants you dead; stop writing
your fucking grievances about corruption activities!" (*Id.* at
¶ 12-13). Plaintiff responded, "I will write complaints as
warranted," to which defendant Wood replied, "Did I tell you
to talk, shut the fuck up!" (*Id.* at ¶ 14-15).

Immediately following this exchange, plaintiff heard
footsteps coming down the stairwell. (*Id.* at ¶ 16). As
plaintiff turned toward the sound, defendant Wood pushed
him, causing plaintiff's head to hit a fire extinguisher on the
wall. (*Id.* at ¶ 18-19). Defendant Wood then pinned plaintiff to
the ground. (*Id.*). At that time, three to four other unidentified
correctional officers entered the stairwell. (*Id.* at ¶ 20-21).
Plaintiff heard one of the unknown officers ask, excitedly,
"is that the nigger Sarge, is that the nigger? Rat." (*Id.* at ¶
22). They proceeded to kick plaintiff, while defendant Wood
continued to pin him to the ground, with his knee in plaintiff's
neck and back and his right hand on plaintiff's head. (*Id.* at
¶ 23-24). Plaintiff claims he was then sexually assaulted by
the unknown officers, who, among other things, "shoved"
an approximately ten-inch-long wooden stick into plaintiff's

rectum. (*Id.* at ¶ 25-38). Defendant Wood held plaintiff down and watched the sexual assault take place. (*Id.*).

**\*2** After, while plaintiff was still on the ground, defendant Wood warned plaintiff to "keep [his] complaints to [him]self," and that if he did not, he would be a "dead nigger." (*Id.* at ¶ 39-40). Defendant Wood then told plaintiff to go to his cell and take the wooden instrument out of his rectum. (*Id.* at ¶42). Plaintiff proceeded to his cell, but could not remove the object due to his pain. (*Id.* at ¶ 42-49). An officer came to plaintiff's cell following the incident to take the list for lunch, and upon seeing plaintiff, took him to the infirmary. (*Id.* at ¶ 45-54).

While plaintiff was waiting to be seen at the infirmary, defendant Wood came into the treatment room and gestured for plaintiff to remain silent, by placing his index fingers against his lips. (*Id.* at ¶ 63-65). Nevertheless, when the doctor asked plaintiff what happened, plaintiff disclosed that he was assaulted by defendant Wood and other unknown officers. (*Id.* at ¶ 66-67). Shortly thereafter, plaintiff was moved to an outside hospital to treat for his injuries. (*Id.* at ¶ 77-88). He returned to Clinton's infirmary later that day. (*Id.* at ¶ 89-90).

**B. Defendant Wood's Assertion of Facts**

At all times relevant to this action, defendant Wood was employed as a sergeant at Clinton. (Declaration of Ronald Wood ("Wood Dec.") at ¶ 1-5, Dkt. No. 65-3). On May 23, 2016, he was at Clinton performing his duties as the west side supervisor, which included supervising the morning meal and conducting rounds. (*Id.* at ¶ 5).

There came a time that morning when defendant Wood was contacted by Correctional Officer ("CO") Nolan, who reported that plaintiff was bleeding from his anus and required medical attention. (*Id.* at ¶ 7). Defendant Wood instructed CO Nolan to escort plaintiff to the infirmary, and also reported to the infirmary himself to investigate the occurrence. (*Id.* at ¶ 8-9). It was not until this time that defendant Wood learned of plaintiff's allegations of injuries and assault. (*Id.* at ¶ 9). Defendant Wood subsequently investigated plaintiff's claims and determined that plaintiff had been securely placed in his cell after attending morning meal earlier that day, and plaintiff otherwise had no "callouts" that would have taken him out of his cell that morning. (*Id.* at ¶ 10).

**DISCUSSION**

**II. <u>Summary Judgement</u>**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

**\*3** In order to "defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant." *Diaz v. Pelo*, No. 915-CV-776 (DNH/DJS), 2019 WL 1411803, at \*2 (N.D.N.Y. Feb. 15, 2019) (*Rep't Rec.*), *adopted*, 2019 WL 1411057 (N.D.N.Y. Mar. 28, 2019); Fed. R. Civ. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.").

Credibility of sworn statements are better left to trier of fact and "should be treated as evidence in deciding a summary judgment motion" when those statements are "more than mere conclusory allegations" and "they are specific and detailed allegations of fact, [and] made under penalty of perjury." *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty*

*v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)).

## III. Unidentified/Unserved Defendants

### A. Legal Standards

"It is a general principle of tort law that a tort victim who cannot identify the tortfeasor cannot bring suit." *Bishop v. City of New York,* No. 13-CV-9203, 2016 WL 4484245, at *3 (S.D.N.Y. Aug. 18, 2016) (quoting *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir. 1997)). In *Valentin,* the Second Circuit reversed a dismissal for failure to identify defendant police officers. However, the court specifically noted that "[t]his opinion is not intended to preclude a finding by the district court, after further inquiry, that the information available is insufficient to identify the defendant with enough specificity to permit service of process, so that dismissal of the complaint is warranted." *Id.* "Thus, following *Valentin,* if a plaintiff is unable to identify [2] defendants after being afforded the opportunity for limited discovery with assistance from the Court, his claims must be dismissed." *Id. See, e.g., Epps v. City of Schenectady,* No. 1:10-CV-1101 (MAD/CFH), 2013 WL 717915, at *4 (N.D.N.Y. Feb. 27, 2013) ("All discovery is complete and thus, plaintiff's failure to identify the "John Doe" defendant mandates dismissal."); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.,* No. 04-CV-2293, 2007 WL 74304, at *5 n.7 (E.D.N.Y. Jan. 8, 2007) ("Fictitious parties must eventually be dismissed, if discovery yields no identities." (brackets omitted) (citation omitted)); *Perrelli v. City of E. Haven,* No. 3:02 CV 0008 (GLG), 2004 WL 1202718, at *3 (D. Conn. May 28, 2004) ("[I]f after the completion of discovery, the plaintiff is not able to identify the actual names of the John Doe defendants, the claims against them must be dismissed").

[2]  Although, generally, a plaintiff is also responsible for serving on each defendant the summons and complaint within 90 days of the filing of the complaint (See Fed. R. Civ. P. 4(m)), because plaintiff here has been granted permission to proceed IFP, he would be entitled to rely on the Court and the U.S. Marshals Service to effect service. *Walker v. Schult,* 717 F.3d 119, 123 n.6 (2d Cir. 2013); see also 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process ... in [IFP] cases."); Fed. R. Civ. P. 4(c)(3) (the court must order the Marshals Service to serve if the plaintiff is authorized to proceed IFP).

Plaintiff's IFP status does not, however, absolve him of responsibility for identifying the John Doe defendants through discovery, in order to avoid dismissal. *See Epps,* 2013 WL 717915, at *4-5.

### B. Application

**\*4**  Defendant Wood seeks dismissal of the amended complaint as against the unidentified and unserved defendants, John Doe #1-3. (Dkt. No. 65-5 at 3, n. 1). Specifically, defendant Wood maintains that the expiration of the joinder and discovery deadlines, coupled with plaintiff's extended opportunity to determine the defendants' identities, render dismissal appropriate. (*Id.*).

Plaintiff does not address this issue directly in his opposition papers. (Dkt. Nos. 69-70). However, plaintiff does claim that the "defendants are quite aware that the court has impeded [plaintiff's] motion for copies of all information surrounding the NYS Police and the NYS DOCCS OSI Reports." Presumably, plaintiff's position is that his ability to identify the John Doe defendants has been frustrated by his inability to conduct the discovery he deems appropriate.

Nevertheless, the docket reflects that plaintiff has been given ample opportunity to identify the unknown defendants against whom he is alleging assault. On August 2, 2018, the court advised plaintiff that he must serve discovery requests upon defense counsel, where he may seek documents or information to help him identify the "John Doe" defendants. (Dkt. No. 35). On September 5, 2018, plaintiff was again instructed to serve discovery demands by mailing them to defense counsel, after plaintiff attempted to mail interrogatories directly to the court. (Dkt. Nos. 37, 38). On October 15, 2018, plaintiff moved for an extension of the discovery deadline, requested witnesses for trial, and requested an FBI investigation. (Dkt. No. 43). Plaintiff's request for an extension of the discovery deadline was granted. (Dkt. No. 46) However, plaintiff's request for certain witnesses to be produced at trial was denied for being premature, and his request for an FBI investigation was denied for being outside of the authority of this court. (*Id.*). On November 9, 2018, plaintiff moved to compel discovery, which the court granted in part and ordered that any DOCCS reports regarding the subject incident, and any DOCCS logs or rosters that identify the officers, be disclosed to plaintiff, with appropriate security precautions and redactions. (Dkt. Nos. 48, 49).

On March 27, 2019, plaintiff's letter motion to produce witnesses and documents was received by the court. (Dkt. No. 62). Plaintiff's motion was denied, because it was unclear what relief he was seeking. (Dkt. No. 64). In the court's text order, plaintiff was instructed that to request witnesses be produced for depositions, he must notice the depositions pursuant to Fed. R. Civ. 30(b) and meet the formal requirements of that rule. (*Id.*). The court further advised plaintiff that to obtain additional discovery, he must send requests by mail to defense counsel, not the court. (*Id.*)

Plaintiff has also taken issue with the manner in which he was allowed to view documents provided by defense counsel, as he was not allowed to retain copies of these documents. However, the court addressed this issue, finding that the manner in which the documents were made available to plaintiff was appropriate, in light of reasonable concerns about security and the privacy of other witnesses. (Dkt. No. 73).

Based on the foregoing, it is clear that plaintiff has been extended every reasonable opportunity to determine the identities of the John Doe defendants, yet has failed to do so. Accordingly, [3] this Court recommends dismissal of the amended complaint as against the John Doe defendants, without prejudice, in light of plaintiff's failure to identify and serve them upon the completion of discovery. *See Coward*, 665 F. Supp. 2d 281, 300-01 (S.D.N.Y. 2009) (holding plaintiff "simply cannot continue to maintain a suit against the John Doe defendant.") (internal citations and quotations omitted); *Burns v. Trombly*, 624 F. Supp. 2d 185, 197-98 (N.D.N.Y. 2008) (dismissing without prejudice *pro se* plaintiff's claims against John Doe defendants after two years of litigation and "adequate opportunity to conduct discovery," where plaintiff failed to name or serve said defendants).

[3]    The court further notes a potential statute of limitations issue with respect to the unserved John Doe defendants. The underlying incident is alleged to have occurred on May 23, 2016. The statute of limitations for a section 1983 claim is three years. *Owens v. Okure*, 488 U.S. 235, 250-51 (1989); *See* N.Y. Civ. Prac. L & R. § 214(5). Without considering whether the statue would be tolled for any reason, the three year statute of limitations would have run on May 23, 2019. If the statute of limitations has run, the only way that plaintiff would be allowed to now name additional defendants is if the substitution "relates back" to

the original complaint. *Moore v. City of Norwalk*, No. 3:17-CV-695, 2018 WL 4568409, at *2 (D. Conn. Sept. 24, 2018) (citing Fed. R. Civ. P. 15). However, there can be no relation back without a mistake about the party's identity. *Id.* The Second Circuit has made it clear that the failure to identify a defendant, when the plaintiff knows that the defendant must be named, may not be characterized as a mistake for relation back purposes. *Id.* (citing inter alia *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013)).

## IV. First Amendment Claim – Retaliation

### A. Legal Standards

**\*5**  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill*, 389 F.3d at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137. Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *See Id.*

In order to establish a causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, No. 98 Civ. 5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001); *see also Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *Turner v. Sidorowicz*, 2014 WL 641454, at *10; *Moore v. Cajigas*, No. 12 Civ. 4120, 2013 WL 4734829, at *6 (S.D.N.Y. Aug. 20, 2013).

### B. Discussion

Defendant Wood moves for partial summary judgment with respect to plaintiff's First Amendment retaliation claim,[4] arguing among other things that plaintiff has not raised a question of material fact with respect to the causal connection element. (Dkt. No. 65-5 at 7-12). As discussed below, and viewing the evidence in a light most favorable to plaintiff, the court recommends denying defendant Wood's motion for partial summary judgment.

[4]     Defendant Wood has not moved for summary judgment with respect to plaintiff's Eighth Amendment claim of excessive force and failure to protect. (Dkt. No. 65-5 at 3, f. 2).

With respect to the first prong of a retaliation claim, filing a grievance is a constitutionally protected activity for an inmate. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under [Section] 1983."); *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 9511178, at *10 (N.D.N.Y. Oct. 30, 2017) (*Rep't Rec.*), *adopted as modified*, 2018 WL 555513 (N.D.N.Y. Jan. 19, 2018); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 206 (N.D.N.Y. 2015).

Records maintained by Clinton's Inmate Grievance Program Supervisor ("IGPS") reflect that plaintiff filed four grievances at Clinton prior to May 23, 2016. (Declaration of Christine Gregory ("Gregory Decl."), ¶ 14, Ex. A, Dkt. No. 65-4 at ¶ 14). On April 6, 2016, plaintiff filed a grievance requesting copies of his medical records from another DOCCS facility. (*Id.* at ¶ 15, Ex. B.). On April 11, 2016, plaintiff filed a grievance alleging that he was sexually assaulted at another DOCCS facility in December 2015, and that his requests for medical care had been ignored at Clinton. (*Id.* at ¶ 16, Ex. C.). On May 10, 2016, plaintiff filed a grievance stating that Clinton staff had fraudulently stolen thousands of dollars in "operational merchandise," including food and pharmaceuticals. (*Id.* at ¶ 17, Ex. D.). On May 17, 2016, plaintiff filed a grievance claiming that medical staff at Clinton had threatened him. (*Id.* at ¶ 18, Ex. E.).

Although plaintiff has not produced any documentary evidence, he alleges that in addition to the aforementioned grievances, he has also filed grievances against Clinton correctional officers for assaulting other inmates. (Dkt. No. 65-2 at 172-74). Plaintiff concedes that he never filed a grievance specifically naming defendant Wood prior to May 23, 2016. (*Id.*). Nevertheless, inasmuch as plaintiff claims that his May 10, 2016 grievance, relating to various, unidentified correctional officers stealing and "pilfering [ ] goods," was protected conduct, plaintiff has presented an issue of material fact with respect to the first prong of his retaliation claim. (*See* Dkt. No. 39 at ¶ 111).

**\*6** With respect to the second prong, it is well settled that physical assault constitutes adverse action, as it is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003); *Hayes*, 2017 WL 9511178, at *10; *Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2017 WL 9511175, at *7 (N.D.N.Y. Aug. 15, 2017) (*Rep't Rec.*), *adopted*, 2017 WL 4221074 (N.D.N.Y. Sept. 22, 2017). A reasonable jury could find that defendant Wood's alleged physical assault on plaintiff, as well as his failure to intervene during the sexual assault, would deter a person of "ordinary firmness" from exercising their right to file a grievance within the DOCCS system. Accordingly, plaintiff has presented an issue of material fact with respect to the second prong of his retaliation claim.

With respect to the third prong, defendant Wood argues plaintiff lacks sufficient evidence to demonstrate a causal connection between plaintiff's protected activity and the adverse action. (Dkt. No. 65-5 at 9). Specifically, defendant Wood points to the lack of evidence that he was even aware of plaintiff's prior grievances, aside from plaintiff's own self-serving testimony. (*Id.* at 9-10). Defendant Wood notes that plaintiff did not attribute misconduct specifically to defendant Wood in his past grievances. (*Id.*; Wood Dec. at ¶ 14-15). Furthermore, defendant Wood maintains that his duties did not include investigating grievances, unless they concerned staff or areas under his direct supervision. (*Id.* at ¶ 14-16). Thus, Clinton administration would not have brought plaintiff's general allegations of stealing, misconduct, and assault to his attention. (*Id.*).

In order to satisfy the causal connection element of a retaliation claim, an inmate must demonstrate "that the protected conduct was a 'substantial or motivating factor' in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, No. 902-CV-915 (GLS), 2005 WL 3531464, *6 (N.D.N.Y. Dec. 22, 2005) (citations omitted). Temporal proximity may be sufficient to support an inference of causal connection if the duration between the adverse action and the protected activity is "no more

2019 WL 5197230

than six months." *Hayes*, 2017 WL 9511178, at *9 (citing *King v. McIntyre*, No. 9:11-CV-1457 (DNH/TWD), 2015 WL 1781256, at *5 (N.D.N.Y. Apr. 8, 2016)). Here, the alleged assault occurred a few weeks after plaintiff filed his May 10, 2016 grievance. Nevertheless, a "showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment" (*Ford v. Deacon*, No. 9:16-CV-01001 (MAD/TWD), 2018 WL 5729352, at *10 (N.D.N.Y. Aug. 27, 2018) (*Rep't Rec.*), *adopted*, 2018 WL 4501208 (N.D.N.Y. Sept. 20, 2018)), and as such this court cannot recommend denying defendant Wood's motion based on this factor alone.

Here, however, the defendant's alleged comments during and immediately after the alleged assault are further probative to our determination. As a general matter, it is difficult to establish one defendant's retaliation for complaints against other correctional officers. *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (plaintiff's retaliation claim was dismissed against a correctional officer when the only alleged basis for the retaliatory action was a complaint plaintiff filed involving a different officer) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"). Nevertheless, this general rule may not apply where there are indications of "a retaliatory purpose—i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 338–39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). Thus, while a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this is not per say barring. *Henderson v. Vanderwerff*, No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016).

**\*7** Plaintiff's allegations herein are sufficient to raise a question of material fact in order to survive summary judgment. Defendant Wood's alleged comments made during and immediately after the alleged assault, including "[y]ou need to mind your fucking business nigger ... stop writing your fucking grievances about corruption activities;" and, "[l]et this be a lesson to you; keep your complaints to yourself, if you don't you'll be a dead nigger," reveal a specific and directed retaliatory motivation for his actions. (Am. Compl.

at ¶ 13); *See Rivera v. Lawrence*, No. 9:05-CV-0967 (TJM/GHL), 2009 WL 1734735, at *5 (N.D.N.Y. June 18, 2009) (alleged statements by defendant including, "you should have not wrote [sic] to the Captain and that grievance [sic] shit," and "that grievance you placed and the letter you sent ... ain't shit," and "well, it seems like you knew and you don't know the rules," was sufficient for a reasonable fact finder to infer that the defendant "may have acted with a retaliatory motive."); *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 733 (S.D.N.Y. 2002) (finding that a defendant's alleged comment during an assault, "you want to file lawsuits and grievances, you're nothing but a coward," and comments after, "I should have fucked you up the minute you entered the unit," pointed to a retaliatory animus); *Flynn v. Ward*, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *10 (N.D.N.Y. June 7, 2018), (*Rep't Rec.*), *adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018) (finding that a defendant's alleged statement, "don't you dare file any more grievances or I will slap you silly," was sufficient to find a causal connection between plaintiff's grievances and the adverse action taken against plaintiff).

Defendant Wood's alleged reference during the assault to conspiracy among Clinton staff specifically reflects the substance of plaintiff's May 10, 2016 grievance. This court also notes that, although plaintiff's account may be self-serving, his recollection of defendant Wood's comments have been consistent across his pleadings, deposition testimony, and opposition papers. (Dkt Nos. 1; 39 at ¶ 13-15; 65-2 at 182; 69; 70); *See Booker v. Graham*, No. 9:13-CV-1342 (GTS/ATB), 2016 WL 11480150, at *10 (N.D.N.Y. Oct. 26, 2016) (*Rep't Rec.*), *adopted*, 2016 WL 7176607 (N.D.N.Y. Dec. 9, 2016) (summary judgment denied despite self-serving recollections by plaintiff).

Plaintiff alleges, and has sworn under oath, that defendant Wood made specific threats regarding his prior grievances during the alleged assault. (Dkt. No. 39 at ¶ 13-15). Defendant, on the other hand, has stated in a sworn declaration that he was not aware of the content of plaintiff's prior grievances. (Dkt. No. 65-3 at ¶ 11). The court, when faced with conflicting sworn statements, must leave such credibility determinations to a reasonable fact finder to determine. *Colon*, 58 F.3d at 873 (holding that disparity between the affidavits of a prisoner and correctional officer "itself creates a credibility issue that is not readily amenable to resolution on summary judgment"). Thus, any credibility determination as to whether defendant Wood made specific references to plaintiff's grievances during defendant Wood's

assault and failure to intervene is a question of fact for the jury. *Id.; McCarroll v. Matteau*, No. 9:09-CV-355 (NAM/TWD), 2012 WL 4380156, at \*12 (N.D.N.Y. June 15, 2012) (comments attributed to defendant during misconduct raised a triable issue of fact regarding the casual connection between plaintiff's protected conduct and the alleged adverse action).

Accordingly, given defendant Wood's alleged comments, and considering the temporal proximity of the adverse action with plaintiff's grievances, plaintiff's allegations are sufficient to create a genuine issue of material fact as to whether defendant Wood was substantially motivated to retaliate against plaintiff for filing past grievances, and this court recommends that plaintiff's retaliation claim survive summary judgment. *See Henderson*, 2016 WL 660921, at \*5 (alleged comments by a defendant not named in plaintiff complaint, "if [plaintiff] didn't like it, then [plaintiff] shouldn't have filed a complaint against [Officer Richardson]," in conjunction with the temporal proximity between the adverse action and the protected activity, was sufficient to survive a motion for summary judgment).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant Wood's motion to dismiss the amended complaint as against defendants John Doe Correction Officers # 1-3 be **GRANTED** and the action be **DISMISSED WITHOUT PREJUDICE** as against defendants John Doe Correction Officers # 1-3, and it is

 **\*8 RECOMMENDED**, that defendant Wood's partial motion for summary judgment on plaintiff's First Amendment claim be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have Fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2019 WL 5197230

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4183894
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brian MACK, Plaintiff,

v.

Ronald G. WOOD, II, Sergeant, Clinton Correctional
Facility; John Doe, Correction Officers #1-3,
Clinton Correctional Facility, Defendants.

9:17-cv-1146 (BKS/ATB)
|
Signed 09/04/2019

**Attorneys and Law Firms**

Plaintiff, pro se: Brian Mack, 15-A-4845, Wallkill
Correctional Facility, Box G, Wallkill, NY 12589.

For Defendants: Letitia James, Attorney General of the State
of New York, Christopher J. Hummel, Assistant Attorney
General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*\*1* Plaintiff pro se Brian Mack brought this action under 42
U.S.C. § 1983 alleging that Defendant Sergeant Ronald G.
Wood II, and John Doe Corrections Officers # 1–3 violated his
constitutional rights under the First and Eighth Amendments
while he was incarcerated at the Clinton Correctional Facility.
(Dkt. No. 39). On April 29, 2019, Defendant Wood moved for
summary judgment on Plaintiff's First Amendment retaliation
claim and sought dismissal of the John Doe Defendants. (Dkt.
No. 65). Plaintiff filed a response in opposition to the motion.
(Dkt. Nos. 69, 70 and 71). This matter was referred to United
States Magistrate Judge Andrew T. Baxter who, on July 26,
2019, issued a Report-Recommendation recommending that
the motion to dismiss the amended complaint as against the
John Doe Defendants be granted and that the motion for
summary judgment on Plaintiff's First Amendment claim
be denied. (Dkt. No. 77). Defendant Wood filed a timely
objection to the Report-Recommendation. (Dkt. No. 79). [1]
For the reasons set forth below, the Report-Recommendation
is adopted in its entirety.

[1]    Plaintiff submitted a letter to the Court, dated
August 22, 2019, but it does not contain
any objection to Magistrate Judge Baxter's
recommendation, and it is therefore not considered
here. (Dkt. No. 81).

**II. STANDARD OF REVIEW**

This Court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection. *Petersen v.
Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C.
§ 636(b)(1)(C). "A proper objection is one that identifies
the specific portions of the [report-recommendation] that
the objector asserts are erroneous and provides a basis for
this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F.
Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks
omitted). Properly raised objections must be "specific and
clearly aimed at particular findings" in the report. *Molefe
v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487
(S.D.N.Y. 2009). "[E]ven a pro se party's objections to a
Report and Recommendation must be specific and clearly
aimed at particular findings in the magistrate's proposal...."
*Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at
*2, 2011 U.S. Dist. LEXIS 95351, at *4 (S.D.N.Y. Aug. 25,
2011) (citation omitted). Findings and recommendations as to
which there was no properly preserved objection are reviewed
for clear error. *Id.*

**III. DISCUSSION**

Defendant moved for summary judgment on the ground that
Plaintiff failed to elicit sufficient facts to show a causal
nexus between the alleged protected activity and the alleged
sexual assault. (Dkt. No. 65-5). In his objection to the Report-
Recommendation, Defendant argues that Magistrate Judge
Baxter erred because Plaintiff's "self-serving testimony and
allegations in his complaint" were insufficient to demonstrate
the requisite causal connection for a First Amendment
retaliation claim. (Dkt. No. 79, at 3). Magistrate Judge Baxter
thoroughly considered, and rejected, that argument in the
Report-Recommendation. (Dkt. No. 77, at 14-18). Having
reviewed Defendant's objection de novo, the Court concurs
in Magistrate Judge Baxter's well-reasoned determination
for the reasons set forth in the Report-Recommendation.
The Court has reviewed the remainder of the Report-
Recommendation for clear error and found none.

**IV. CONCLUSION**

2019 WL 4183894

**\*2**  For these reasons, it is hereby

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 77) is **ADOPTED** in all respects; and it is further

**ORDERED** that Defendant's motion to dismiss the amended complaint as against Defendants John Doe Correction Officers #1-3 (Dkt. No. 65) is **GRANTED** and Plaintiff's complaint is **DISMISSED without prejudice** as against Defendants John Doe Correction Officers #1-3; and it is further

**ORDERED** that Defendant Wood's partial motion for summary judgment on Plaintiff's First Amendment claim (Dkt. No. 65) is **DENIED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4183894

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5440596

2016 WL 5440596
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trazz SAWYER, Plaintiff,

v.

Albert PRACK, et al., Defendants.

Civil Action No. 9:14-CV-1198 (DNH/DEP)
|
Signed 07/29/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: TRAZZ SAWYER, Pro se, 97-B-2413, Orleans Correctional Facility, 3531 Gaines Basin Road, Albion, NY 14411.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, Attorney General of the, State of New York, The Capitol, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Albany, NY 12224.

REPORT AND RECOMMENDATION

David E. Peebles, U.S. Magistrate Judge

 **\*1** *Pro se* plaintiff Trazz Sawyer, a New York state prison inmate, has commenced this civil rights action against several employees of the New York State Department of Corrections and Supervision ("DOCCS"), four who are identified by name and three of whom are sued as "John Doe" defendants, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that he was assaulted by corrections officers, and that a prison nurse failed to intervene and later refused to treat his injuries resulting from the beating. Plaintiff also contends that he was denied procedural due process at a related disciplinary hearing, resulting in a finding of guilt and service of five months confinement in a special housing unit ("SHU").

Currently pending before the court is a motion for summary judgment brought by the defendants seeking dismissal of plaintiff's pending claims. In their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies before commencing suit, (2) no reasonable factfinder could conclude plaintiff's procedural due process rights were violated based upon the record now before the court, (3) the claim asserted against defendant Albert Prack, the

DOCCS Director of Special Housing/Inmate Disciplinary Program should alternatively be dismissed for lack of personal involvement, (4) the John Doe defendants should be dismissed from the action based upon plaintiff's failure to timely identify and serve process upon them, and (5) in any event all defendants are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied, and that plaintiff's claims against defendants Phelix and Prack and the John Doe defendants be dismissed.

I. BACKGROUND [1]

[1]   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. At the times relevant to his claims in this action, he was confined at the Bare Hill Correctional Facility ("Bare Hill"), located in Malone, New York. *Id.*

On the morning of October 1, 2011, plaintiff was working in the music room at Bare Hill. Dkt. No. 1 at 8; Dkt. No. 37-1 at 1; Dkt. No. 35-21 at 1. For reasons that are in dispute, the plaintiff was ordered to submit to a pat frisk, and was holding a pen in his hand when corrections officers Richards and Langdon, both of whom are defendants in this case, began conducting the frisk. Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. Defendants Richards and Langdon forcibly removed the pen from plaintiff's hand and took him to the ground. *Id.* Dkt. No. 1 at 11-12; Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. The parties dispute whether additional force was used once plaintiff was on the ground. Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 2-3. Plaintiff claims that defendants Richards and Langdon "violently slammed him to the floor" and dislocated his shoulder. Dkt. No. 1 at 12.

 **\*2** Plaintiff alleges that after being transported to the Bare Hill SHU, he was again assaulted by corrections personnel. Dkt. No. 1 at 3, 12-14. At the time he filed his complaint, plaintiff did not know the identities of the corrections officers who assaulted him, and therefore asserted claims related to this alleged second assault against three John Doe defendants. *Id.* Plaintiff now "believe[s]" that one of the three corrections officers who assaulted him in the SHU was defendant Richards. Dkt. No. 37-2 at 5.

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 316 of 328

Based on the events of October 1, 2011, plaintiff was issued a Tier III misbehavior report for violent conduct, disobeying a direct order, interference, and harassment.[2] Dkt. No. 1 at 15; Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 3. In preparation for the hearing, plaintiff met with a counselor, who plaintiff refers to as an employee assistant, three days before the hearing. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Plaintiff contends that the "employee assistant was inadequate." Dkt. No. 37-2 at 5. Plaintiff also contends that his due process rights were violated at the ensuing Tier III disciplinary hearing, and with respect to the notice that gave rise to the hearing. Dkt. No. 37-2 at 5-6.

[2]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* *Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

On October 6, 2011, a disciplinary hearing was conducted by Deputy Superintendent of Security D. Phelix, another defendant in this action. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 3. During the hearing, defendants Langdon and Richards testified regarding the incident that occurred on the morning of October 1, 2011. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 4; Dkt. No. 35-10 at 17, 22. Defendant Phelix also heard testimony from plaintiff and considered the following documents: (1) the October 1, 2011 misbehavior report signed by defendant Richards; (2) a memorandum from defendant Richards to Sergeant Carey, dated October 1, 2011; (3) a memorandum written by Sergeant Carey to Lieutenant Munson, dated October 1, 2011; (4) a use of force report, dated October 1, 2011; and (5) an inmate injury report, dated October 1, 2011. Dkt. No. 35-10 at 7-16.

As part of his defense, plaintiff requested that inmates Ponder and Farrell be called to testify on his behalf. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. While inmate Ponder was called as a witness, he testified that he was not present during the encounter between the plaintiff and defendants Langdon

and Richards. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Inmate Farrell refused to appear as a witness at the plaintiff's disciplinary hearing. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

During the hearing plaintiff also requested a sign-in sheet from the music room. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Defendant Phelix recessed the hearing so that an attempt could be made to locate the requested sign-in sheet. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Upon reconvening the hearing, defendant Phelix advised plaintiff that the sign-in sheets are not kept on file, and were therefore unavailable. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

**\*3** Defendant Phelix then called Officer Sauve as a witness, who testified that the sign-in sheets are not maintained by Bare Hill staff. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Officer Sauve did, however, provide defendant Phelix with a list of ten porters who worked in the music room area on October 1, 2011. Dkt. No. 35-10 at 49; Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Plaintiff requested that he be permitted to call all ten of the listed porters as witnesses. Dkt. No. 35-10 at 49. Plaintiff was unable to identify which of the ten porters were working in the music room during the relevant events on October 1, 2011, stating only that he "saw a whole bunch of guys that day." Dkt. No. 35-10 at 50. Defendant Phelix declined to allow plaintiff to call all ten porters as witnesses, but did permit him to identify five porters that he desired to call as witnesses, and then contacted each of those five porters. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 50-51. All five of the requested inmate porters that defendant Phelix contacted refused to testify. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. There was no testimony at the hearing from any witnesses other than the officers involved and plaintiff as to what happened during the pat frisk. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 7-12. Plaintiff also did not provide defendant Phelix with any documentary evidence, other than medical records, in defense of the charges brought against him. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5-6.

At the conclusion of the hearing, defendant Phelix found plaintiff guilty of all charges, except as to the allegation of interference, and sentenced Sawyer to two years of disciplinary SHU confinement. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff appealed the hearing officer's determination to defendant Prack, another defendant in this case. Dkt. No. 1 at 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. In his decision, defendant Prack upheld the hearing officer's finding of guilt, but reduced the sentence to six months in

2016 WL 5440596

SHU. Dkt. No. 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff subsequently filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York state court. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. While that petition was pending, the disciplinary determination was administratively reversed. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. By that time, plaintiff had spent approximately five months in SHU confinement. Dkt. No. 1 at 17; Dkt. No. 35-3 at 79.

Plaintiff claims that defendant Phelix violated his Fourteenth Amendment right to due process by failing to provide him with proper notice regarding the charges against him, finding him guilty without supporting evidence, denying him adequate assistance in preparation for the hearing, and rejecting his request for witnesses. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff claims that defendant Prack violated plaintiff's Fourteenth Amendment right to due process by ignoring "strong" evidence that would have warranted a reversal of defendant Phelix's determination. Dkt. No. 1 at 17-18; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8.

## II. PROCEDURAL HISTORY

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on October 1, 2014. Dkt. No. 1. Plaintiff's complaint named as defendants the following DOCCS employees: (1) Albert Prack, the DOCCS Director of Special Housing/Inmate Discipline Program; (2) D. Phelix, a deputy superintendent of security at Bare Hill; (3) Bare Hill corrections officers D. Richards and S. Langdon; (4) Ms. Mulverhill, a registered nurse at Bare Hill; and (5) two John Doe corrections officers and a John Doe corrections sergeant at Bare Hill. *Id.* at 1.

On December 31, 2014, the court issued an order granting plaintiff's request for leave to proceed *in forma pauperis* and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 4. Based on that decision, plaintiff's two remaining claims include: (1) excessive use of force and failure to protect claims under the Eighth Amendment, asserted against defendants Richards, Langdon, John Doe #1, John Doe #2, and John Doe #3; and (2) a violation of due process cause of action under the Fourteenth Amendment, asserted against defendants Phelix and Prack. *Id.* at 9-11, 22-23. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering, as well as for his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 18-20.

**\*4** Following the close of discovery, defendants filed a motion for summary judgment, arguing that plaintiff's complaint should be dismissed because the record evidence conclusively establishes that plaintiff inexcusably failed to exhaust his administrative remedies and, in any event, defendants are all entitled to qualified immunity. *See generally* Dkt. No. 35. In their motion, defendants additionally argue that the John Doe defendants should be dismissed from the action based upon plaintiff's failure to identify and serve them with process, and that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Phelix and Prack violated plaintiff's due process rights; or (2) defendant Prack was personally involved in the Fourteenth Amendment constitutional violation alleged. *Id.* Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

2016 WL 5440596

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Available Administrative Remedies

#### 1. Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*5** Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified

three circumstances in which such unavailability can be found. *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[ ] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Lastly, exhaustion can be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." [4] *Id.* at 1860.

[4]    Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the exhaustion requirement by the Second Circuit in such cases as *Hemphill v. New York,* 380 F. 3d 680 (2d Cir. 2004).

#### 2. The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that an inmate must satisfy when he has a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(i), (ii).

[5]    Depending on the type of matter complained of by the grievant, the superintendent has either seven or

twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

### 3. <u>Analysis</u>

Plaintiff has conceded that he did not fully exhaust his administrative remedies with respect to any of the claims currently remaining in this action. *Compare* Dkt. No. 35-21 at 7 *with* Dkt. No. 37-1 at 8-9. When asked during his deposition whether he attempted to exhaust his administrative remedies with respect to the first use-of-force incident that occurred on October 1, 2011, plaintiff testified that he did not file a grievance while he was in SHU because he thought "it would have been futile" to do so based on his understanding that mail he was "sending out" was not "arriving where it was going." Dkt. No. 35-3 at 70. Plaintiff further testified that he did not "believe" he filed a grievance once he was "out of that particular SHU," but further stated, "maybe I did[,] I'm not one hundred percent sure[,] I would have to look at the documents." [6] Dkt. No. 35-3 at 70. With regard to the alleged second incident of assault that occurred on October 1, 2011 in the Bare Hill SHU, plaintiff testified candidly that he did not file a grievance. *Id.* at 71. Plaintiff further testified that he did not file a grievance against either defendant Phelix or defendant Prack based on their alleged violations of his due process rights because, according to him, formal exhaustion is not a requirement for raising a Fourteenth Amendment due process claim when an inmate has pursued an administrative appeal from a hearing officer's determination. *Id.* at 80; *see also* Dkt. No. 37-1 at 10.

[6]     Plaintiff testified that he was held in SHU at Bare Hill for sixteen days before being transferred into the Upstate Correctional Facility ("Upstate"). Dkt. No. 1 at 14; Dkt. No. 35-3 at 71.

**\*6** The record evidence adduced by defendants in support of their non-exhaustion defense includes a declaration from Jeffery Hale, the Assistant Director of the DOCCS IGP, and the custodian of records maintained by the CORC. Dkt. No. 35-6. In his declaration, Hale states that his office conducted a search of the appeals filed by plaintiff with the CORC, which revealed that plaintiff filed twenty-four appeals to the CORC between August 21, 2000 and January 3, 2012. *Id.* at 2. Hale further states that plaintiff filed a grievance with the CORC bearing grievance number UST-48092-12, and that grievance alleges that "[p]laintiff tried to file a related grievance on October 26, 2011 at Bare Hill." [7] *Id.* at 3. Hale indicates that plaintiff's grievance dated October 26, 2011 was "properly returned to [p]laintiff by the Bare Hill IGRC" because plaintiff was not housed at Bare Hill at that time, and that plaintiff's subsequent filing of a grievance on December 27, 2011 at Upstate, where he was housed, was "untimely." *Id.*

[7]     A letter sent to plaintiff on November 9, 2011 from the Director of the Inmate Grievance Program, Karen Bellamy, identifies October 20, 2011, and not October 26, 2011, as the actual date that plaintiff attempted to file a grievance at Bare Hill. Dkt. No. 35-8 at 15.

Grievance Number UST-48092-12 mentions the October 1, 2011 use of force incident, but does not name any specific officers and does not raise any due process complaints. *Id.*; Dkt. No. 35-8 at 6-10, 17-20. Plaintiff also states in that grievance that he "attempted to file a grievance" regarding the alleged assault as early as October 11, 2011, [8] "[f]irst at Bare Hill where the assault occurred, then here at Upstate[,]" and that "[e]very attempt to file a grievance concerning the assault by officers have [sic] been prevented[.]" Dkt. No. 35-8 at 17. Plaintiff identifies October 20, 2011 as the second date on which he attempted to file a grievance, and states that this grievance was mailed from Upstate to the Bare Hill IGRC, and responded to on October 26, 2011, with a notation that the grievance needed to be filed at Upstate. *Id.* Plaintiff further states that on November 7, 2011, after he was released from the hospital at Upstate, he sent a letter to the Upstate IGRC requesting a forty-five day extension of his deadline to grieve the events of October 1, 2011, and attached to that

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 320 of 328

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

letter a copy of the grievance he filed on October 20, 2011. *Id.* at 18. Plaintiff claims he never received a response to that request, but did receive a letter from "director Bellamy" on November 9, 2011, informing him that "Upstate and Bare Hill claim their IGRC were not receiving [his] grievances and none were on file." *Id.* Against this backdrop, the court must decide whether plaintiff's failure to exhaust his administrative remedies regarding the use of excessive force is excusable.

8       In that grievance, plaintiff initially states that he was assaulted on September 1, 2011, and first attempted to file a grievance on September 11, 2011. At a later point in the same grievance, plaintiff identifies the date he first attempted to file a grievance as October 11, 2011. Dkt. No. 35-8 at 17. In his affidavit submitted in opposition to defendants' motion, plaintiff identifies October 11, 2011 as the first date on which he attempted to file a grievance. Dkt. No. 37-2 at 7. The affidavit does not indicate whether the grievance plaintiff attempted to file on October 11, 2011 pertained to both alleged incidents of assault that occurred on October 1, 2011, or just the first use of force incident. Plaintiff also states in paragraph 72 of his statement of additional material facts that his reference to September 11 was incorrect, and should have read October 11, 2011. Dkt. No. 37-1 at 12. Defendants have not responded to plaintiff's statement of additional material facts. In light of this, the deference owed to plaintiff as the non-movant, the undisputed fact that a use-of-force incident occurred on October 1, 2011, and the impossibility of plaintiff filing a grievance in September with respect to an event that occurred in October of the same year, I view all references to a September date in Grievance Number UST-48092-12 as mistakes.

**\*7** Plaintiff has submitted record evidence, in the form of an affidavit, indicating that he attempted to file a grievance at Bare Hill on October 11, 2011, and that "guards at Bare Hill in-take the grievances and they would then disappear." Dkt. No. 37-2 at 7. Plaintiff also testified that, while he was confined in the SHU at Bare Hill, he attempted to mail letters to his sisters, and that those letters never arrived. Dkt. No. 35-3 at 71. While the court has not been provided with a copy of the October 11, 2011 grievance and understands defendants' position to be that no such grievance was ever filed, viewing the evidence in the light most favorable to plaintiff, these assertions create questions of fact regarding the filing of the grievance and availability of a grievance

procedure to plaintiff. *See Ross*, 136 S. Ct. at 1860 (noting that "thwart[ing] [the] inmate[ ] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation" may effectively render a grievance program unavailable to an inmate).

I note, moreover, that the undisputed record before the court conclusively establishes plaintiff mailed a grievance to the IGRC at Bare Hill on October 20, 2011, nineteen days after the incidents that occurred on October 1, 2011, pertaining to at least the first alleged assault. [9] While it is also undisputed that plaintiff should have filed this grievance at Upstate, where he was housed on October 20, 2011, [10] it appears that Bare Hill did not receive plaintiff's grievance until October 26, 2011, and therefore plaintiff did not receive a response notifying him of his mistake until October 26, 2011. *See* Dkt. No. 35-8 at 1, 18. This date, of course, is beyond the twenty-one day exhaustion deadline. Plaintiff's grievance dated December 29, 2011 also contains a statement by him that within twelve days of receiving a response from Bare Hill regarding his October 20, 2011 grievance, he submitted a request to the Upstate IGRC for an extension of his exhaustion deadline relative to the events of October 1, 2011, pursuant to 7 N.Y.C.R.R. § 701.6(g), and attached to that request a copy of the October 20, 2011 grievance. [11] *See* Dkt. No. 35-8 at 8. Plaintiff states that he did not receive a response to his request, but did speak with a woman "whom [he was] told was grievance staff," which caused him to believe that his grievance was being investigated. [12] *Id.*; *see also* Dkt. No. 37-1 at 12.

9       Neither party has submitted a copy of this grievance. While I have serious doubts regarding whether plaintiff ever attempted to exhaust his administrative remedies with respect to the second alleged incident of assault, based on his deposition testimony, I am unable to decide this issue based on the current record.

10      *See* 7 N.Y.C.R.R. § 701.5.

11      Plaintiff's grievance dated December 29, 2011 also indicates that he was in the hospital at Upstate beginning on an undisclosed date and concluding on November 7, 2011, and that he was unable to "mail anything" from the hospital during this period. Dkt. No. 35-8 at 8.

12      While not citing any record evidence in support of this statement, plaintiff has indicated in his

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

statement of additional material facts that he submitted the October 20, 2011 grievance to the Upstate IGRC on November 7, 2011, and that the grievance was "held without filing until 45 days expired, then deemed untimely." *See* Dkt. No. 37-1 at 12.

The regulation on which plaintiff purportedly relied in requesting his extension, 7 N.Y.C.R.R. § 701.6(g), contemplates an extension of an inmate's time to grieve when the request is made beyond twenty-one days but within forty-five days of the incident, upon a showing of mitigating circumstances. Assuming plaintiff made his request to the Upstate IGRC on November 7, 2011, that is within forty-five days of October 1, 2011. Assuming further that plaintiff never received a response to his request for an extension of time, as he states, a question of fact remains regarding whether the process for requesting an extension of time under 7 N.Y.C.R.R. § 701.6(g) was available to plaintiff within forty-five days of October 1, 2011.

 **\*8** Moreover, plaintiff has adduced evidence of mitigating circumstances, in that he tried to timely file his grievance but submitted it to the wrong facility, and has further established that he filed a separate complaint grieving, among other things, the denial of an extension to the time limit. Dkt. No. 35-8 at 6-9. Defendants have not responded to plaintiff's contention that he requested an extension of time to exhaust his administrative remedies and never received a response to this request. It is therefore unclear whether, if the Upstate IGRC received plaintiff's request for an extension and the October 20, 2011 grievance within forty-five days of October 1, 2011, the request would have been granted. Based on these circumstances as well, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of plaintiff's excessive force claims for failure to exhaust available administrative remedies. [13]

[13] Recently, the Second Circuit ruled in *Williams v. Priatno*, ___ F.3d ___, 2016 WL 3729383 (2d Cir. July 12, 2016) that a *pro se* inmate plaintiff was excused from exhausting his administrative remedies where the record showed that he (1) attempted to file a grievance at a facility where he was assaulted, (2) followed up with the Superintendent at the facility about the grievance after having received no response, (3) was then transferred to another facility, and (4) never appealed the grievance. 2016 WL 3729383, at

\*2, \*5-\*6. The *Williams* court rejected defendants' argument that the plaintiff in that case "still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)" even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that "even if Williams technically could have appealed his grievance, ... the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it].' " *Id.* at \*5 (quoting *Ross*, 136 S. Ct. at 1859). Based on the Second Circuit's holding in *Williams*, it would seem that plaintiff's failure to appeal the non-decision on his request for an extension, as well as plaintiff's failure to appeal the non-decision on his grievance submitted on October 11, 2011, is excusable.

With respect to plaintiff's due process claim, plaintiff does not contend that administrative remedies were not available to him. Rather, his argument appears to be that the IGP procedure need not be followed in situations where the claim is for a due process violation stemming from a disciplinary hearing and there has been a "final administrative appeal." Dkt. No. 35-21 at 7; Dkt. No. 37-1 at 10.

There is support for plaintiff's claim that formal exhaustion may not be required with respect to plaintiff's due process claim against defendant Phelix, based on his having appealed defendant Prack's affirmance of defendant Phelix's determination into the New York state courts. *See, e.g.* *Toliver v. Stefinick*, 12-cv-0077, 2016 WL 3351974, at \*2 (N.D.N.Y. Mar. 22, 2016) (Baxter, M.J.) ("This court agrees that, before he initiated this lawsuit, plaintiff failed to exhaust his administrative remedies with respect to all of his remaining claims, except for the due process claims relating to disciplinary proceedings, which must be exhausted by administrative appeals of the sanctions imposed, not through the grievance process."), *adopted by* 2016 WL 3349316 (N.D.N.Y. June 15, 2016) (D'Agostino, J.); *see also LaBounty v. Johnson*, 253 F. Supp.2d 496, 502 n. 5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at \*2 (S.D.N.Y. Jan. 29, 2002)); *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at \*8 (S.D.N.Y. Sept. 12, 2002). Based upon these decisions, I recommend that plaintiff's due process claim be addressed on the merits.

C. Merits of Plaintiff's Claims

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

**\*9** Defendants maintain that in the event plaintiff is allowed to pursue his due process claim on the merits, summary judgment dismissing that claim is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff's due process rights were violated during the course of his disciplinary hearing.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[14] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases

involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

[14]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

**\*10** In this instance, the record evidence shows that, as a result of defendant Phelix's decision following the disciplinary hearing, plaintiff was held in disciplinary confinement for approximately 150 days before the decision was administratively reversed. Dkt. No. 35-3 at 79. Defendants do not dispute this fact.

The Second Circuit has explained that when an inmate plaintiff claims a due process violation plaintiff has been confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions ... and make a fact-intensive inquiry, ... examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364

Case 9:18-cv-00077-GLS-TWD     Document 111     Filed 03/06/20     Page 323 of 328

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

F.3d 60, 65 (2d Cir. 2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, ... but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff has introduced minimal evidence regarding the conditions of his SHU confinement during the period in question. [15] Defendants, however, have failed to introduce any evidence concerning the conditions of SHU confinement at Bare Hill and Upstate. Because the parties have provided the court with little evidence regarding the conditions of plaintiff's SHU confinement, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally cognizable liberty interest as a result of defendant Phelix's determination.

[15]    Plaintiff argues in his opposition brief that the conditions were atypical because he was denied medical treatment, prevented from filing complaints, and had his mail tampered with. Dkt. No. 37 at 12. Plaintiff has offered some evidence in support of his argument that his mail was tampered with and that, on one occasion, he was prevented from filing a grievance while in Bare Hill. However, plaintiff has not offered any evidence that he was denied medical treatment at either facility, aside from his conclusory statement, or subject to any atypical conditions of confinement while housed in Upstate's SHU. Plaintiff merely states that the conditions he experienced while confined in SHU were "terrible," and that while there he faced "extreme hostile, threating [sic] conditions." Dkt. No. 1 at 17.

### 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and

the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also* *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

**\*11**  The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Examining the record to determine whether plaintiff was afforded procedural due process at the disciplinary hearing, I find no reasonable factfinder could conclude that defendant Phelix or defendant Prack denied plaintiff the protections afforded under the due process clause. Plaintiff was served with formal notice of the charges against him four days before the hearing, was provided with an assistant three days prior to the hearing, was present for the hearing and allowed to question witnesses, had witnesses called on his behalf, and had the opportunity to respond to statements made by DOCCS employees as well as provide his own version of the events giving rise to the charges against him. Dkt. No. 35-10; Dkt. No. 35-21 at 3-5; Dkt. No. 37-1 at 3-7.

Plaintiff contends that the notice of charges provided to him was deficient, that defendant Phelix denied him the opportunity to call five witnesses, identified as inmate porters who may or may not have been working in the music room on October 1, 2011, that defendant Phelix was biased, and

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 324 of 328

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

that defendant Phelix's determination was not supported by any credible evidence. Dkt. No. 37-2 at 5-6. Plaintiff further claims that the assistant provided to him was "inadequate." *Id.* at 5.

With respect to plaintiff's challenge to the notice, plaintiff appears to be arguing that the notice charging him with "violent conduct" was procedurally improper because it did not identify the specific incident of violent conduct that gave rise to the charge. Dkt. No. 37-2 at 5-6. The misbehavior report that listed the charges against plaintiff, which was read into the record at the outset of plaintiff's disciplinary hearing, [16] set forth the date, time, and location of the incident giving rise to the charges, and included a very specific account of the interaction between plaintiff and defendants Richards and Langdon. *See* Dkt. No. 35-12. The description of the incident also explained that plaintiff refused to release an uncapped pen during a pat frisk procedure despite multiple orders for him to do so. *Id.*

[16]    *See* Dkt. No. 35-10 at 10-11.

It appears to be plaintiff's position that a refusal to release an uncapped pen when a guard is preparing a pat frisk cannot be construed as "violent conduct." It is unnecessary to resolve that question, since in any event there is no dispute that plaintiff was apprised of the charges against him in a manner that allowed him to prepare his defense, which is the relevant inquiry as it relates to plaintiff's due process claim against defendant Phelix based on improper notice. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir. 1999) (rejecting inmate plaintiff's due process challenge based upon a "discrepancy as to the precise nature of the threatened harm" because the discrepancy "did not represent a failure of specificity that would impair Kalwasinski's ability to prepare his defense" given that the variance between the charge and proof arose in the context of an otherwise detailed misbehavior report). Moreover, to the extent plaintiff felt that the charge of violent conduct was improper or unwarranted, such a belief does not give rise to a due process claim against defendant Phelix. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *Fulmore v. Raimo,* 10-cv-1096, 2012 WL 4033731, at *4 (N.D.N.Y. Sept. 12, 2012) ("[J]ust as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate

possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing."); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."); *Alexander v. Fischer,* 14-cv-0548, 2015 WL 10568892, at *8 (N.D.N.Y. Dec. 21, 2015) (Baxter, M.J.) ("A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process."), *adopted by* 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016) (Sharpe, J.).

**\*12**  Turning next to the issue of uncalled witnesses, the record clearly shows that (1) plaintiff did not know which inmate porters were working in the music room on October 1, 2011, (2) plaintiff did not know whether any of the inmate porters who were working in the music room on October 1, 2011 witnessed the use of force by defendants Langdon and Richards, (3) plaintiff was allowed to choose five out of the ten inmate porters to call as witnesses, and (4) defendant Phelix asked the five inmate porters identified by plaintiff to be witnesses, and each declined. Dkt. No. 35-10 at 50-52. Plaintiff contends that, once the five inmate porters that he identified refused to testify as witnesses, defendant Phelix was obligated to ask the other five inmate porters to participate as witnesses, and his failure to do so violated plaintiff's due process rights. Dkt. No. 37 at 6-7, 15; Dkt. No. 37-2 at 5-6.

Prison disciplinary hearings are subject to judicial review for harmless error in a setting such as that now presented. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation."). Moreover, it is well-established that "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy,* 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell,* 418 U.S. 539, 566-67 (1974).)

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

In denying plaintiff's request to call all ten inmate porters, defendant Phelix noted that plaintiff's request was "a little excessive," and that whether any of these inmate porters had relevant testimony to offer was "a shot in the dark" given that plaintiff did not know who was in the music room on October 1, 2011, or what they witnessed, if anything. Dkt. No. 35-10 at 50. Plaintiff did not object to this characterization by defendant Phelix. Instead, he chose the witnesses he wanted to call, and informed defendant Phelix that he spoke with one of these witnesses, implying that he knew the identity of at least one inmate porter who was working in the music room on October 1, 2011. Dkt. No. 35-10 at 50. That witness, as well as the other four inmate porters identified by plaintiff, refused to testify.

An inmate's refusal to testify at the disciplinary hearing of another inmate does not give rise to a due process claim against the hearing officer. *See, e.g., Creech v. Schoellkoph*, 688 F.Supp.2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify). Similarly, an inmate's speculation regarding what testimony a potential witness might have offered is not enough to demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing. *See Tafari v. Rock*, 10-cv-0729, 2012 WL 1340799, at *7 (W.D.N.Y. Apr. 18, 2012) (dismissing due process claim based on denial of right to call employee witnesses where inmate plaintiff "failed to show how he was prejudiced, if at all, by the alleged lack of their testimony" and "it appear[ed] that [the plaintiff did] not know whether [these witnesses] would have provided helpful or even relevant testimony"). Accordingly, defendant Phelix's decision not to ask five inmate porters whether they would be witnesses in plaintiff's disciplinary hearing based on plaintiff's speculation that one or more of them could potentially possess relevant information regarding the charges against him does not rise to the level of a due process violation. *Id.*; *see also Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's ... regulations, ... [the] decision to deny, without reason, Plaintiff's request to call ... witnesses ... did not rise to the level of a due process violation because Plaintiff failed to allege ... how he was prejudiced").

**\*13** Plaintiff's claim of bias on the part of defendant Phelix is entirely conclusory with no evidentiary support, and is therefore insufficient to withstand a motion for summary judgment. *See, e.g., Bunting v. Nagy*, 452 F.Supp.2d 447, 460-61 (S.D.N.Y. 2006) ("[I]n order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment' " of the disciplinary hearing officer) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). Indeed, there is no evidence in the record that defendant Phelix ever even had any interactions with plaintiff prior to the disputed disciplinary hearing, nor is there any evidence in the record that would in any way suggest a prejudging of the charges by defendant Phelix. Similarly, plaintiff's contention that his assistant was inadequate does not give rise to a claim against defendant Phelix, who was not personally involved in any alleged inadequate services rendered by the corrections counselor assigned to assist plaintiff at his disciplinary hearing.

Finally, with respect to plaintiff's contention that defendant Phelix's ruling on the charges was not supported by "any real credible evidence," plaintiff is misguided. The Supreme Court has made clear that "where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least 'some evidence' to support the decision." *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) (quoting *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985)).

In this case, plaintiff was charged with violent conduct, interference with an employee, harassment, violating a direct order, and refusal of a search and frisk. Dkt. No. 35-10 at 4-5, 17. Plaintiff was found guilty of all charges with the exception of the charge of interference with an employee. *Id.* at 55. In addition to both the misbehavior report and written memorandums created by defendant Richards setting forth grounds for the charges against plaintiff for which he was found guilty, defendants Langdon and Richards testified at plaintiff's disciplinary hearing. Dkt. No. 35-10 at 17-19, 23-25. Both testified that plaintiff refused several orders to drop an uncapped pen in his hand while he was in a pat frisk position, despite having time to drop the pen and knowing that defendants Langdon and Richards were ordered by Sergeant Carey to conduct a pat frisk. *Id.* Defendant Richards further testified that, after plaintiff was ordered to drop the pen, plaintiff cursed at defendant Richards and then resisted his and defendant Langdon's effort to place him in restraints, while still holding the pen. *Id.* at 17-19. This testimony constitutes "some evidence" that plaintiff was guilty of the

Case 9:18-cv-00077-GLS-TWD   Document 111   Filed 03/06/20   Page 326 of 328

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

charges against him other than interference, as defendant Phelix concluded. *Id.* at 55.

In short, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Phelix during the course of his disciplinary hearing. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's claims against defendants Phelix and Prack should be dismissed. [17]

[17]  It could be argued that plaintiff's due process claim against defendant Prack is also potentially subject to dismissal for lack of personal involvement. Plaintiff's claim against defendant Prack is based on defendant Prack's failure to overturn defendant Phelix's determination. While the issue is the subject of debate in this circuit, at least some courts have held that a failure to reverse a disciplinary hearing officer's determination at the administrative appellate level does not, by itself, give rise to a separate constitutional violation. *See Jackson v. Bradt*, 13-cv-0004, 2014 WL 2505218, at *4 (W.D.N.Y. May 28, 2014) ("As to defendant Prack, the only allegation is that he affirmed Murray's disposition[, and] [t]his allegation alone is insufficient to state a claim against Prack."); *Parks v. Smith*, 08-CV-0586, 2011 U.S. Dist. LEXIS 102460, 2011 WL 4055415, at *13 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.); *Woodward v. Mullah*, No. 08-CV-463A, 2009 U.S. Dist. LEXIS 113917, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009); *but see Smith v. Rosati*, 10-cv-1502, 2013 WL 1500422, at *7 (N.D.N.Y. Feb. 20, 2013) (collecting cases holding that "the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon [v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)].") (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y. Apr. 10, 2013) (Hurd, J.).

D. Qualified Immunity

**\*14** Defendants also seek dismissal of plaintiff's claims asserted against them based on the doctrine of qualified immunity. Dkt. No. 35-22 at 20. Having already dismissed

plaintiff's due process claims against defendants Phelix and Prack on the merits, I will only address this argument with respect to plaintiff's excessive force claims against defendants Langdon and Richards.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However,

Case 9:18-cv-00077-GLS-TWD    Document 111    Filed 03/06/20    Page 327 of 328

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
2016 WL 5440596

'[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful.' " *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

**\*15**  In this case, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for defendants Langdon and Richards to believe their acts were lawful when they used force against plaintiff on the morning of October 1, 2011. For example, plaintiff testified that defendant Richards knew plaintiff to be in possession of a pen before commencing a pat frisk, and proceeded with the frisk while at the same time preventing plaintiff from releasing the pen. Dkt. No. 35-3 at 18-19, 38-45. The misbehavior report drafted by defendant Richards also indicates that plaintiff's possession of the pen was the reason why force was used against him.[18] Dkt. No. 35-12. Crediting plaintiff's version of the events, a reasonable factfinder could conclude that no amount of force was needed to effectuate a pat frisk under the circumstances such that defendant Richards and Langdon's use of force was not objectively reasonable. Plaintiff also testified that, as a result of the force used against him, he suffered a dislocated shoulder. Dkt. No. 35-3 at 56-57. Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against defendants Langdon and Richards on the basis of qualified immunity be denied.

[18]  The misbehavior report notes that Sergeant Casey ordered defendants Richards and Langdon to take plaintiff to the floor. *See* Dkt. No. 35-12. Plaintiff, however, testified that it was defendant Richards who gave that order. *See* Dkt. No. 35-3 at 43-45.

With respect to the second alleged use-of-force incident that occurred on October 1, 2011, plaintiff testified that, while at the SHU facility and facing the wall in a room, he was approached from behind and punched in the ribs by a sergeant

he did not know, after which point he was hit multiple times on the head, legs and inner-thigh by other unknown officers, all without provocation or any justification. Dkt. No. 35-3 at 58, 61-63. Defendants have not offered any evidence to contradict plaintiff's version of the events. Accordingly, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for any force to be used against plaintiff while he was in SHU on October 1, 2011.

### E. Status of Doe Defendants

In his complaint, plaintiff alleges that he was assaulted twice on October 1, 2011. Dkt. No. 1 at 12-14. With respect to the second alleged incident of assault, plaintiff names as defendants John Doe #1, John Doe #2, and John Doe #3. *Id.* at 3. Plaintiff admitted during his deposition that he did not know the identity of anyone who participated in this second alleged incident of assault. Dkt. No. 35-3 at 63, 68. In plaintiff's response to defendants' motion for summary judgment, plaintiff now states for the first time that he believes defendant Richards was one of the individuals present during this second assault. Dkt. No. 37-2 at 5. Plaintiff cites as support for this believe an inmate injury report. *Id.* (citing Dkt. No. 37-3 at 21).

Leaving aside the question of whether defendant Richards was involved in the second assault on October 1, 2011, plaintiff has failed to take any steps to identify any of the Doe defendants despite his testimony that the names of the officers who escorted him "around in the SHU area to a cell" after the second alleged assault ended was "probably part of discovery" because he "asked who was present including those people who was working there." Dkt. No. 35-3 at 68.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at \*21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.*, 07-cv-2027, 2010 WL 882990, at \* 5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

and opportunity to identify and serve John Doe Defendants");
*Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."). Likewise, on a motion from a defendant, and in the absence of a showing of good cause by the plaintiff, dismissal of a claim under Rule 4(m) is appropriate if the defendant has not been served within ninety days after the complaint is filed.

 **\*16** The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against the John Doe defendants, provided that plaintiff "take reasonable steps to ascertain the identity" of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them. Dkt. No. 4 at 22. That order warned plaintiff, however, as follows: "If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed." *Id.* The deadline for joining parties to this lawsuit and amending pleadings was originally July 2, 2015. Dkt. No. 15 at 5. That deadline was extended twice, and ultimately passed on September 8, 2015. Dkt. Nos. 19, 21. Discovery in this matter was originally scheduled to close on September 4, 2015. Dkt. No. 15 at 5. That deadline was subsequently extended four times, ultimately to December 18, 2015. Dkt. Nos. 19, 21, 28, 31.

It is now more than ten months past the extended deadline for joinder of parties. Yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed corrections officers. As such, I recommend that the claims brought against these unnamed Doe defendants be *sua sponte* dismissed, without prejudice.

## IV. SUMMARY AND RECOMMENDATION
Defendants seek dismissal of all of plaintiff's claims set forth in the complaint based on a variety of grounds, both procedural and substantive. While plaintiff's due process claim is subject to dismissal on the merits, plaintiff's excessive force claim asserted against defendants Langdon and Richards should survive defendants' motion because questions of fact remain relating to the procedural issue of exhaustion, and at least the factual issue of whether the amount of force used against plaintiff was reasonable under the circumstances. Plaintiff's excessive force claim asserted against the John Doe defendants, however, should be dismissed based upon plaintiff's failure to take the steps necessary to identify the three Doe defendants and join them in the action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED in part and DENIED in part, as follows:

(1) Plaintiff's due process claim asserted against defendants Phelix and Prack should be DISMISSED;

(2) Plaintiff's excessive force claims asserted against the John Doe defendants should be DISMISSED; and

(3) Plaintiff's excessive force claims, asserted against defendants Richards and Langdon, should survive defendants' motion; and it is further respectfully

RECOMMENDED that defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 be DISMISSED from this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 29, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5440596

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.